# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

INDEX NO.: 1:21-cv-03890-JSR

LEPATNER & ASSOCIATES, LLP,

        Plaintiff,

vs.

RSUI GROUP, INC.,

        Defendant.
_____/


REMOTE DEPOSITION OF BARRY LEPATNER


DATE TAKEN:    November 22, 2021

TIME:          10:03 a.m. – 5:25 p.m.
               (Based on Time Zone from Notice)


WITNESS

APPEARED BY:   Video teleconference


Reported By:
VIVIAN MARBAN, CER No. 1273
Notary Public for the State of New York

Barry Lepatner
November 22, 2021

## Page 2

```
 1   APPEARANCES
 2
 3   On behalf of LEPATNER & ASSOCIATES, LLP:
         BRAMNICK, RODRIGUEZ, GRABAS, ARNOLD & MANGAN, LLC
 4       BY: CARL A. SALISBURY, ESQUIRE
         1827 East Second Street
 5       Scotch Plains, New Jersey 07076
         csalisbury@jonbramnick.com
 6       APPEARED VIA VIDEO TELECONFERENCE
 7
 8   On behalf of RSUI GROUP, INC.:
         KAUFMAN BORGEEST & RYAN LLP
 9       BY: PATRICK STOLTZ, ESQUIRE
         200 Summit Lake Drive
10       Valhalla, New York 10595
         pstoltz@kbrlaw.com
11       APPEARED VIA VIDEO TELECONFERENCE
12
13
14
15
16
17
18
19
20
21
22   ALSO PRESENT:
         Brandy Mackay, USLS Intern
23       Neil Fox, Esquire, Kaufman Borgeest & Ryan, LLP
24
25
```

## Page 3

```
 1               INDEX TO EXAMINATION
 2
 3   EXAMINATION OF BARRY LEPATNER          PAGE
 4   By Mr. Stoltz                            9
 5   Certificate of Reporter                241
 6   Certificate of Transcriptionist        242
 7   Errata Sheet                           243
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                    INDEX TO EXHIBITS
 2        PLAINTIFF'S EXHIBITS FOR IDENTIFICATION:
 3             (No Exhibits Marked.)
 4        DEFENDANT'S EXHIBITS FOR IDENTIFICATION:
 5   NUMBER        DESCRIPTION                      PAGE
 6   Exhibit A     Transcript
                   Deposition of Barry LePatner      19
 7   Exhibit B     Transcript
                   Deposition of Barry LePatner
 8                 Continuation                      22
 9   Exhibit C     30(b)(6) Notice                   29
10   Exhibit D     Website Screenshot                38
11   Exhibit E     Website Screenshot                44
12   Exhibit F     Email dated November 24, 2013     52
13   Exhibit G     Invoice 37698                     52
14   Exhibit H     Lawsuit                           60
15   Exhibit I     Proposal for Legal Services       70
16   Exhibit J     Notice of Termination             88
17   Exhibit K     Complaint                         92
18   Exhibit L     Invoice 37711                    104
19   Exhibit M     Email dated October 16, 2018     118
20   Exhibit N     Email dated February 4, 2020     122
21   Exhibit O     Invoice 37982                    132
22   Exhibit P     Disclosure of Expert Witness
                   Russell Knuth                    143
23   Exhibit Q     Disclosure of Expert Witness
                   Charles Martorana                145
24
25
```

## Page 5

```
 1   DEFENDANT'S EXHIBITS FOR IDENTIFICATION, CONTINUED:
 2   NUMBER        DESCRIPTION                      PAGE
 3   Exhibit R     Disclosure of Expert Witness
                   Michael P. Tracey                148
 4
 5   Exhibit S     Disclosure of Expert Witness
                   Abraham Warfel                   150
 6
 7   Exhibit T     Letter                           153
 8   Exhibit U     Email dated November 17, 2020    154
 9   Exhibit V     Transcript - Deposition of
                   Francisco Rivera                 156
10
11   Exhibit W     Email dated May 14, 2021         166
12   Exhibit X     Invoice 37891                    169
13   Exhibit Y     Invoice 37710                    171
14   Exhibit Z     Invoice 37920                    180
15   Exhibit AA    Email dated May 28, 2014         185
16   Exhibit BB    Email dated April 2, 2014        191
17   Exhibit CC    Email dated April 3, 2014        196
18   Exhibit DD    Email dated April 1, 2014        198
19   Exhibit EE    Email dated March 19, 2014       200
20   Exhibit FF    Email dated March 20, 2014       201
21   Exhibit GG    RSUI Professional Liability
                   Policy Declarations              204
22
23   Exhibit HH    CNA Application for Lawyers
                   Professional Liability Insurance 210
24   Exhibit II    Complaint                        216
25   Exhibit JJ    RSUI July 20, 2017 Coverage Letter 217
```

Barry Lepatner
November 22, 2021

---

Page 6

```
 1              REQUESTED DOCUMENTS
 2                  Page          Line
 3                  56            8
 4                  57            22
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 7

```
 1              P R O C E E D I N G S
 2       Deposition taken before VIVIAN MARBAN, CER
 3   No. 1273, pursuant to Notice.
 4              - - - - - - -
 5       THE COURT REPORTER:  Time on is 10:03.
 6       The parties participating in this proceeding
 7   acknowledge that I am not physically present in the
 8   proceeding room and that I will be reporting this
 9   proceeding remotely.  They further acknowledge that in
10   lieu of an oath administered in person, the witness
11   will declare their testimony to be under penalty of
12   perjury.  The parties and their counsel consent to
13   this arrangement and waive any objections to this
14   manner of reporting.
15       Please indicate your agreement by stating
16   your name and your agreement on the record.
17       MR. SALISBURY:  Carl Salisbury, Bramnick,
18   Rodriguez, consents.
19       MR. STOLTZ:  Patrick Stoltz, Kaufman
20   Borgeest & Ryan for the Defendant, consent.
21       THE WITNESS:  Barry LePatner, the deponent,
22   consents.
23       MR. FOX:  Neil Fox, Kaufman Borgeest & Ryan,
24   consent.
25       THE COURT REPORTER:  Okay.  Thank you.
```

---

Page 8

```
 1   Please be aware that the recording equipment in use is
 2   very sensitive and may pick up whispering and private
 3   conversations not intended to be on the record.  All
 4   conversations will be captured and transcribed as part
 5   of the deposition transcript unless the parties agree
 6   to go off the record.  Please indicate when you would
 7   like to go off the record, and upon agreement by all
 8   parties, recording will be suspended.
 9       Will the witness please say and spell your
10   first and last name for the record?
11       THE WITNESS:  Barry B. LePatner, B-a-r-r-y,
12   L-e, capital P as in Peter, a-t as in Thomas, n-e-r.
13       THE COURT REPORTER:  Okay.  Thank you.  And
14   will the witness please indicate the city and state
15   that you are currently calling in from?
16       THE WITNESS:  I'm calling in from
17   Southampton, New York.
18       THE COURT REPORTER:  And your address, for
19   the record?
20       THE WITNESS:  50 Hidden Cove Court,
21   Southampton, New York 11968.
22       THE COURT REPORTER:  Okay.  And that is a
23   private home, no apartment number, correct?
24       THE WITNESS:  Yes.
25       THE COURT REPORTER:  Okay.  Will the witness
```

---

Page 9

```
 1   please repeat the following declaration for the
 2   record?  I declare my testimony in this matter --
 3       THE WITNESS:  I declare my testimony in this
 4   matter --
 5       THE COURT REPORTER:  -- is under penalty of
 6   perjury.
 7       THE WITNESS:  -- is under penalty of
 8   perjury.
 9       THE COURT REPORTER:  Okay.  Thank you.  Do
10   the parties have any stipulations they would like to
11   put on the record at this time?
12       MR. STOLTZ:  Not at this time.
13       MR. SALISBURY:  No.
14       THE COURT REPORTER:  Okay.  Thank you.  You
15   may proceed.
16              BARRY LEPATNER
17   was called as a witness and, after having declared his
18   testimony to be under penalty of perjury, testified as
19   follows:
20              EXAMINATION
21   BY MR. STOLTZ:
22       Q.   Thank you.  Good morning, Mr. LePatner.  As
23   we just introduced ourselves, my name is Patrick
24   Stoltz, and I represent the defendant RSUI Group,
25   Incorporated.  And please feel free to call me Patrick
```

---

Barry Lepatner
November 22, 2021

Page 10

1   throughout the day.  And as I indicated off the
2   record, my colleague, Neil Fox, is also attending this
3   deposition.  He's going to be assisting me with the
4   exhibits.
5           You're an attorney, correct?
6   A.   That is correct.
7   Q.   So you're familiar with the rules of
8   deposition, correct?
9   A.   I am.
10  Q.   Now, one quick housekeeping issue, when I
11  refer to the underlying action, or the underlying
12  litigation, I'm referring to the underlying action
13  brought by Jamal and Julia Nusseibeh against Project
14  Solutions and LePatner & Associates in the Superior
15  Court of Connecticut; is that okay?
16  A.   That is correct.  And just for the record
17  the pronunciation of their name, as they pronounce it,
18  was Nusseibeh.
19  Q.   Thank you.  You know I'm -- I was
20  mispronouncing it this entire time.
21      MR. STOLTZ:  And, Vivian, we'll get you a
22  spelling at some point.
23      THE WITNESS:  I'll do it right now.
24      MR. STOLTZ:  Sure.
25      THE WITNESS:  N-u-s-s-e-i-b-e-h.  Jamal,

Page 11

1   J-a-m-a-l, and Julia, J-u-l-i-a, Nusseibeh.
2   BY MR. STOLTZ:
3   Q.   Another housekeeping issue, when I refer to
4   Project Solutions, I'm referring to LePatner Project
5   Solutions, LLC; is that okay?
6   A.   That's correct.
7   Q.   And unless I specify otherwise, when I refer
8   to the project, I'm referring to the project at issue
9   in the underlying action involving the Nusseibehs at
10  35 Andrews Farm Road in Greenwich, Connecticut; is
11  that okay?
12  A.   That's correct.
13  Q.   Now, I know you had your deposition taken in
14  the underlying action over the course of two days,
15  correct?
16  A.   I believe that's correct.
17  Q.   Now, other than the deposition you gave in
18  the underlying action, can you tell me how many times
19  you've been deposed?
20  A.   Approximately a half dozen.
21  Q.   And what kind of cases were you deposed in?
22  A.   In some cases, I was witness to a
23  construction project and many years ago I was witness
24  in a claim where a law firm was suing a client for
25  legal fees and had to testify as to the services

Page 12

1   performed.
2   Q.   And was the law firm you're referring to
3   LePatner & Associates?
4   A.   Yes.
5   Q.   So with respect to the depositions you
6   testified you gave, were LePatner & Associates or
7   Project Solutions a party in those cases?
8   A.   LePatner & Associates would have been the
9   party, the law firm.
10  Q.   Okay.  Now, other than the underlying action
11  where we're here talking about today, were any of
12  those other actions a malpractice action against
13  LePatner & Associates or Project Solutions?
14  A.   I'm not 1,000 percent certain, but I will
15  say there is the likelihood of when a lawyer sues for
16  fees, that there is a counterclaim for malpractice.
17  So I believe, in that one case, which was many years
18  ago, that was the situation.
19  Q.   Do you recall the style of that case?  When
20  I say "style," I mean, you know, who the parties were
21  and where it was venued and all that?
22  A.   I -- I barely remember the nature of the --
23  involved some residents, see, a homeowner.
24  Q.   Do you remember what year it was?
25  A.   Probably in the 1990s.

Page 13

1   Q.   Okay.  Now, how many times has LePatner &
2   Associates and Project Solutions, or any of their
3   predecessors, for that matter, been sued?
4   A.   LePatner Project Solutions has never been
5   sued.  So there is the answer to that.
6   Q.   Well, has LePatner & Associates been subject
7   to any countersuits by a party that they sued?
8   A.   I'm sorry, I want to amend my -- I want to
9   amend my answer because I'm overlooking a current
10  litigation.  Sorry, I'm going into the past.
11      There is a current litigation where
12  LePatner & Associates has sued for several hundred
13  thousand dollars in legal fees with respect to a
14  residential project in New York City.
15      The sponsor -- the project developer of that
16  counterclaimed for legal malpractice, which in three
17  years they have never put forward a claim or explained
18  or clarified that they do have a claim, and we just
19  won a partial summary judgment motion for a
20  substantial amount of those fees through an award from
21  the appellate division.  So I'm sure I can provide you
22  with the caption of that case, which is ongoing right
23  now.
24  Q.   Is that the 320 West 115th Street case?
25  A.   That -- that's correct.  320 West 115

Barry Lepatner
November 22, 2021

Page 14

1  Street, LLC.
2      Q.   What did I say?  115th Street, sorry.  I'm
3  from Brooklyn, so I --
4      A.   No, no, no, this is --
5      Q.   (speaking simultaneously) --
6      A.   -- this is in, like, Harlem.
7      Q.   Yeah, yeah, Harlem, no, I understand.
8           Well, over the course of your career, can
9  you tell me how many depositions you've taken as an
10  attorney?  You can estimate, I'm sure.
11      A.   Dozens.
12      Q.   And can you estimate how many depositions
13  you defended as an attorney?
14      A.   Many more than dozens.
15      Q.   Are you saying, you know, more than 50?
16      A.   I -- I'm sure more than 50, yes, and...
17      Q.   Okay.  Would it be fair to say you're
18  familiar with the typical instructions that attorneys
19  give to witnesses regarding the conduct of
20  depositions?
21      A.   Yes.  I am -- I would be fully aware of all
22  of the preliminary statements or questions with
23  clarifications you would make to a witness, or to me,
24  in this situation.
25      Q.   Okay.  Good.  Now, both of your days of

Page 15

1  deposition in the underlying action were before the
2  world changed as we know it, meaning they were both
3  before the COVID-19 pandemic, correct?
4      A.   I'm sorry.  I didn't understand the
5  question.
6      Q.   No, no.  My question is:  Your deposition in
7  the underlying action in this case, they were taken
8  before COVID-19 and before we had to do depositions
9  over Zoom, correct?
10      A.   Yes.  Because it was in-person depositions.
11      Q.   Right.  And have you taken defendant or been
12  a participant in a remote deposition, like we're in
13  now, over Zoom?
14      A.   I can't recall one at this time.
15      Q.   Well, you understand that we're not all
16  physically present in the same room because of COVID
17  and there is a court reporter here transcribing these
18  proceedings, although she's not physically present in
19  the same room.  Again, just want to make sure that
20  we're on the same page.  That all the same rules and
21  instructions governing depositions still apply.  You
22  understand that, correct?
23      A.   I'm fully familiar and I've been involved in
24  court hearings over Zoom and I'm familiar with -- that
25  they are recorded and there is a reporter, et cetera,

Page 16

1  yes.
2      Q.   Fair enough.  And because I'm not in the
3  same room as you, I can't reach over a conference room
4  table and hand you a document like you would normally.
5  So what we're going to do here is when I want to show
6  you a document, I'm going to have my colleague, Neil
7  Fox, share his screen and the document will be on the
8  screen for you to look at, okay?
9      A.   That's fine.
10      Q.   And obviously, you're going to have the
11  ability to look at any part of the document you think
12  you need to answer my questions.  Just direct Neil
13  where you want to go and if you want to scroll up or
14  down, okay?
15      A.   Okay.
16      Q.   Now, where are you physically located?  Can
17  you just -- again, for the record, just state where
18  you are?
19      A.   Yes.  I'm at my home in South Hampton,
20  New York.
21      Q.   And is there anybody else in the room with
22  you?
23      A.   No.
24      Q.   Do you have any documents related to this
25  case in front of you?

Page 17

1      A.   No.
2      Q.   Well, so -- one instruction is, if you have
3  anything in front of you, which you can use to
4  communicate with someone, like, a cell phone, or if
5  you have your email inbox open, can you just take a
6  moment to turn it off or exit out of it like you would
7  normally if you were in person?
8      A.   Hold on.  Let me grab an iPad, which is
9  sitting over here.  Let me figure out how to shut it
10  down for a second, which I'm not 100 percent sure.
11  Oh, I found it.  You're going to have to wait a
12  second.  I'm not sure if I --
13      Q.   Well, if it's just powering off
14  Mr. LePatner --
15      A.   Yeah.
16      Q.   -- I'm fine with that.
17      A.   Go ahead.
18      Q.   So can you just confirm that everything that
19  you have that you can communicate with someone is off,
20  like, a cell phone and email?
21      A.   Yeah.
22      Q.   Email inbox?
23      A.   Yeah.  Let me confirm that my cell phone --
24  hold on a second -- is powered off.  Is that off?
25  Yes.  Got it.  I'm good with you.

Barry Lepatner
November 22, 2021

Page 18

1      Q.   So while we're on the topic of your
2  deposition in the underlying action, I'd like to take
3  care of, you know, one more housekeeping issue if we
4  could.
5          MR. STOLTZ:  Neil, can you bring up
6  Mr. LePatner's deposition transcript in the underlying
7  action from October 24th, 2019?  So this is where
8  we're going to share our screen and mark exhibits.
9          Now, Vivian, we're going to have Neil share
10 his screen, and we're also going to put the document
11 in the chat.
12         THE COURT REPORTER:  Perfect.  Thank you.
13 BY MR. STOLTZ:
14     Q.   So, Mr. LePatner, do you see your deposition
15 transcript from October 24th, 2019, on the screen?
16     A.   I do.
17     Q.   So I'm going to represent to you that this
18 is a copy of your transcript from your first day of
19 testimony on October 24th, 2019.  And do you recall
20 sitting for this deposition on October 24th, 2019?
21     A.   I do.
22     Q.   And can you just take a look at it and
23 confirm for me that this is a true and correct copy of
24 your deposition transcript from October 24th, 2019,
25 and, you know, you -- feel free to have Neil scroll

Page 19

1  through just to confirm.  I know it's a lengthy
2  document, but I just want to make sure that we can
3  authenticate this document going forward.
4          MR. SALISBURY:  It's also possible to turn
5  control over to Mr. LePatner if that makes it easier,
6  but it's up to you-all.
7          THE WITNESS:  Well --
8          MR. STOLTZ:  Well, why don't we have Neil
9  work on it, and then if it becomes an issue then we
10 could figure something else out.
11         But, Neil, if you could just, again, just
12 quickly scroll through.
13 BY MR. STOLTZ:
14     Q.   I'm not asking any questions about any of
15 the testimony in there, Mr. LePatner.  I just want you
16 to confirm that this is a copy of your transcript.
17     A.   Now, aside from the fact that it misspells
18 my name as L-a-P-a-t-n-e-r instead of L-e, yes, that
19 is the transcript.
20     Q.   Okay.  And do you recall making any errata
21 changes to your October 24th, 2019, transcript?
22     A.   No.
23         MR. STOLTZ:  Can we just make sure we mark
24 this transcript as Defendant's Exhibit A?
25         (Exhibit A marked for identification.)

Page 20

1          MR. STOLTZ:  Carl, is it all right that I
2  use letters for defense exhibits?
3          MR. SALISBURY:  It's fine with me, but it
4  only has to be unique, that's all.
5          MR. STOLTZ:  Yeah, yeah, no, understood.  So
6  we'll just mark this transcript as Defendant's
7  Exhibit A.
8          And, Neil, if you could please bring up
9  Mr. LePatner's transcript from January 16th, 2020.
10 BY MR. STOLTZ:
11     Q.   And I'm going to ask you the same series of
12 questions, again, just to authenticate the document.
13         MR. SALISBURY:  Is this one going to go in
14 the chat as well?
15         MR. STOLTZ:  Yeah.  We're -- so we're going
16 to put everything in the chat.  And if we -- and if we
17 miss something, Carl, that's inadvertent.  You know,
18 just tell us and we'll put it in the chat.
19         MR. SALISBURY:  Yeah, it just hasn't shown
20 up yet.
21         MR. STOLTZ:  Oh, okay.
22         MR. FOX:  I'm working on getting the chat
23 window open so I can share it.
24         MR. STOLTZ:  Now -- just, Neil, if you
25 could, for the court reporter's purposes, just -- if

Page 21

1  you're going to state something, just say who you are,
2  that way -- or unless the court reporter doesn't need
3  it, it's all right.
4          THE COURT REPORTER:  I -- it's okay.  He
5  doesn't have to.
6          MR. STOLTZ:  Now, Mr. LePatner, I know we're
7  not -- this is -- we're not getting a video of this,
8  but your video is -- there you go.  Sorry.
9          MR. FOX:  Patrick, I'm just going to
10 un-share my screen really quick and open up the chat
11 window again so I can share the document.
12         MR. STOLTZ:  Okay.  The world of doing
13 depositions over Zoom.  It's -- so going forward, I
14 would suggest you just put it in the chat first.
15         So going forward, Neil, I would suggest that
16 you just put it in the chat first and then bring up
17 the document on screen.
18 BY MR. STOLTZ:
19     Q.   So when the document comes back up, I'm
20 going to ask you if this is a true and correct copy of
21 your deposition transcript from January 16th, 2020.
22         MR. STOLTZ:  Can you scroll through, Neil,
23 please.
24 BY MR. STOLTZ:
25     Q.   And just so the record is clear,

Barry Lepatner
November 22, 2021

Page 22

1  Mr. LePatner, I'll ask the question again.
2          Is this a true and correct copy of your
3  deposition transcript from January 16th, 2020?
4      A.  I believe it is so.
5      Q.  And do you recall making any errata changes
6  to your January 16th, 2020, transcript?
7      A.  I don't recall any.
8          MR. STOLTZ:  Can we mark this transcript as
9  Exhibit B?
10         (Exhibit B marked for identification.)
11         MR. STOLTZ:  You can take it down now, Neil.
12  BY MR. STOLTZ:
13     Q.  You worked at the Wilson Elser Law Firm,
14  correct?
15     A.  That was correct.  I was a partner there.
16     Q.  Can you tell me the start and end date of
17  when you worked there?
18     A.  That's a long time ago.  I started in
19  September of 1973 as an associate.  Four years later,
20  I was made a partner of the firm.  And I left to start
21  my own firm, which was started on November 3, 1980.
22     Q.  Why did you leave Wilson Elser?  Was it to
23  start your own firm?
24     A.  Yes.
25     Q.  You weren't terminated or asked to leave,

Page 23

1  correct?
2      A.  Oh, no.  I left voluntarily and formed my
3  own firm.
4      Q.  Now, was there a specific practice with
5  Wilson Elser that you worked in?
6      A.  Well, I was a very unusual, I played an
7  unusual role in the firm because most of the attorneys
8  were given discrete practice areas.  And my portfolio,
9  for a number of reasons, covered architects and
10  engineering law, meaning AE malpractice claims;
11  covered legal malpractice claims; covered groups that
12  fell under directors and officers and trustees and
13  fiduciaries claims.  And also represented Lloyd's of
14  London on their title reinsurance coverage cases.
15     Q.  Now, in your practice at Wilson Elser, is it
16  fair to say that you were retained by insurance
17  carriers to defend cases involving their insureds?
18     A.  Yes.
19     Q.  That would be a routine thing, correct?
20     A.  Yes.  That's -- that's the nature of a
21  defense practice.
22     Q.  And Wilson Elser was on a panel of law firms
23  that insurance companies would use to defend
24  professional liability cases like the case -- the
25  underlying action we're here talking about today,

Page 24

1  correct?
2      A.  In many of the instances Wilson Elser was
3  the sole defense counsel assigned and written into the
4  policy of the program.
5      Q.  Would that be with respect to, like, London
6  insurers that -- or other foreign insurers?
7      A.  If it's an engineer, they were the sole
8  exclusive for, I think, what's called Shan Morehand
9  (phonetic) or Northbrook Insurance for all their AE
10  liability cases.  There were other programs I don't
11  recall at this moment, because it was a long time ago,
12  where they were written in by the underwriters as the
13  -- I'll call it "the claims gateway," where all claims
14  were reported.
15     Q.  Did you ever do any work for RSUI while you
16  were at Wilson Esler?
17     A.  No.
18     Q.  Or what about Landmark American Insurance
19  Company?  Did you ever do any work for Landmark while
20  you were at Wilson Elser?
21     A.  No.  No, I don't know them.
22     Q.  Can you just, I mean, ballpark it, estimate
23  how many cases you handled while at Wilson Elser where
24  you were retained by an insurance company to defend a
25  professional?  More than 100?  More than 500?  I mean,

Page 25

1  can you estimate?
2      A.  Where I was the counsel involved in the
3  handling of the matter?
4      Q.  And where you were retained by an insurance
5  company to defend the matter.
6      A.  With Wilson Elser or Kroll Edleman, the
7  predecessor firm, was retained?
8      Q.  Yes.
9      A.  It would be many, many, many thousands of
10  cases.  Thousands.  Because I also oversaw five
11  associates, who handled 350 cases each at any one
12  time.
13     Q.  I'm trying to do the math.  And I'm just --
14     A.  It's -- it --
15     Q.  -- and I'm joking.
16         So you're familiar with what the duty to
17  defend is in the insurance context, correct?
18     A.  Yes.
19     Q.  And can you tell me what your understanding
20  of the duty to defend is?
21     A.  In New York state, there is an unfettered
22  right of the insured when there is a reservation of
23  rights.  They have the right to retain its own counsel
24  and control its own defense.
25         MR. STOLTZ:  Can you give me a -- or read

Barry Lepatner
November 22, 2021

Page 26

1   back the last answer?
2           THE COURT REPORTER:  Sure.  One moment.
3           (The previous answer was read back.)
4   BY MR. STOLTZ:
5       Q.   Now, when you were retained, or when Wilson
6   Elser was retained by an insurer to defend one of
7   their insureds, you occasionally have to report to the
8   insurance company representative on developments in
9   the case as necessary, correct?  That's something you
10  would normally do?
11      A.   Well, let me explain.  There were -- there
12  was one primary role of Wilson Elser, which was to
13  identify the nature and extent of the claim and report
14  them to the underwriters and largely establish the
15  necessary legal -- legal and loss reserves.
16          There were situations, not many, a small
17  percentage where the law firm was retained to
18  represent the insured.  Either because we practiced in
19  the area, in one of our offices around the nation, at
20  that time, or for other reasons where the insured
21  consented to have our firm represent them.
22          So there were two hats that we wore
23  depending on the circumstances and the relationship
24  with the insured, but never, never, if there was the
25  reservation of rights, did the law firm represent the

Page 27

1   insured, they were given the right to select their own
2   counsel.  If they didn't have counsel, we would
3   recommend panel counsel from their location, wherever
4   the insured was in the action or the claim was being
5   presented, and they would have that counsel who
6   represented them solely.
7       Q.   When you were defending the insured,
8   meaning, you were defending the actual architect or
9   engineer that was being sued for malpractice, and that
10  retention was as panel counsel as, you know, for an
11  insurance company, you would have to report to the
12  insurance company on things like legal strategy or
13  settlement or the client's potential exposure,
14  correct?
15      A.   If there was no reservation of rights, it
16  was pure claim that was covered under the four corners
17  of the complaint, or the claim, and the insured
18  consented to us, we represented the insured.  Can't
19  have a conflict like that, never could.
20      Q.   Well, you're saying that you would never
21  defend an architect or engineer where the insurance
22  company issued a reservation of rights letter?
23      A.   Of course not.  That would be -- I mean, if
24  the insured consented, let's assume, the insured and
25  the insurer both knew.  The reservation of rights that

Page 28

1   was brought from day one, said, oh --
2       Q.   Oh, okay.  Yeah.
3       A.   -- we're -- if there was a totally
4   out-of-bounds reservation of rights and the insured
5   says, "I want you anyway.  I know you've represented
6   us before."  We represented the insured and their
7   interest.  There was no material question about
8   coverage, we represented the insured and they accepted
9   that role and there was no conflict.
10      Q.   Okay.  But in those situations, you would
11  report to the insurance company on things like legal
12  strategy and settlements as necessary or developments
13  in the case as necessary, correct?
14      A.   That's correct.
15      Q.   And at times the insurance company would
16  request information on the status of the case, you
17  know, if it's going to trial or during the deposition,
18  they'd want to know about the developments in the
19  case, correct?
20      A.   That's correct.
21      Q.   In fact, sometimes that kind of reporting is
22  required by an insurance company's billing guidelines
23  even, correct?
24      A.   It was routine, and it was a standard
25  practice to regularly provide those reports because

Page 29

1   that's what the insurers needed for their own internal
2   purposes.
3       Q.   Now, I'm going to switch topics real quick.
4           MR. STOLTZ:  Neil, can you please pull up
5   the 30(b)(6) notice.  I know it's in the chat already,
6   because we gave it to Vivian, but we never really
7   marked it as an exhibit.
8           So Mr. LePatner -- or actually, Neil, if you
9   could pull up the 30(b)(6) notice, which, Carl, is
10  already in the chat.
11          And let's mark this notice as Defendant's
12  Exhibit C.
13          (Exhibit C marked for identification.)
14  BY MR. STOLTZ:
15      Q.   Mr. LePatner have you seen this document
16  before?
17          MR. STOLTZ:  And you can scroll through,
18  Neil, please, so I can look at it.
19          THE WITNESS:  Let's go back.  I want to see
20  the signature page.  I don't know who signed that.
21  I'm sorry.  Could you scroll back up to the top?  Oh,
22  the deposition notice?  No.  I've never seen that.
23  BY MR. STOLTZ:
24      Q.   You've never seen this document before?
25          MR. STOLTZ:  And, Neil, can you just scroll

Barry Lepatner
November 22, 2021

Page 30

1  through it and make sure?
2      THE WITNESS:  I've never seen that.  Yeah,
3  it's a deposition notice with a subpoena for documents
4  to be provided.
5  BY MR. STOLTZ:
6      Q.  No, actually, this is a 30(b)(6) that was
7  served on LePatner & Associates in this case.  Is it
8  your testimony that you've never seen this document
9  before?
10     A.  I've never seen it, I don't know where it
11 was served.
12     Q.  It was served on your counsel via email and
13 also overnight mail.
14     A.  I mean, I know about this, but I have not
15 seen it.
16     Q.  Well --
17     A.  I know of it, but counsel has discussed what
18 has to be provided, but I have not seen it.  That is
19 my answer.
20     Q.  Well, if you turn to Exhibit A, which is on
21 screen now.  Do you see where it says "Matters for
22 Testimony"?
23     A.  Let me see.  Hold on.  Yes.
24     Q.  And following that there are 35 different
25 numbered paragraphs.  Do you see that?

Page 31

1      A.  Uh-huh.  Yes.
2      Q.  Well, obviously, since this is the first
3  time you're reading these 35 different matters --
4  well, withdrawn.
5          What did you do to prepare for your
6  deposition here today?
7      A.  I spoke with counsel.
8      Q.  And did you review any documents?
9      A.  Certainly, yes.
10         MR. SALISBURY:  That's a "yes" or "no,"
11 right.
12         THE WITNESS:  Yes.
13 BY MR. STOLTZ:
14     Q.  Now, when you say you spoke with counsel, is
15 that Mr. Salisbury?
16     A.  Yes.
17     Q.  When did you speak to him?
18     A.  Last week in order to confirm the date of
19 today and yesterday.
20     Q.  And how long did you speak to him for?
21     A.  Last week, the conversation may have been
22 for ten minutes.  Yesterday, for perhaps an hour or
23 hour and a half.
24     Q.  And outside of your attorney, did you speak
25 to anyone else regarding your testimony here today?

Page 32

1      A.  No.  No.
2      Q.  Are you -- okay.  So are you prepared to
3  testify with respect to these topics listed here in
4  Exhibit A?
5      A.  Yes.
6      Q.  Well -- sorry, I guess you broke up there.
7          MR. STOLTZ:  Vivian, did you get that?
8          THE COURT REPORTER:  Yes.  He said, "Yes."
9          MR. STOLTZ:  Okay.  Good, all right.
10 BY MR. STOLTZ:
11     Q.  Well, let's start with Topic 10, which is:
12 Information concerning or relating to the formation
13 and corporate (sic) structure of LePatner &
14 Associates.  Are you prepared to testify as to that
15 topic?
16     A.  Yes.
17     Q.  When was LePatner & Associates formed?
18     A.  I'm not 100 percent sure as I sit here right
19 now.  It would have been formed by someone in my
20 office who filed for the formation of that company at
21 some time in the past.  I -- I can't recall the date.
22     Q.  LePatner & Associates is registered with the
23 State of New York as a limited liability partnership,
24 correct?
25     A.  No.  And LL -- LePatner & Associates is

Page 33

1  registered as a limited liability partnership,
2  correct, the law firm.
3      Q.  In the State of New York, correct?
4      A.  In the State of New York to practice law.
5      Q.  Who are the current owners of LePatner &
6  Associates?
7      A.  I am 100 percent current owner of the firm.
8      Q.  And who were the owners of LePatner &
9  Associates in November 2013 through May of 2014?
10     A.  I was.
11     Q.  And who were the owners of LePatner &
12 Associates in November 2016 through December 2016?
13     A.  I was.
14     Q.  And who were the owners of LePatner &
15 Associates in 2017?
16     A.  Same answer, me.
17     Q.  Okay.  And how many attorneys worked for
18 LePatner & Associates in November of 2013?
19     A.  I don't know precisely, but I believe it was
20 about five or six.
21     Q.  And what about January 2014 through May of
22 2014?  How many attorneys worked at LePatner &
23 Associates?
24     A.  I don't know the exact title, but I would
25 assume it's about the same answer.

Barry Lepatner
November 22, 2021

Page 34

1     Q.    Now, the website for LePatner & Associates
2  is www.lepatner.com, correct?
3     A.    Yes.
4     Q.    Was that always the website for LePatner &
5  Associates?
6     A.    Wow.  We had a -- we were a forerunner in
7  New York City and New York State of --
8     Q.    I'm sorry.  You broke up there in the
9  beginning of the answer.  Can you repeat what you
10 said?
11    A.    Yeah, we were --
12          MR. STOLTZ:  Vivian, are you hearing a
13 little, like, break up when he's starting to speak.
14          THE COURT REPORTER:  Sometimes.  But I
15 got --
16          (The previous answer was read back.)
17 BY MR. STOLTZ:
18    Q.    Okay.  Sorry.
19    A.    Back in 1996, we created a website.  It may
20 have been bblesq.com.  I'm not sure.  But for almost
21 -- for most of the last 25 or more years, I believe
22 it's been www.lepatner.com.
23    Q.    And that website, www.lepatner.com, that's
24 the same website for Project Solutions, correct?
25    A.    The -- we have reference to LePatner Project

Page 35

1  Solutions on that website, correct.
2     Q.    And when was Project Solutions formed?
3     A.    The name was created perhaps ten years or so
4  ago, if not more, 15 years ago, but we had -- we may
5  have had a preliminary name before that, but I do not
6  recall what it was.
7     Q.    Project Solutions is registered with the
8  State of New York as a limited liability company,
9  correct?
10    A.    Yes.
11    Q.    And who are the current owners of Project
12 Solutions?
13    A.    I am.
14    Q.    And who were the owners of Project Solutions
15 in November of 2013 through May of 2014?
16    A.    It was me.
17    Q.    And who were the owners of Project Solutions
18 from November -- excuse me -- November 2016 through
19 December 2016?
20    A.    Myself.
21    Q.    And who were the owners of Project Solutions
22 in 2017?
23    A.    Same answer, myself.
24    Q.    And how many employees did Project Solutions
25 have in November of 2013?

Page 36

1     A.    Zero.
2     Q.    And how many employees did Project Solutions
3  have in January 2014 through May of 2014?
4     A.    Zero.
5     Q.    You were not an employee of Project
6  Solutions at that time?
7     A.    Nope.
8     Q.    What is LePatner C3 Project Services?
9     A.    Somewhere, it could have been 10 or 15 years
10 ago, we created a whitepaper that was called LePatner
11 C3 Methodology.  C3 stands for complete construction
12 cost.  And it was a methodology that we had developed
13 for our clients to address the numerous inefficiencies
14 in a design and construction process of the industry,
15 which plagued owners through enormous cost overruns
16 and enormous delays to their projects.
17          And we developed the methodology, or the C3
18 method, that was supplemented by all sorts of
19 additional materials for our clients to read -- to
20 show that the LePatner law firm had identified these
21 deficiencies and had a specific program to minimize
22 them for the benefit of our clients.
23    Q.    So I'm not sure that -- well, I'll withdraw
24 the question.
25          One other quick question, does Project

Page 37

1  Solutions currently have any employees?
2     A.    No.
3     Q.    What is LePatner C3, LLC?
4     A.    As I said, that might have been a
5  predecessor to the name LePatner Project Solutions.
6     Q.    Okay.  What's the relationship, if any,
7  between LePatner C3 Project Services and Project
8  Solutions?
9     A.    Well, I think it's -- it's some -- it's not
10 used currently, and it hasn't been used at all
11 probably since we gave it -- we gave -- created the
12 LePatner Project Solutions, LLC.  So I'm not sure how
13 to answer that other than it promoted my idea of what
14 C3 represented in terms of our offerings to our
15 clients.
16    Q.    But do you know when LePatner C3, LLC was
17 formed?
18    A.    Oh, no, I don't.  But it would have been at
19 the time, or just prior to -- or some years prior to
20 the formation of Project Solutions.
21    Q.    And is it your testimony that LePatner C3,
22 LLC was the predecessor for Project Solutions?
23    A.    Yes, that's what I said.  It would have been
24 preceding it by a day, a month, a year, or two years,
25 but it would have been superseded by the name LePatner

Barry Lepatner
November 22, 2021

Page 38

1  Project Solutions.
2      Q.   Okay.
3          MR. STOLTZ:  Neil, if you could please share
4  your screen and pull up a screen shot of the LePatner
5  named homepage.  I was -- and put it in the chat
6  first.  That way Carl can download it and then we can
7  share it on screen.  Thanks.
8  BY MR. STOLTZ:
9      Q.   Mr. LePatner, I had my colleague, Neil, pull
10 up a screenshot of your website.  Do you recognize
11 what's on the screen right now as the homepage for
12 your website, www.lepatner.com?
13     A.   Yes.
14         MR. STOLTZ:  So let's mark this as Exhibit
15 -- I think we're up to D now?
16         (Exhibit D marked for identification.)
17         THE COURT REPORTER:  Yes.
18         MR. STOLTZ:  Okay.  Vivian, you're all set
19 with that?
20         THE COURT REPORTER:  Yes, thank you.
21 BY MR. STOLTZ:
22     Q.   Is this how your website looked in November
23 of 2016?  And if you want, you can scroll down --
24     A.   I'm sorry.  Could you repeat that question?
25     Q.   I'm asking is this how your website looked

Page 39

1  in November of 2016?
2      A.   No.
3      Q.   What changes were made to your website since
4  December of 2016?
5      A.   I'm sure graphically there was a different
6  graphic and I'm sure we may have moved around titles
7  or what we wanted to put in front of clients and
8  prospective clients as the division of services or
9  what we offer to our clients.
10     Q.   Well, can you just tell me, if you can, what
11 graphics or what, you know, if you're able to specify,
12 looking at this page, what graphics were changed?
13     A.   It would always been some -- nice
14 illustration of a construction project that the people
15 who put these things together for us would have chosen
16 and then I would have said, "That's nice."
17     Q.   Okay.  Now, at the top of the page we're
18 looking at on the screen, there are separate tabs for
19 legal services and project services, correct?
20         MR. STOLTZ:  If we scroll up, Neil.  All the
21 way up.  That's all right.  Keep going.
22 BY MR. STOLTZ:
23     Q.   Do you see on the top left-hand corner?
24     A.   Yeah.  Yes.
25     Q.   There are separate tabs for the legal

Page 40

1  services and the project services, correct?
2      A.   That's correct.
3      Q.   And if you scroll down on the page, there
4  are separate descriptions of the services, LePatner &
5  Associates and Project Solutions provide, correct?
6      A.   That was for the public.  Anybody could have
7  seen that at any time, yes.
8      Q.   And that's -- and there was separate tabs
9  for LePatner & Associates and Project Solutions, those
10 separate tabs were on the website in November of 2016,
11 correct?
12     A.   In one form or another, yes.
13     Q.   Okay.  And what about in December '16?  Just
14 to, you know, for sake of completeness.
15     A.   I'm sure we --
16     Q.   They were also --
17     A.   Sorry.
18     Q.   Sorry.  Just let me get my question out and
19 that way -- those separate tabs were also on the
20 website in December 2016, correct?
21     A.   In one form or another, yes.
22     Q.   Now, because this is a screenshot, but for
23 whatever reason, there are icons for LePatner &
24 Associates and Project Solutions above their --
25         MR. STOLTZ:  No, if you stay there, Neil.

Page 41

1  BY MR. STOLTZ:
2      Q.   -- right above their respective decisions,
3  if you go on the website, the live website, you can
4  actually click on the icons if you go to the actual
5  website, correct?
6      A.   That's correct.
7      Q.   But you understand that they're not shown on
8  this screen shot because, for whatever reason, when we
9  took a screenshot of it to use it at today's
10 deposition, those icons just didn't show up.
11     A.   I don't understand your question, but if you
12 mean that you click on it and you go to a further
13 elaboration of services, yes, that's what it's
14 intended to do digitally.
15     Q.   Now, where is this website hosted?  Is there
16 a webhost?
17     A.   I believe it's Amazon Web Services, AWS.
18     Q.   And where was the website hosted in November
19 through December of 2016?
20     A.   I would not recall that.
21     Q.   Do you have any way of figuring that
22 information out?
23     A.   I wouldn't even know who to ask.  I don't
24 know who -- who manages this in our organization.
25     Q.   Well, if not you, who normally manages the

Barry Lepatner
November 22, 2021

Page 42

1  website in your organization?
2      A.  Well, it would have been my -- my own
3  assistant.  It could have been our public relations
4  people and it could have been the tech people who we
5  work with from one year to the next who might have
6  changed over time.  I wouldn't know.
7      Q.  Who are the tech people you work with in
8  November through December of 2016?
9      A.  I wouldn't recall the names of them.
10      Q.  Do you have any documents that might
11  refresh --
12      A.  I -- I don't --
13      Q.  Let me -- let me just --
14      A.  I'm sorry.
15      Q.  Sorry, yeah.  So I know it's tough because
16  we're not in person and it's hard to figure out when
17  I'm stopping and when I'm asking questions, but just
18  so the court reporter doesn't lose her mind, if you
19  could just, you know, give each other a pause, so I
20  can get my complete question out.
21          Do you have any documents that would refresh
22  your recollection as to who your tech support firm was
23  in November through December of 2016?
24      A.  I wouldn't know where to go.  I'm not -- I
25  just would not have any idea on how to find that

Page 43

1  information out.
2      Q.  Do you know who your current tech support
3  firm is?
4      A.  Yes.  I know who that individual is, yes.
5      Q.  Who is that individual?
6      A.  His name is Sal Gil, G-i-l, and I don't
7  remember the name of it, but I just dealt with him
8  because we were pulling up documents for a -- from a
9  project that we needed to be recalled to look at how
10  certain things were handled in that case.
11      Q.  Is Mr. Gil an employee of your firm?
12      A.  No.
13      Q.  He's an outside consultant?
14      A.  Yes.
15      Q.  Okay.  Who is your assistant?
16      A.  Currently, I have none.
17      Q.  Who was your assistant in November through
18  December of 2016?
19      A.  Tadhg, T-a-d-h-g, O'Connor.
20      Q.  I'm sorry.  Can you spell that again?
21  T-a --
22      A.  d-h-g.
23      Q.  And the last name was?
24      A.  O'Connor.
25      Q.  Well, that's an Irish name.

Page 44

1      A.  He would probably say yes.
2      Q.  Was -- is that -- was this a man or a woman?
3      A.  A man.
4      Q.  Okay.  And is that person still with your
5  firm?
6      A.  No, he retired last February or March.  In
7  fact, of this year, February or March of 2021.
8      Q.  Now, if you click on the tab, going back to
9  your webpage here, if you click on the tab for
10  "Project Services," in the actual website, it would
11  bring you to the Project Solutions webpage, correct?
12      A.  I believe so.
13          MR. STOLTZ:  Neil, if you could bring up the
14  Project Solutions page and take down this page.  We'll
15  bring up the Project Solution page.
16          Now, Mr. LePatner, I'll represent to you
17  that this is a screenshot of the Project Solutions
18  that we took from your website.
19          MR. STOLTZ:  And why don't we go ahead and
20  mark this Defendant's Exhibit E.
21          (Exhibit E marked for identification.)
22          MR. STOLTZ:  Okay, Vivian?
23          THE COURT REPORTER:  Yes.
24  BY MR. STOLTZ:
25      Q.  Okay.  If you scroll down on this page,

Page 45

1  there are a number of different bullet points, which
2  describe the services that Project Solutions provides,
3  correct?
4      A.  Correct.
5      Q.  And you'd hold yourself out to be an expert
6  with respect to the bullet points listed here,
7  correct?
8      A.  Either I or the people who work for me under
9  LePatner & Associates, that's correct.
10      Q.  Now, one of the items listed here if you
11  scroll down under project-specific analysis, there we
12  go, is "Review and recommend insurance requirements
13  for owner, professionals, and contractors and bonding
14  coverage as needed."
15          MR. STOLTZ:  If you could -- I don't know,
16  Neil, if you have the ability to highlight?  There you
17  go.
18  BY MR. STOLTZ:
19      Q.  Do you see that?
20      A.  I see that.
21      Q.  Okay.  And under the heading, "Assemble the
22  Right Team," you have listed on the third bullet point
23  down, "Review and recommend insurance coverage,"
24  correct?
25      A.  That is correct.

Barry Lepatner
November 22, 2021

Page 46

1      Q.   And under the heading, "Getting It built,"
2   you have listed on the second bullet point down,
3   verify that project team member have procured required
4   insurance, correct?
5      A.   That is correct.
6      Q.   And it's your testimony that you or someone
7   else that works for you is an expert with respect to
8   those bullet points we just went through?
9      A.   We do that for many clients, yes.  When you
10  say --
11     Q.   Now, in --
12     A.   -- the word "experts" -- when you say the
13  word "expert," I don't know what that means but we
14  know what the requisite types and kinds of insurance
15  and levels of insurance that project team members
16  should secure when we recommend that to our clients.
17     Q.   Yeah, so it's something that you guys do on
18  a daily basis?  Those bullet points, correct?  That's
19  work that you do in the normal course, correct?
20     A.   I wouldn't say on a daily basis but it's
21  part of our services.
22     Q.   Okay.  Now, can someone hire just LePatner &
23  Associates or just Project Solutions or do they have
24  to hire both?
25     A.   Every client that we have is a client of

Page 47

1   LePatner & Associates.  There is no situation, ever,
2   where a client came and said we want to hire LePatner
3   Project Solutions.  Never happens.
4      Q.   Now, does LePatner & Associates and Project
5   Solutions file separate taxes?
6      A.   There has never been a tax filing, to my
7   knowledge, of LePatner Project Solutions and it has
8   never been treated, operated, as a separate entity.
9      Q.   Okay.  LePatner & Associates, again, just to
10  confirm, is an LLP and Project Solutions is an LLC,
11  correct?
12     A.   Yes.
13     Q.   So they are separate corporate entities,
14  correct?
15     A.   Separate entities, that's correct.
16     Q.   Okay.  Does LePatner & Associates and
17  Project Solutions currently have the same physical
18  address?  10 East 40th Street, Suite 710?
19     A.   Yes.
20     Q.   And they share common office space, correct?
21     A.   There is no separate office space for
22  LePatner Project Solutions.  It is an entity that
23  solely -- solely is created for the benefit of
24  providing certain services for our clients, because
25  they hire LePatner & Associates as the law firm.

Page 48

1      Q.   So a prospective client could not just hire
2   Project Solutions?  They would also have to hire
3   LePatner & Associates; is that correct?
4      A.   No.  You -- I can't agree with your
5   statement.
6      Q.   Okay.  So what's wrong with that statement?
7      A.   In the construction, real estate, design
8   world that I live in, or have lived in for the past 41
9   years, clients come because they are recommended, or
10  they know about us through networks and contacts and
11  their lawyers.  And they call me because they have
12  unique problems either on how to commence the project
13  or do it without suffering the slings and arrows most
14  owners who get caught up in that process and don't
15  have sophisticated advisory services, or their project
16  has already failed, at one point or another, and I am
17  asked to put Humpty Dumpty back together again.
18          They come to me to create the strategy and
19  to me to create the program for either avoiding
20  problems and risk managing their projects so that they
21  do not fall within those usual categories of the
22  things that plague owners or they ask me to develop a
23  strategy to get them out of very serious problems that
24  they've already encountered.
25          I determine whether there is any need to

Page 49

1   utilize the name of LePatner Project Solutions for
2   part of accomplishing their business needs and legal
3   needs.
4      Q.   I'm not sure that answered my question.  My
5   initial question was:  Can someone hire Project
6   Solutions but not LePatner & Associates?  Can you just
7   answer that question?
8      A.   My answer -- no, my ans- -- my answer was
9   nobody comes to me and says, "We want to consider
10  hiring LePatner Project Solutions nor would I
11  recommend a situation, or has there ever been a
12  situation, where we just -- there was just a retention
13  of LePatner Project Solutions without the law firm.
14  It's not going to happen.  It can't happen.
15     Q.   Why can't it happen?
16     A.   Because it's always an adjunct of providing
17  a subset of services on the law firm and you -- and
18  when people come to me, come to the firm, they are
19  hiring sophisticated, corporate, construction counsel,
20  lawyers, and they are provided legal services.  They
21  are not provided services of any other kind that don't
22  fall within the ambit of what you see on this screen
23  and on our law firm website.
24          MR. STOLTZ:  Okay.  Neil, you can take down
25  the screen.

Barry Lepatner
November 22, 2021

Page 50

1    BY MR. STOLTZ:
2        Q.   Just to make sure I understand your
3    testimony here, can someone hire just LePatner &
4    Associates but not hire Project Solutions?
5        A.   Yes.
6        Q.   Okay.  Now, going back to the office space,
7    did LePatner & Associates and Project Solutions share
8    the same common office space in 2013?
9        A.   Only in title.
10       Q.   I don't -- explain what you mean by that.
11       A.   There is no physical space in our law firm
12   assigned to LPS.
13       Q.   Can you -- when you say LPS, you mean
14   Project Solutions?
15       A.   Yes, LePatner Project Solutions is the full
16   name.
17       Q.   Okay.  And what about in 2014?  Did
18   LePatner & Associates and Project Solutions share the
19   same office space?
20       A.   Same answer.
21       Q.   Which was?
22       A.   On our website, on the sign outside it says
23   LePatner & Associates and it may say -- it may or may
24   not say from depending on the sign hanging out there,
25   LePatner Project Solutions, but there is no dedicated

Page 51

1    physical space for Project Solutions.
2        Q.   Is it -- so I just want to be clear about
3    this, because this is important.
4             The sign outside the door would read
5    LePatner & Associates and LePatner Project Solutions
6    and they would be in front of the same door at the
7    same physical address, correct?
8        A.   Yes, but I'm not sure whether we list
9    currently, or if we ever have, shown Project Solutions
10   on that sign outside.
11            MR. STOLTZ:  Can you just give me one
12   second, please?
13            MR. SALISBURY:  Patrick?  We've been
14   going --
15            MR. STOLTZ:  Oh, yeah.
16            MR. SALISBURY:  -- for about an hour.  Could
17   we take a comfort break?  Just a quick one.
18            MR. STOLTZ:  Sure, of course.  Yeah.  We'll
19   go off the record.
20            (Off the record at 11:06 a.m.)
21            (On the record at 11:12 a.m.)
22            MR. STOLTZ:  Neil, can you bring up the
23   Project Solutions agreement?  The LPS agreement for
24   the underlying project.
25            So Mr. LePatner, I'm showing what's being

Page 52

1    marked as Exhibit F.
2             (Exhibit F marked for identification.)
3             THE COURT REPORTER:  F, yes.
4             MR. STOLTZ:  Is that what we're up to?
5    BY MR. STOLTZ:
6        Q.   Okay.  Which is the written proposal to the
7    Nusseibehs dated November 24th, 2013, and this is for
8    project management services on behalf of Project
9    Solutions for the project, correct?
10       A.   That's correct.
11       Q.   And if you see --
12            MR. STOLTZ:  Neil, if you can scroll down to
13   the bottom of Page 1 in the footer.
14   BY MR. STOLTZ:
15       Q.   It identifies Project Solutions address is
16   575 Lexington Avenue in New York, correct?
17       A.   That's correct at the time.
18            MR. STOLTZ:  Okay.  Now, Neil, if you could
19   just bring up one of the invoices from the project.
20   It doesn't really matter which one.  You can take this
21   screen down for a second.
22            Now, Mr. LePatner, I'm showing you a
23   document that is being marked as Exhibit G.
24            (Exhibit G marked for identification.)
25   \\

Page 53

1    BY MR. STOLTZ:
2        Q.   And this is one of the invoices that were
3    issued in connection with the project.  Do you
4    recognize this document?
5        A.   Yes.
6        Q.   And this is a document that is an invoice
7    that was issued in connection or issued to the --
8    well, withdrawn.
9             Is this an invoice that was issued to the
10   Nusseibehs in connection with the project?
11       A.   Yes.
12       Q.   Okay.  And if you look at the top of the
13   invoice, it identifies LePatner & Associates address
14   as 575 Lexington Avenue in New York, correct?
15       A.   Yes.
16       Q.   Okay.  Now, having looked at the prior
17   exhibit, Exhibit F, the proposal and looking at this
18   exhibit, Exhibit G, does that refresh your
19   recollection at all as to whether or not LePatner &
20   Associates and Project Solutions shared office space
21   in and around 2014?
22            MR. SALISBURY:  Objection; that lacks
23   foundation but go ahead and answer.
24            THE WITNESS:  It doesn't change my answer.
25   \\

Barry Lepatner
November 22, 2021

Page 54

1  BY MR. STOLTZ:
2      Q.  Does Project -- well, what was your prior
3  answer?
4      A.  The answer was that LePatner & Associates,
5  the law firm, maintained offices at the locations
6  where they did at the various times and that Project
7  Solutions, LePatner Project Solutions, operated solely
8  within the ambit of the legal services offered by
9  LePatner & Associates.  And there is nothing
10  inconsistent here that you're showing me from the
11  answers that I gave you previously.
12          MR. STOLTZ:  Take it down, Neil.  You can
13  take down the exhibit.  Can you bring up the Project
14  Solutions for the -- sorry, the proposal again?
15  Exhibit F?
16  BY MR. STOLTZ:
17      Q.  Again, just to confirm though, this is,
18  again, a proposal --
19          MR. STOLTZ:  And you can highlight it, Neil,
20  for me.
21  BY MR. STOLTZ:
22      Q.  A proposal for project management services
23  on behalf of LePatner Project, LLC in connection with
24  the investigation and completion of your residence at
25  35 Andrews Farm Road in Greenwich, Connecticut,

Page 55

1  correct?
2      A.  That's what it says, right.
3      Q.  And this is on LePatner Project Solutions,
4  LLC letterhead, correct?
5      A.  Yes, correct.
6      Q.  And it's dated November 24th, 2013?
7      A.  That's what it says.  That's correct.
8      Q.  And it was sent via email by you to Julia
9  and Jamal Nusseibeh?
10      A.  Yes.
11      Q.  And if you scroll down to the bottom, again,
12  it lists Project Solutions physical address as 575
13  Lexington Avenue, New York, New York 10022, correct?
14      A.  Correct.
15      Q.  What's the cross street -- just out of
16  curiosity -- what's the cross street of that address?
17      A.  52nd Street and Lexington Avenue.
18      Q.  My -- just as an aside, my dad worked on
19  54th and Lexington and I used to go see him all the
20  time, so I'm familiar with the area.
21          MR. STOLTZ:  Okay.  So you can take this
22  down, Neil.  Thanks.
23  BY MR. STOLTZ:
24      Q.  Does Project Solutions currently have
25  insurance?

Page 56

1      A.  Yes.
2      Q.  Who is its current carrier?
3      A.  I am unaware.  It was placed by our
4  insurance broker.
5      Q.  And who is your insurance broker?
6      A.  Rampart, R-a-m-p-a-r-t, Insurance Services,
7  I believe it's insurance services, is their name.
8          MR. STOLTZ:  Well, I'm -- Carl, I'm going to
9  call for production of Project Solutions current
10  insurance policy.  I'll follow up in writing.
11  BY MR. STOLTZ:
12      Q.  Did Project Solutions have its own insurance
13  in 2014?
14      A.  No.
15      Q.  What type of insurance does Project
16  Solutions currently have?
17      A.  I believe it's called an errors and
18  omissions policy.
19      Q.  And what about in 2015, did Project
20  Solutions have its own insurance?
21      A.  No.
22      Q.  What about in 2016, did Project Solutions
23  have its own insurance?
24      A.  No.
25      Q.  What about 2017, did Project Solutions have

Page 57

1  its own insurance?
2      A.  No.
3      Q.  When is the first time that Project
4  Solutions procured its own errors and omissions
5  insurance?  What year?
6      A.  It could be wrong, but I think it was 2019.
7      Q.  And what led to the decision to procure
8  errors and omissions insurance for Project Solutions
9  in 2019?
10      A.  My insurance brokers said you don't need the
11  craziness of claims like the ones brought by the
12  Nusseibehs.  So even though you -- the structure of
13  your agreements on all your other projects would
14  otherwise indemnify you, you don't need the question
15  about coverage, defense costs and the like, and for a
16  very nominal cost we've found, I guess, you'd call it
17  professional liability insurance for all LePatner
18  Project Solutions.  So don't complain about it.  Don't
19  say anything.  Just send us the premium, because this
20  is what we think is best for you.  And I went -- said,
21  "Okay."
22          MR. STOLTZ:  I'm going to call for all
23  production of all communications between Mr. LePatner
24  and his firm and his broker, Rampart, concerning the
25  procurement of insurance for Project Solutions.  Carl,

Barry Lepatner
November 22, 2021

Page 58

1  I'll follow up in writing.
2      MR. SALISBURY: Okay. It goes under
3  advisement.
4      MR. STOLTZ: Yeah, I'm sure you will.
5  BY MR. STOLTZ:
6      Q.  Well, prior to 2019, why didn't Project
7  Solutions have its own insurance?  So -- well, I'll
8  withdraw the question, sorry.
9          Prior to 2019, why did Project Solutions not
10 have its own errors and omissions insurance?
11     A.  Two responses. With exception of the
12 proposal that you just introduced to the Nusseibehs,
13 every prior issuance of a proposal for services by
14 LePatner Project Solutions stated throughout the
15 agreement that these services were as agent for the
16 client. And did not represent an independent
17 consulting services and were only going to be there to
18 provide the services requested and by the client to be
19 performed in their name. And included the fact that
20 the client indemnified LePatner Project Solutions for
21 any and all claims because they could not perform
22 services other than that, which the client wanted to
23 be performed.
24          Second answer is that we never envisioned,
25 no one contemplated, and no prior situation or client

Page 59

1  ever, ever, misconstrued the role of LePatner Project
2  Solutions and the reasons why they had us there in the
3  field on any prior project.
4      Q.  Who does LePat- -- I'm sorry, withdrawn.
5          Who was Project Solutions insurer in 2019?
6      A.  I don't know the name of them. You'd have
7  to ask the broker. I've not seen the policy.
8      Q.  Again, just forgive me if this was already
9  asked, but just so I'm clear. Who is the current
10 errors and omissions carrier for Project Solutions?
11     A.  I just stated, I do not know the answer.
12     Q.  Okay. Project Solutions have any other type
13 of insurance currently?
14     A.  No.
15     Q.  Okay.
16         MR. STOLTZ: Neil, can you bring up the
17 verified answer and counterclaims from the 320 West
18 115 Street case? If you'll scroll down to -- sir, I'm
19 going to mark this document, which is the verified
20 answer and counterclaims in a lawsuit venued in the
21 Supreme Court, State of New York, Index No. 651437 of
22 2018, it's -- if you scroll up, Neil -- LePatner
23 Project Solutions, LLC, a/k/a LPS and LePatner &
24 Associates, LLP against 320 West 115 Realty, LLC, et
25 all.

Page 60

1          I'm going to mark this as Exhibit -- where
2  are we up to, Vivian?
3          THE COURT REPORTER: H.
4          MR. STOLTZ: Exhibit H.
5          (Exhibit H marked for identification.)
6  BY MR. STOLTZ:
7      Q.  Do you recognize this document?
8      A.  Yes.
9      Q.  And what is this -- sorry, withdrawn.
10         Do you recognize this as the verified answer
11 and counter claims of defendants 320 West 115 Realty,
12 LLC?
13     A.  Yeah, I haven't seen all of it in front of
14 me. I haven't looked through it, but there is such a
15 document on file in that matter.
16     Q.  And in this lawsuit -- well, withdrawn.
17         This lawsuit was brought by LePatner Project
18 Solutions, LLC and, separately, as well, by LePatner &
19 Associates, LLP, correct?
20     A.  Yes.
21     Q.  Okay.
22         MR. STOLTZ: If you scroll down, Neil,
23 please, to paragraph -- why don't you make it a little
24 smaller, that way Mr. LePatner can see it. Just
25 scrolled down to, what is it, paragraph, keep going --

Page 61

1  keep going. Yeah, there we go.
2  BY MR. STOLTZ:
3      Q.  Mr. LePatner, if you could take a look at
4  Paragraph 73, which reads:
5          "According to the Project Management
6  Services Agreement ("PMA") between them, LPS, would,"
7  quote, "act as an agent for ownership [320 West]
8  relative to the assumption of project management for
9  the above project resulting from the termination of
10 the former contractor, All Building Construction
11 Corp."" Is that what it says?
12     A.  Yes.
13     Q.  Okay. So and, sorry, the preceding
14 paragraph states, "On September 7, 2016 Defendant and
15 Counterclaim plaintiff 320 West 115 Realty, LLC, hired
16 LePatner Project Solutions, an entity run by Barry B.
17 LePatner, a New York attorney specializing in
18 construction law," correct?
19     A.  That is the accurate statement stated by my
20 client and it is correct.
21         MR. STOLTZ: Okay. Now, if you scroll down,
22 Neil, to Paragraph 77.
23 BY MR. STOLTZ:
24     Q.  It states, "On September 15, 2016, 320 West
25 hired LePatner & Associates, Mr. LePatner's law firm,

Barry Lepatner
November 22, 2021

Page 62

1  by a legal services agreement of that date."  Do you
2  see that?
3       A.   Yes.
4       Q.   So in this case, these parties are alleging
5  that they entered into a separate agreement Project
6  Solutions and a separate agreement for legal services
7  for LePatner & Associates, correct?
8       A.   As I told you before, that is the
9  traditional role when you see LPS, LePatner Project
10 Solutions, it is because they hired the law firm
11 first, yes.
12      Q.   So I go back to my original question.  Can
13 someone hire Project Solutions separately from hiring
14 LePatner & Associates, as they did here?
15      A.   Same -- same answer.  They are not hired
16 separately.  If I determine, after I analyze the
17 problem that the client has, that there is some role
18 to be played to carry out -- for a law firm to carry
19 out the objectives business and legal of the client
20 that could be best effected through LePatner Project
21 Solutions, then I will recommend that that -- the
22 nature of those services be provided under a separate
23 agreement.
24      MR. STOLTZ:  Now, paragraph -- scroll up,
25 please, Neil.

Page 63

1  BY MR. STOLTZ:
2       Q.   In Paragraph 72, it's alleged that they
3  entered into a -- I'm sorry, Paragraph 73 --
4  withdrawn.
5            In Paragraph 73, these parties allege that
6  they enter into a project management services
7  agreement with LPS, correct?
8       A.   They first entered into an arrangement
9  whereby they retained the law firm and then down the
10 road, when they asked for certain claims or services
11 from the law firm, where we had to put certain people
12 in the field to accomplish their business and legal
13 goals, that's when we initiated the proposal from
14 Project Solutions, yes.
15      MR. STOLTZ:  Can you reduce the sizes of
16 that screen, Neil, so I can see 72 and 75?  Okay.
17 There you go.
18 BY MR. STOLTZ:
19      Q.   But that's not what you're alleging here.
20 They're saying that on September 7th, the defendant
21 hired LePatner Project Solutions in Paragraph 72, and
22 then in Paragraph 77, they're saying on September
23 15th, they hired LePatner & Associates.  So, in fact,
24 here, these parties are alleging that they first hired
25 Project Solutions on September 7th and then hired

Page 64

1  LePatner & Associates on September 15th, correct?
2       A.   You're saying when they signed certain
3  documents, I'm telling you from a factual standpoint,
4  they came to LePatner & Associates, they hired the law
5  firm and when we talked about what they needed and
6  there was a need for people in the field to accomplish
7  their business and legal goals.  They consented to
8  both.  When they sign the two agreements a week apart,
9  two weeks apart, or a month apart is irrelevant to the
10 facts.  They were hiring the law firm to get them out
11 of a very, very difficult situation, which we did.
12      Q.   They signed two separate agreements, right?
13 One with Project Solutions and one with LePatner &
14 Associates, correct?
15      MR. SALISBURY:  Asked and answered but go
16 ahead.
17      THE WITNESS:  Correct.
18      MR. STOLTZ:  Okay.  You can take this down.
19 BY MR. STOLTZ:
20      Q.   Were you, or anyone, at LePatner &
21 Associates licensed or admitted to practice law in
22 Connecticut in 2013?
23      A.   No one was.
24      THE COURT REPORTER:  I'm sorry.  Repeat the
25 answer.  You were cutting out.

Page 65

1  BY MR. STOLTZ:
2       Q.   Yeah, that was one of those --
3       A.   I never was licensed to practice in
4  Connecticut -- practice law in Connecticut.
5       Q.   Okay.  What about being admitted to practice
6  law in Connecticut?  Were you ever admitted to
7  practice law in Connecticut?
8       A.   No.
9       Q.   Okay.  And that includes 2013 to present?
10      A.   At no time in my career.
11      Q.   What about anyone else at LePatner &
12 Associates, were they ever licensed or admitted to
13 practice law in Connecticut?
14      MR. SALISBURY:  Ever?  Since the finding of
15 the firm?
16 BY MR. STOLTZ:
17      Q.   Well, let's start with just in 2013 to
18 present.
19      A.   I wouldn't know if one of our attorneys was
20 licensed in Connecticut.  I -- I don't know as I sit
21 here.
22      Q.   Okay.  This is important.  So I want to make
23 sure the record is clear here, Mr. LePatner.
24           Was anyone at LePatner & Associates, to your
25 knowledge, licensed or admitted to practice law in the

Barry Lepatner
November 22, 2021

Page 66

1  state of Connecticut from 2013 to present?
2       A.   I can only speak for myself, and I've given
3  you the answer and that is no.
4       Q.   Well, what would you need to look at in
5  order to determine whether or not anyone was licensed
6  or admitted to practice law in the state of
7  Connecticut, say, in 2013?
8       A.   I would need to know what right RSUI has to
9  even initiate those inquiries in this matter, and I
10 would have to ask my lawyer as to whether those
11 questions were proper or not in this forum.
12      Q.   Move to strike the non-responsive portions
13 of Mr. LePatner's answer.
14           What document would you need to look at to
15 determine whether or not or who would you need to --
16 withdrawn.
17           What document or who or what person would
18 you need to speak with to determine whether or not
19 anyone was licensed or admitted to practice law in the
20 state of Connecticut in 2013?
21      A.   I would have to identify the lawyers who
22 worked for me at that time and question them.
23      Q.   Who were the lawyers who worked for LePatner
24 & Associates in 2013?
25      A.   I do not recall as I sit here now.

Page 67

1       Q.   Do you have any documents that would reflect
2  -- refresh your recollection?
3       A.   I'm sure there are documents I could go back
4  to in the large documentation of matters that we've
5  done.  I can tell you one lawyer would be Jeff
6  Kleiner, because I remember he did some legal services
7  on this project.  So I saw his name on some of our
8  invoices.  So that would be --
9       Q.   Well, we'll go through some -- sorry.  We'll
10 go through some documents that will help refresh your
11 recollection, but speaking of Mr. Kliman (sic), was he
12 an attorney at LePatner & Associates in 2013?
13      A.   Jeff Kleiner, K-l-e-i-n-e-r, was an attorney
14 in 2013, correct.
15      Q.   For LePatner & Associates?
16      A.   Yes, sir.
17           THE COURT REPORTER:  That was yes?  I'm
18 sorry.  You -- it just cut out.
19           MR. SALISBURY:  That was a yes.
20           THE WITNESS:  The answer was yes.
21 BY MR. STOLTZ:
22      Q.   Okay.  What about in 2014?  Was Mr. Kleiner
23 an attorney at LePatner & Associates?
24      A.   I don't believe so.
25      Q.   Well, to your knowledge, was Mr. Kleiner

Page 68

1  admitted to practice law in the state of Connecticut
2  in 2013 or 2014?
3       A.   I wouldn't have any knowledge whatsoever?
4       Q.   Was Mr. Kleiner involved in the project at
5  issue in this case?
6       A.   He was involved in a limited role on certain
7  legal issues that arose with respect to this project,
8  yes.
9       Q.   Have you ever been disciplined by any bar in
10 the country?
11           MR. SALISBURY:  Can you give me some reasons
12 why this would be at all relevant?  I'm not suggesting
13 that he's not going to answer, but this is pretty far
14 afield.
15           MR. STOLTZ:  I don't need to take a proffer,
16 Carl, at a deposition regarding the relevancy of the
17 information sought.  I mean, I'm asking him -- you
18 know, he -- he's the sole owner of LePatner &
19 Associates and, you know, his credibility is at issue
20 as well as, you know, whether or not he was admitted
21 to practice or licensed to practice law in Connecticut
22 at issue in this case.  So I think it's entirely
23 relevant to ask whether or not he's ever been
24 disciplined.  And quite frankly, I don't need to make
25 a proffer of the relevancy, but I can just tell you

Page 69

1  that I'm only asking, you know, I'm not trying to you
2  know, go down the rabbit hole in these sets of
3  questions.  I just wanted to, you know, ask this one
4  question.
5           MR. SALISBURY:  All right.
6           THE WITNESS:  To my knowledge, I have never
7  had any discipline.  What do -- what would we say?
8  The result award (phonetic) judgment, et cetera, from
9  any ethical panel against me, personally.
10 BY MR. STOLTZ:
11      Q.   Just to be -- just to make sure that I get
12 the record clear, because I don't know if that was
13 entirely responsive to my question.  I'll just ask it
14 again.
15           Have you ever been disciplined by any bar in
16 the country?
17      A.   To my knowledge, no, never.
18      Q.   Now, in the normal course when LePatner &
19 Associates is retained to perform legal services for
20 our client, does it provide the client with a written
21 engagement or retainer agreement or proposal?
22      A.   Yes.
23           MR. STOLTZ:  Neil, if you -- again, if you
24 could pull up the proposal for legal services with 320
25 West 115.

Barry Lepatner
November 22, 2021

Page 70

1        Mr. LePatner, I'm showing you what's been
2    marked as Exhibit -- Vivian, help me out here.
3        THE COURT REPORTER:  This will be I.
4        MR. STOLTZ:  I, thank you.
5        (Exhibit I marked for identification.)
6    BY MR. STOLTZ:
7        Q.   Which is a letter dated August 10th, 2016,
8    from you, on LePatner & Associates letterhead, to
9    Stephen Kirschenbaum of Madison Advisory Group with a
10   Re: line of "320 West 115th Street NYC" and then it
11   says below that "Legal Services Proposal."  And it's
12   actually Bates stamped at the bottom, RSUI_000122 and
13   the document runs through RSUI_000125.
14       Do you recall this letter?
15       A.   In general, yes.
16       Q.   Okay.  And this is, in fact, a legal
17   services proposal issued by LePatner & Associates from
18   August 10th, 2016, correct?
19       A.   Well, if you scroll up, I'll be able to tell
20   you whether -- with the exception of the unique things
21   to that client -- whether it's the standard letter
22   that we issued for all clients as a matter of policy
23   in the firm.
24       Q.   Well, that's not my question, but if you can
25   just have my question in mind when you're reviewing

Page 71

1    the document, which was:  Is this, in fact, a legal
2    services proposal issued by LePatner & Associates from
3    August 10th, 2016?
4        A.   When I see the rest of the document, I'll
5    answer your question.
6        Q.   Sure.
7        MR. STOLTZ:  Neil, if you could -- and make
8    -- and scroll through it slowly enough so that
9    Mr. LePatner has a fair opportunity to review the
10   document.
11       You know, off the record, Vivian.
12       (Off the record discussion.)
13       MR. STOLTZ:  Back on the record.
14       THE WITNESS:  Go ahead -- is there anymore?
15   Is this the last page?  There is another page, I
16   believe.  Yep.  Thank you.
17       This is the legal services proposal that we
18   provided to that client.
19   BY MR. STOLTZ:
20       Q.   Is this a standard retainer agreement for
21   LePatner & Associates?
22       A.   Yes.  Except for the individual issues that
23   relate to -- pertinent to that client, yes.
24       Q.   Like the name and the location and that sort
25   of thing?  (speaking simultaneously) --

Page 72

1        A.   And the last page.
2        Q.   And the last page?  What about the last page
3    is individual or unique?
4        A.   We attach that because I believe that we're
5    required to under the Joint Rules of the Appellate
6    Division that last page of requirements that you're
7    supposed to tell every client if you're a lawyer when
8    you're retained.
9        Q.   And do you attach -- and when you're talking
10   about the last page, you're talking about RSUI_000125,
11   correct?  Do you see the Bates number on the bottom
12   there?
13       A.   Yes.
14       Q.   Okay.  And this is a statement of clients'
15   rights pursuant to Section 1210.1 of the Joint Rules
16   of the Appellate Division, correct?
17       A.   That's correct.
18       Q.   And this statement of clients' rights, is it
19   always attached to the written retainer agreements
20   provided by LePatner & Associates?
21       A.   When you say "always," I can't guarantee,
22   but it is the standard part of our legal services
23   template that we send to each client upon retention.
24       Q.   Understood.  Okay.
25       MR. STOLTZ:  Now, if you could scroll up,

Page 73

1    Neil.
2    BY MR. STOLTZ:
3        Q.   This proposal contains an explanation of the
4    scope of the proposed legal services to be provided,
5    correct?
6        MR. STOLTZ:  Scroll up.
7        THE WITNESS:  That is correct.
8    BY MR. STOLTZ:
9        Q.   And this proposal also contains an
10   explanation of the attorney's fees to be charged and
11   expenses and billing practices, right?  On Page 2?
12       A.   That's correct.
13       Q.   And this proposal also provides that the
14   client may have a right to arbitrate fee disputes on
15   Page 3, correct?
16       A.   Yes.
17       Q.   And then, again, just to confirm, this
18   document does contain the statement of clients'
19   rights, as codified by Section 1210.1 of the Joint
20   Rules, correct?
21       A.   Yeah, that's correct.
22       Q.   Okay.  I'd like to switch topics just for a
23   moment and talk about the project at issue in the
24   underlying action.
25       MR. STOLTZ:  You can take that down, Neil.

Barry Lepatner
November 22, 2021

Page 74

```
1  BY MR. STOLTZ:
2      Q.  How did you first come in contact with the
3  Nusseibehs?
4      A.  My recollection is they learned about me and
5  my law firm from a lawyer, I believe, that they knew
6  who through some way in the real estate or whatever,
7  corporate, referred them to me.
8      Q.  And when was that?  Do you recall
9  approximately?
10     A.  I believe it was in November of 2013.
11     Q.  And do you recall who the, I guess, friend
12 or colleague that did the referral is?
13     A.  I could never --
14     Q.  Sorry.
15     A.  -- since the inception of --
16         MR. STOLTZ:  Vivian, did you get the
17 question?
18         THE COURT REPORTER:  Yes.  I did.
19         MR. STOLTZ:  Okay.  Good.  Sorry.
20 BY MR. STOLTZ:
21     Q.  You can answer.
22     A.  Since the inception of the Nusseibeh
23 litigation, I've racked my brain to try and remember
24 who referred that, but I have been unable to recall
25 who the referring individual was.
```

Page 75

```
1      Q.  Who is Francisco Rivera?
2      A.  I'm sorry.  Did you say who is he?
3      Q.  Who is Francisco Rivera?
4      A.  He's an employee of LePatner & Associates
5  who works under me at the law firm.
6      Q.  Do you consider Mr. Rivera to be an honest
7  individual?
8      A.  Very honest.
9      Q.  And do you consider Mr. Rivera to be --
10         MR. SALISBURY:  Note my objection -- note my
11 -- I'm sorry.  I -- you spoke too quickly.  I was
12 going to put an objection on the record but go ahead.
13         THE WITNESS:  I'm sorry.
14 BY MR. STOLTZ:
15     Q.  And would you consider Mr. Rivera to be an
16 intelligent person?
17         MR. SALISBURY:  Go ahead, Barry.
18         THE WITNESS:  Yes.
19 BY MR. STOLTZ:
20     Q.  Is he employed -- sorry, withdrawn.
21     Is Mr. Rivera employed by Project Solutions?
22     A.  No.
23     Q.  Is Mr. Rivera currently employed with you or
24 any firm owned by you?
25     A.  No.
```

Page 76

```
1      Q.  When did Mr. Rivera leave your employment?
2      A.  I think about three years ago he left to
3  begin his own business in New Haven, Connecticut,
4  where he lives and where he commuted.
5      Q.  Do you know the name of that business?
6      A.  Oh, no, he formed his own company, and I
7  wouldn't know the name of it.
8      Q.  And you testified that was about three years
9  ago that he did this?
10     A.  Yes, three or four -- three -- three --
11 about three years ago, I think it was, yeah.
12     Q.  Now, Mr. Rivera is not an attorney, right?
13     A.  Correct.
14     Q.  And in 2013 and 2014, when he was employed
15 with you, he was not an attorney, correct?
16     A.  Correct.
17     Q.  What was Mr. Rivera's job title November of
18 2013 through May of 2014?
19         MR. SALISBURY:  Objection; lacks foundation.
20 Go ahead and answer.
21         THE WITNESS:  I -- I wouldn't recall what it
22 was.  I'm sure it's on some of the correspondence in
23 this project.
24 BY MR. STOLTZ:
25     Q.  Well, what was Mr. Roles -- excuse me,
```

Page 77

```
1  withdrawn.
2         What was Mr. Rivera's role on the project?
3      A.  After we learned from the Nusseibehs about
4  their victimization by York Development or York
5  Construction Management, whatever York's name was,
6  through the discussions we had with the Nusseibehs
7  that I had, and through their agreement with the
8  strategy that we developed and recommended to them,
9  Mr. Rivera was part of that -- carrying out that
10 strategy to do a number of things related to
11 identifying work done by York.  The remediation of the
12 inferior defective work that they had done, to assist
13 in providing information about the damages resulting
14 from that and helping us to coordinate that into a --
15 ultimately, a forensic plan to go after York.
16     Q.  Now, the work that Mr. Rivera performed on
17 the project, is that pursuant to the proposal that we
18 had previously looked at dated November 24th, 2013 for
19 the Nusseibehs?
20     A.  Largely, no.
21     Q.  No?
22     A.  The answer to your question is largely no.
23     Q.  So -- well, did Mr. Rivera provide legal
24 services to the Nusseibehs?
25     A.  no, he's not qualified to.  He provided the
```

Barry Lepatner
November 22, 2021

Page 78

1    services that I ans- -- I just answered.
2        Q.    And the services you just answered, were
3    they pursuant to the proposal that we had just
4    discussed?  I believe it was Exhibit --
5            THE COURT REPORTER:  I.
6            MR. STOLTZ:  No.  Exhibit F?
7            THE COURT REPORTER:  The previous proposal
8    was F, sorry.
9            MR. STOLTZ:  Yeah.
10           THE WITNESS:  I just answered that question.
11   I said the answer is no, largely no.
12   BY MR. STOLTZ:
13       Q.    So what agreement was Mr. Rivera providing
14   services to the Nusseibehs on the project under?
15       A.    Despite the --
16       Q.    I'll withdraw the -- sorry -- it was a
17   poorly phrased question.  My apologies.  I just want
18   to make sure that I ask the right question here.
19           What was the agreement pursuant to which
20   Mr. Rivera was performing work for the Nusseibehs on
21   the project?
22       A.    Number one, it was total inadvertence.  The
23   most unusual one in this case, that the standard form
24   legal services agreement did not get issued to the
25   Nusseibehs for their formal retention, which they

Page 79

1    obviously affirmed each month when they paid our legal
2    services invoicing.
3            Number two, in meetings in the weeks after I
4    met -- after the issuance of the Project Solutions
5    proposal, Mr. and Mrs. Nusseibeh, largely
6    Mr. Nusseibeh, Jamal, disavowed the structure and
7    tenor of the LPS proposal, rejected most of the
8    critical services, and they were not performed under
9    that agreement.
10       Q.    Are you finished?
11       A.    Yes.
12       Q.    Okay.  I don't think that was responsive to
13   my question.
14           My question was:  Can you identify an
15   agreement pursuant to which Mr. Rivera performed work
16   for the Nusseibehs on the project?
17       A.    Yes.
18       Q.    And if so, what is that agreement?
19       A.    The oral agreement to provide legal services
20   to Mr. and Mrs. Nusseibeh.
21       Q.    Now, again, Project Solutions is not a law
22   firm, correct?
23       A.    Yes, that's correct.
24       Q.    And Project Solutions didn't provide legal
25   services to the Nusseibehs, correct?

Page 80

1        A.    That is correct.  Didn't --
2        Q.    And you would agree that Project Solutions
3    couldn't provide legal services to the Nusseibehs
4    under the applicable Rules of Professional Conduct,
5    correct?
6        A.    Correct.
7        Q.    And you had that understanding in 2013 and
8    2014?
9        A.    Correct.
10       Q.    And you're aware that under the New York
11   Rules of Professional Conduct, a lawyer can only
12   practice law in a jurisdiction in which the lawyer is
13   authorized to practice law, correct?
14       A.    I was not practicing law.  I was offering
15   consulting services.
16       Q.    That's not my question.
17       A.    And the issue being --
18       Q.    Excuse me.  That wasn't my question.  I'm
19   asking you whether or not you were aware that under
20   the New York Rules of Professional Conduct a lawyer
21   may practice only in a jurisdiction in which the
22   lawyer is authorized to practice?  Yes or no.
23           MR. SALISBURY:  Actually, it can't -- you
24   can't limit him to "yes" or "no" if it -- if his
25   obligation to tell the truth requires him to explain

Page 81

1    but go ahead.
2            MR. STOLTZ:  Okay.
3    BY MR. STOLTZ:
4        Q.    You can answer the question.
5        A.    I understand what the rules are about
6    practicing outside jurisdictions where you are
7    licensed.
8        Q.    And you had that understanding in 2013 and
9    2014, correct?
10       A.    Yes.
11           MR. STOLTZ:  Neil, if you could pull up the
12   Project Solutions agreement that's previously been
13   marked.  I think it's Exhibit G.  No, I'm sorry.  I
14   take that back.  It's Exhibit F.
15   BY MR. STOLTZ:
16       Q.    Again, I'm showing you what's been
17   previously marked as Exhibit F and this is the written
18   proposal to the Nusseibehs dating November 24th, 2013,
19   that we previously discussed.
20           MR. STOLTZ:  Now, if you could turn to
21   Page 6 of the agreement.  And again, you can review
22   any part of this document you need to in order to
23   answer my questions, but if you could turn to Page 6.
24   Oh, before we get to Page 6.  Can you just look on the
25   bottom of this page or any of these pages, Neil?

Barry Lepatner
November 22, 2021

Page 82

1  BY MR. STOLTZ:
2      Q.  Mr. LePatner, do you see a Bates stamp on
3  the bottom right-hand corner of this document?
4      A.  Oh, yes.
5      Q.  And the Bates stamp is LPA -- the Bates
6  stamp on the document we're looking at now is LPA0052,
7  correct?
8      A.  Yes.
9      Q.  And this is a document which was produced by
10 the Plaintiff in this case, correct?  As indicated by
11 the Bates lettering?
12     A.  Yes.  It was produced during the underlying
13 Nusseibeh action, yes.
14     Q.  Well, no.  I'm asking whether or not this
15 document was produced to RSUI in this litigation as
16 evidenced by the Bates numbering on the bottom.
17     A.  You'd have to ask counsel.  I would not be
18 aware of that.
19     Q.  This document was signed by you, correct, as
20 we're seeing here on this page?
21     A.  Yes.
22     Q.  And it was also countersigned by Julia
23 Nusseibeh and Jamal Nusseibeh?
24     A.  Nusseibeh, yes, that's my understanding.
25         MR. STOLTZ:  Okay.  And go to Page 6, Neil.

Page 83

1  BY MR. STOLTZ:
2      Q.  Do you see where -- the third paragraph down
3  under general terms where it states:
4         "It is understood and agreed that this
5  agreement pertains solely to project management
6  services that do not include the performance of legal
7  services.  In the event that any legal services are
8  requested they shall be performed under separate
9  agreement by LePatner & Associates LLP."
10        Do you see that?
11     A.  I do.
12     Q.  Now, does that refresh your recollection at
13 all as to whether or not someone seeking to retain the
14 services of Project Solutions could just retain
15 Project Solutions, but not LePatner & Associates?
16        MR. SALISBURY:  Objection; lacks foundation.
17        THE WITNESS:  I'm going to continue to try
18 and emphasize to you that the decision to employ
19 non-legal services people in my employ, such as
20 Francisco Rivera, is the decision I make with the
21 clients as to how to carry out their business and
22 legal objectives.  This -- these two sentences are
23 exactly consistent with that and is -- as clear as day
24 that this document would not have been promulgated if
25 the client had not retained LePatner & Associates LLP.

Page 84

1  BY MR. STOLTZ:
2      Q.  I just want to, again, move to strike the
3  non-responsive portions of his testimony.
4         MR. SALISBURY:  There is nobody here to rule
5  on that motion.
6         MR. STOLTZ:  Okay.  Well, I'm just noting it
7  for the record.  Vivian, thank you.
8         MR. SALISBURY:  Okay.
9  BY MR. STOLTZ:
10     Q.  This is an agreement between Project
11 Solutions LLC and Nusseibehs, correct?
12     A.  It was a proposal that was never carried
13 out.
14     Q.  This document is signed by you and
15 countersigned by the Nusseibehs, correct?
16     A.  That is correct.
17     Q.  And it contains a scope of services to be
18 provided by Project Solutions for the project?
19     A.  It does --
20     Q.  Correct?
21     A.  -- it does describe the proposed services,
22 correct.
23         MR. STOLTZ:  Stop right there, Neil.
24 BY MR. STOLTZ:
25     Q.  And it contains the fees to be charged in

Page 85

1  connection with the project?
2      A.  If -- if accepted -- if accepted and carried
3  out, it set forth the nature of the fees to be
4  charged, yep.
5         MR. STOLTZ:  And again, if you scroll down
6  to the bottom, Neil.  Down to the bottom of the next
7  page.  Keep going.
8  BY MR. STOLTZ:
9      Q.  Again, it says "accepted," and under
10 accepted it's signed by Julia Nusseibeh and Jamal
11 Nusseibeh?
12     A.  On November -- a late November date in 2013.
13 That is correct.
14     Q.  So is it your testimony that this is not a
15 fully formed contract between Project Solutions LLC
16 and the Nusseibehs?
17     A.  Do you have a record of the Nusseibehs
18 getting invoices from LPS, Mr. Stoltz?
19     Q.  Sir, I -- I get to ask the questions here.
20 I'm sorry.  It's not proper for you to be posing
21 questions to me.
22     A.  I'm answering -- I'm answering it with a
23 question because a proposal --
24     Q.  Well, let me --
25     A.  -- that is signed --

Barry Lepatner
November 22, 2021

Page 86

1    Q.   -- let me just repeat my question then, just
2    so it's clear.
3    A.   Uh-huh.
4    Q.   Is it your testimony, because this is very
5    important, is it your testimony that this is not a
6    fully formed contract between Project Solutions LLC
7    and the Nusseibehs?
8    A.   The answer is that the time and date that
9    they signed that there was the intent of this to be a
10   proposal to be carried out as the services to be
11   offered to the clients as discussed with them, yes.
12   Q.   Okay.  And the paragraph that we just read,
13   where it starts with, "It is understood," it
14   contemplates that "In the event that any legal
15   services are requested they shall be performed under a
16   separate agreement by LePatner & Associates LLP,"
17   correct?
18   A.   That's what it states.
19   Q.   So this document, Exhibit F, is not a
20   written agreement for legal services to be provided by
21   LePatner & Associates, correct?
22   MR. SALISBURY:  Objection; asked and
23   answered.  Go ahead.  Answer it again.
24   THE WITNESS:  That's -- that is correct.
25   BY MR. STOLTZ:

Page 87

1    Q.   Now, LePatner & Associates held itself out
2    to be counsel to the Nusseibehs in connection with the
3    project, correct?
4    A.   We were retained to provide the framework
5    for pursuing a claim against York, their prior
6    construction manager, and to give them all the
7    elements of how they could pursue that claim with
8    Connecticut counsel proceeding as their carrier.
9         It never was an intention from day one, from
10   LePatner & Associates, to be representing the
11   Nusseibehs in any court of law or in anything other
12   than providing consulting services in the area of
13   which we specialize, understanding construction
14   projects, what's right, and what's wrong.
15   Q.   Does LePatner & Associates hold itself out,
16   in writing, to be counsel for the Nusseibehs in
17   connection with the project?
18   A.   Unfortunately, in this project, there was no
19   writing.
20   MR. STOLTZ:  Can you, Neil, pull up
21   RSUI_001577, please.  We'll take this document down,
22   but keep it handy, Neil, we're going to refer back to
23   it.
24   Off the record.
25   (Off the record discussion.)

Page 88

1    MR. STOLTZ:  Mr. LePatner, I'm showing you a
2    document that is being marked as Exhibit J.
3    (Exhibit J marked for identification.)
4    THE COURT REPORTER:  Yes, J.
5    BY MR. STOLTZ:
6    Q.   Which is a November 26, 2013 letter on
7    LePatner & Associates letterhead from you to somebody
8    named Nicholas Barile of York Construction &
9    Development, 210 Sound Beach Avenue, Old Greenwich,
10   Connecticut.  And this is Bates stamped RSUI_001577
11   and the document runs all the way through to
12   RSUI_0015 --
13   MR. STOLTZ:  Neil, can you help me out here?
14   BY MR. STOLTZ:
15   Q.   -- 79, Do you see that?
16   A.   Yes.
17   Q.   Do you recognize this document?
18   MR. STOLTZ:  Neil, could you scroll to the
19   top?
20   THE WITNESS:  Yes, I do.
21   BY MR. STOLTZ:
22   Q.   Now, in this document, did LePatner &
23   Associates hold their self out as counsel to Jamal and
24   Julia Nusseibeh with respect to certain construction
25   work being performed by York at the property located

Page 89

1    at 35 West -- I'm sorry -- 35 Andrews Farm Road,
2    Greenwich, Connecticut?
3    A.   At the request of Jamal, who is an attorney,
4    after I suggested that he -- after I prepared this for
5    his signature to send out, he asked me to frame it
6    this way.  I told him I was not -- and I'm not going
7    to practice law in Connecticut.  He said he's not
8    bringing that claim, but he doesn't want to bring
9    other lawyers into this case, could I please frame it
10   like this, and I consented.
11   Q.   Is it your testimony that by holding
12   yourself out to be counsel to Nusseibehs, the
13   construction -- in connection with the construction
14   work being performed on the project, and by sending
15   letters, such as the one that we have marked as
16   Exhibit J, that you were not practicing law in the
17   state of Connecticut in and around 2013?
18   MR. SALISBURY:  Objection.
19   THE WITNESS:  It is --
20   MR. SALISBURY:  That lacks foundation but go
21   ahead and answer.
22   THE WITNESS:  It is my understanding that as
23   long as I was not formally practicing in the court of
24   law, or in any adversary proceeding, to merely provide
25   this kind of letter was not a practice of law.

Barry Lepatner
November 22, 2021

Page 90

1        MR. STOLTZ:  Okay.  Would you take the
2  letter down, please?  And if you could pull back up
3  the Project Solutions agreement.
4        Excuse me.  If you could scroll back down.
5  Oh, wait, actually, you know what?  Stay there.
6  Sorry.
7  BY MR. STOLTZ:
8     Q.   You would agree with me, wouldn't you, that
9  this letter that we have -- well, withdrawn.
10        We have up on screen the Project Solutions
11  proposal that we've marked as Exhibit F, I believe.
12  You'd agree with me that this is a proposal for
13  project management services on behalf of LePatner
14  Project Solutions LLC in connection with the project,
15  correct?
16     A.   Yes.
17     Q.   And you would agree with me that this
18  document --
19        MR. STOLTZ:  If you scroll down to the
20  paragraph on Page 6 that we reviewed.
21  BY MR. STOLTZ:
22     Q.   This document, again, is not for the
23  provision of legal services, correct?
24        MR. SALISBURY:  Objection; asked and
25  answered.  Answer it again.

Page 91

1        THE WITNESS:  Correct.
2  BY MR. STOLTZ:
3     Q.   And it contemplates that in the event that
4  any legal services are requested, they're performed by
5  -- under a separate agreement by LePatner &
6  Associates, correct?
7        MR. SALISBURY:  Objection; asked and
8  answered.
9        THE WITNESS:  Correct.
10  BY MR. STOLTZ:
11     Q.   Sir, you would agree with me then that this
12  proposal does not -- well, withdrawn.
13        MR. STOLTZ:  Why don't we do a quick break?
14        MR. SALISBURY:  Okay.  When do you want to
15  come back?
16        MR. STOLTZ:  It's -- I have 12:08, do you
17  want to do -- can I get ten minutes?
18        MR. SALISBURY:  Sure.
19        MR. STOLTZ:  So 12:18?  Is that good?
20  Vivian?
21        MR. SALISBURY:  Sounds good.
22        THE COURT REPORTER:  Yes, that's fine.
23        (Off the record at 12:08 p.m.)
24        (On the record at 12:19 p.m.)
25  BY MR. STOLTZ:

Page 92

1     Q.   There was no written engagement or retainer
2  agreement between LePatner & Associates and the
3  Nusseibehs, correct?
4     A.   That is correct.
5        MR. STOLTZ:  Neil, can you bring up the
6  underlying complaint filed in -- by the Nusseibehs?
7        Mr. LePatner, I'm showing you what's been
8  marked as Exhibit K, I believe.
9        (Exhibit K marked for identification.)
10        THE COURT REPORTER:  Yes.
11  BY MR. STOLTZ:
12     Q.   And this is the complaint that was filed in
13  the underlying action.  Do you recognize this
14  document?
15     A.   Yes.
16     Q.   And this is the underlying action that was
17  filed by the Nusseibehs, correct?
18     A.   That is correct.
19     Q.   Now, the -- the underlying complaint asserts
20  a cause of action against Project Solutions -- well,
21  withdrawn.
22        The underlying complaint names Project
23  Solutions and LePatner & Associates separately,
24  correct?
25     A.   That is correct.

Page 93

1     Q.   And it also names a few other defendants who
2  were not involved in the coverage litigation we're
3  here about today, correct?
4     A.   Yes.
5     Q.   But it does separately name Project
6  Solutions and LePatner & Associates, we can agree to
7  that, right?
8     A.   Yes.
9     Q.   And the underlying complaint asserts a cause
10  of action against Project Solutions and LePatner &
11  Associates for breach of contract, correct?
12     A.   Yes.
13        MR. STOLTZ:  Now, if you can go to
14  Paragraph 40 of the underlying complaint.  Neil, you
15  might try to reduce the size of the page so that it's
16  -- Mr. LePatner can just read the entirety of the
17  page.
18        MR. SALISBURY:  Reduce it too much, we can't
19  read it.
20        MR. STOLTZ:  Right.  Good point.  If your
21  eyes are like mine, then you're going to need to
22  increase it probably a little bit.
23        MR. SALISBURY:  Yeah.
24        MR. STOLTZ:  But anyway --
25        THE WITNESS:  You're doing that for Carl,

Barry Lepatner
November 22, 2021

Page 94

1  because he's much older and his eyesight is failing.
2      MR. SALISBURY:  That's true.
3  BY MR. STOLTZ:
4      Q.  Well, okay, so if you can go to Paragraph 4
5  of the underlying complaint -- I'm sorry, 40 --
6  withdraw the question.
7          If you can go to Paragraph 40 of the
8  underlying complaint, which states:  LPS and L&A -- by
9  the way -- LPS, just for the record, is LePatner
10  Project Solutions, correct?
11     A.  Yes.
12     Q.  And L, ampersand, A, that's LePatner &
13  Associates, correct?
14     A.  Yes.
15     Q.  Okay.  So again, Paragraph 40 reads, "LPS
16  and L&A failed to fulfill their obligations under the
17  LPS agreement and breached the LPS agreement in one or
18  more of the following ways." and then they outline
19  the ways the LPS agreement was allegedly breached in
20  Subparagraphs A and F, do you see that?
21     A.  Well, I'm looking down now.  Yes.
22     Q.  Take your time, if you want to read that
23  (speaking simultaneously) --
24     A.  A through F, yes, just to F, right, before
25  they go into the other defendants.

Page 95

1      Q.  Now, the contract the Nusseibehs are
2  allegedly -- or withdrawn.
3          The contract the Nusseibehs were alleging
4  was breached.  That was the Project Solutions
5  agreement that's been marked as Exhibit F, correct?
6      A.  I'm not sure the way they characterize it,
7  because they claim both entities failed in these ways
8  and while they reference the LPS agreement, they say
9  both entities fail to or breached their agreement or
10  failed to provide these services.
11     MR. STOLTZ:  When you go to Paragraph 40,
12  Neil, if you can go up again.
13  BY MR. STOLTZ:
14     Q.  When you talk about the LPS agreement in
15  Paragraph 40, they're talking about the Project
16  Solutions that was marked as Exhibit F, correct?
17     MR. SALISBURY:  Objection; lacks foundation.
18  Go ahead.
19     THE WITNESS:  But the -- the beginning of
20  Paragraph 40 says both entities failed to fulfill
21  their obligation under the LPS agreement and breached
22  the LPS agreement.  So it's not clear how -- how they
23  are demarking or if they are even saying that they
24  both had a similar obligation and there is no need to
25  reference the LPS agreement.  It's -- it's poorly

Page 96

1  drafted and as we saw during the course of the
2  litigation, it did not make out much of a claim either
3  way, but that's my answer.
4  BY MR. STOLTZ:
5      Q.  I'm not sure your answer -- withdrawn.
6      MR. STOLTZ:  Neil, can you find the
7  definition of LPS agreement in this document, please?
8  BY MR. STOLTZ:
9      Q.  Mr. LePatner, on Paragraph 17 of this
10  exhibit, the Nusseibehs allege:
11         "On or about November 14 (sic), 2013, the
12  Nusseibehs entered into an agreement with LPS and
13  L&A," and then it defines it as the "LPS Agreement,"
14  "wherein LPS and L&A agreed to perform certain
15  construction management services" --
16     A.  Uh-huh.
17     Q.  -- excuse -- wait one second -- "for the
18  Nusseibehs in connection with the performance of
19  certain home improvement work on the Property," and
20  then it goes on and on and on.  It's a long sentence.
21  And then it says at the end, "A Copy of the LPS
22  Agreement is attached hereto as Exhibit 1 and made a
23  part hereof."
24         Do you see that?
25     A.  I see it, yes.

Page 97

1      Q.  Okay.  And the term "LPS Agreement," is
2  defined as November 24th, 2013, Project Solutions
3  agreement that we have marked as Exhibit F at this
4  deposition, correct?
5      A.  No.  It does not state that.  It says they
6  entered into an agreement with LPS and L&A.  That's
7  their statement.  And if you want to adopt -- if RSUI
8  wants -- wants to adopt that statement, then you're
9  adopting the statement that makes the law firm party
10  to that agreement.  Do you want to do that or not?  I
11  don't know, you'd have to decide, but you're asking me
12  to look at this statement and I'm telling you it -- it
13  does not characterize properly what happens.
14     Q.  The term LPS Agreement in Paragraph 17 is
15  defined, correct?
16     A.  It defines -- their definition says they
17  entered into an agreement with both LPS and the law
18  firm.
19     Q.  On what date?
20     A.  November 24, 2013.  That's what their
21  statement says.
22     Q.  And they -- at the bottom, on the last
23  sentence, they say "A copy of the LPS Agreement is
24  attached hereto as Exhibit 1 and made a part hereof,"
25  correct?

Barry Lepatner
November 22, 2021

Page 98

1    A.   Of which we know, when we look at the
2    agreement, it was just the agreement between the
3    Nusseibehs and LPS.
4        Q.   I'm just asking you about the definition of
5    LPS agreement.  I'm not asking you what your
6    contention was with respect to the underlying
7    complaint.
8            MR. STOLTZ:  Why don't we do this?  Why
9    don't we go to Exhibit 1 of this complaint, Neil, if
10   you could?  Is there no exhibit attachments?  We'll
11   have to take a break and pull up the exhibit because
12   we clearly have an issue here.
13           Neil, can you find a copy of --
14           THE WITNESS:  I think you're creating an
15   issue because you're looking at an agreement in one
16   context, which I'm testifying to --
17           MR. STOLTZ:  Neil, can you pull up the --
18           THE WITNESS:  -- and then you're looking
19   (speaking simultaneously) --
20           MR. STOLTZ:  -- a copy of the agreement?
21           THE WITNESS:  You're interrupting me.
22           THE COURT REPORTER:  One -- just one at a
23   time, please.
24           MR. STOLTZ:  No, I was -- I'm just --
25           THE WITNESS:  I was testifying --

Page 99

1            MR. STOLTZ:  There is no question pending.
2    Sir, there is no question pending.
3            THE WITNESS:  I was --
4            MR. STOLTZ:  Can you please, Neil, pull up a
5    copy of the underlying complaint that has Exhibit 1
6    attached?
7            MR. FOX:  Yeah, I'm pulling it up now.
8            MR. STOLTZ:  You'll have an opportunity to
9    answer the question, Mr. LePatner.  I just want a
10   clear record.
11           Why don't we go off the record while he does
12   this?
13           (Off the record at 12:29 p.m.)
14           (On the record at 12:32 p.m.)
15           MR. STOLTZ:  So we attempted to pull the
16   underlying complaint in which we've marked as Exhibit
17   F -- I'm sorry -- Exhibit I, I believe, from the State
18   of Connecticut Judiciary Website, but for whatever
19   reason the copy that's been loaded onto the State
20   Judiciary website does not have the exhibits attached.
21   But we may end up coming back to that issue if we can
22   locate a copy of the underlying complaint that has the
23   exhibits, but for sake of, you know, trying to get
24   through this we're going to move on.
25           Neil, if you could pull back the underlying

Page 100

1    complaint?  Can we go back to Paragraph 40 again?
2    BY MR. STOLTZ:
3        Q.   The Project Solutions agreement that we've
4    marked as Exhibit F, that was the only written
5    agreement between any LePatner entity and the
6    Nusseibehs, correct?
7        A.   Yes.
8        Q.   And the Project Solutions agreement that
9    we've marked as Exhibit F, that's the only agreement
10   between Project Solutions and the Nusseibehs, correct?
11       A.   You just asked that, and I believe it's the
12   same question you just asked.  The answer is yes.
13       Q.   No, the first question was that it was
14   between -- well, withdrawn.  We can move on.
15           MR. STOLTZ:  Why don't we go on to
16   Paragraph 44 if you could, Neil.
17   BY MR. STOLTZ:
18       Q.   So the underlying complaint also asserts a
19   cause of action against Project Solutions and LePatner
20   & Associates for violation of the Connecticut Unfair
21   Trade Practices Act, correct?
22       A.   It's what it states.
23       Q.   And in Paragraph 44, the Nusseibehs allege
24   that Project Solutions and LePatner & Associates
25   violated the Connecticut Unfair Trade Practices Act by

Page 101

1    among other things.
2            MR. STOLTZ:  If you highlight it, Neil.
3    BY MR. STOLTZ:
4        Q.   Performing constructing management and
5    related construction services for the Nusseibehs under
6    the LPS Agreement in violation of the Connecticut Home
7    Improvement Act, Section 20-418, et seq., because it
8    was not licensed as a home improvement contractor and
9    the LPS Agreement did not meet the requirements of
10   Section 20-249 (sic) of the Connecticut General
11   Statutes.
12           Did I read that correct?
13       A.   That's what it states.  You read it
14   correctly.
15       Q.   Now, the LPS agreement that they're
16   referring to, in Paragraph 44(a), you would agree with
17   me, right, is that document, which we previously
18   marked as Exhibit F, the proposal -- I mean, the
19   project management services agreement, correct?
20       A.   Yes, I would agree with you.
21       Q.   Okay.  Now, Project Solutions was not
22   licensed as a home improvement contractor in the state
23   of Connecticut at the time of the project, correct?
24       A.   Correct.
25       Q.   And you'd agree with me that Project

Barry Lepatner
November 22, 2021

Page 102

1  Solutions did not comply with the Connecticut Home
2  Improvement Act in connection with its work with the
3  Nusseibehs, correct?
4       A.  Had no reason to because it was not -- it
5  did not perform any services.
6       Q.  What's the factual basis for your belief or
7  your testimony that it -- that Project Solutions did
8  not need to comply with the Connecticut Home
9  Improvement Act because it did not provide any
10  services?
11       A.  In the weeks following the issuance of that
12  proposal, as I described in meetings with Jamal and
13  Julie, what we proposed would be in their best
14  interest, they rejected the major elements of the
15  proposal and as a result, we did not perform those
16  services.
17           We did not even get started on them, because
18  they stated that they did not want those services and
19  wanted us to proceed in an entirely different manner
20  that was set out in our initial understanding of what
21  they wanted accomplished for their project.
22       Q.  Is it your testimony --
23       A.  Noted --
24       Q.  Sorry, go ahead.
25       A.  So -- so let me finish the last part.  All

Page 103

1  of this was confirmed by Mr. Nusseibeh in his
2  deposition and if we go back to the proposal, I'm
3  happy to take you through what we proposed and what he
4  confirmed in those subsequent -- in his deposition, in
5  our subsequent meetings, where he rejected the
6  proposal, and as a result no invoices were sent and
7  no, we did not perform under that agreement.
8       Q.  Is it your testimony that Project Solutions
9  did not perform any work or provide any services in
10  connection with the -- or pursuant to the Project
11  Solutions agreement we've marked as Exhibit F in this
12  case -- of the (speaking simultaneously) --
13       A.  I don't understand your question.  Could you
14  repeat it --
15       Q.  I'll withdraw the question.  It was poorly
16  phrased.
17           Is it your testimony that Project Solutions
18  did not perform any work or provide any services to
19  the Nusseibehs pursuant to the Project Solutions
20  agreement that we have marked as Exhibit F in this
21  deposition?
22       A.  There were no invoices ever sent and the
23  Nusseibehs never paid for those services as defined
24  under the project management agreement, which is the
25  exhibit you've been referring to.

Page 104

1       MR. STOLTZ:  Can you, Neil, pull up Invoice
2  37711 and take down this document?
3       MR. LePatner, I'm showing you a document
4  that we are marking as Defendant's Exhibit --
5       THE COURT REPORTER:  L.
6       MR. STOLTZ:  What are we up to?  L.
7       (Exhibit L marked for identification.)
8  BY MR. STOLTZ:
9       Q.  And this is an invoice dated January 31st,
10  2014, on LePatner & Associates letterhead to Jamal and
11  Julia Nusseibeh and it is Bates stamped JNP_0002581
12  through JNP_0002586.
13           Do you recognize this document?
14       A.  I do.
15       Q.  By the way, the Bates numbering there, JNP,
16  do you recognize that Bates numbering?
17       A.  Well, I wouldn't have any familiarity with
18  any of the Bates stamp numbers, no.
19       Q.  Do you know that Bates numbering on the
20  bottom right-hand corner, that's the Bates stamp that
21  was put on the document by the Nusseibehs in the
22  underlying litigation?  Are you aware of that?
23       A.  I would not be aware.
24       Q.  Okay.  If you scroll to the top of this
25  document, do you see where it says under "Client No.

Page 105

1  Re:  Phase 2 - Project Oversight/Completion."  Do you
2  see that?
3       A.  Yes.
4       Q.  Okay.  And the invoices that we've marked as
5  Exhibit L, that was for Phase 2 Project
6  Oversight/Completion, correct?
7       A.  It -- if you would just have to explain one
8  thing to me before I answer your question.  Is this
9  the first invoice that was sent?
10       Q.  I'm not --
11       A.  Is that --
12       Q.  -- Mr. LePatner, my question is very simple.
13  The document that is in front of you, does it say "Re:
14  Phase 2 - Project Oversight/Completion."  Your
15  testimony was "Yes."
16           My next question was is this invoice for
17  Phase 2 Project Oversight, slash, Completion, yes, or
18  no.
19       A.  What --
20       Q.  And if you can't answer "yes" or a "no,"
21  then --
22       A.  The answer is it -- it purports to do that,
23  yes.
24       Q.  Okay.  And if you look at the first entry on
25  this invoice, it's FRR, who is that?

Barry Lepatner
November 22, 2021

1    A.   Francisco Rivera.

2    Q.   And what is -- and what's the date of that

3  entry?

4    A.   January 1, 2014.

5    Q.   And what's the narrative for that entry?

6    A.   "Coordination with Millwork Installers

7  regarding Jamal's closet."

8    MR. STOLTZ:  Okay.  Now, Neil, if you could

9  pull back up the Project Solutions agreement or

10  Exhibit F.

11    And when you do, Mr. LePatner, if you keep

12  in mind the portion of this document that we have that

13  says Phase 2 - Project Oversight/Completion.

14    And, Neil, if you can scroll down to the

15  scope of services, keep going.

16  BY MR. STOLTZ:

17    Q.   Do you see where it says Phase 2, overseeing

18  completion of the work?

19    A.   Yep, yes.

20    Q.   Now, having reviewed the invoice that we

21  just looked at, that we've marked as Exhibit L, is

22  that your -- refresh your recollection as to whether

23  or not Project Solutions performed work or provided

24  services to the Nusseibehs pursuant to the Project

25  Solutions agreement we've marked as Exhibit F?

1    MR. SALISBURY:  Objection; lacks foundation.

2  Go ahead and answer.

3    THE WITNESS:  It confirms my statement to

4  you that the Nusseibehs rejected the LPS proposal

5  because the first things we were required to do, or

6  that we proposed to do, which is to oversee and get

7  control of the problems -- if you phase up -- go up to

8  Phase 1 of that, please, document.

9    The first things we recommended, and this

10  was the most important thing, which you may have no

11  understanding of or no awareness, we recommended that

12  all of the subcontractors currently at the residence

13  be fired.

14    Number two, we stated that the reason York

15  took you for a ride and literally were able to steal a

16  million dollars from you, was because you did not give

17  them a set of architect or engineering drawings from

18  which to define the scope of their work, which would

19  have defined the amount they could charge.  And when

20  you did not get -- give them a set of design

21  documents, and you let them run around your property,

22  doing whatever they wanted, and then doing it over

23  again and again under certain guises, you had been the

24  cause of your problems.

25    And, in other words, we want to fire the

1  current subcontractors that had been retained by York.

2  We wanted to bring on an architect or engineer to

3  prepare a set of design drawings so that we could

4  define the scope of, A, what had been truly performed

5  and, B, what needed to be performed to remediate all

6  the problems in this very large mansion.

7    And we say in doing so, with the new set of

8  drawings, we would be able to bid out those drawings

9  to a set of contractors or construction managers to

10  get you a fixed price and a fixed schedule.  Without

11  that, you cannot complete this work properly.  We will

12  never fully understand all of the things they did

13  poorly.  We will never be able to give you a fixed

14  price.  We will never be able to give you a schedule,

15  because you have the wrong people working on your job.

16  BY MR. STOLTZ:

17    Q.   Is it your testimony that all of that

18  work --

19    MR. SALISBURY:  Sorry, what -- wait, wait,

20  wait.  No, no, no.

21    THE COURT REPORTER:  One moment.  I'm sorry.

22  One moment, please.  One at a time.

23    THE WITNESS:  I am -- I am not finished, and

24  I want to complete my answer because -- forget the

25  because.  Let me continue.

1    The Nusseibehs advised me in those weeks

2  following the issuance of this proposal, they could

3  not let us fire the subs because they needed to be in

4  the house by March 15th, a date we told them was

5  ridiculous and likely unachievable because we need two

6  or three months to determine the full scope of the

7  problems that we -- on down the -- uncovered in the

8  months ahead, let alone to identify the trades that

9  would be needed to fix those problems because we had

10  no confidence in the skills of the trades that were

11  working in the residence hired by York.

12    And we explained to them, that you can't

13  have a schedule and a budget for a million dollars'

14  worth of poor performance because we did not know

15  whether we were going to have to rip out major

16  sections of the home to remediate --

17  BY MR. STOLTZ:

18    Q.   Mr. LePatner, this is non-responsive to my

19  question and your attempt to filibuster here is

20  unwarranted.  My -- my question --

21    A.   No --

22    Q.   I'm sorry.  My question was very simple.

23  Did Project Solutions perform any work or provide any

24  services to the Nusseibehs pursuant to the project

25  management -- excuse me -- project services -- Project

Barry Lepatner
November 22, 2021

Page 110

1  Solutions agreement that we've marked as Exhibit F?
2  Yes or no.
3       MR. SALISBURY:  Okay.  Object -- objection
4  and I object to the requirement of yes or no and I
5  object to your raising your voice.
6       MR. STOLTZ:  I'm sorry.  I didn't mean to
7  raise my voice.
8       But, Mr. LePatner, my question is very
9  simple, and I ask that you just please keep it in mind
10  when giving your answer.
11      Can we just go back to the lawsuit, please?
12  The underlying complaint.  Can you go down to
13  Paragraph 40?
14  BY MR. STOLTZ:
15      Q.  Do you agree that in Paragraph 40, the
16  Nusseibehs are alleging that LPS and L&A breached the
17  LPS agreement as defined in this document?
18      MR. SALISBURY:  Objection; asked and
19  answered go ahead.
20      THE WITNESS:  No.  I -- I don't agree.
21      MR. STOLTZ:  Okay.  And if you can turn to
22  Paragraph 44.
23  BY MR. STOLTZ:
24      Q.  Do you agree that in Paragraph 44(a), the
25  Nusseibehs are alleging that LPS and L&A performed

Page 111

1  construction management and related construction
2  services for the Nusseibehs under the LPS agreement in
3  violation of the Home Improvement Act?
4       A.  Is this your question that that's what it
5  says there?
6       Q.  I'm asking you to confirm that, in fact,
7  that's what it says there.  Is that your --
8       A.  How would I -- how would I credibly deny.
9  It says it there.
10      Q.  Okay.  Now --
11      A.  And -- and then there was a lawsuit that
12  confirmed that they --
13      Q.  All right.
14      A.  -- did not -- could not prove those
15  statements but put that aside.
16      Q.  Now, you agree that LePatner & Associates
17  could not have been in breach of Project Solutions
18  agreement we've marked as Exhibit F, because it wasn't
19  a party to that agreement, correct?
20      A.  It -- that -- that's number one.  Number two
21  is that the client voided the agreement.  None of that
22  was performed by -- under the aegis of the LePatner
23  Project Solutions proposal.  It was performed as
24  stated on our website and as agreed to by the
25  claimants, Jamal and Julia Nusseibeh that the law firm

Page 112

1  was performing these services in furtherance of the
2  instructions they gave us to help them achieve their
3  business and legal goals and that's what we did.  We
4  never billed them through LPS.
5       Q.  Where on your website does it say that?
6       A.  You're the one who brought it up on the
7  front of the --
8       Q.  Well, let's bring up the website.
9       A.  -- LePatner -- on the front page of
10  lepatner.com it provides both of those services, which
11  the law firm provides.  It's right there.  You want to
12  go back to it?  Let's go back to it and I'll show you.
13      Q.  Let's go back -- we can go back to the
14  website.
15      I guess my first question though is:  Did
16  the Nusseibehs repudiate or void the Project Solutions
17  agreement in writing or orally?
18      A.  When they only were billed by the law firm
19  for the same exact services that they -- what were
20  provided under the law firm, aegis, and when they paid
21  those bills every month, they were validating the fact
22  that there were no services -- ongoing services
23  performed by LPS.
24      Q.  So is it your testimony that that is the
25  only way in which they repudiated or voided the

Page 113

1  Project Solutions agreement marked as Exhibit F?
2       A.  It was never performed, because they did not
3  want the services provided.
4       Q.  Did the --
5       A.  They did not want us to be --
6       Q.  I'm sorry.  Go ahead.
7       A.  -- quote, "project managers," of the
8  project.
9       Q.  Did the Nusseibehs state, in writing, that
10  they are voiding or repudiating the Project Solutions
11  agreement marked as Exhibit F?
12      A.  No.
13      Q.  Did the Nusseibehs orally tell you or anyone
14  else that they were voiding or repudiating the Project
15  Solutions agreement marked Exhibit F?
16      A.  No.
17      Q.  And you would agree with me, wouldn't you,
18  that three years later in 2017, the Nusseibehs sued
19  project management -- I'm sorry -- Project Solutions
20  alleging that they breached the Project Solutions
21  agreement that we've marked as Exhibit F, correct?
22      MR. SALISBURY:  You may not mean to do it,
23  but you are -- you continue to yell at Mr. LePatner.
24      MR. STOLTZ:  I'm sorry.  Because this thing
25  doesn't -- I'm not -- I don't mean to do it.

Barry Lepatner
November 22, 2021

Page 114

1        MR. SALISBURY:  Okay.
2        MR. STOLTZ:  I'm just -- I'm worried that
3   maybe he can't hear me.
4        THE WITNESS:  In my non-legal -- in my
5   non-legal opinion, I suggest you use Apple air pods.
6   I think -- I think the $39 version of that is not
7   getting you the best opportunity to hear.
8        MR. STOLTZ:  Listen, we do the best we can.
9   Vivian, can you repeat my question, please?
10        THE COURT REPORTER:  Sure one moment.
11        (The previous question was read back.)
12   BY MR. STOLTZ:
13        Q.  Your answer?
14        A.  That is what their -- that is correct.
15   Their lawyer put those words down on a piece of paper
16   before he had all the information that he learned
17   during the course of the accident.  That's correct.
18        Q.  And what additional information did he learn
19   during the course of the accident?
20        A.   In the course of the litigation Jamal's
21   testimony was taken and he admitted he did not want us
22   to provide the recommended strategy, which would have
23   gotten him the best result for remediating the
24   problems of York, helping to identify the nature and
25   extent of the damages and to get him control over

Page 115

1   schedule and budget.  All of that was laid out in the
2   proposal.
3        He didn't want us to have control over the
4   project because he had a man called John Santoro,
5   S-a-n-t-o-r-o, who had been brought on by York who he
6   kept on as the project manager who sat every day in
7   the kitchen and controlled the subcontractors,
8   reviewed their invoices, approved them, and kept watch
9   on them most of which we were supposed to take over
10   and try and help control.
11   '        And he wanted us to do limited services
12   merely to get them to move back into the house because
13   his father-in-law was pressuring him daily and
14   emotionally inflicting a tremendous amount of pain,
15   which he acknowledged to me, because they needed to be
16   in the house one way or another, whether things got
17   fixed or not, whether they were completely identified
18   or not.
19        The project became something entirely
20   different, but it was not what was initially composed
21   in the LPS agreement and therefore he was relying on
22   the law firm to compress the time frame to get the
23   information on York prepared to turn it over to the
24   legal counsel in Connecticut we identified and put him
25   in touch with so he could sue York.  That's what

Page 116

1   happened in the limited few months of our retention.
2        Q.  Finished?
3        A.  Complete.
4        Q.  Okay.  Is your testimony that Project
5   Solutions did not submit any invoices to the
6   Nusseibehs pursuant to work that it performed on
7   behalf of the Nusseibehs pursuant to the Project
8   Solutions agreement we've marked as Exhibit F?
9        A.  To my knowledge, based on dealings with the
10   litigation with the Nusseibehs, their only invoices
11   that I was shown and that I knew went out to them
12   under the letterhead, under the invoices of LePatner &
13   Associates and the non-legal personnel who provided
14   those services were under my direct supervision and
15   our -- and their -- their time spent was
16   particularized in the invoices of the law firm.
17        Q.  We can do this a number of different ways.
18   I'll ask it a different way then.
19        Is it your testimony that Project Solutions
20   did not submit invoices for work at Project Solutions
21   did on behalf of the Nusseibehs pursuant to the
22   Project Solutions agreement marked as Exhibit S -- F?
23        A.  To my knowledge, I have never seen -- I am
24   unaware, let me say it that way, of any invoicing from
25   Project Solutions to the Nusseibehs.  I'm unaware of

Page 117

1   it.
2        Q.  Is it your testimony that every invoice that
3   was submitted to the Nusseibehs for payment was for
4   the provision of legal services in connection with
5   this project?
6        A.  That is my statement.  That is correct and
7   those were issued -- those were the services invoice
8   by LePatner & Associates.
9        Q.  Let's move on.
10        Isn't it true that the Nusseibehs could not
11   point to any alleged legal malpractice against
12   LePatner & Associates and admitted as much in their
13   deposition in the underlying action?
14        MR. SALISBURY:  Objection; lacks foundation.
15   Go ahead and answer.
16        THE WITNESS:  No.  No.  To the very end,
17   they were arguing with us that just like you showed in
18   the complaint, that both LPS and L&A breached by not
19   doing the following one, two, three, four, five, six.
20   It was --
21        MR. STOLTZ:  Do you --
22        THE WITNESS:  -- their contention.
23        MR. STOLTZ:  Okay.  Can you pull this
24   document down and, Neil, if you can pull up
25   RSUI_000934.

Barry Lepatner
November 22, 2021

Page 118

1      What are up to, Vivian?

2          THE COURT REPORTER:  This will be L.  Wait.

3  No, I'm sorry.  This will be M.  Excuse me.

4          (Exhibit M marked for identification.)

5  BY MR. STOLTZ:

6      Q.   I'm showing you what has been marked as

7  Exhibit M and this is an email from Jody Cappello to

8  Katherine Dowling and RSUI dated October 16th, 2018,

9  and the subject line is LePatner and Associates LLP

10  and it lists the claim number there and lists the

11  claimant as the Nusseibeh.

12          And do you see that?

13      A.   I've never seen this before.  I'm not copied

14  on it, and I've never furnished a copy of this.

15      Q.   Who is Jody Cappello?

16      A.   He was the appointed counsel who was

17  defending LePatner & Associates and LPS in the

18  underlying litigation with the Nusseibehs.

19      Q.   Now, I know you weren't on this email, but

20  you do see in the second sentence in the email where

21  Mr. Cappello states, quote, "Last week we conducted

22  the depositions of the Claimants," meaning the

23  Nusseibehs, and he stated, quote, "Notably, they could

24  not point to any alleged legal malpractice and

25  admitted as much (in laymen's terms)."  Do you see

Page 119

1  that?

2      A.   I see it stated there, yes.

3      Q.   Now, does that refresh your recollection at

4  all that the Nusseibehs could not point to any alleged

5  legal malpractice against LePatner & Associates and

6  admitted as much in their deposition?

7          MR. SALISBURY:  Objection, lacks foundation.

8          THE WITNESS:  All the --

9          MR. SALISBURY:  Go ahead.

10          THE WITNESS:  All the services performed for

11  the Nusseibehs were performed under the aegis of the

12  law firm.  Any claim they --

13  BY MR. STOLTZ:

14      Q.   (speaking simultaneously) --

15      A.   -- had was a claim against the law firm.

16      Q.   Well, that's now what they're alleging in

17  the complaint they filed against LePatner & Associates

18  and Project Solutions, correct?  They sued Project

19  Solutions and LePatner & Associates separately, am I

20  right?

21      A.   They -- no, you -- you read from their

22  complaint, and they were suing us jointly.

23      Q.   Well, let's go up and take a look at the

24  complaint again.

25      A.   It says both LPS and L&A breached (speaking

Page 120

1  simultaneously) --

2      Q.   No, my question is -- maybe we're not

3  talking -- maybe we're talking past each other.

4          My question is:  They were named as separate

5  defendants, correct?  Project Solutions and LePatner &

6  Associates?

7      A.   Correct.

8      Q.   Okay.

9          MR. STOLTZ:  You can take down this

10  document.

11  BY MR. STOLTZ:

12      Q.   Do you recall in the underlying action that

13  the legal malpractice claims against LePatner &

14  Associates were never really pursued by the Nusseibehs

15  and that discovery and the underlying action focused

16  on the acts and omission of Project Solutions?

17          MR. SALISBURY:  Objection; lacks foundation.

18  Go ahead.

19          MR. STOLTZ:  You can take this document

20  down, Neil.

21          THE WITNESS:  Where would -- where -- what

22  would be the basis for you to make that conclusion?

23  Did you talk to the claimant or their attorneys?  To

24  the very end of that case being resolved, that legal

25  malpractice claim was a matter of record.  It had

Page 121

1  never been dismissed.  And for anybody to contend

2  otherwise, they just don't understand what they were

3  reading, because there was never an issue but that we

4  were under the gun, preparing for trial, and faced

5  legal malpractice claims.

6  BY MR. STOLTZ:

7      Q.   Did the Nusseibehs retain an expert on legal

8  malpractice?

9      A.   I don't -- I don't recall.

10      Q.   Did the Nusseibehs retain any experts in the

11  underlying action?

12      A.   I'm sorry.  You're not clear.

13      Q.   Sorry.  It's my -- my cheap headphones here.

14          Did the Nusseibehs retain any experts in the

15  underlying action?

16      A.   I only remember -- they may have had several

17  for different parts of the claim.  I know they had

18  various experts and we were prepared to take the

19  depositions.  I'm -- I'm not sure who it was.

20      Q.   And do you recall who the experts -- or

21  withdrawn.

22          Do you recall whether or not the experts

23  were related to the legal malpractice claim against

24  LePatner & Associates or were they related to the

25  project management services provided by Project

Barry Lepatner
November 22, 2021

Page 122

1 Solutions?

2        MR. SALISBURY:  Objection; lacks foundation.

3        THE WITNESS:  No.  I don't know.  I don't

4 know that we were prepared to defend every one of

5 those statements or claims that they made and defend

6 them vigorously because we opposed the entire essence

7 of their complaint from the day it was issued.

8        MR. STOLTZ:  Neil, can you pull up

9 RSUI_001421.

10        I'm showing you an email that's been marked

11 as Exhibit N.

12        (Exhibit N marked for identification.)

13 BY MR. STOLTZ:

14     Q.    And this is an email from Jody Cappello to

15 Robert Orr at RSUI dated February 4th, 2020, and the

16 subject line is LePatner & Associates LLP, and it

17 lists the claim number, and the claimant is listed as

18 Nusseibeh.

19        And I know you weren't copied on this email,

20 but do you see the to, from, and date, and the subject

21 line listed?

22     A.    I see what's on the screen.

23     Q.    Okay.  And --

24     A.    Go ahead.

25     Q.    -- the next sentence -- well, I should say,

Page 123

1 six sentences down in an email, do you see where

2 Mr. Cappello states, "The claims against him," meaning

3 Barry LePatner, "as attorney have never taken off."

4        Do you see that?

5     A.    Yes.

6     Q.    And then the next sentence states, quote,

7 "Counsel has not obtained a requisite expert and has

8 not significantly explored or argued those claims."

9        Do you see that?

10     A.    Yes.

11     Q.    And then the next sentence after that

12 states, "The discovery in this case has focused on the

13 act/omissions taken by your Insured's construction

14 consulting business.

15        Do you see that?

16     A.    Yes.

17     Q.    Now, does any of this refresh your

18 recollection that the Nusseibehs were not really

19 pursuing a legal malpractice claim against LePatner &

20 Associates and that the underlying action was,

21 instead, focused on the acts of Project Solutions?

22     A.    Are you arguing for the insurer who was

23 looking to disclaim coverage?  Because I'm telling you

24 that when the Nusseibehs did not go forward with the

25 LPS project management agreement, they were going

Page 124

1 after the law firm for the activities that we provided

2 that they claim were construction related.

3        I don't care who doesn't want to understand

4 that, but we understood that we faced that exposure

5 during a trial that was contemplated.  And anybody who

6 doesn't understand where we saw the risks that the law

7 firm could be brought -- brought to trial, and they

8 could try to prove those construction-related claims

9 against our law firm, doesn't understand what happened

10 in this case.

11     Q.    Experts that were disclosed by the

12 Nusseibehs in underlying action were only engineering

13 experts, correct?

14        MR. SALISBURY:  Objection; asked and

15 answered.  Go ahead.

16        THE WITNESS:  I'm not sure.  I think they

17 were construction experts as well.

18 BY MR. STOLTZ:

19     Q.    Were they legal experts?

20     A.    I -- as I say, I don't know all of the

21 experts that were produced by them.

22     Q.    And the experts that were disclosed by

23 LePatner & Associates and Project Solutions, were they

24 experts that opined with respect to issues of legal

25 malpractice?

Page 125

1     A.    Well, no, the experts -- the experts that we

2 hired were covering one of the largest areas of the

3 claim who was related to the MEP issues of this claim,

4 which they went into as one of the -- one of the areas

5 in great -- in great efforts to prove liability for

6 LePatner & Associates and LPS.

7        MR. STOLTZ:  Will you read back that last

8 answer?  I'm sorry.

9        THE COURT REPORTER:  Sure.  One moment.

10        MR. STOLTZ:  Kind of broke up there.

11        THE COURT REPORTER:  Uh-huh.

12        MR. STOLTZ:  Actually read back the question

13 and the answer, please, Vivian.

14        THE COURT REPORTER:  One moment.

15        (The previous question and answer was read

16 back.)

17 BY MR. STOLTZ:

18     Q.    What is the MEP issues that you're referring

19 to in that answer?

20        THE COURT REPORTER:  I'm sorry.  Can you

21 repeat that, Counsel?  I -- I didn't hear the

22 question.

23        THE WITNESS:  Neither of us heard it.

24 BY MR. STOLTZ:

25     Q.    Okay.  What is the MEP issue that you

Barry Lepatner
November 22, 2021

1  referred to you in your answer just now?

2      A.  MEP, mechanical, electrical, and plumbing

3  issues, were a big part of what the claimants

4  pointed to and that is we quickly ascertained that there were

5  major problems with work done by York on those

6  systems, which include HVAC, HV like in Victor, AC,

7  heating, ventilating, and air conditioning, and

8  mechanical problems, electrical problems, and plumbing

9  problems regarding the heating systems and the duct

10  systems throughout the house.

11      We, with the Nusseibehs approval, hired an

12  engineer.  LePatner hired an engineer who came in and

13  identified that the reasons we weren't getting heat in

14  this huge house, and it was affecting the painting and

15  it was affecting the woodworking and having tremendous

16  problems throughout all the work, was that they

17  installed an expensive boiler and put ducts, heating,

18  air conditioning ducts, throughout the house, that

19  were totally wrong for this installation.

20      Not only that, but they wrongly connected up

21  the piping into the heating system such that we came

22  to realize, and were told we had to evacuate the

23  house, because they had run the gas lines right

24  adjacent to the open flame of the boiler and it could

25  explode at any moment.  This was what one of the

1  things that York had done so disastrously for the

2  Nusseibehs.

3      We immediately took steps to disengage that

4  system.  Everybody stopped everything else and once we

5  had disconnected the heating system, we had to go out

6  and arrange for a replacement but for to do that, the

7  engineers had to figure out what would be an

8  appropriate replacement.

9      So that became a big issue because we

10  recommended a system and we told them we'd have to

11  replace many of the ducts throughout the house and the

12  Nusseibehs went something short of berserk because

13  they said that would prevent us from moving back in on

14  our scheduled date of March 15th, which we kept

15  telling them was unrealistic because we kept finding

16  one problem after another problem.

17      And we had to work out a solution around all

18  of their crazy responses, which showed a disdain for

19  doing the right job for this $12 million mansion that

20  they wanted at any -- at any price, at any cost to get

21  in, immediately, whether or not things got done

22  correctly, which created tremendous tensions

23  throughout the project.  That's where we, the law

24  firm, had to intervene.

25      I had to have many conferences with Jamal

1  and Julia, telling them the seriousness of the nature,

2  how if they had been in the house, there was every

3  likelihood the boiler would have exploded causing

4  tremendous damage and maybe loss of life and we, the

5  law firm, had to recommend the remedial work with the

6  engineers that we had retained.

7      So there was never a doubt that all of these

8  recommendations, and I personally had to be there, and

9  I was there once a week at least, that this was the

10  law firm giving recommendations to them in furtherance

11  of the damages they incurred from York, the forensic

12  analysis we were putting together to make the claims,

13  and the recommendations for getting new work that

14  would have been part of the damages completed to put

15  the house in order.

16      Q.  Are you finished?

17      A.  Yes.

18      Q.  Is it your testimony that all of the work

19  that you just described in your previous answer, were

20  legal services performed on behalf of a client as an

21  attorney?

22      A.  As set forth on our website and as they

23  requested.  They had Barry LePatner and his team from

24  LePatner & Associates there to address the myriad of

25  these issues, to put them into a framework for a legal

1  claim against York, and to hand it over to the Wiggin

2  and Dana law firm, which we put Jamal in touch with,

3  with a partner there, a litigation partner --

4      Q.  What would you testify --

5      A.  -- to carry forth --

6      Q.  Mr. LePatner, you're now repeating yourself

7  in response to my answers -- to my questions.

8      Let me ask a different question:  All the

9  work that you just testified to two answers ago, is it

10  your testimony that the work that was performed was

11  not pursuant to the Project Solutions agreement that

12  we've marked as Exhibit F in this case?

13      A.  I've so testified, yes.  I never invoiced --

14      Q.  Is it your testimony -- just this is very

15  important.  I want to make sure I get this exactly

16  clear now.

17      Is it your testimony that all the work that

18  you just testified to a couple of answers ago, in that

19  very long response, regarding retaining an engineer

20  and reviewing the duct work and dealing with the HVAC

21  system, all of that work, were legal services provided

22  by --

23      A.  Yes.

24      Q.  -- a law firm?  Just -- listen to my

25  question now.  Those were legal services provided by a

Barry Lepatner
November 22, 2021

Page 130

1  law firm?  I just want to make sure we're clear.

2      A.   Listen carefully.  For 40 years, that is

3  what --

4      Q.   That's -- excuse me -- that --

5           MR. SALISBURY:  Whoa, whoa, let him finish.

6           THE WITNESS:  I'm sorry.  I'm going to

7  answer it and then you can object.

8           For 40 years, LePatner & Associates has

9  provided precisely those services for countless

10 clients who I could march and parade in front of RSUI

11 ad nauseum who would say --

12 BY MR. STOLTZ:

13     Q.   I'm asking the Nusseibehs.  I'm not --

14     A.   -- what --

15     Q.   -- asking about 40 years of work that --

16 that's been done.

17     A.   Yes, the answer is to your question is --

18     Q.   I'm sorry to interrupt you, Mr. LePatner,

19 but you're not --

20     A.   -- yes.

21     Q.   -- answering my question.

22          THE COURT REPORTER:  I'm sorry.  I need one

23 at a time, please.

24 BY MR. STOLTZ:

25     Q.   You're not answering my question.  My

Page 131

1  question is very simple.  The work that you testified

2  that was performed for the Nusseibehs, you just gave a

3  very long answer, is it your testimony that that was

4  all legal services performed by a client or performed

5  for a client by an attorney, by LePatner & Associates?

6           MR. SALISBURY:  And I'm going to ask you not

7  to interrupt him when he answers, please.

8           MR. STOLTZ:  Okay.  As long as he gives me a

9  responsive answer.  You know, he's filibustering with,

10 you know --

11          MR. SALISBURY:  It -- oh, come on, let's not

12 do this.

13          MR. STOLTZ:  Okay.  Fine.

14          THE WITNESS:  LePatner & Associates provides

15 legal and business advisory services to clients who

16 own construction projects.  There isn't a day, a week

17 that goes by that I am not discussing highly technical

18 issues of design and construction with clients, that

19 are no different than the ones I discussed with the

20 Nusseibehs in terms of the technical problems they

21 encountered, which is precisely what we advertise on

22 our homepage and it's precisely what the Nusseibehs

23 asked of me, not of LPS.  They asked me to provide,

24 and all those services related to the MEP problems

25 they experienced is what I advised on and gave them

Page 132

1  advice and I never changed my hat.  I was counseling

2  them based on my experience what the solutions should

3  be.

4           MR. STOLTZ:  Neil, can you pull up the

5  Invoice 37982, please.  We'll take this document down.

6           We'll mark this as Exhibit O.

7           (Exhibit O marked for identification.)

8           THE COURT REPORTER:  Yes.

9           MR. STOLTZ:  Vivian?  Okay.

10          THE COURT REPORTER:  Yes.

11 BY MR. STOLTZ:

12     Q.   Mr. LePatner, this is a March 31, 2014,

13 invoice, and it's for Jamal and Julia Nusseibeh and

14 the Re: is Phase 2 - Project Oversight/Completion.

15          Looking at the first entry, March 1, 2014,

16 from Francisco Rivera, it reads "Punchlist

17 review/update," correct?

18     A.   Yes.

19     Q.   Is it your testimony that that is legal

20 services provided by an attorney for a client?

21     A.   Not by an attorney, by this law firm, to

22 countless clients.

23     Q.   Okay.  Let me rephrase the question.

24          Is it your testimony that the March 1st,

25 2014, entry from Francisco Rivera, which states in the

Page 133

1  narrative, "Punchlist review/update," are legal

2  services provided by LePatner & Associates?

3      A.   The Nusseibehs requested that I provide them

4  a list of certain rooms that were almost ready for

5  them to consider complete.  At my direction, Francisco

6  Rivera was at the site, prepared that punch list, some

7  of which had been done previously, but he updated it,

8  and he prepared that for me to give to the client at

9  their request for information they wanted, correct.

10          MR. STOLTZ:  Can you go, Neil, to Page --

11          THE WITNESS:  Why don't you look at the

12 second entry, that's a better one, because it proves

13 the point I was making.

14          MR. STOLTZ:  Can you go to the second page?

15 There is an entry for a March 5th, 2014.

16 BY MR. STOLTZ:

17     Q.   Do you see the entry for March 5th, 2014,

18 there?

19     A.   Yes.

20     Q.   And who is BBL?

21     A.   I'm sorry.  Oh, BBL.  It's yours truly.

22     Q.   That's you?  Barry LePatner?

23     A.   Barry Bruce LePatner.

24     Q.   Excuse me.  Then it states -- the narratives

25 states, "Site Visit and meetings with all subs re

Barry Lepatner
November 22, 2021

1  completion of work by Friday; preparation and review
2  of scope of work for mechanical contractor and review
3  of engineering scope for replacement of HVAC system;
4  review of basement area for dangerous pipes and scope
5  of removal; preparation of report to client."
6        Did I read that correctly?
7     A.  Yes.
8     Q.  And the amount of hours is five hours,
9  correct?
10    A.  I was at the site all that time, yes.
11    Q.  Is it your testimony that the work reflected
12  in this entry for March 5th, 2014, for work that you'd
13  performed were legal services performed by an attorney
14  for a client?
15    A.  No.  They were business advisory services of
16  a construction lawyer who was tasked by the client to
17  provide these kinds of services in order to solve
18  their business problem and it is what I do every day,
19  of every month, of every year, and when we get off
20  this phone call -- this deposition, there are five
21  clients waiting for me to answer very similar
22  questions that they have on their projects because
23  they want my advice.  Yes, sir.
24    Q.  Do you perform any services as an attorney?
25    A.  Shame on you and your underwriting

1  department for not having asked those questions when
2  they agree to write a policy of errors and omissions
3  insurance --
4     Q.  Move to strike --
5     A.  -- for my law firm.
6     Q.  -- move to strike the non-responsive answer.
7        My question is simple.  Were you performing
8  the services reflected on March 5th, 2014, in this
9  invoice that we have up, which is exhibit --
10       MR. STOLTZ:  What is it, Vivian?
11       THE COURT REPORTER:  This is Exhibit O.
12  BY MR. STOLTZ:
13    Q.  Exhibit O.  Is it your testimony that you
14  were performing these services in your capacity as a
15  lawyer?
16    A.  The simple answer is yes.  It's what I do.
17    Q.  Okay.  Go down to March 11th, 2014.  And
18  there is a number of different entries there.  The
19  first one is yours, correct?
20    A.  Correct.
21    Q.  And it states, "Attendance at residence to
22  meet this trades; telephone conversation with bathroom
23  slab sub and delivery dates; preparation of response
24  to Jamal questions."  You see that?
25    A.  It's right there, yes.

1     Q.  And it's for three hours, correct?
2     A.  That's correct.
3     Q.  Is it your testimony that you performed all
4  of the work reflected in this entry in your capacity
5  as an attorney?
6     A.  It was performed in my capacity as the
7  construction adviser to the Nusseibehs who had invited
8  me to look at the totality of all of their
9  construction problems caused by York.  Identify them,
10  talk with people on how to correct them, get a price
11  for all of this that the Nusseibehs could approve, and
12  put it down as one of the damage of many for the
13  destruction that York had done to their very expensive
14  house, yes, or otherwise --
15    Q.  Can you repeat the --
16    A.  -- Jamal would have said to me -- would have
17  said to me, "What the hell are you looking at that
18  for?  I didn't ask you to do that."  Just the
19  opposite.  He wanted the answers to all of these
20  questions and thousands of others that involve his
21  house that had been destroyed, in large part, by these
22  marauders who preceded us.  And we choose -- he chose
23  not to sue.
24    Q.  Is it your testimony that the work reflected
25  in this entry from you are legal services?

1     A.  I just explained.
2        MR. SALISBURY:  Objection; asked and
3  answered.
4        MR. STOLTZ:  No, that wasn't the same.  We
5  could lead back the last question and answer, Carl,
6  and you'll see that it's not the same question.  My
7  first question was whether he asked the question --
8  whether he performed this work -- his work in his
9  capacity as a lawyer and --
10       MR. SALISBURY:  Fair enough, fair enough.
11       THE WITNESS:  As the lawyer hired by the
12  Nusseibehs, in order to determine the nature or extent
13  of the damages caused by York, put them into definable
14  claims, determine the damages ultimately that the
15  Nusseibehs would be allowed to pursue against them, I
16  need to know all the answers to every one of these
17  design and construction problems, and I do, and I
18  learned them, and I communicated them to Jamal and his
19  wife.  As -- as --
20  BY MR. STOLTZ:
21    Q.  So it's your --
22    A.  -- the lawyer and for which he paid me.
23    Q.  So it's your testimony that the work you
24  performed on this project was strictly legal in nature
25  and that you did not -- and that neither LePatner &

Barry Lepatner
November 22, 2021

Page 138

1  Associates nor Project Solutions performed any project
2  management work pursuant to the Project Solutions
3  agreement?
4      A.  Precisely.
5      Q.  Okay.  So if you scroll down, there is an
6  entry from Francisco Rivera and it's for six and a
7  half hours.  Do you see that?
8      A.  Yeah.  Yes.
9      Q.  And it reads, "Basement Design
10 Coordination;" colon (sic), "Garage plan coordination,
11 shower tile coordination; wine cellar coordination;
12 Foam insulation proposal coordination; site visit
13 coordination."
14     Do you see that?
15     A.  Yes.
16     Q.  Is it your testimony that the work reflected
17 in that entry are legal services?
18     A.  In order for me to put the claim together
19 against York, we had countless problems down in the
20 basement, in the garage, and in some of those areas
21 that we had to figure out what was wrong and how much
22 it would cost to correct that and bring it under the
23 various line items of claim against York.  If I
24 haven't -- didn't direct Francisco to do this work, we
25 would have failed to complete our assignment that the

Page 139

1  Nusseibehs asked us to do.
2      Q.  Again, Francisco is not an attorney, right?
3  We can agree to that?
4      A.  We have frequently agreed to that during
5  this course of this discussion.
6      Q.  And -- okay, let's scroll down to an entry
7  from March 13, 2014, and it -- it's an entry from you
8  and it's for four hours -- four and a quarter hours,
9  and the first entry in this -- or the first task in
10 this entry is "Telephone conversation with shade
11 vendor delivery."
12     Do you see that?
13     A.  Yes.
14     Q.  Can you explain to me how that, in your
15 testimony, is legal services provided by an attorney?
16 How telephone conversations with a shade vendor
17 regarding delivery are actually legal services
18 provided by an attorney?
19     A.  Sure.
20     Q.  Can you explain that?
21     A.  Sure.  For many, many thousands of dollars,
22 ten -- maybe tens of thousands of dollars of the claim
23 against York was that they were calling up vendors and
24 ordering things for other projects under the guise of
25 getting the Nusseibehs to pay them, because nobody was

Page 140

1  paying attention, at that time, to what was being paid
2  for.  And for this, and his other references to
3  hardware, there is other references to doors and
4  windows, we had a major task to figure out from
5  invoices that we got from York, which ones were
6  properly chargeable to this project, that the
7  Nusseibehs should pay for, and which ones they had
8  paid for which were in -- were intended by York to be
9  used on other projects.
10     So it was a major part of our investigation,
11 and we work closely with Dan Rosen, the accountant of
12 the Nusseibehs, who had been paying out these checks
13 to also sorts of vendors that York had said was
14 approved and nobody was doing their due diligence.  So
15 we have to clean up the mess of this.
16     And as each of these arose from month to
17 month and they constantly arose because you'll see
18 further down one -- two lines down, LED lighting
19 coordination manufacturer, there were, again, some of
20 them Francisco handled.  Some of them I had to get on
21 the phone.  Some I had to review the invoices with the
22 accountants.  This was ongoing and a major damage item
23 against York.  That was requested for us to do by the
24 Nusseibehs.  How much had they improperly paid out?
25     Q.  All the work reflected in this invoice we've

Page 141

1  been looking at, it's your testimony here today that
2  these are all legal services, correct?
3      A.  Of course.  We're putting a legal claim
4  together against York.  Who else --
5      Q.  And --
6      A.  -- who else, but someone knowledgeable about
7  construction, could put this claim together?
8      Q.  And if you go up to the first page of this
9  invoice, it reflects that all of these invoices -- all
10 these entries were with respect to Phase 2 project
11 oversight, slash, completion, correct?
12     A.  That's a good -- that's a good generic
13 heading, yes.
14     MR. STOLTZ:  Okay.  You can take the
15 document down.
16     THE WITNESS:  Your mother just called, she's
17 telling me to remind you not to squint.
18     MR. STOLTZ:  My mom passed away three days
19 ago in 2015.  I'm glad you find it funny.
20     MR. SALISBURY:  I don't think he heard you,
21 Patrick.  I heard you, but I don't think he did.
22     MR. STOLTZ:  Okay.
23 BY MR. STOLTZ:
24     Q.  Go through -- let's see -- do you recall
25 that RSUI agreed to pay for half of the costs of the

Barry Lepatner
November 22, 2021

Page 142

1  expert fees in the underlying case?
2      A.  Yes.
3      Q.  And that's despite the fact that the expert
4  retained did not opine on any issues related to be
5  malpractice; isn't that correct?
6          MR. SALISBURY:  Objection; lacks foundation.
7          THE WITNESS:  I'm -- I don't agree with
8  that.
9  BY MR. STOLTZ:
10     Q.  Okay.  What don't you agree with there --
11 with respect to that?
12     A.  Because all of the things that they were
13 defending us were, I'm sorry, independently
14 investigating to potentially be experts for us related
15 to the kinds of services that you saw, and we just
16 discussed, under my legal services invoice.
17     Q.  We can agree, at least, that RSUI agreed to
18 pay for 50 percent of the legal -- of the expert fees,
19 correct?
20     A.  I've never seen the totals, but I'm told
21 that.
22     Q.  Okay.
23         MR. STOLTZ:  Neil, if you can pull up the
24 expert disclosures.  Why don't we start with the one
25 from Russell Knuth?  Pronouncing his name correctly.

Page 143

1          Mr. LePatner, I'm showing you a document
2  that we will mark as Defendant's Exhibit --
3          THE COURT REPORTER:  P.
4          MR. STOLTZ:  -- P.  See I'm not losing it
5  too much here.
6          (Exhibit P marked for identification.)
7  BY MR. STOLTZ:
8      Q.  Which is "Defendants LePatner Project
9  Solutions, LLC and LePatner & Associates, LLP's
10 Disclosure of Expert Witness."
11         Do you see this document?
12     A.  I see it in front of me.
13     Q.  And have you seen this document before
14 today?
15     A.  No.
16     Q.  Well, can we agree that this is Defendant
17 LePatner Project Solutions and LePatner & Associate's
18 expert witness disclosure in the underlying case or
19 one of them?
20     A.  Could you scroll up so -- could you scroll
21 up so I can see the (speaking simultaneously) --
22     Q.  Sure.  Yeah, and take your time and review
23 the entirety of the document, if you need to, to
24 answer my question.
25     A.  Okay.  I will agree that that was -- oh,

Page 144

1  there is more, hold on.  No, that's it.
2      Q.  (speaking simultaneously) --
3      A.  I -- I will agree that was filed on -- on
4  behalf of both LePatner defendants.
5      Q.  Okay.  Now, if you can scroll up.
6          The first paragraph states, "Pursuant to
7  Conn. Practice Book § 13-4(4), the Defendants,
8  LePatner Project Solutions and LePatner & Associates,
9  LLP, hereby disclose the following expert witness who
10 may be called to testify at the time of trial in
11 person or through documented opinions:" And then it
12 reads, Russell Knuth, K-n-u-t-h, Consulting
13 Engineering Services, 811 Middle Street, Middletown,
14 Connecticut.  Do you see that?
15     A.  Yes.  He was the expert I hired.
16     Q.  Okay.  Mr. Knuth is a PE, correct?
17     A.  He's a licensed professional engineer in the
18 state of Connecticut.
19     Q.  And Consulting Engineering Services is his
20 engineering firm, correct?
21     A.  That is his firm.  He's the principal of it.
22     Q.  Can you point to where in the substance of
23 facts and opinions -- well, withdrawn.
24         As a professional engineer, Mr. Knuth,
25 cannot opine on whether LePatner & Associates met the

Page 145

1  duty of care applicable to attorneys, correct?
2      A.  Oh, I don't -- I don't think he opined on
3  that at all.  That's not what we asked him to do.
4      Q.  Well, what was the scope of what you asked
5  him to opine on?
6      A.  Based on your inspection, tell us just how
7  bad the mechanical, electrical, plumbing, and HVAC
8  systems installed by York were in the Nusseibeh
9  residence and what remedial steps needed to be taken
10 and how much do you think is a reasonable cost to do
11 all this.
12     Q.  Can we agree that Mr. Knuth is not providing
13 an expert opinion regarding any legal malpractice
14 claims against LePatner & Associates?
15     A.  Specifically, he was not asked to provide
16 any opinion on that subject.
17         MR. STOLTZ:  Okay.  You can take this down.
18 Can you bring up, Neil, the expert disclosure of
19 Charles Martorana?
20         We'll mark this as Exhibit Q.
21         (Exhibit Q marked for identification.)
22 BY MR. STOLTZ:
23     Q.  And, Mr. LePatner, this is another expert
24 disclosure on behalf of LePatner & Associates and
25 Project Solutions in the underlying action.  Do you

Barry Lepatner
November 22, 2021

Page 146

1  see that?

2      A.  Yes.

3      Q.  And this expert disclosure is of Charles F.

4  Martorana, P.E., correct?

5      A.  That is correct.

6      Q.  And Mr. Martorana is a professional

7  engineer, correct?

8      A.  Yes, he is.

9      Q.  And Mr. Martorana was not retained to

10 provide any expert witness or any expert opinion

11 regarding the legal malpractice claims against

12 LePatner & Associates, correct?

13     A.  He was retained to testify that the LePatner

14 & Associates defendants, both the law firm and LPS did

15 not reach the applicable standard of care with respect

16 to the specifics of the items he was asked to review.

17     Q.  Okay.  So there is a subheading.  It says

18 "Substance of Facts and Opinions."  Can you show me

19 exactly where Mr. Martorana is providing an expert

20 opinion concerning the applicable standard of care for

21 attorneys or any opinion regarding the legal

22 malpractice claims?

23     A.  This law firm, LePatner & Associates

24 undertook to understand and analyze major elements of

25 work that York had performed, electrical, mechanical,

Page 147

1  plumbing --

2      Q.  Where are you reading from?

3      A.  That's what he says right here, "With

4  respect to some or all of the items claimed by the

5  Plaintiffs."  He's expected to testify the LePatner

6  defendants properly considered and evaluated all

7  necessary and relevant facts, circumstances,

8  documents, codes, regulations and requirements when

9  performing their services on the project.

10         He was going to, and did, endorse the proper

11 coordination of all of our efforts in the best

12 interest of the plaintiffs and refute the claims in

13 the complaint against LePatner & Associates and LPS

14 who didn't perform any services.

15     Q.  Is there anywhere else in the substance of

16 facts or opinions that you believe Mr. Martorana is

17 providing an expert opinion regarding the standard of

18 care applicable to attorneys and/or with respect to

19 legal malpractice claims?

20         MR. SALISBURY:  Objection.  Go ahead.

21         THE WITNESS:  He was never asked to provide

22 such an opinion.

23 BY MR. STOLTZ:

24     Q.  Okay.  I just -- okay.  So it -- just to

25 make sure we're on the same page here, Mr. Lepatner,

Page 148

1  is it correct that Mr. Martorana was never asked to

2  provide an expert opinion regarding the legal

3  malpractice claims against LePatner & Associates; is

4  that correct?

5      A.  I thought you just asked that question.  Am

6  I wrong?  Is that similar to the provider one?  You

7  just asked me a different way?

8      Q.  I'm ask -- if I was asking a different way,

9  I'll rephrase the question.  And I apologize if it was

10 asked and answered, but I want to be sure the record

11 is clear.

12     A.  Okay.

13     Q.  Was Mr. Martorana, P.E., retained to provide

14 an expert opinion regarding the legal malpractice

15 claims against LePatner & Associates?

16     A.  No.

17         MR. STOLTZ:  Okay.  Can you take this down?

18 Can you pull up the expert disclosure of Michael

19 Tracey?

20         And I know we -- Carl, I know we got to get

21 on a call soon.  So I'm going to try to --

22         MR. SALISBURY:  Yeah.

23         MR. STOLTZ:  -- wrap up this line.

24         Can we mark this as Exhibit R?

25         (Exhibit R marked for identification.)

Page 149

1          THE COURT REPORTER:  R, uh-huh.

2  BY MR. STOLTZ:

3      Q.  This is an expert disclosure on behalf of

4  LePatner Project Solutions and LePatner & Associates

5  of Michael Tracey, P.E.

6          Do you see that?

7      A.  Yes.

8      Q.  And he's affiliated with a company called

9  CED Technologies, Inc.  Do you see that?

10     A.  Yes.

11     Q.  And are those the experts obtained by

12 LePatner Project Solutions and LePatner & Associates

13 in the underlying action?

14     A.  Yes.

15     Q.  Were any other experts retained by LePatner

16 Project Solutions and LePatner & Associates in the

17 underlying action?

18     A.  I believe the one prior you mentioned,

19 Mr. Tracey, I believe there was a third, I could be

20 wrong, each of whom looked at different elements of

21 all of our services and each of whom gave an opinion

22 in support of the fact that we did not breach any

23 standards of care in providing those services.

24     Q.  Mr. Tracey is a professional engineer,

25 correct?

Barry Lepatner
November 22, 2021

Page 150

1    A.    Yes.

2    Q.    And he's not an attorney, correct?  We can
3  agree to that?

4    A.    That's my understanding.

5    Q.    Okay.  Was Mr. Tracey retained to provide an
6  expert opinion regarding the legal malpractice claims
7  against LePatner & Associates in the underlying
8  action?

9    A.    He was not hired to -- with the specifics of
10  looking at any legal issue whatsoever.

11    MR. STOLTZ:  Okay.  Can you take this down,
12  please?  And can you pull up the expert disclosure of
13  Abraham Warfel?

14  BY MR. STOLTZ:

15    Q.    This may have been the other person that you
16  were thinking of.

17    A.    Okay.  Thank you.  I wouldn't have
18  remembered his name.

19    Q.    Mr. LePatner, I'm showing you an expert
20  disclosure of Abraham Warfel, P.E. on behalf of
21  Project Solutions and LePatner & Associates.

22    You see this document?

23    A.    Yes, sir.  Yes, I'm familiar with it.

24    Q.    And your -- you've seen this expert
25  disclosure before?

Page 151

1    A.    Yes, I believe I -- I saw one of them, yes.

2    Q.    Okay.  Is Mr. Warfel -- withdrawn.

3    Was Mr. Warfel retained to provide an expert
4  opinion regarding a legal malpractice claims against
5  LePatner & Associates in connection with the
6  underlying action?

7    A.    I don't believe so.

8    MR. STOLTZ:  Okay.  You can take this down.

9  BY MR. STOLTZ:

10    Q.    Are you aware -- other than the legal mal-
11  -- sorry, withdrawn.

12    Other than the expert disclosures that we've
13  just gone through -- the four that we've just gone
14  through, are you aware of any other experts that were
15  retained by Project Solutions or LePatner & Associates
16  in connection with the underlying action?

17    A.    I gave a series of very highly regarded
18  lawyers who are familiar with our services to Mr.
19  Cappello, our legal counsel, to prepare them for
20  testimony at our trial.  I'm unaware, as I sit here
21  now, which, if any, he ever spoke to or prepared to
22  testify against any claim of legal malpractice in the
23  performance of my services for the Nusseibehs.

24    Q.    I'm really asking you to keep my question in
25  mind and answer the following question:  Are you aware

Page 152

1  of any other experts retained by Project Solutions or
2  LePatner & Associates other than the four experts we
3  just talked about previously?

4    A.    As I stated, I don't know if Jody Cappello
5  reached out and retained any of the lawyer experts
6  that I recommended who would be prepared to testify on
7  my behalf.  So you'd have to ask Mr. Cappello whether
8  he retained them, had their reports in reserve, and
9  chose to disclose or not disclose them to the
10  plaintiffs.

11    Q.    Are you aware of any other experts that were
12  disclosed to the plaintiffs other than the four
13  experts we just talked about previously?

14    A.    I -- I'm unaware of the full listing of
15  experts.  I know the ones you just referred to, but
16  I'm unaware of the full list of panel expert -- I'm
17  sorry -- experts who are going to be testifying.

18    MR. STOLTZ:  1:50, why don't we go off the
19  record?

20    (Off the record at 1:51 p.m.)

21    (On the record at 2:48 p.m.)

22    MR. STOLTZ:  Neil, can you pull up December
23  8th, 2020 letter from Wayne to Mr. LePatner.

24    Now, Mr. LePatner, I'm showing you what's
25  been marked as Defendant's Exhibit -- what are we up

Page 153

1  to now?

2    THE COURT REPORTER:  T as in Tom.

3    MR. STOLTZ:  T.

4    (Exhibit T marked for identification.)

5  BY MR. STOLTZ:

6    Q.    And this is a December 8th, 2020, letter
7  from Wayne Borgeest and Neil Fox at Kaufman Borgeest &
8  Ryan to you.

9    Do you recall receiving this letter?

10    A.    I -- I have to see it.

11    Q.    Take your time and read it.

12    A.    Go ahead.  Yeah, okay, I remember this
13  letter.

14    MR. STOLTZ:  Now, if you go to Page 2, Neil.
15  Right at the top there.

16  BY MR. STOLTZ:

17    Q.    Do you see where it states -- excuse me --
18  "On November 2, 2020, you," meaning Barry LePatner,
19  "sent an email to Rampart Insurance Services in which
20  you demand that Landmark pay $72,000 in purported
21  expert fees."

22    Do you recall sending that November 2, 2020,
23  email to Rampart Insurance Services?

24    A.    I remember I objected to paying those expert
25  fees and speaking to Rampart as my broker.  I may not

Barry Lepatner
November 22, 2021

Page 154

1  recall sending the November 2 letter, but I assume I
2  did if it says it.
3      MR. STOLTZ:  Neil, can you pull up
4  RSUI_000890?
5      I'm showing you what's been marked as, I
6  guess, Exhibit U.
7      (Exhibit U marked for identification.)
8  BY MR. STOLTZ:
9      Q.   And it's an email thread that if you go all
10 the way down, it starts with an email from you dated
11 November 2, 2020, to Rose Schneider and Gina Gerbino
12 at Rampart Insurance, and that beings at the second
13 page of the document and goes onto the third page.
14      Do you see that?
15      A.   Yes.
16      Q.   Again, I may have asked, but forgive me, but
17 who is Rampart Insurance again?
18      A.   My firm's insurance brokers.
19      Q.   Are they LePatner -- when you say your
20 "firms," are you referring to LePatner & Associates or
21 are you referring to Project Solutions or both?
22      A.   No, we didn't have insurance for Project
23 Solutions.  They represented LePatner & Associates and
24 secured the professional liability insurance for us
25 annually.

Page 155

1      Q.   Is Rampart -- earlier you testified that
2  Project Solutions currently does have -- or has, since
3  2019, procured errors and omissions insurance.  Was
4  that insurance procured with Rampart Insurance?
5      A.   Yes.
6      Q.   Okay.  Now, if you go to Paragraph No. 4, do
7  you see where you write, quote, "A portion of the
8  assessment was performed by LePatner & Associates LLP
9  employees, to wit, Brad Cronk and Francisco Rivera."
10 And then the next sentence states, "To repeat, these
11 two were employees of the law firm."
12      Do you see that?
13      A.   Yes.
14      Q.   Who is Brad Cronk?
15      A.   Oh, he was our project director and was the
16 senior person for all project services that we would
17 provide for our clients.
18      Q.   Now, earlier you testified that Francisco
19 Rivera was an honest and intelligent person.  Do you
20 recall that?
21      A.   Yes.
22      Q.   Are you aware that Francisco Rivera
23 testified under oath in the underlying action that he
24 was an employee of Project Solutions and paid by
25 Project Solutions?

Page 156

1      A.   He -- he was -- if he testified to that, he
2  was in error.
3      Q.   Well, let's pull up Mr. Rivera's transcript
4  from November 16th.
5      A.   If you say so, I'll accept.  I don't have to
6  read it.  But his pay stubs would not have -- to my
7  knowledge, would not have shown that he was paid by
8  anybody but -- as an employee of LePatner &
9  Associates.
10      Q.   Let's just pull it up and, you know, I'll
11 try to refresh your recollection and refresh you --
12      A.   I wouldn't -- you're not going to refresh my
13 recollection.  I never read his transcript, but if
14 it's there, I'm just telling you he's in error.
15      MR. STOLTZ:  Okay.  Can you go to Page 22,
16 Line 20?  And so we're at Page 22 -- oh, I'm sorry.
17 Let's mark this as an exhibit.  This would be
18 Exhibit V, correct, Vivian?
19      (Exhibit V marked for identification.)
20      THE COURT REPORTER:  Yes.  That's correct.
21      MR. STOLTZ:  V for Vivian?
22      THE COURT REPORTER:  Yes, that's correct.
23 BY MR. STOLTZ:
24      Q.   And this is a copy of Mr. Rivera's
25 deposition transcript in the underlying action,

Page 157

1  correct, Mr. LePatner?
2      A.   Oh, yes.
3      Q.   Now, if you go to the question and answer
4  that is on screen right now, Page 22, Line 20.  Do you
5  see where it states:
6  "Q  So are you familiar with LePatner &
7  Associates, the entity LePatner & Associates?
8  "A  Excuse me.  Yes, LePatner & Associates is a
9  separate, I guess, entity than the LePatner Project
10 Solutions, because I imagine there is legal aspects
11 and then there is a project management aspect, and I
12 was LePatner Project Solutions, and whatever
13 relationship is there is -- I'm on LePatner Project
14 Solutions."
15      A.   Uh-huh.
16      Q.   Do you see that?
17      A.   Yes.
18      Q.   Is that -- well, withdrawn.
19      MR. STOLTZ:  If you go to page 24, Line 25.
20 Can you scroll up?
21 BY MR. STOLTZ:
22      Q.   Okay.  So at the bottom of Page 24 on Line
23 25, it reads:  Question.  Okay.  But I'm asking if you
24 know the entity, -- it goes onto the next page -- that
25 actually pays you.

Barry Lepatner
November 22, 2021

1          And we're on line -- we're on Page 25 now:
2     "A   Project Solutions.
3     "Q   Project Solutions?
4     "A   I imagine whatever their bank situation is,
5  that I just -- you know, for me, that's what is
6  going --"
7          Does any of the testimony that we just went
8  through from Francisco Rivera change your testimony or
9  refresh your recollection as to whether or not
10 Francisco Rivera worked for LePatner & Associates or
11 Project Solutions?
12     A.   Absolutely not.  It's -- read below.  It
13 says, "You don't get a physical check?"  "No."  He
14 gets a direct payment.  And the only direct payments
15 that could ever be authorized was LePatner &
16 Associates.
17     Q.   Again, just to confirm, Francisco Rivera was
18 not providing legal services or advice to the
19 Nusseibehs, correct?
20     A.   Yes.
21     Q.   And but it's your testimony that Project
22 Solutions was providing legal services to the
23 Nusseibehs in connection with the project, right?
24     A.   That is not my testimony.  You just
25 mischaracterized it.  So I will repeat the answer.

1     Q.   Okay.  So is it correct -- let me just ask
2  the question.
3          Is it correct that Project Solutions was
4  providing legal services to the Nusseibehs in
5  connection with the project?
6     A.   They were providing no services to the
7  Nusseibehs who rejected that proposal.
8     Q.   Okay.  How were services billed to the
9  Nusseibehs by LePatner & Associates during the
10 project?
11     A.   You've been showing me the documents.  Our
12 -- our invoice is on the letterhead or the invoice
13 from LePatner & Associates and included the personnel
14 who are non-lawyers who were proceeding to provide the
15 services requested by the client under my direction.
16     Q.   Now, was the work -- was any work by Project
17 Solutions invoiced on LePatner & Associates
18 letterhead?
19     A.   No, the personnel who would have purportedly
20 provided LPS services, meaning in the field, were
21 always working through the auspices of the law firm
22 and when they were -- whether they were LPS name or
23 LePatner & Associates, their services were exactly the
24 same, dictated by my understanding of what was needed
25 to be provided in the field for satisfactory --

1  satisfactory performance, what the clients wanted.
2          THE COURT REPORTER:  Did we lose Carl?  Or
3  is he --
4          MR. STOLTZ:  I didn't even notice.  Carl?
5          THE COURT REPORTER:  I think he just -- he
6  just dropped off.
7          MR. STOLTZ:  Let's go off the record.
8          THE COURT REPORTER:  Yeah.
9          MR. STOLTZ:  Let's go off.
10         (Off the record at 2:59 p.m.)
11         (On the record at 3:14 p.m.)
12 BY MR. STOLTZ:
13    Q.   So Mr. LePatner, your testimony is that the
14 Project Solutions agreement that we marked as
15 Exhibit F, was repudiated or voided by the Nusseibehs;
16 is that correct?
17    A.   Yes.  It was vitiated by their unwillingness
18 to engage the services that were sent out in the
19 proposal.
20    Q.   And you also testified that there was no
21 agreement between LePatner & Associates and the
22 Nusseibehs for the provision of legal services,
23 correct?
24         MR. SALISBURY:  Objection.
25         THE WITNESS:  Other than they were -- yeah,

1  I'm sorry.
2          Other than -- other than --
3          MR. SALISBURY:  Objection; lacks foundation.
4  Go ahead.
5          THE WITNESS:  Other than their validation of
6  their retention of me as their lawyer as is repeatedly
7  shown through their correspondence, all the way to the
8  last emails that we wrote before our services we --
9  where we terminated our services and as payment of our
10 invoices every month.
11 BY MR. STOLTZ:
12    Q.   So if there was no -- withdrawn.
13         So if the Project Solutions agreement,
14 marked as Exhibit F, was vitiated or voided, as you
15 testified, and there was no written agreement between
16 the Nusseibehs and LePatner & Associates, as you
17 testified, what was the agreement pursuant to which
18 LePatner & Associates or Project Solutions was
19 performing work for the Nusseibehs in connection with
20 the project?
21    A.   Oh, there was no misunderstanding about what
22 the agreement was.  I had constant --
23    Q.   Explain to me what the agreement was.
24    A.   The agreement was what they instructed me to
25 do, after we understood they didn't want the project

Barry Lepatner
November 22, 2021

Page 162

1  services, that I was going to aid them in putting
2  together the claim against York in every detail for
3  all their items of damage, identifying the specific
4  claims that contractually, negligently, or whatever,
5  or fraudulently, could be developed so that it could
6  be passed off to Connecticut legal counsel chosen as
7  Wiggin and Dana who were going to prosecute York
8  Management and Development.
9       MR. STOLTZ:  I'm sorry, Vivian, can you just
10 repeat the last answer for me?
11      THE COURT REPORTER:  Sure.  One moment.
12      (The previous answer was read back.)
13 BY MR. STOLTZ:
14      Q.   Negligent or fraudulent claims that you're
15 referring to in your response there, that you were
16 developing, were those claims that were being
17 developed against York?
18      A.   Totally, yes, and their -- and their
19 principals.
20      MR. STOLTZ:  Okay.  Neil, can you turn back
21 to the -- to Exhibit F.  Can you go to Page 3,
22 "Phase III.  Reconciliation of Accounts with York"?
23 BY MR. STOLTZ:
24      Q.   So I'm showing you Exhibit F, which is the
25 Project Solutions agreement that we've been talking

Page 163

1  about.  And do you see "Phase III.  Reconciliation of
2  Accounts with York"?
3       A.   Yes.
4       Q.   Now, when you talk about developing claims
5  against York, isn't that the work that's being
6  referenced here in Phase III of the LPS agreement?
7       A.   This is re-putting into context the
8  discussions I had initially with the Nusseibehs to
9  identify the steps that we would be going through or
10 need to go through to prepare the claim and to secure
11 the documentation we needed, because these were people
12 that were not versed in construction.  They had no
13 full grasp of how they have been victimized by York
14 and I wanted to let them know that it was going to be
15 a complicated process and I used the proposal from LPS
16 to outline some of those steps as you see here.
17      Q.   Okay.  When you say it developed claims,
18 you're talking about developing claims against York,
19 correct?
20      THE COURT REPORTER:  I'm sorry.  Can you
21 repeat the question?  It just is coming through, like,
22 fuzzy.
23      MR. STOLTZ:  Oh, sorry.
24 BY MR. STOLTZ:
25      Q.   When you say developed claims, are you

Page 164

1  talking about developing claims against York, correct?
2       A.   That is correct.  The sole -- the sole
3  purpose of why we were retained was to give a roadmap
4  to the Nusseibehs on how to go after these people as
5  they began to realize they wasted over a million
6  dollars with them.
7       Q.   And the work performed in connection with
8  developing claims against York, that's the work that's
9  reflected here in Phase II, entitled "Reconciliation
10 of Accounts with York," correct?
11      A.   This is one aspect of it that we've
12 outlined.  You know, many, many aspects, but all of
13 them fell under that purview of preparing the claims
14 against the former construction manager.
15      MR. STOLTZ:  You can take this down, Neil.
16 BY MR. STOLTZ:
17      Q.   So the work that you're talking about in
18 terms of developing claims against York, that would
19 not be work that was performed in connection with
20 project completion or project oversight, correct?
21      A.   Oh, of course it would be.  In order to
22 determine the full nature and extent of the damages
23 that York caused, as we do on many projects, we're
24 asked to develop the framework for how to secure the
25 information for what money was wasted or what -- what

Page 165

1  property was damaged or what designs weren't followed,
2  all the way through the steps of talking about experts
3  who are going to help us determine those costs who
4  were going to be the experts to reject that work in
5  place, like, we brought in CES.  And finally, when we
6  have our arms around the totality of all of the
7  different items of damages, to put a complete number
8  on it so that the client knows what the full extent of
9  their claim -- various claims are against, in this
10 case, York.
11      Q.   So is it your testimony that whether it be
12 LePatner & Associates or Project Solutions, that there
13 was no work performed by any LePatner entity on behalf
14 of the Nusseibehs in furtherance of just completing
15 the project?  That it was all in connection with
16 asserting claims against York?
17      A.   Well, you keep asking different versions of
18 the same question.
19      Q.   Because I'm not getting the answer.  I'm
20 getting sort of a --
21      A.   But, no, you're not getting your arms around
22 the fact, and let me state it simply, once, to answer
23 your question and then if you don't understand it, you
24 can ask further questions.
25      LePatner Project Solutions is the entity

Barry Lepatner
November 22, 2021

Page 166

1  that LePatner & Associates uses for its non-legal
2  employees on projects that enable the law firm to help
3  its clients achieve their legal and business
4  objectives.  I am called in on failed projects, all
5  the time, several --
6       Q.   I -- I don't really care about your other
7  projects.  I'm talking about this project.
8       A.   This project is just like I've done it for
9  40 years or almost 40 years.
10       Q.   And again, I'm not asking you about 40 years
11  ago or 40 years' worth of projects.  I'm just asking
12  about this project in particular.  Just so that we
13  have a frame of reference here.
14       A.   Go ahead.  Ask your questions.
15       Q.   So I'm sorry, I'll withdraw the --
16            MR. STOLTZ:  Can we pull up -- you know
17  what, Neil, pull up the May 14th, 2021 letter.
18            Mr. Lepatner, I'm showing you a letter dated
19  May 14th, 2021.
20            Can you mark this as Exhibit --
21            THE COURT REPORTER:  W.
22            MR. STOLTZ:  -- W.
23            (Exhibit W marked for identification.)
24  BY MR. STOLTZ:
25       Q.   It's a May 14, 2021 letter from your

Page 167

1  attorney to Wayne Borgeest at Kaufman Borgeest & Ryan.
2  The Re: line is LePatner & Associates.  Have you seen
3  this letter before?
4       A.   I haven't seen it yet.  Let me see it.
5       Q.   Well, take a look at it and let me know if
6  you've seen it before.
7       A.   This was sending the invoice.
8            THE WITNESS:  Go ahead, I'm ready for the
9  next page.  Oops.  Hold it.  Go back on that page.
10  There was one thing I was just looking at.
11            Oh, okay, I'm -- I've seen this letter, yes.
12  BY MR. STOLTZ:
13       Q.   And did you review this letter before it was
14  sent out?
15       A.   No.
16       Q.   Well, would you agree that this letter would
17  not have been sent out without your authority?
18            MR. SALISBURY:  Let's see.  I think that
19  tiptoes at least a toe over the line of privileged
20  information.
21            MR. STOLTZ:  I'll withdraw the question.
22  I'll withdraw the question.
23  BY MR. STOLTZ:
24       Q.   Were you copied on this letter?
25       A.   Oh, it shows a copy and I received one, yes.

Page 168

1       Q.   Okay.  Now, at the time this letter was
2  sent, May 14, 2021, LePatner & Associates had not yet
3  commenced the action that we're here about today
4  against RSUI, correct?
5       A.   I believe that is correct.
6       Q.   Now, if you go to the first page of the
7  letter, do you agree that the letter purports to
8  attach, quote, "all of the invoices for all of the
9  work that LePatner did on the Nusseibeh project,"
10  correct?
11            MR. STOLTZ:  Can you highlight that?
12            THE WITNESS:  Correct.
13  BY MR. STOLTZ:
14       Q.   And do you believe that to be a true
15  statement?
16       A.   I am led to believe that this letter
17  conveyed the invoices to Mr. Borgeest.
18       Q.   Okay.  Now, attached to this letter are six
19  separate invoices that were on LePatner & Associates
20  letterhead, correct?  You can scroll down to confirm
21  for yourself.
22       A.   Oh, yes.  No, I'm -- I'm sure that they
23  included the invoices, some of which we've been
24  discussing.
25            MR. STOLTZ:  All right.  Now, Neil, if you

Page 169

1  can pull up Invoice 37891 dated January 31st, 2014, I
2  don't know if this has been previously marked or not.
3  So if it has, let me know.
4            THE WITNESS:  It has been.
5            MR. STOLTZ:  You can take this document
6  down, Neil.  And if you could pull up 37891.  Has this
7  been previously marked, Neil, do you know?
8            THE WITNESS:  It has been.  I've testified
9  to it.
10            THE COURT REPORTER:  I don't -- I don't
11  think it was this invoice.
12            MR. STOLTZ:  Okay.  Well, let's mark this.
13            THE WITNESS:  Oh, okay.
14            MR. STOLTZ:  As Exhibit --
15            THE WITNESS:  This is January --
16            THE COURT REPORTER:  X, yes.
17            MR. STOLTZ:  Okay.
18            (Exhibit X marked for identification.)
19  BY MR. STOLTZ:
20       Q.   Okay.  Now, this invoice that we marked as
21  Exhibit X is an invoice dated January 31, 2014, and
22  this is for work performed between January 9th, 2014,
23  and January 30th, 2014.
24            Do you see that?
25       A.   Yes.

Barry Lepatner
November 22, 2021

Page 170

1    Q.   Now, I represent to you that this invoice
2  was attached to that -- to the May 14th, 2021 letter
3  sent by your attorney.  Will you accept my
4  representation?
5    A.   Sure, yes.
6    Q.   Who --
7         MR. STOLTZ:  If you scroll all the way to
8  the bottom -- just a quick question, just -- sorry --
9  the bottom of 37891.  No, no, go up.  Can you -- yeah,
10  there you are, just where they have the names listed.
11  BY MR. STOLTZ:
12    Q.   I think we previously talked about
13  Mr. Kleiner, is that the -- can you pronounce his
14  name?  Sorry.  Jeffrey --
15    A.   Kleiner.
16    Q.   -- Kleiner.  Again, who is Mr. Kleiner
17  employed by in January of 2014?
18    A.   LePatner & Associates as an associate of the
19  firm, law firm.
20    Q.   Okay.  Now, who is Katherine Hofmann?
21    A.   Katherine Hofmann was -- I'm going to say an
22  associate.  I'm trying to remember whether she had
23  been -- may -- she may have been one of our paralegals
24  and became a lawyer.  There was a time it switched
25  over, but one -- one or the other.  She was involved

Page 171

1  in this project as either attorney or as internship --
2  what was I just going to say -- paralegal, I'm sorry.
3    Q.   Do you know if she was admitted to practice
4  law in Connecticut in January of 2014?
5    A.   I never said that.
6    Q.   No, I'm asking whether or not you knew she
7  was admitted to practice law in Connecticut of January
8  of 2014?
9    A.   I would have no knowledge one way or
10  another.
11    Q.   Now, if you take a look at the first entry
12  on this invoice, there is an entry from January 9th,
13  2014, for Francisco Rivera that reads, "Review and
14  analysis of email documents regarding potential for
15  recovery from York via Porticullis Partners," and the
16  time amount is 0.50 hours.
17         Do you see that?
18    A.   Yes.
19         MR. STOLTZ:  Neil, if you could just pull up
20  Invoice 37710, and keep this one handy.
21         Can we mark this as Exhibit --
22         THE COURT REPORTER:  This would be Y.
23         MR. STOLTZ:  -- Y?
24         (Exhibit Y marked for identification.)
25  BY MR. STOLTZ:

Page 172

1    Q.   This is Invoice No. 37710, dated January 31,
2  2014, and this is for work performed between December
3  17, 2013, and January 30th, 2014.
4         Now, there is an entry on January 9th, 2014,
5  for Francisco Rivera.
6         MR. STOLTZ:  And if you could highlight
7  that, Neil.
8  BY MR. STOLTZ:
9    Q.   That states, "Review and analysis of email
10  documents regarding potential for recovery from York
11  via Porticullis Partners."
12         Do you see that?
13    A.   Yes.
14    Q.   Do you have any explanation for why the same
15  entry for work performed by Francisco Rivera on
16  January 9th is on Invoice No. 37891 and Invoice
17  No. 37710?
18    A.   On a different date.
19    Q.   They're not the same -- they're not
20  different dates.  They're the exact same date.
21    A.   Oh, okay.  Scroll down to the bottom of
22  this.  I want to see the bottom of this one.
23    Q.   And if you could, while you're doing this,
24  have my question in mind, which is:  Do you have an
25  explanation for why the same entry for work performed

Page 173

1  by Francisco Rivera on January 9th, 2014, is on
2  Invoice No. 37891, which we've marked as Exhibit W,
3  and Invoice 37710, which we've marked as Exhibit Y.
4    A.   One clear possibility is it could have been
5  the subject of duplication and erroneous billing by
6  the service that we use for billing.  It could
7  potentially have been.  I'm not sure if there are any
8  others that you have painstakingly tried to find
9  duplication of billing, for whatever purpose, in aid
10  of the Nusseibehs asking me to give them back $100,
11  but it could be duplication.
12    Q.   Any other possibilities that exist for why
13  there is the same entry for work on two different
14  invoices and two different invoice numbers?
15    A.   Oh, no, it wouldn't have been the first --
16  it wouldn't have been the first time, because
17  sometimes our personnel, lawyers and non-lawyers, were
18  a little lax in billing and it took them four extra
19  weeks after bills went out to put some of their time
20  back on that they realized they didn't enter.  That's
21  -- it's happened in every law firm I've ever
22  associated with and come to me and say, forgive me,
23  but we have to go back and collect for time we never
24  billed.
25         So it could be one or the other, but in this

Barry Lepatner
November 22, 2021

Page 174

1  case, if I had to give myself the benefit of the doubt
2  in favor of the client, could be a duplication for
3  that half hour.
4      Q.  Both of these entry -- excuse me -- sorry,
5  withdrawn.
6          Both of these invoices were sent to the
7  Nusseibehs for payment, correct?
8      A.  Correct.
9      Q.  Who was the servicer or company that you
10  used to do the invoicing in January of 2014?
11     A.  Back then it was called Timeslips, a very
12  popular legal billing service provider.
13     Q.  And how would time -- was this a
14  computer-based -- withdrawn.
15         Was this a computer-based billing system?
16     A.  It was a software based.  They installed
17  software --
18     Q.  Software.
19     A.  -- and people enter their time, they are
20  trained on it, and monthly bills -- press the button
21  and they -- bills are reviewed and go out.
22         MR. STOLTZ:  Okay.  Now, if you go back to
23  Exhibit W, Neil, that's Invoice 37891.
24  BY MR. STOLTZ:
25     Q.  And you'll see the first entry on January

Page 175

1  14th, 2014, is for JWK, that's Jeffrey Kleiner or
2  Kleiner?
3      A.  Kleiner.
4      Q.  And it reads, "Discussion of potential
5  claims against York and related construction parties.
6  Review and discussion of initial damages assessment,"
7  and the time amount was 0.75 hours.
8          Do you see that?
9      A.  Yes.
10         MR. STOLTZ:  Now, Neil, if you can go back
11  to Invoice 37710.
12  BY MR. STOLTZ:
13     Q.  Do you agree that the exact same entry for
14  Jeffrey Kleiner's time on January 14th, 2014, is
15  listed on Invoice 37710?
16     A.  Yes.
17         MR. STOLTZ:  Can you highlight it?
18         THE WITNESS:  Yes.  And the 1/15 one for
19  myself looks similar.  So it does look like some --
20  some entries were picked up and duplicated, yes, I see
21  that now.
22  BY MR. STOLTZ:
23     Q.  Okay.  And we'll go through them just to
24  make sure that the record is clear.
25     A.  Does this, by the way, just to clarify, is

Page 176

1  this a basis, an exclusion, under the insurance
2  company to deny the claim?
3      Q.  Mr. LePatner, you've taken you've said over
4  100s of depositions and defended over 100s of
5  depositions.
6      A.  Yeah.
7      Q.  So you should know, more than anybody, that
8  you're not allowed to ask any questions at this
9  deposition.
10     A.  Oh, I'm sorry.
11     Q.  I'm the one asking questions here, okay.
12     A.  I apologize.
13     Q.  It's okay.  I appreciate that.
14         So now if you can go back to 37891.
15     A.  Go ahead.
16     Q.  Can you see there is an entry for you from
17  January 15, 2014, that states, "Conference to discuss
18  meeting with clients and action against York," and the
19  time amount was one hour, right?
20         MR. STOLTZ:  Can you just highlight these
21  things, Neil, so he can see it?  For sake of --
22         THE WITNESS:  I see it.
23  BY MR. STOLTZ:
24     Q.  And now if you go back to 37710, you'll see
25  the exact same billing entry.

Page 177

1      A.  Okay
2      Q.  And this is on 37710, correct?
3      A.  Yes.
4      Q.  And if you go back to 37891, again on
5  1/16/2014, you see "Conference to discuss meeting with
6  clients and action against York," and the time amount
7  was one hour.  And that's on 1/16/2014, do you see
8  that?
9      A.  Yes.
10     Q.  If you go back to 37710, you'll see the
11  exact same billing entry, correct?
12     A.  Yes.
13     Q.  And if you go back -- well, actually, can
14  you look at the billing entry from January 23, 2014,
15  for Jeffrey Kleiner, 37891?  And you see where it says
16  "Conference to review permit issues and York's failure
17  to obtain proper permits" --
18     A.  Yes.
19     Q.  -- and "Review issues related to obtaining
20  same on a expedited manner"?
21     A.  Yes.
22     Q.  Time is 1.25 hours?  Now, if you go back to
23  37710, do you agree that you see the same exact
24  billing entry from Mr. Kleiner on January 23rd, 2014,
25  correct?

Barry Lepatner
November 22, 2021

Page 178

1    A.  I see that.  That is correct.
2        MR. STOLTZ:  Okay.  Now, can you just pull
3  up Invoice 37918, dated February 28th, 2014.  I
4  believe it's in the same packet, Neil.
5  BY MR. STOLTZ:
6    Q.  Can you -- this is part of the same exhibit,
7  and this is -- excuse me -- an invoice dated February
8  28th, 2014.  It's Invoice 37918.  And I'll represent
9  to you that this invoice was attached to the May 14th,
10  2021, letter that Mr. Salisbury sent to Wayne
11  Borgeest.  Will you accept my representation of that?
12    A.  Of course.
13    Q.  Okay.  Now, if you turn to Page 2, there is
14  an entry on February 20th, 2014, for you, Barry
15  LePatner, that states, "Telephone conversation with N.
16  Barile, re alleged claims by subs; site visit at
17  residence and meeting with clients; conference with D.
18  Marks re punch list acceleration; conference call with
19  CT local counsel," and the amount of time is four and
20  a half hours.
21        Do you see that?
22    A.  Yes.
23    Q.  All right.  Who is N. Barile, do you know?
24    A.  Yes.  He is one of the two principals of
25  York construction and development.  The culprit here

Page 179

1  in the case.
2    Q.  And who is D. Mark (sic)?
3    A.  D. Marks was -- is Daisy, D-a-i-s-y, Daisy
4  Marks was the interior designer who, at the request of
5  Jamal and Julia Nusseibeh, I was asked to give a
6  reference to -- I'm sorry -- recommend be hired
7  because of all the problems that we had in the
8  basement area, it was a very large basement.
9        And I said we could not find anything to
10  proceed with or understand what York had done there
11  without an interior designer coming in there,
12  surveying it, and creating a re-design of the mess
13  that had gone on down there.
14        They followed that recommendation.  They
15  retained Daisy Marks and she did a very credible job,
16  which they, in the deposition, complimented her for.
17    Q.  Now, that entry conference with D. Marks re
18  punch list acceleration, what, in fact, were you guys
19  discussing on that conference or during that
20  conference?
21    A.  Because there was work going on down there
22  that was tied into the boiler room and all the conjury
23  of electric work, plumbing work, mechanical work, that
24  came out of there, and went through the ceilings and
25  the walls of the basement area where she was

Page 180

1  designing.  And we needed her to prepare a punch list
2  on an accelerated basis, so that we could quantify the
3  amount of work that the subs would have to do and put
4  that into the claim.  And that was the nature of that
5  discussion.
6    Q.  Is it your testimony that all of your work
7  that you performed in connection with the interior
8  designer, Daisy Mark, was legal services provided on
9  behalf of the Nusseibehs?
10    A.  Yes.  It was in furtherance of putting the
11  damage analysis together and the list of the claims
12  eventuated on that same day, related to that same
13  entry, in the discussion with the litigation partner
14  at Wiggin and Dana, the Connecticut local counsel
15  referenced there.
16    Q.  Now, the amount of the time in that entry is
17  four and a half hours, do you see that?
18    A.  Yes.
19        MR. STOLTZ:  If you can, Neil, go to Invoice
20  37920.  It's not in here.  You can share -- stop
21  sharing the screen and go to 37920, please?  I'm going
22  to owe Neil a steak dinner after this.
23        Can we mark this as Exhibit, what, Z?
24        (Exhibit Z marked for identification.)
25        THE COURT REPORTER:  Z, yes.

Page 181

1        MR. STOLTZ:  We're getting close to the
2  double letters now.
3  BY MR. STOLTZ:
4    q.  This is an invoice dated February 28th,
5  2014.  It's Invoice No. 37920.  If you go to Page 3 at
6  the top.  Do you see an entry for February 20th, 2014,
7  for Barry LePatner that states, "Telephone
8  conversation with N. Barile re alleged claims by
9  subs"?
10        Do you see that?
11        MR. STOLTZ:  Can you highlight it for him?
12        THE WITNESS:  I see that there, yes.
13  BY MR. STOLTZ:
14    Q.  Okay.  And the time listed is one hour.  Do
15  you see that?
16    A.  Yes.
17    Q.  Now, why is that the billing entry for your
18  telephone conversation with N. Barile on February 24th
19  is listed on two different invoices with the same
20  date, with two different invoice numbers?
21        MR. SALISBURY:  Object -- objection; that
22  lacks foundation.
23        THE WITNESS:  It could have been that I
24  either had a separate conversation or in the four and
25  a half hours that I put down for the first entry, that

Barry Lepatner
November 22, 2021

Page 182

1  I did not account for the full time on the Barile --
2  or didn't include it, and then I entered it as a
3  separate entry.
4  BY MR. STOLTZ:
5      Q.  Why is it that there are multiple invoices
6  for the same date but with different invoice numbers?
7      A.  Mr. Stoltz, as I've explained to you, I'm
8  dealing with a software system that as every lawyer
9  and every business person has ever known, has its
10  vague areas, has its moments of driving you all crazy.
11  We try to pick these inconsistencies up if they are
12  apparent.
13          And in a situation with the Nusseibehs, if
14  there were inadvertent entries like this, I will refer
15  you to the bottom of several of these invoices, where
16  we gave them credits totaling 50-, $60,000 or more of
17  our services, credits that they didn't ask for, but we
18  billed to accomplish their goal and nevertheless wrote
19  off an enormous amount of time because we didn't feel
20  that the clients should pay for all that enormous
21  time, and we were being favoring to them.
22          So you'll see the credits on the bottom of
23  several of these invoices and if you want to question
24  me further on them, you can, so (speaking
25  simultaneously) --

Page 183

1      Q.  Let's go down to the bottom (speaking
2  simultaneously) --
3      A.  Now, I -- I've apologized to the Nusseibehs
4  -- no, I don't.  They were mistakes.  They were
5  inadvertent.  Every law firm has seen these things and
6  I'm trying not to be offended that you're wasting my
7  time asking me questions about them.
8      Q.  Well, I'm slightly offended that you're
9  accusing me of wasting your time.  I assure you that I
10  am not doing that at all.
11      A.  We'll see.
12      Q.  Why don't we switch topics for a moment?
13          When did the Nusseibehs terminate Project
14  Solutions?  Do you have the exact date in mind?
15      A.  I don't have the exact date other than
16  correspondence exists where I terminated them after a
17  project meeting at the residence where
18  Mr. Nusseibeh --
19          MR. STOLTZ:  Carl, can I -- I'm sorry -- I'm
20  going to stop.  Carl, can I use the terms that I
21  used --
22          MR. SALISBURY:  I actually think you're --
23          MR. STOLTZ:  You cannot -- you cannot --
24          MR. SALISBURY:  -- misunderstanding his
25  question.

Page 184

1          MR. STOLTZ:  Yeah.
2          THE WITNESS:  Oh.
3          MR. STOLTZ:  And honestly, Mr. LePatner, I'm
4  surprised that you think it's okay to ask your
5  attorney in the middle of a question about how to
6  answer -- how to give testimony.
7  BY MR. STOLTZ:
8      Q.  My question is this:  When did the
9  Nusseibehs terminate Project Solutions?  Do you have
10  the exact date or precise date in mind?
11      A.  They did not terminate us.
12      Q.  Okay.  When did the Nusseibehs terminate
13  LePatner & Associates?
14      A.  They did not terminate LePatner &
15  Associates.
16      Q.  Well, then how did the relationship between
17  LePatner & Associates and the Nusseibehs end?
18      A.  I resigned.
19      Q.  Do you recall the date that you resigned?
20      A.  The dates are recorded in the email from
21  Jamal, the next day, to me, apologizing for him
22  realizing why I had every reason in the world to
23  resign.
24      Q.  And would these emails that you're referring
25  to, would they have been produced in discovery in the

Page 185

1  underlying action?
2      A.  I believe so.  I believe there was
3  questioning of Jamal about these emails I'm referring
4  to.
5      Q.  Okay.
6      A.  It was at his deposition.
7      Q.  But you would agree, wouldn't you, that the
8  relationship between LePatner & Associates and the
9  Nusseibehs did not end amicably, correct?
10      A.  Correct.
11          MR. STOLTZ:  All right.  So can we just --
12  real briefly, Carl, we need to call the Court at 4:00
13  p.m.
14          MR. SALISBURY:  Yep.
15          MR. STOLTZ:  This is sort of a natural
16  stopping point for me.  Can we go off the record?
17          THE COURT REPORTER:  Yes.
18          (Off the record at 3:52 p.m.)
19          (On the record at 4:12 p.m.)
20          MR. STOLTZ:  Can you bring up, Neil,
21  JNP_0003528?
22          Let's mark this as Exhibit, what, AA, or no,
23  Exhibit Z, right?
24          (Exhibit AA marked for identification.)
25          THE COURT REPORTER:  No, this would be AA.

Barry Lepatner
November 22, 2021

Page 186

1  Exhibit Z was 37920, Invoice 37920.
2        MR. STOLTZ:  Okay.  Thank you.
3  BY MR. STOLTZ:
4        Q.  I'm showing you what's been marked as
5  Exhibit AA, which is an email from you to the
6  Nusseibehs dated May 28th, 2014, and it's Bates
7  stamped JNP_0003528.
8        Do you recall this email?  Just take a
9  moment to review to see if it refreshes your
10 recollection?
11       A.  I don't recall this email, no.
12       Q.  Well, sitting here today, do you have any
13 reason to doubt that you sent this email on May 28th,
14 2014?
15       A.  Oh, no.
16       Q.  Now, you see in the second sentence you
17 discuss a formal legal agreement with Alfa Electric.
18 Do you see that?
19       A.  Yes.
20       Q.  And in the next sentence, you state, "We
21 were in the process of negotiating the agreement when
22 we were dismissed," referring to the agreement with
23 Alfa Electric, correct?
24       A.  I -- I see those words, yes.
25       Q.  Yeah, and this email has your auto signature

Page 187

1  as Barry LePatner, Esq., LePatner & Associates LLP,
2  correct?
3        A.  Correct.
4        Q.  So would it be fair to say that at least as
5  of May 28th, 2014, the Nusseibehs had dismissed
6  LePatner & Associates?
7        A.  No.  What was not included here, by
8  intention, was the quote marks around the words
9  "dismissed."  Because between the time we walked off
10 the job, when I had every good reason to walk away
11 from the two of them, Julia and Jamal, to this time,
12 there was a series of discussions and emails and a lot
13 of my discussions were Daniel Rosen, their accountant,
14 that they owed us a final payment.  And they had said,
15 well, could you just give us this information and that
16 information.
17       And this went back and forth for about a
18 month or two, and they were saying, oh, no, no, we
19 dismissed you.  I said, "What happened to your memory
20 that I walked off the job and said I wouldn't work for
21 people who said I was a conman and dishonest and would
22 not allow anybody, any client, to talk to me that way.
23 I'm out of here."  And they said well, well, yeah, oh,
24 yes, but we -- so I never put the quote marks around
25 the words dismissed to -- not to get into a further

Page 188

1  contest of words with them.
2        But there was no question because everybody
3  on the site heard his crazy ranting diatribe and it
4  was so disgusting and it was so much a result of his
5  being medicated that he was out of his gourd and
6  didn't know what he was saying, but I was not up for
7  producing the quality of the work we were doing for
8  him any longer when he kind of attacked my reputation,
9  which I high -- hold rather high and valuable.
10       So, yes, the word "dismissed" is there.  It
11 lacks the quotation marks, but it's in the context of
12 not wanting to get -- exercise further discussion over
13 there fact that I terminated the relationship first.
14       Q.  I want to make sure the record is very clear
15 here, because this is important.  Is it your testimony
16 that the Nusseibehs did not dismiss LePatner &
17 Associates despite the fact that you state in this
18 email that we were in the process of negotiating the
19 agreement when we were dismissed?  I just want to make
20 sure I understand your testimony.
21       MR. SALISBURY:  Objection; asked and
22 answered.
23       THE WITNESS:  There is an email -- there is
24 an email from Jamal, if you want, we can spend the
25 time in producing it, where he says, "I don't need

Page 189

1  LePatner Project Solutions, I don't care about that,
2  but I would like LePatner to stay on as our counsel."
3  So it's there in and about the same time as this,
4  maybe a few weeks earlier, but it's a matter of
5  record.
6  BY MR. STOLTZ:
7        Q.  I don't think you answered my question.  My
8  question was:  Despite what words are used in this
9  email, is it your testimony that the Nusseibehs did
10 not dismiss LePatner & Associates?
11       MR. SALISBURY:  Objection; asked and
12 answered.  Go ahead.
13       THE WITNESS:  As I said, I terminated the
14 relationship.  I walked off the job and made it very
15 clear we're out of here when they cast aspersions on
16 my reputation.  I do not tolerate that from anybody.
17 BY MR. STOLTZ:
18       Q.  Now, at the --
19       A.  After that -- after that, they took it upon
20 themselves to deem that they wanted me to stay on as
21 their counsel, I refused, we had further discussions,
22 they wrote a thing saying, "Oh, you're dismissed," it
23 didn't matter at that point.  I was gone.
24       Q.  So if you go to the last sentence of this
25 email.  It states, "We were in the process of bringing

Barry Lepatner
November 22, 2021

Page 190

1  Alfa in line with the check bid when we were
2  dismissed."
3        Do you see that?
4     A.   What I was trying to say was we're not going
5  to continue to do those services.
6     Q.   Can you just answer my question?  I'm just
7  asking whether or not you see those words written on
8  this page?
9     A.   You can -- well, words speak for themselves.
10 I don't have to read back to you what you just read to
11 me, sir.  They speak for themselves.
12    Q.   You're not answering the question.  You're
13 not answering --
14       THE COURT REPORTER:  Just one at a time.
15       THE WITNESS:  It's not a situation that you
16 ask me to repeat -- I'm not going to keep repeating
17 what you just said -- read to me from my email that
18 I've acknowledged.
19 BY MR. STOLTZ:
20    Q.   Okay.  So can we agree that you used the
21 words "we were dismissed" twice in this email,
22 correct?
23       MR. SALISBURY:  Objection; asked and
24 answered.  And it's now beginning to be harassment.
25       But go ahead and answer it one more time,

Page 191

1  Barry.
2        THE WITNESS:  The document speaks for
3  itself.
4  BY MR. STOLTZ:
5     Q.   Okay.
6     A.   And if you don't like that answer, get a
7  judge to rule differently.
8        MR. STOLTZ:  Can you pull up Exhibit 8461?
9        I'm showing you what's been marked as
10 Exhibit BB, which is an email from the Nusseibehs to
11 you dated April 2nd, 2014, and it's Bates stamped
12 JNP_0008461.
13       (Exhibit BB marked for identification.)
14 BY MR. STOLTZ:
15    Q.   Do you recall this email?
16    A.   Yep, I do.
17    Q.   And I'll represent to you that this email
18 was produced to us in discovery by your attorney.
19 Will you accept my representation?
20    A.   Yes.
21    Q.   Now, if you look at the first sentence of
22 the second paragraph that reads, quote, "I do not
23 expect to change your opinion of the quality -- or,
24 excuse me.
25       "I do not expect to change your opinion

Page 192

1  about the quality of the project management provided
2  by LePatner Project Solutions LLC, and I imagine that
3  we will remain at odds over this matter."
4        Do you see that?
5     A.   I see that first sentence of the second
6  paragraph as well as the first sentence in the first
7  paragraph, yes.
8     Q.   Now, in the next paragraph, Jamal Nusseibeh
9  writes, in the third sentence down, quote, "I would
10 like to suggest the following - whilst of course
11 reserving all of our rights, etc.:  we consider the
12 contract with LePatner Project Solutions LLC for
13 project management terminated, and any outstanding
14 items can be wrapped up in the coming few days, to
15 make the hand-over a little less bumpy.  I will manage
16 the rest of the project myself."
17       Do you see that?
18    A.   Yes.
19    Q.   So you would agree with me then that as of
20 April 2nd, 2014, Project Solutions had been considered
21 terminated from the project by the Nusseibehs,
22 correct?
23    A.   No.  I disagree as of my testimony as
24 repeatedly said.  LePatner Project Solutions never
25 provided services.  They were rejected out of hand by

Page 193

1  the claimants by -- by the Nusseibehs, who did not
2  want those services that we outlined provided and the
3  field services of the non-lawyer personnel that were
4  assigned to this project, were under the purview, my
5  direct supervision of LePatner & Associates.
6     Q.   You would agree with me that Jamal Nusseibeh
7  is writing to you here and stating that they consider
8  the contract with LePatner Project Solutions LLC for
9  project management to be terminated, correct?
10    A.   What he says here is what he says.  What I
11 know is what I've been telling you.
12    Q.   Okay.
13    A.   If he had -- if he could have contend --
14 contended all of these, he would have proven a
15 different claim.  None of which, in his allegations,
16 could he prove all the way through a projected date of
17 trial.  So what he writes about in his drug-addled
18 state from time to time was just what I said.  Someone
19 who had a serious medication problem and rambled and
20 spoke and talked much of which came out of his mouth
21 that he regretted as he wrote in the very first
22 sentence of this email, when he realized, or his wife
23 told him, you stepped out of bounds, and you better
24 make some amends with Barry.  That's what this was all
25 about.

Barry Lepatner
November 22, 2021

Page 194

1      Q.  What's the factual basis for your testimony
2  that Mr. Nusseibeh was drug-addled and had a
3  medication problem?
4      A.  Sir, I am quite familiar with people who are
5  overmedicated, and I have personal experiences of
6  knowing people with glazed eyes, unable to complete
7  full sentences, whose mind are off in fantasy world,
8  can't maintain eye contact, and I could go on and on,
9  which are rendition of someone who is on some kind of
10  medication or some kind of other stimulation or
11  whatever, that they are not dealing in a reality.
12  And --
13      Q.  Are you a medical doctor?
14      MR. SALISBURY:  Objection.  You know, this
15  is argumentative.
16      MR. STOLTZ:  Well, I'm just trying to get
17  the factual basis for -- he -- we're arguing, Carl, I
18  mean, I don't want to get into on the record in front
19  of the witness.  But he's taking issue with statements
20  that are made in an email to him as being made by
21  somebody who is on drugs and I'm trying to understand
22  the factual basis for his statement that Mr. Nusseibeh
23  was on drugs.  That's all I'm trying to do.  He said
24  it.
25      MR. SALISBURY:  And he --

Page 195

1      MR. STOLTZ:  I didn't.  So I'm asking what
2  the factual basis --
3      THE WITNESS:  (speaking simultaneously) --
4      MR. STOLTZ:  Excuse me, wait.  I'm asking
5  you, Mr. LePatner, for the factual basis of your
6  statement that Mr. Nusseibeh is on drugs.
7      MR. SALISBURY:  And can I -- before you
8  answer -- I have an objection.  The objection is asked
9  and answered, and I objected because you asked a
10  question in an argumentative way.
11      MR. STOLTZ:  Okay.
12      MR. SALISBURY:  He gave you the factual
13  basis.
14  BY MR. STOLTZ:
15      Q.  So let me just withdraw the question.  I'll
16  ask it this way, Mr. LePatner.
17      Do you have any evidence, other than your
18  own opinion, that Mr. Nusseibeh was drug-addled and
19  was overly medicated?
20      A.  Yes.
21      Q.  What is that evidence?
22      A.  The observations of other people on the
23  project who encountered him at the same time.
24      Q.  And who is that?
25      A.  I'm not going to go into that.  And if it

Page 196

1  becomes a subject that the judge orders me to go into
2  lanes, which is pertinent to this litigation, I will
3  certainly be glad to get back on the record, if you
4  get a decision from a judge to have me fill in the
5  rest of their stuff.  You'll get your answer, but I've
6  said enough on this subject.
7      Q.  All right.  Why don't we move on?
8      MR. STOLTZ:  Can you pull up JNP_0008462?
9      I'm showing you what's been marked as
10  Exhibit CC, which is an email from you to the
11  Nusseibeh dated April 3rd, 2014, and it's Bates
12  stamped JNP_0008462.
13      (Exhibit CC marked for identification.)
14  BY MR. STOLTZ:
15      Q.  Do you recall this email?
16      A.  Yes, I do.
17      Q.  Now, I'll represent to you that this email
18  was produced to you in discovery by your attorney.  Do
19  you accept my representation?
20      A.  I do.
21      Q.  Okay.  Now, you can see from the document
22  that this email is in response to Jamal Nusseibeh's
23  April 2nd, 2014, email that we just discussed and
24  that's been marked as Exhibit BB, correct?
25      A.  That is correct.

Page 197

1      Q.  And if you direct your attention to the
2  second paragraph where you state, "From a personal and
3  professional standpoint, I have never been exposed to
4  such angry vitriol as I heard from you that morning.
5  To consider a future relationship with such
6  vituperation ringing in my ears is most difficult, not
7  to mention that it is hard to question how we could
8  assist you when you repeatedly called Francisco and I
9  "con men".  I can only imagine the words you use for
10  the folks at York."
11      Now, this email, just to confirm, this was
12  in response to Jamal Nusseibeh's April 2nd, 2014,
13  email that we've marked as Exhibit BB; is that
14  correct?  Just to confirm.  I want to make sure I
15  understand that.
16      MR. SALISBURY:  Barry, are you still there?
17      THE WITNESS:  I'm sorry.  I thought he was
18  asking the court reporter if this has been marked.  I
19  must have misunderstood.
20  BY MR. STOLTZ:
21      Q.  You know what?  Let's move on.  Sorry.
22      Do you recall the Nusseibehs accusing
23  LePatner & Associates of leaving the Nusseibehs in the
24  lurch and accusing you of resigning after being paid
25  lots of money?  Do you recall that?

Barry Lepatner
November 22, 2021

Page 198

1    A.    Oh, they made lots of charges like that in
2  the weeks after I walked off the job.  You see it
3  here.  You see it here in this exchange where he's
4  asking me to find some way to continue to work for him
5  and you see my response.
6          MR. STOLTZ:  Neil, if you could pull up
7  JNP_0008375.
8          I'm showing you what's been marked as
9  Exhibit DD, which is an email from the Nusseibehs to
10  you dated April 1st, 2014, Bates stamped JNP_0008375.
11         (Exhibit DD marked for identification.)
12  BY MR. STOLTZ:
13    Q.    Do you recall receiving this email?
14    A.    This preceded the ones you just showed me.
15  You took them out of order.  So we're now on April 1
16  instead of April 3 and 4.  So you're going backwards,
17  but I'm most interested in Paragraph 3.
18         Yes, I see this.
19    Q.    I'm asking whether or not you recall this
20  email.
21    A.    Yes, I do.
22    Q.    (speaking simultaneously) Okay.
23    A.    Yes, I do.
24    Q.    Now, in this email, Mr. Nusseibeh highlights
25  three things, you see that?

Page 199

1    A.    Yes.
2    Q.    In the third bullet point, Mr. Nusseibeh
3  writes, "
4          I will be interested to see how you explain
5  leaving us in the lurch as both our project manager
6  and our lawyer, with absolutely nothing - no single
7  part of the renovation- finished, and in the midst of
8  ongoing negotiations with York and an outstanding lien
9  on the house which you were dealing with."
10         Do you see that?
11    A.    Yes.
12    Q.    Do you agree that in this email and No. 3,
13  Mr. Nusseibeh is accusing you of leaving them in the
14  lurch as to being -- as to both being their project
15  manager and lawyer?
16    A.    He's acknowledging I walked off the job in
17  the capacity that I was retained, as his lawyer.  And
18  if he wanted to believe there was still project
19  management services, that's -- hey, I'm not going to
20  get into his head -- but he's acknowledging I walked
21  off the job, and the prior email shows why.
22    Q.    Is it your testimony that you were not
23  retained by the Nusseibehs in your capacity as project
24  manager?
25         MR. SALISBURY:  Objection; asked and
answered.  Go ahead and answer again.

Page 200

1          THE WITNESS:  Wow.  Aw, c'mon.  Yes.
2  BY MR. STOLTZ:
3    Q.    Okay.
4    A.    They voided or invalidated the proposal for
5  project management services for which they never paid,
6  and we proceeded to take those non-legal
7  professionals, who do this work for me, and with their
8  consent and knowledge, we invoiced them monthly under
9  my law firm's invoices, correct.
10         MR. STOLTZ:  Neil, can you pull up -- you
11  can this down -- can you pull Exhibit 7898?
12         I'm showing you what's been marked as
13  Exhibit EE, which is an email from the Nusseibehs to
14  you from March 19th, 2014, and it's Bates stamped
15  JNP_0007898.
16         (Exhibit EE marked for identification.)
17  BY MR. STOLTZ:
18    Q.    Do you recall this email?
19    A.    I recall this email.
20    Q.    And do you agree that about halfway down the
21  email, Jamal -- Jamal Nusseibeh writes, "This is not
22  acceptable."
23         Do you see that?
24         MR. STOLTZ:  Can you highlight it for the
25  witness, please?

Page 201

1          THE WITNESS:  Do those four words -- do
2  those four words exist?  Of course they exist there.
3  You've got to read the whole thing and you have to
4  know the context of what has prompted him to write
5  this email.  And --
6  BY MR. STOLTZ:
7    Q.    Do you see in the next paragraph where Jamal
8  Nusseibeh writes, "Unfortunately I think the delays
9  are due to incompetent management."
10    A.    Yes, my management.  He's -- he's objecting
11  to my management of the process, I see that.
12         MR. STOLTZ:  Can you pull up -- take this
13  down.  Can you pull up JNP_0007981?
14         I'm showing you what's been marked as
15  Exhibit EE?
16         THE COURT REPORTER:  This is FF.
17         MR. STOLTZ:  FF.
18         (Exhibit FF marked for identification.)
19  BY MR. STOLTZ:
20    Q.    Which is an email from the Nusseibehs to you
21  dated March 20th, 2014, and it's Bates stamped 79 --
22  JNP_0007981.  It's actually part of a multi-page email
23  thread, correct?
24    A.    I (speaking simultaneously) --
25         MR. STOLTZ:  Scroll through it (speaking

Barry Lepatner
November 22, 2021

Page 202

1 simultaneously) --

2      THE WITNESS:  I don't see the rest of it.

3 So, yeah, if you can just show it to me and refresh

4 my --

5      MR. STOLTZ:  Well, yeah, let -- we will.

6 We'll do that.

7      THE WITNESS:  Hold it.  Hold it.  Go ahead.

8      MR. STOLTZ:  Keep going.  Just tell him to

9 stop whenever you need, Barry.

10      THE WITNESS:  Thank you.

11 BY MR. STOLTZ:

12      Q.  Now, I actually want to focus on the

13 March 20th, 2014, email.

14      A.  Yes.  The one I'm reading now.

15      Q.  Yes.

16      A.  Whoops, we just went to -- a little too

17 quick.  Could we scroll down a little bit to the prior

18 page?  Yep.

19      Q.  Actually, my apologies, I don't want to take

20 you there.  I want to take you somewhere else in this.

21      MR. STOLTZ:  If you could scroll up, Neil.

22      THE WITNESS:  Well, let me finish this one,

23 so I'm familiar with the whole context, please.

24      MR. STOLTZ:  Okay.  Yeah.  Take -- take your

25 time and review the document if you need to.  I only

Page 203

1 have a question about a certain portion of it.

2      THE WITNESS:  Is this the end of it?  Is

3 there any further beyond this?  Scroll down, please.

4      MR. STOLTZ:  Neil, can you scroll down to

5 confirm.

6      THE WITNESS:  Okay.  I'm familiar with all

7 -- all of these, yes, rantings, yes.

8 BY MR. STOLTZ:

9      Q.  Do you recall the email thread that we've

10 marked here as Exhibit FF?

11      A.  Yeah -- I'm sorry -- yes.  Yes, I do.

12      Q.  Now, do you see -- do you recall Jamal

13 Nusseibeh emailing and saying, "Please don't push me

14 into something we will both regret."  Do you see that?

15      A.  Oh, yes.  That's one of his many rantings.

16 Yes, I see that.

17      MR. STOLTZ:  You can take it down.

18      I'd like to switch topics if we could.

19      Neil, can you pull up the policy, please.

20 Now --

21      MR. SALISBURY:  Can you put it in the chat?

22      THE COURT REPORTER:  I'm sorry.  Yeah,

23 did --

24      MR. STOLTZ:  Yeah.  Did it go in the chat,

25 Neil?

Page 204

1      MR. SALISBURY:  Thank you.

2      MR. STOLTZ:  So I'm showing you what has

3 been marked as Exhibit GG.  Vivian, correct?

4      (Exhibit GG marked for identification.)

5      THE COURT REPORTER:  Yes, that's correct.

6      MR. STOLTZ:  And this is the Landmark

7 policy, Policy No. LHR761397, and if you go to the

8 declaration page, Neil.

9 BY MR. STOLTZ:

10      Q.  And it was issued to LePatner & Associates

11 with a policy period of January 1, 2017 to January 1,

12 2018.

13      Do you recognize this document?  And feel

14 free to scroll through if you need to.

15      A.  I may have seen the declarations page

16 before.

17      Q.  Okay.  Is this the Landmark American

18 Insurance Policy that Landmark American issued to

19 LePatner & Associates for the policy period of --

20      A.  I can't --

21      Q.  -- January 1, 2017 to January 1, 2018?

22      A.  I will accept your representation that that

23 is the policy.

24      Q.  Do you see at the bottom of all these pages

25 there is a Bates number, and it starts with LPA?

Page 205

1      A.  Yes, I do.

2      Q.  Will you accept my representation that that

3 is a Bates number in a document production that was

4 provided to us by your attorney?

5      A.  Oh, of course.

6      Q.  Okay.  And this is the policy that the

7 plaintiffs -- or excuse me, withdrawn.

8      This is the insurance policy that plaintiff

9 is seeking coverage for under -- it's been a long day.

10 I'll withdraw the question.

11      This is the policy that plaintiff is seeking

12 coverage under in this action, correct?

13      A.  Yes.  For which we're seeking full coverage

14 under the wording of the policy as issued to LePatner

15 & Associates.

16      Q.  And just to be clear here, this is a policy

17 that was issued by Landmark American Insurance

18 Company, correct?

19      MR. STOLTZ:  Can you just scroll up?

20      THE WITNESS:  That's -- that's my

21 understanding, the name of the insurer is --

22 BY MR. STOLTZ:

23      Q.  Okay.

24      A.  -- Landmark American.

25      Q.  Now, if you turn to Part I, which is the

Barry Lepatner
November 22, 2021

Page 206

1    "Insuring Agreement," on Page 4, and that's Bates
2    stamped LPA_0004.  Do you see where it states "Covered
3    Services"?
4         A.   Yes.
5         Q.   Now, under "Covered Services" it reads, "The
6    Company will pay on behalf of the Insured as shown in
7    the Declarations, all sums that the Insured becomes
8    legally obligated to pay as Damages and associated
9    Claim Expenses arising out of a negligent act, error,
10   omission, or Personal Injury, even if the Claim
11   asserted is groundless, false or fraudulent, in the
12   rendering of or failure to render Professional
13   Services as a Lawyer."
14        Do you see that?
15        A.   I do.
16        Q.   By the way, if you go back to the
17   declarations page, I just want to confirm that the
18   name of the -- the name of the insured listed is what?
19   If you can --
20        A.   Oh, LePatner & Associates LLP.
21        MR. STOLTZ:  Okay.  Now, again, if you go
22   back to Part I, again, "Covered Services," Neil.
23   Sorry to make you jump around there, but...
24   BY MR. STOLTZ:
25        Q.   Would you agree with me that this policy

Page 207

1    only applies to professional services as a lawyer?
2         A.   I believe that this policy was issued to
3    LePatner & Associates after sound underwriting
4    policies, by the insurer, who understood fully the
5    nature of the specialized legal services that my firm
6    offered, including all ancillary-related services so
7    that I could perform my objective of meeting our
8    client's needs for construction-related counseling and
9    all related advisory services.  I believe that, yes.
10        Q.   I don't think that was responsive to my
11   question.  So I'm going to ask it again.
12        Having read Part I, "Insuring Agreements,"
13   Section A. "Covered Services," do you or do you not
14   agree that the policy only applies to professional
15   services as a lawyer?
16        A.   I believe this is written for me as the
17   insured and I accept the insuring agreement.  If
18   you're asking me my understanding of it, I just
19   answered it for you.  If you want me to re-read what
20   the insuring agreement says, we can all read it
21   together.
22        Q.   Is the plaintiff's position in this case
23   that RSUI must fund the defense of Project Solutions
24   in the underlying action?
25        MR. SALISBURY:  Objection, lacks foundation.

Page 208

1         THE WITNESS:  I see here, in the insuring
2    agreement, that it says I will be afforded -- they're
3    legally obligated to pay as damages and associated
4    claim expenses arising out of any negligent act,
5    error, or omission, or personal injury, even if the
6    claim asserted is groundless, false, or fraudulent,
7    and having --
8    BY MR. STOLTZ:
9         Q.   Mr. LePatner, I don't want to interrupt you,
10   but --
11        MR. SALISBURY:  You are interrupting.
12   BY MR. STOLTZ:
13        Q.   -- you're not answering my question.
14        A.   I'm a lawyer enough to know that you are
15   interrupting me, and I should be allowed to --
16        Q.   Well --
17        A.   -- finish my answer.
18        Q.   -- but you're --
19        A.   Even if you don't like it.
20        Q.   -- filibustering with non-responsive
21   answers.  All that's going to do, Mr. LePatner, is
22   give me grounds to call you back for a further
23   deposition.
24        My question is this --
25        A.   If you had the right to do that, you can do

Page 209

1    it, but to interrupt me, you don't have the right.
2         Q.   My question is this:  Is it plaintiff's
3    position that RSUI has to pay for Project Solutions
4    defense costs in the underlying action?  Yes or no.
5    That's all I'm asking.  I'm entitled to know what your
6    position is regarding what RSUI has to pay in the
7    underlying action, you know --
8         MR. SALISBURY:  That -- that's a different
9    question than the one you just asked.
10        MR. STOLTZ:  Okay.  So I'll ask that
11   question then.
12   BY MR. STOLTZ:
13        Q.   Is it plaintiff's position that RSUI has to
14   pay for Project Solutions defense costs that were
15   incurred in the underlying action?
16        MR. SALISBURY:  Yet another different
17   question but go ahead.
18        THE WITNESS:  All -- all the claims against
19   LPS in this claim -- in this case, in the Nusseibeh
20   action, for which we're seeking coverage are based on
21   an improper premise of the plaintiffs.  Their claim is
22   based on an improper claim of the plaintiffs that
23   there is a duality.  There is a separate entity.
24   There is a separate whole other thing of LPS when it
25   is, in fact, the sole creation that exists for the law

Barry Lepatner
November 22, 2021

Page 210

1  firm's performance of its services, legal and business
2  advisory.  That is the answer.  And you may not like
3  it, but that is the answer.  So your answer is, yes, I
4  believe that the insurer owes a duty to LePatner &
5  Associates and LPS in this litigation.
6        MR. STOLTZ:  Can you take this down, Neil?
7  Can you pull up the policy application?
8        THE WITNESS:  Oh, I'm -- oh, pulling down.
9  I'm sorry.
10        Can you mark this as Exhibit -- do you --
11  HH?
12        (Exhibit HH marked for identification.)
13        THE COURT REPORTER:  This will be HH, yes.
14        MR. STOLTZ:  Testing my alphabet skills
15  here, Vivian.
16  BY MR. STOLTZ:
17        Q.  I'm showing you what's been marked as
18  Exhibit HH, and this is the application for coverage
19  that you submitted in connection with the Landmark
20  policy that we just saw.  Do you recognize this
21  document?  And, please, take your time and scroll
22  through it?
23        A.  I don't recognize it, because it says an
24  "Application for CNA" and I know I'm -- for this
25  period of time, I was insured by Landmark, but I will

Page 211

1  accept your representation that Landmark, or whoever
2  underwrote this policy, reviewed this application in
3  furtherance of issuance of the policy in question.
4        Q.  Let me ask you a different way.  Do you
5  agree that this is the application for coverage that
6  was submitted to RSUI for coverage under the policy?
7        A.  I will accept your representation or cause
8  that we -- we've submitted that -- with that
9  understanding.  I -- I won't want to say any more than
10  that.
11        Q.  All right.  Well, let me just tie a bow
12  around this.  Do you have any reason to doubt that
13  this is the application for coverage that was
14  submitted to RSUI for coverage under the policy?
15        A.  No, only because at the bottom here it looks
16  like "other information on RSUI was attached to that
17  CNA application, and the relevant date at the bottom
18  looks like it would have been in anticipation of the
19  RSU policy, which is providing coverage, of one form
20  or another, for this claim.
21        Q.  You know what, it doesn't matter.  You've
22  already admitted in your RFA responses that this is
23  the application.
24        So if you can go to -- well, let's go and
25  just check the signatures.  And just can you please

Page 212

1  confirm?
2        MR. STOLTZ:  And, Neil, if you can, just
3  scroll through for Mr. LePatner.  Can you just confirm
4  that all the signatures in this document are
5  Mr. LePatners?
6  BY MR. STOLTZ:
7        Q.  If you go through and see one that's not
8  your signature, can you just identify it?
9        A.  No.  Those are all my signatures.
10        Q.  Now, if you turn to Page 21 -- or,
11  actually --
12        MR. STOLTZ:  Well, go up, Neil, if you
13  could.  I'm sorry.  I got a little turned around on
14  this.  Can you go to the -- yeah, there we go -- go
15  down -- down -- yeah, can you go to Question 5, Neil?
16  My apologies.
17        THE WITNESS:  (speaking simultaneously)
18  there.
19  BY MR. STOLTZ:
20        Q.  Okay.  Do you see under "Firm Coverage
21  Information," there is a Question 5, and it says "Type
22  of Entity"?
23        MR. STOLTZ:  Neil, if you could highlight
24  that for me, please?
25  BY MR. STOLTZ:

Page 213

1        Q.  Do you see that?
2        A.  Yes.
3        Q.  Do you agree that you -- the box that's
4  checked under "Type of Entity" is "LLP," correct?
5        A.  Yes.
6        Q.  And you would agree with me that the box for
7  LLC is unchecked in Question 5, correct?
8        A.  Correct.
9        Q.  Now, if you go to Question 8 on this
10  document.  It reads, "Does the firm practice in states
11  other than the primary location?"  And you have
12  checked off "No," correct?
13        A.  That is correct.
14        Q.  And the primary location of LePatner &
15  Associates at the time you completed this application
16  was New York, correct?
17        A.  Then and now.
18        Q.  Okay.  If you turn to Question 26 a. it
19  asks, "Does the firm regularly confirm representations
20  in writing via use of formal engagement letters?"  And
21  you answered "Yes," correct?
22        A.  That is our policy and we do that.  That was
23  correctly answered, yes.
24        Q.  But you had no such written engagement
25  letters in your dealings with the Nusseibehs, correct?

Barry Lepatner
November 22, 2021

Page 214

1    A.   That was a very highly unfortunate exception
2  to our policy, yes.
3        MR. STOLTZ:  Now -- you can take this down.
4  BY MR. STOLTZ:
5    Q.   After the RSUI policy -- sorry, withdrawn.
6         After the Landmark policy was issued to
7  LePatner & Associates, did you review it?
8    A.   I'm sure I didn't.
9    Q.   I'm sorry.  Can you --
10       MR. SALISBURY:  Yeah, was that sure did not
11 or did?
12       THE WITNESS:  I -- I'm sure I did not.
13 BY MR. STOLTZ:
14   Q.   Okay.  So just -- I want to make absolutely
15 sure I understand your testimony here.  After RS --
16 after -- excuse me -- withdrawn.
17        After the policy that we've marked as
18 Exhibit, I believe GG, was issued to LePatner &
19 Associates.  You did not review it, correct?
20       MR. SALISBURY:  Objection; asked and
21 answered.  Go ahead.
22       THE WITNESS:  I do not -- I do not recall
23 reviewing it.
24 BY MR. STOLTZ:
25   Q.   Okay.

Page 215

1    A.   But there came a later date when I had
2  discussions about it, when there was questions of
3  coverage, but I do not, as a matter of course, sit and
4  review policies after they're issued and reviewed by
5  our brokers who I rely on.
6    Q.   And I think you would agree with me then
7  that putting aside issues of coverage that we're here
8  talking about today, after you received the Landmark
9  policy, you didn't have any questions about coverage,
10 correct?  In other words, if you hadn't reviewed the
11 policy, you wouldn't have had any questions about
12 coverage at the time, correct?
13       MR. SALISBURY:  Object to the form.  Go
14 ahead.
15       THE WITNESS:  I've had professional
16 liability policies for 40 -- 35 years, at least.  And
17 I'm pretty familiar with the basic, so asked to
18 discuss them with the brokers, and when they tell me
19 we're replacing your coverage with this company or
20 that company this year, here is what your deductible
21 is, it's the customary aggregate limits, limits
22 proclaim, et cetera, and assuming they don't tell me
23 there is any unusual exclusion, I know what I'm
24 getting, and I count on them to secure that for me.
25       MR. STOLTZ:  Can you pull up the complaint

Page 216

1  that was filed in this action, Neil?  We'll mark this
2  as Exhibit II.
3        (Exhibit II marked for identification.)
4        THE COURT REPORTER:  Yes.
5  BY MR. STOLTZ:
6    Q.   I'm showing you what's been marked as
7  Exhibit II, and this is the complaint that you filed
8  against RSUI in the action that we're here about
9  today, correct?
10   A.   I believe so, correct.
11       MR. STOLTZ:  Now, if you go to Paragraph 17,
12 Neil.
13 BY MR. STOLTZ:
14   Q.   It states RSUI -- sorry, if you go to the --
15 withdrawn.
16        If you go to the, I believe, second
17 sentence.  It reads RSUI informed LePatner that it
18 would only -- it's been a long day.  Withdrawn.
19        "RSUI informed LePatner that it would pay
20 only 50% of the Claim Expenses, including expert fees,
21 incurred in connection with the defense of the
22 Nusseibeh action."
23        Do you see that?
24   A.   Yes.
25   Q.   Isn't it true that RSUI agreed to provide a

Page 217

1  full defense to LePatner & Associates under a
2  reservation of rights?
3    A.   It agreed to provide coverage to LePatner &
4  Associates, but not to all aspects of the claim for
5  which we were being sued, that we believe were covered
6  under the policy.
7    Q.   Did RSUI agree to provide a full defense to
8  LePatner & Associates under a reservation of rights?
9    A.   No.
10       MR. STOLTZ:  Okay.  Can you pull up the
11 RSUI's July 20th, 2017, coverage letter, please?  It's
12 RSUI_001150.
13        Can you mark this Exhibit as JJ?
14       (Exhibit JJ marked for identification.)
15       THE COURT REPORTER:  Yes.
16 BY MR. STOLTZ:
17   Q.   Mr. LePatner, I'm showing you Exhibit JJ,
18 which is the July 20th, 2017, letter from Katherine
19 Dowling at RSUI to you and LePatner & Associates.
20        Do you recall receiving this letter?
21   A.   Yes, I do.
22   Q.   Now, if you turn to Page 13 of the letter,
23 under "Landmark's Coverage Position," the first
24 sentence reads --
25       MR. STOLTZ:  And, Neil, you can highlight

Barry Lepatner
November 22, 2021

Page 218

1  it.
2  BY MR. STOLTZ:
3      Q.  -- "Pursuant to the policy terms and
4  provision, Landmark has agreed to provide coverage to
5  LePatner & Assoc. with respect to this claim, subject
6  to the above-stated reservation of rights."
7      Do you see that?
8      A.  Oh, hold on a sec.  I'm sorry.  It's with
9  the -- I see that, yes.
10     Q.  And the next sentence provides that Landmark
11 is appointing Jody Cappello of Winget Spadafora to
12 represent LePatner & Associates, correct?
13     A.  Yes.
14     Q.  And in fact, RSUI did appoint Jody Cappello
15 to represent LePatner & Associates in the underlying
16 action, correct?
17     A.  I'm sorry.  I didn't hear the first part of
18 your sentence.
19     Q.  And in fact, RSUI did appoint Jody Cappello
20 to represent LePatner & Associates in the underlying
21 action, correct?
22     A.  Well, notwithstanding their appointment or
23 suggesting, because of the reservation of rights, I
24 did my own due diligence, and on my own behalf,
25 retained Jody to be my counsel, my sole counsel, in

Page 219

1  this action, notwithstanding the reservation of
2  rights, and my learning that they were not going to
3  cover my full defense expenses in this action.
4      Q.  Did you retain Jody on behalf of LePatner &
5  Associates or on behalf of Project Solutions?
6      A.  I retained him to represent the interest of
7  LePatner & Associates in all respects, which included
8  LPS.
9      Q.  Who represented Project Solutions in the
10 underlying action?  Was it Jody Cappello?
11     A.  That's correct.
12     Q.  And that was pursuant to what agreement?
13     A.  Any insurer who had done the due diligence
14 appropriate for insuring my law firm had full access
15 to information that is public --
16     Q.  Mr. LePatner --
17     A.  -- that shows that we operate and perform
18 services for our clients that are unlicensed people to
19 be in the field operate under the name of LePatner
20 Project Solutions.  Without it, we would be putting
21 lawyers -- people who are law firm names -- in the
22 field, which would be unacceptable to the design and
23 construction community.  Anyone would have known that
24 if they did due diligence.
25     So as far as I'm concerned, as far as we've

Page 220

1  contended, and as far as we will consistently contend
2  throughout the course of this litigation, LPS had the
3  same obligations we represented as LePatner &
4  Associates under this policy.
5      Q.  Do you agree that in this letter that we
6  have up in front of you, in that highlighted portion
7  that is under "Landmarks Coverage Position," that
8  Landmark is saying that they agree to provide coverage
9  to LePatner & Associates with respect to the claim
10 subject to a reservation of rights?
11     A.  But they did not provide that coverage to
12 LePatner & Associates and when they chose to create
13 some separate identity of interests with respect to
14 LPS.
15     Q.  So that's the factual basis for your
16 contention that RSUI has a duty to defend our --
17 Project Solutions that RSUI created a separate
18 identity of interest for Project Solutions?  Is that
19 your --
20     A.  No.
21     Q.  -- your testimony?
22     A.  They -- they created -- they created an
23 artificial distinction that did not exist because LPS
24 is LePatner and LePatner is LPS.
25     Q.  (speaking simultaneously) They're separate

Page 221

1  legal --
2      A.  And we cannot --
3      Q.  -- entities, correct?  Are they separate --
4      A.  And we cannot --
5      Q.  -- legal entities?
6      A.  -- provide the full panoply of our legal
7  services, except by operating in the field, with LPS
8  personnel under that entity name as opposed to being
9  lawyers in the construction world and anybody would
10 have known that if they'd done the due diligence.
11     Q.  LePatner & Associates and Project Solutions
12 were two separate legal entities, correct?
13     A.  They were one and the same in so far as
14 performing the services that the law firm promises to
15 its clients and its clients fully understood that.
16     Q.  LePatner & Associates was a limited
17 liability partnership, correct?
18     A.  Yes.
19     Q.  And Project Solutions was a limited
20 liability corporation, correct?
21     A.  A non-operating limited liability
22 corporation that has a nominal name to distinguish it
23 so that it could -- we can send our non-licensed
24 personnel into the field to work with construction
25 workers, architects, and engineers, in a

Barry Lepatner
November 22, 2021

Page 222

1  non-adversarial process.
2       Q.  But you filed a separate -- withdrawn.
3           You, in order to create Project Solutions,
4  had to file a separate articles of incorporation for
5  Project Solutions, correct?
6           MR. SALISBURY:  Objection; lacks foundation.
7  BY MR. STOLTZ:
8       Q.  Well, let me withdraw.
9           Did you file separate articles of
10  incorporation for Project Solutions LLC?  Yes or no.
11      A.  Yes.  I'm sorry.  I didn't know if you were
12  finished.  Yes.
13      Q.  All right.  And you filed separate articles
14  of incorporation for the creation of LePatner &
15  Associates LLP, correct?
16      A.  Well, the equivalent of that, yes, it's a
17  limited liability partnership.  It's partnership.
18      Q.  Whatever the governing document is.  You
19  created a separate one from LePatner & Associates,
20  correct?
21      A.  That had always existed long before LPS was
22  brought into existence.
23      Q.  So again, I just want to make perfectly
24  clear, because this is very important in the case.
25           Despite what's written on these -- on this

Page 223

1  page here, wherein Landmark is saying that they agreed
2  to provide coverage to LePatner & Associates with
3  respect to the claim, subject to a reservation of
4  rights, it's your testimony that Landmark did not
5  provide coverage to LePatner & Associates with respect
6  to the claim subject to a reservation of rights?
7       A.  With respect to this claim, because they did
8  not afford coverage to LPS who was the direct
9  authorized extension of services that the law firm was
10  providing to its client.  The fact that Landmark did
11  not provide that extended defense to LePatner Project
12  Solutions, I believe was a breach of its agreement and
13  falls afoul of the obligation under New York insurance
14  law to provide an unfettered defense to protect the
15  interest of the insured whether the claim is false,
16  which it was; fraudulent, which it was; or otherwise
17  not representative in any other capacity, which this
18  complaint -- meaning the Nusseibeh complaint -- was
19  because it manufactured claims that were found to be
20  without basis.  They owed us a full defense.
21      Q.  You testified that you were -- well,
22  withdrawn.
23           Were you pleased with the representation
24  provided by Winget Spadafora in the underlying action?
25      A.  Yes.

Page 224

1       Q.  Okay.  And Winget Spadafora represented,
2  again, both LePatner & Associates and Project
3  Solutions in the underlying action, correct?
4       A.  They understood to represent the best
5  interest of LePatner & Associates was the dual,
6  simultaneous representation, of the interest of LPS.
7           MR. STOLTZ:  Can you -- I'm sorry.  It's
8  been a long day, Vivian, I apologize for this.  Can
9  you read back the last answer?
10          THE COURT REPORTER:  Sure.  One second.
11          (The previous answer was read back.)
12  BY MR. STOLTZ:
13      Q.  And again, is it your testimony that you
14  separately retained Winget Spadafora to represent
15  either LePatner & Associates or Project Solutions in
16  the underlying action?
17          MR. SALISBURY:  Objection; lacks foundation.
18  Go ahead.
19  BY MR. STOLTZ:
20      Q.  Well, withdrawn.
21      A.  I know --
22      Q.  Did you separately -- did you -- I'll
23  withdraw the question and ask a different one.
24          Did you separately retain Winget Spadafora
25  to represent either LePatner & Associates or Project

Page 225

1  Solutions in the underlying action?
2       A.  I had the right, under New York law, to
3  retain my own choice of counsel.  I could have picked
4  any law firm in Connecticut to represent me.  The
5  recommendation of Landmark of the Winget firm, was
6  reviewed by me, discussed with people I know in
7  Connecticut who knew the firm, I had discussions with
8  Jody Cappello.  He gave me all of his background and
9  after that due diligence, I -- "I" selected him to be
10  the counsel for the defendants in the Nusseibehs case.
11      Q.  Did you have a written document that
12  confirms your selection of the Winget Spadafora firm
13  to serve --
14      A.  Sure.
15      Q.  -- as counsel in the Nusseibeh action?
16      A.  Of course.
17      Q.  Okay.  And was that written document --
18      A.  It's called the -- it's called the answer
19  that we filed where he answered on behalf of both
20  entities.
21      Q.  Any other document, which you content is an
22  agreement to serve as counsel for Project Solutions
23  and LePatner & Associates in the --
24          MR. SALISBURY:  Objection.
25          MR. STOLTZ:  -- underlying action?

Page 226

1          MR. SALISBURY:  Sorry.  Objection --
2          THE WITNESS:  As a lawyer, do you think I
3  need further documentation?  Would I have ever
4  permitted someone to file an answer on my behalf?
5  BY MR. STOLTZ:
6     Q.   Again, I'm the one asking questions here,
7  Mr. LePatner.  So you've --
8     A.   Yes.
9     Q.   -- got to answer the questions I ask.
10    A.   I hope you get to this -- the effort by RSUI
11 or their representatives to try and replace
12 Mr. Cappello.  We should have a question about whether
13 I did my due diligence on that as well.
14    Q.   Just move to strike the non-responsive
15 portions of Mr. LePatner's testimony.
16         I'm going to ask you one more time.  Did you
17 separately retain Winget Spadafora to represent
18 Project Solutions or LePatner & Associates in
19 connection with the underlying action?
20    A.   I retained them, as I stated, to represent
21 the interests of both entities, yes.
22    Q.   And what was the written retainer agreement
23 that you entered into with the Winget Spadafora firm
24 to represent the interest of Project Solutions and
25 LePatner & Associates in connection with the

Page 227

1  underlying action?
2     A.   Are you implying the client issues a
3  retainer agreement to the law firm?  Because that's
4  not how it works --
5     Q.   Can you --
6     A.   -- as us lawyers do.
7     Q.   I'll withdraw the question.
8          What is the written retainer agreement that
9  was issued that confirms that you separately retained
10 Project Solutions and LePatner & Associates -- no,
11 withdrawn, sorry.
12         What is the separate written retainer
13 agreement that confirms that you retained the Winget
14 Spadafora firm to represent the interests of Project
15 Solutions and LePatner & Associates in connection with
16 the underlying action?
17    A.   After Landmark proposed Jody Cappello's
18 firm, and I spoke with him, Jody wrote a letter to me
19 saying he would -- was willing, after this
20 recommendation from the insurer, to represent me in
21 this action and I never responded negatively.  We
22 then, after I'd done my due diligence, we moved
23 forward, and he actively proceeded to represent me.
24         So if there was any written acknowledgement,
25 it's from the Winget firm to me proposing that they be

Page 228

1  selected by me, and I so agreed.
2     Q.   Well, I've never seen any such document and
3  it wasn't in the documents that have been produced in
4  discovery by the plaintiffs in this action.
5          MR. STOLTZ:  So I'm going to call for
6  production of that letter and I'll follow up in
7  writing, Carl.
8          MR. SALISBURY:  We don't need to, Patrick.
9  That was part of the discussion, I believe, that we
10 had with the judge this afternoon.
11         MR. STOLTZ:  Okay.
12         MR. SALISBURY:  Those documents have not yet
13 been produced by Jody Cappello.
14         MR. STOLTZ:  Okay.
15 BY MR. STOLTZ:
16    Q.   Do you agree that Winget Spadafora separated
17 the fees incurred in connection with the defense of
18 LePatner & Associates and Project Solutions in the
19 underlying action?
20    A.   I never saw that separation.  I was never --
21 I don't know if I ever received any invoice from the
22 firm.
23    Q.   Would you agree that Winget Spadafora in its
24 own discretion determined which of its fees related to
25 LePatner & Associates and Project Solutions?

Page 229

1          MR. SALISBURY:  Objection; lacks foundation.
2          THE WITNESS:  If they did do that, it was
3  contrary to my instructions, contrary to what I
4  believe was the obligation I'm owed from the insurance
5  company, and I would rather vociferously object to him
6  unilaterally providing that information unless the
7  insurance company threatened him, in some way, to
8  provide that information because they certainly never
9  discussed that with me.  I never would have agreed to
10 it.
11 BY MR. STOLTZ:
12    Q.   What were your specific instructions as you
13 just testified to?
14    A.   To represent the interests of LePatner &
15 Associates and LePatner Project Solutions in defending
16 against every allegation asserted by the Nusseibehs
17 who wrongfully accused me of causing them harm in the
18 face of all the documentation I provided them to
19 pursue the claim against York.  That is the underlying
20 travesty where they made me the victim of their own
21 victimhood and refused to go after the appropriate
22 party who we clearly documented had wronged them.
23    Q.   Can you just note, you know, for the record,
24 I'm moving to strike the non-responsive portion of
25 Mr. LePatner's answer.

Barry Lepatner
November 22, 2021

Page 230

1    My question to you is this:  You testified
2  two questions ago that if Winget Spadafora had
3  separated the invoices between LePatner & Associates
4  and Project Solutions, that that would be contrary to
5  your instructions.  Those were your words, not mine.
6        And my question to you is:  What were your
7  specific instructions with -- that you gave to Winget
8  Spadafora in connection with the invoicing of fees for
9  the underlying action?
10   A.   I never gave instructions.  I assumed he was
11  going to bill the insurance company.
12   Q.   Well, do you have any evidence to suggest
13  that in separating the fees incurred between LePatner
14  & Associates and Project Solutions that Winget
15  Spadafora did not exercise its own discretion in good
16  faith?
17        MR. SALISBURY:  Objection; it totally lacks
18  foundation but go ahead and answer.
19        MR. STOLTZ:  I'm asking if he has any
20  evidence.
21        THE WITNESS:  You're asking me to go --
22  BY MR. STOLTZ:
23   Q.   Go ahead.
24   A.   You're asking me --
25        THE COURT REPORTER:  I'm sorry.  You're all

Page 231

1  talking at once.  I need one person at a time.
2        MR. SALISBURY:  I know.  It would be good --
3  I mean, look, you --
4        MR. STOLTZ:  All right.  I'll withdraw it.
5  I'll withdraw the question, Carl.  I'll ask a
6  different question.
7  BY MR. STOLTZ:
8   Q.   Do you know whether Winget Spadafora
9  exercised its discretion and good faith in determining
10  which of its fees related to LePatner & Associates and
11  Project Solutions, do you know?  Yes or no.
12        MR. SALISBURY:  Also lacks foundation but go
13  ahead.
14        THE WITNESS:  I do not know.
15  BY MR. STOLTZ:
16   Q.   Okay.
17   A.   I never received any billing from them that
18  I know of.
19   Q.   Well, just to confirm, I want to make sure
20  the record is clear here.  Has Winget Spadafora sought
21  payment for Project Solutions for any of the fees it's
22  incurred in this case?
23   A.   No.
24   Q.   And are you aware that RSUI has paid or will
25  pay Winget's fees incurred in the defense of LePatner

Page 232

1  & Associates?
2   A.   I learned yesterday from Mr. Salisbury --
3        MR. SALISBURY:  I'd rather you didn't talk
4  about what you learned --
5        MR. STOLTZ:  Well, yeah, yeah, time out.  I
6  don't want to know about any conversations with
7  Mr. Salisbury.
8  BY MR. STOLTZ:
9   Q.   So, I mean, you can answer yes or no to that
10  question or I could repeat it, but as far as the
11  substance of the discussion with Mr. Salisbury, that
12  -- I'm going to take your client -- your attorney's
13  advice here.  But let me ask the question.
14        Are you aware that RSUI has paid or will pay
15  Winget's fees incurred in the defense of LePatner &
16  Associates?  Yes or no.
17        MR. SALISBURY:  Without disclosing where you
18  learned it or how.
19        THE WITNESS:  Yes.
20        MR. STOLTZ:  Okay.  Can you pull the
21  complaint up again, Neil?  Can you go to Paragraph 22?
22  We're back at -- I think this is exhibit -- I don't
23  know what exhibit number this is, Vivian.  What is
24  this?
25        THE COURT REPORTER:  I think this is K.

Page 233

1        MR. STOLTZ:  Well, we're in the doubles now,
2  KK?
3        THE COURT REPORTER:  Let me see.  Hold on.
4  Oh, this is the next -- I'm sorry.  I didn't realize
5  this was a new --
6        MR. STOLTZ:  No, no, it's not a new exhibit.
7  This is --
8        THE COURT REPORTER:  This is II then.  This
9  is II.
10        MR. STOLTZ:  Okay.  Right.
11        THE COURT REPORTER:  Sorry about that.
12  BY MR. STOLTZ:
13   Q.   So I'm showing you the complaint that you
14  filed or that -- excuse me -- that LePatner &
15  Associates filed in this action against RSUI and we're
16  on Paragraph 22 of that complaint.
17        It states, "RSUI's position on the defense
18  of the Nusseibeh action has placed LePatner in the
19  untenable position of being unable to present an
20  adequate defense to the claims, to participate fully
21  in a court-conducted mediation, or to prepare for
22  trial of the matter, currently scheduled for July
23  2020."
24        Do you see that?
25   A.   I see all the paragraphs on that page, which

Barry Lepatner
November 22, 2021

Page 234

1  are (speaking simultaneously) --
2        Q.  Okay.
3        A.  -- to that.
4        Q.  Now, there was no trial in the underlying
5  action, correct?
6        A.  There was a settlement before trial.
7        Q.  Okay.  And without getting to the specifics
8  of the settlement, including the numbers, RSUI and
9  LePatner & Associates and you, personally, came to an
10 agreement concerning what portion of that settlement
11 RSUI is going to contribute towards, correct?
12          MR. SALISBURY:  I'm going to --
13          THE WITNESS:  Yes.
14          MR. SALISBURY:  -- object to this line of
15 questioning is violative of Rule 408 but go ahead and
16 answer.
17          MR. STOLTZ:  Well --
18          THE WITNESS:  Yes.
19          MR. STOLTZ:  -- I'm not asking him to -- I'm
20 not asking him the amount of the settlements.  And I'm
21 just asking whether or not the parties reached an
22 agreement concerning RSUI's contribution towards the
23 settlement.
24          MR. SALISBURY:  I didn't direct him not to
25 answer the question.  I just object to it because it's

Page 235

1  settlement discussions and not an appropriate -- not
2  appropriate for this action but go ahead.
3          THE WITNESS:  My answer was yes.
4  BY MR. STOLTZ:
5        Q.  Okay.  Is it fair to say that given the
6  settlement of the underlying action, that there is no
7  longer any dispute concerning RSUI's duty to indemnify
8  LePatner & Associates in connection with the
9  underlying matter?
10          MR. SALISBURY:  That's an appropriate
11 question.
12          THE WITNESS:  I believe that's a fair
13 statement, yes.
14 BY MR. STOLTZ:
15       Q.  Okay.  Now, we had served an interrogatory
16 on plaintiff that sought the quantum of fees incurred
17 by defense counsel at Winget Spadafora, which
18 plaintiff contends RSUI is liable to pay, and we
19 haven't received a response in interrogatory.  And
20 I'll represent to you that it's subject that that --
21 that interrogatory is subject of a -- of the court
22 conference that we had this afternoon.
23          But let me just ask for the record:  Do you
24 know what the total amount of defense fees incurred in
25 the underlying action that you were contending RSUI is

Page 236

1  liable to pay?
2        A.  No.
3        Q.  And do you know what the total amount of
4  expert fees in the underlying action you contend RSUI
5  is liable to pay?
6        A.  I've heard different numbers from 82,000, of
7  which there have been partial payment, down to there
8  is a remaining 32 or 35,000.  I'm not sure what the
9  accounting is on that side of the equation.
10       Q.  Now, the expert fees that you just
11 referenced, those are from CED, the expert that we
12 discussed earlier in your testimony, correct?
13       A.  I believe they were from the three
14 individuals, not CES.  I'm not sure if that -- if CES
15 submitted any expert fees, but I was told that there
16 was a big issue with the expert fees that those three
17 individual experts, who were retained by Jody Cappello
18 had invoiced, at one time, $82,000 or sometimes I
19 heard 70-something-thousand.  I'm not sure what the
20 number was.
21       Q.  And are the defense fees incurred by Winget
22 and the expert fees from the experts that we
23 previously discussed, are those the only damages
24 plaintiffs are seeking from RSUI in this matter, at
25 this point?

Page 237

1        A.  I don't know how to answer that, because it
2  would require me to give a legal answer.
3        Q.  Okay.  What would you need to determine the
4  amount of defense fees incurred by Winget that you're
5  seeking from RSUI in this matter?  What information
6  would you need?
7        A.  An award -- an award by the judge of summary
8  judgment that I'm entitled to an unfettered full
9  defense of my interests as an insured, that would
10 obligate RSUI --
11       Q.  It was -- yeah, I think --
12       A.  -- to pay the full amount, whatever that is.
13       Q.  Yeah.  That wasn't my question, but I'll
14 withdraw the question anyway.
15          How much of the outstanding defense costs
16 incurred by the Winget firm in the underlying action
17 do you think Project Solutions is responsible for
18 paying?
19          MR. SALISBURY:  Objection; lacks foundation.
20 Go ahead.
21          THE WITNESS:  I don't think there is a
22 separation.  I think -- I don't -- I don't know how
23 many different ways I can explain to you that the two
24 entities are entirely intertwined under the law firm
25 is only the law firm that dictates the services and

Barry Lepatner
November 22, 2021

Page 238

1  forget about what name you put under it, what --
2  whether you call it construction advisory project --
3  it's in furtherance of the law firm fulfilling its
4  obligation to its client which invoices the client for
5  all those services, one and the same.
6  BY MR. STOLTZ:
7      Q.   What dollar amount do you believe Project
8  Solutions is responsible for paying to the Winget firm
9  in connection with its defense in the underlying
10  action?  What dollar amount?
11     A.   I can't even tell you -- I can't tell you
12  because the full amount of the defense costs should be
13  paid.  There is no separation.  It doesn't -- it's
14  irrelevant to the -- to the argument that we're making
15  to you.
16     Q.   Do you think Project Solutions should pay
17  anything?
18     A.   No.
19     Q.   To Winget Spadafora in connection with the
20  defense of the matter -- underlying action?
21         MR. SALISBURY:  Wait a minute -- is the
22  question should Project Solutions pay Winget
23  Spadafora?
24         MR. STOLTZ:  Yes.
25         MR. SALISBURY:  All right.

Page 239

1         THE WITNESS:  And the answer is no.
2  BY MR. STOLTZ:
3      Q.   Okay.  And what about the experts?  Do you
4  think Project Solutions should pay anything towards
5  the experts in the underlying action?
6      A.   Same answer, no.
7      Q.   Has LePatner & Associates paid the entirety
8  of the policies deductible in this matter?
9      A.   Yes.
10     Q.   How much is that?
11     A.   $15,000.  It's right on the appli-- -- the
12  declarations page of the policy and I paid that to the
13  experts at the request of Jody Cappello.
14     Q.   So it's your testimony that you satisfied
15  the entire $15,000 policy deductible through a payment
16  to the experts in the underlying action?
17     A.   Yes.
18         MR. STOLTZ:  Okay.  So at this time, I have
19  no further questions for Mr. LePatner.  However, I am
20  reserving my right to call Mr. LePatner back for a
21  further deposition following the production of
22  additional documents as set forth by the Court during
23  this afternoon's telephonic conference.
24         And I will be submitting a proposed order to
25  the Court this evening which memorializes the

Page 240

1  developments following the Court's conference and
2  among one of the items that I will be putting in that
3  proposed order is a reservation of our ability, of
4  defendant's ability, to recall Mr. LePatner to answer
5  any questions with respect to documents that have not
6  yet been produced in discovery and that is going to be
7  subject to the Court's order, which we anticipate the
8  Court will enter at some point tomorrow.  So --
9         MR. SALISBURY:  Can we have the -- can we
10  have a read out of the amount of time thus far?
11        MR. STOLTZ:  Why don't we go off the record?
12        THE COURT REPORTER:  Yeah.  Thank you.
13        (Remote deposition concluded at 5:25 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 241

1              CERTIFICATE OF REPORTER
2
3  STATE OF NEW YORK    )
4  COUNTY OF WESTCHESTER COUNTY  )
5
6      I, VIVIAN MARBAN, CER No. 1273, do hereby certify
7  that I was authorized to and did electronically report
8  the deposition of BARRY LEPATNER; that BARRY LEPATNER
9  declared to be under penalty of perjury on the date
10  indicated; that the questions and answers thereto were
11  reduced to typewriting under my direction; and that
12  the foregoing is a true and accurate electronic
13  recording of the proceedings.
14     I FURTHER CERTIFY that I am not a relative,
15  employee, or attorney, or counsel of any of the
16  parties, nor am I a relative or employee of any of the
17  parties' attorneys or counsel connected with the
18  action, nor am I financially interested in the action.
19
20     DATED this 8th day of December 2021.
21         _Vivian Marban_
22     _____
22     VIVIAN MARBAN, CER No. 1273
23
24
25

Barry Lepatner
November 22, 2021

Page 242

1        CERTIFICATE OF TRANSCRIPTIONIST

2

3        I, JEANNE MURIE, do hereby certify that I

4    transcribed the electronic recording produced by

5    VIVIAN MARBAN, CER No. 1273, of the deposition of

6    BARRY LEPATNER; and that the foregoing transcript is a

7    true transcript of said electronic recording.

8

9        I FURTHER CERTIFY that I am not a relative,

10   employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am

13   I financially interested in the action.

14

15        DATED this 8th day of December 2021.

16

17

18   _____

     JEANNE MURIE

19   AAERT CET No. 1309

20

21

22

23

24

25

Page 243

1        E R R A T A   S H E E T

2    Witness: BARRY LEPATNER
     RE: LEPATNER & ASSOCIATES, LLP vs. RSUI GROUP, INC.

3    Date of Proceeding: November 22. 2021
     U.S. Legal Support Reference No.: 6034534

4

5      PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
          REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM

6

7    Page / Line /      Change     / Reason

8    _____/_____/_____/_____

9    _____/_____/_____/_____

10   _____/_____/_____/_____

11   _____/_____/_____/_____

12   _____/_____/_____/_____

13   _____/_____/_____/_____

14   _____/_____/_____/_____

15   _____/_____/_____/_____

16   _____/_____/_____/_____

17   _____/_____/_____/_____

18   _____/_____/_____/_____
     Under penalties of perjury, I declare that I have

19   read the foregoing transcript and that the facts
     stated in it are true.

20
     _____  _____

21   BARRY LEPATNER                    Date

22   (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
     Sworn and subscribed to before me this ___ day of

23   _____, 20____.

24
     _____  _____

25   NOTARY PUBLIC              BARRY LEPATNER

Barry Lepatner
November 22, 2021

---

**Exhibits**

EX A Barry Le
patner 112221
4:6 19:24,25
20:7 30:20
32:4
EX AA Barry L
epatner 11222
1
5:15 185:24
186:5
EX B Barry Le
patner 112221
4:7 22:9,10
EX BB Barry L
epatner 11222
1
5:16 191:10,
13 196:24
197:13
EX C Barry Le
patner 112221
4:9 29:12,13
EX CC Barry L
epatner 11222
1
5:17 196:10,
13
EX D Barry Le
patner 112221
4:10 38:16
EX DD Barry L
epatner 11222
1
5:18 198:9,
11
EX E Barry Le
patner 112221
4:11 44:20,
21
EX EE Barry L
epatner 11222
1
5:19 200:13,
16 201:15

EX F Barry Le
patner 112221
4:12 52:1,2
53:17 54:15
78:6 81:14,
17 86:19
90:11 95:5,
16 97:3
99:16,17
100:4,9
101:18
103:11,20
106:10,25
110:1 111:18
113:1,11,15,
21 116:8
129:12
160:15
161:14
162:21,24
EX FF Barry L
epatner 11222
1
5:20 201:18
203:10
EX G Barry Le
patner 112221
4:13 52:23,
24 53:18
81:13
EX GG Barry L
epatner 11222
1
5:21 204:3,4
EX H Barry Le
patner 112221
4:14 60:4,5
EX HH Barry L
epatner 11222
1
5:22 210:12,
18
EX I Barry Le
patner 112221
4:15 70:5
99:17

EX II Barry L
epatner 11222
1
5:24 216:2,
3,7
EX J Barry Le
patner 112221
4:16 88:2,3
89:16
EX JJ Barry L
epatner 11222
1
5:25 217:14,
17
EX K Barry Le
patner 112221
4:17 92:8,9
EX L Barry Le
patner 112221
4:18 104:7
105:5 106:21
EX M Barry Le
patner 112221
4:19 118:4,7
EX N Barry Le
patner 112221
4:20 122:11,
12
EX O Barry Le
patner 112221
4:21 132:6,7
135:11,13
EX P Barry Le
patner 112221
4:22 143:6
EX Q Barry Le
patner 112221
4:23 145:20,
21
EX R Barry Le
patner 112221
5:3 148:24,
25
EX S Barry Le
patner 112221
5:5 116:22

EX T Barry Le
patner 112221
5:7 153:4
EX U Barry Le
patner 112221
5:8 154:6,7
EX V Barry Le
patner 112221
5:9 156:18,
19
EX W Barry Le
patner 112221
5:11 166:23
173:2 174:23
EX X Barry Le
patner 112221
5:12 169:18,
21
EX Y Barry Le
patner 112221
5:13 171:24
173:3
EX Z Barry Le
patner 112221
5:14 180:24
185:23 186:1

---

**"**

**"PMA**
61:6

---

**$**

**$100**
173:10
**$12**
127:19
**$15,000**
239:11,15
**$39**
114:6
**$60,000**
182:16
**$72,000**
153:20

Barry Lepatner
November 22, 2021

**$82,000**
  236:18

---

**0**

---

**0.50**
  171:16
**0.75**
  175:7

---

**1**

---

**1**
  52:13 96:22
  97:24 98:9
  99:5 106:4
  107:8 132:15
  198:15
  204:11,21
**1,000**
  12:14
**1.25**
  177:22
**1/15**
  175:18
**1/16/2014**
  177:5,7
**10**
  32:11 36:9
  47:18
**100**
  17:10 24:25
  32:18 33:7
**10022**
  55:13
**100s**
  176:4
**10:03**
  7:5
**10th**
  70:7,18 71:3
**115**
  13:25 59:18,
  24 60:11
  61:15 69:25
**115th**

13:24 14:2
  70:10
**11968**
  8:21
**11:06**
  51:20
**11:12**
  51:21
**11th**
  135:17
**1210.1**
  72:15 73:19
**1273**
  7:3
**12:08**
  91:16,23
**12:18**
  91:19
**12:19**
  91:24
**12:29**
  99:13
**12:32**
  99:14
**13**
  139:7 217:22
**13-4(4)**
  144:7
**14**
  96:11 166:25
  168:2
**14th**
  166:17,19
  170:2 175:1,
  14 178:9
**15**
  35:4 36:9
  61:24 176:17
**15th**
  63:23 64:1
  109:4 127:14
**16**
  40:13
**16th**
  20:9 21:21
  22:3,6 118:8
  156:4

**17**
  96:9 97:14
  172:3 216:11
**1973**
  22:19
**1980**
  22:21
**1990s**
  12:25
**1996**
  34:19
**19th**
  200:14
**1:50**
  152:18
**1:51**
  152:20
**1st**
  132:24
  198:10

---

**2**

---

**2**
  73:11 105:1,
  5,14,17
  106:13,17
  132:14
  141:10
  153:14,18,22
  154:1,11
  178:13
**20**
  156:16 157:4
**20-249**
  101:10
**20-418**
  101:7
**2013**
  33:9,18
  35:15,25
  50:8 52:7
  55:6 64:22
  65:9,17
  66:1,7,20,24
  67:12,14
  68:2 74:10

76:14,18
  77:18 80:7
  81:8,18
  85:12 88:6
  89:17 96:11
  97:2,20
  172:3
**2014**
  33:9,21,22
  35:15 36:3
  50:17 53:21
  56:13 67:22
  68:2 76:14,
  18 80:8 81:9
  104:10 106:4
  132:12,15,25
  133:15,17
  134:12
  135:8,17
  139:7 169:1,
  21,22,23
  170:17
  171:4,8,13
  172:2,3,4
  173:1 174:10
  175:1,14
  176:17
  177:14,24
  178:3,8,14
  181:5,6
  186:6,14
  187:5 191:11
  192:20
  196:11,23
  197:12
  198:10
  200:14
  201:21
  202:13
**2015**
  56:19 141:19
**2016**
  33:12 35:18,
  19 38:23
  39:1,4
  40:10,20
  41:19 42:8,
  23 43:18

56:22 61:14,
24 70:7,18
71:3
**2017**
33:15 35:22
56:25 113:18
204:11,21
217:11,18
**2018**
59:22 118:8
204:12,21
**2019**
18:7,15,19,
20,24 19:21
57:6,9 58:6,
9 59:5 155:3
**2020**
20:9 21:21
22:3,6
122:15
152:23
153:6,18,22
154:11
233:23
**2021**
44:7 166:17,
19,25 168:2
170:2 178:10
**20th**
178:14 181:6
201:21
202:13
217:11,18
**21**
212:10
**210**
88:9
**22**
156:15,16
157:4 232:21
233:16
**23**
177:14
**23rd**
177:24
**24**
97:20

157:19,22
**24th**
18:7,15,19,
20,24 19:21
52:7 55:6
77:18 81:18
97:2 181:18
**25**
34:21
157:19,23
158:1
**26**
88:6 213:18
**28th**
178:3,8
181:4 186:6,
13 187:5
**2:48**
152:21
**2:59**
160:10
**2nd**
191:11
192:20
196:23
197:12

---
**3**
---

**3**
22:21 73:15
162:21 181:5
198:16,17
199:11
**30(b)(6)**
29:5,9 30:6
**30th**
169:23 172:3
**31**
132:12
169:21 172:1
**31st**
104:9 169:1
**32**
236:8
**320**
13:24,25

59:17,24
60:11 61:7,
15,24 69:24
70:10
**35**
11:10 30:24
31:3 54:25
89:1 215:16
**35,000**
236:8
**350**
25:11
**37710**
171:20
172:1,17
173:3
175:11,15
176:24
177:2,10,23
**37711**
104:2
**37891**
169:1,6
170:9 172:16
173:2 174:23
176:14
177:4,15
**37918**
178:3,8
**37920**
180:20,21
181:5 186:1
**37982**
132:5
**3:14**
160:11
**3:52**
185:18
**3rd**
196:11

---
**4**
---

**4**
94:4 155:6
198:16 206:1

**40**
93:14 94:5,
7,15 95:11,
15,20 100:1
110:13,15
130:2,8,15
166:9,10,11
215:16
**408**
234:15
**40th**
47:18
**41**
48:8
**44**
100:16,23
110:22
**44(a)**
101:16
110:24
**4:00**
185:12
**4:12**
185:19
**4th**
122:15

---
**5**
---

**5**
212:15,21
213:7
**50**
8:20 14:15,
16 142:18
**50%**
216:20
**50-**
182:16
**500**
24:25
**52nd**
55:17
**54th**
55:19
**575**
52:16 53:14

Barry Lepatner
November 22, 2021

55:12
**5:25**
240:13
**5th**
133:15,17
134:12 135:8

---

**6**

**6**
81:21,23,24
82:25 90:20
**651437**
59:21

---

**7**

**7**
61:14
**70-something-
thousand**
236:19
**710**
47:18
**72**
63:2,16,21
**73**
61:4 63:3,5
**75**
63:16
**77**
61:22 63:22
**7898**
200:11
**79**
88:15 201:21
**7th**
63:20,25

---

**8**

**8**
213:9
**811**
144:13

**82,000**
236:6
**8461**
191:8
**8th**
152:23 153:6

---

**9**

**9th**
169:22
171:12
172:4,16
173:1

---

**A**

**a-t**
8:12
**a.m.**
51:20,21
**a/k/a**
59:23
**AA**
185:22,24,25
186:5
**ability**
16:11 45:16
240:3,4
**able**
39:11 70:19
107:15
108:8,13,14
**above**
40:24 41:2
61:9
**above-stated**
218:6
**Abraham**
150:13,20
**absolutely**
158:12 199:5
214:14
**AC**
126:6
**accelerated**

180:2
**acceleration**
178:18
179:18
**accept**
156:5 170:3
178:11
191:19
196:19
204:22 205:2
207:17
211:1,7
**acceptable**
200:22
**accepted**
28:8 85:2,9,
10
**access**
219:14
**accident**
114:17,19
**accomplish**
63:12 64:6
182:18
**accomplished**
102:21
**accomplishing**
49:2
**account**
182:1
**accountant**
140:11
187:13
**accountants**
140:22
**accounting**
236:9
**Accounts**
162:22 163:2
164:10
**accurate**
61:19
**accused**
229:17
**accusing**
183:9
197:22,24

199:12
**achieve**
112:2 166:3
**acknowledge**
7:7,9
**acknowledged**
115:15
190:18
**acknowledgeme
nt**
227:24
**acknowledging**
199:15,19
**act**
61:7 100:21,
25 101:7
102:2,9
111:3 206:9
208:4
**act/omissions**
123:13
**action**
10:11,12
11:9,14,18
12:10,12
15:1,7 18:2,
7 23:25 27:4
73:24 82:13
92:13,16,20
93:10 100:19
117:13
120:12,15
121:11,15
123:20
124:12
145:25
149:13,17
150:8 151:6,
16 155:23
156:25 168:3
176:18 177:6
185:1 205:12
207:24
209:4,7,15,
20 216:1,8,
22 218:16,21
219:1,3,10
223:24

224:3,16
225:1,15,25
226:19
227:1,16,21
228:4,19
230:9
233:15,18
234:5 235:2,
6,25 236:4
237:16
238:10,20
239:5,16
**actions**
12:12
**actively**
227:23
**activities**
124:1
**acts**
120:16
123:21
**actual**
27:8 41:4
44:10
**ad**
130:11
**additional**
36:19 114:18
239:22
**address**
8:18 36:13
47:18 51:7
52:15 53:13
55:12,16
128:24
**adequate**
233:20
**adjacent**
126:24
**adjunct**
49:16
**administered**
7:10
**admitted**
64:21 65:5,
6,12,25
66:6,19

68:1,20
114:21
117:12
118:25 119:6
171:3,7
211:22
**adopt**
97:7,8
**adopting**
97:9
**adversary**
89:24
**advertise**
131:21
**advice**
132:1 134:23
158:18
232:13
**advised**
109:1 131:25
**advisement**
58:3
**adviser**
136:7
**advisory**
48:15 70:9
131:15
134:15 207:9
210:2 238:2
**AE**
23:10 24:9
**aegis**
111:22
112:20
119:11
**affecting**
126:14,15
**affiliated**
149:8
**affirmed**
79:1
**afford**
223:8
**afforded**
208:2
**afield**
68:14

**afoul**
223:13
**afternoon**
228:10
235:22
**afternoon's**
239:23
**agent**
58:15 61:7
**aggregate**
215:21
**ago**
11:23 12:18
22:18 24:11
35:4 36:10
76:2,9,11
129:9,18
141:19
166:11 230:2
**agree**
8:5 48:4
80:2 90:8,
12,17 91:11
93:6 101:16,
20,25
110:15,20,24
111:16
113:17 135:2
139:3 142:7,
10,17
143:16,25
144:3 145:12
150:3 167:16
168:7 175:13
177:23 185:7
190:20
192:19 193:6
199:11
200:20
206:25
207:14 211:5
213:3,6
215:6 217:7
220:5,8
228:16,23
**agreed**
83:4 96:14
111:24 139:4

141:25
142:17
216:25 217:3
218:4 223:1
228:1 229:9
**agreement**
7:15,16 8:7
51:23 58:15
61:6 62:1,5,
6,23 63:7
69:21 71:20
77:7 78:13,
19,24 79:9,
15,18,19
81:12,21
83:5,9 84:10
86:16,20
90:3 91:5
92:2 94:17,
19 95:5,8,9,
14,21,22,25
96:7,12,13,
22 97:1,3,6,
10,14,17,23
98:2,5,15,20
100:3,5,8,9
101:6,9,15,
19 103:7,11,
20,24 106:9,
25 110:1,17
111:2,18,19,
21 112:17
113:1,11,15,
21 115:21
116:8,22
123:25
129:11 138:3
160:14,21
161:13,15,
17,22,23,24
162:25 163:6
186:17,21,22
188:19 206:1
207:17,20
208:2 219:12
223:12
225:22
226:22
227:3,8,13

Barry Lepatner
November 22, 2021

234:10,22

**agreements**
  57:13 64:8,
  12 72:19
  207:12

**ahead**
  17:17 44:19
  53:23 64:16
  71:14 75:12,
  17 76:20
  81:1 86:23
  89:21 95:18
  102:24 107:2
  109:8 110:19
  113:6 117:15
  119:9 120:18
  122:24
  124:15
  147:20
  153:12 161:4
  166:14 167:8
  176:15
  189:12
  190:25
  199:25 202:7
  209:17
  214:21
  215:14
  224:18
  230:18,23
  231:13
  234:15 235:2
  237:20

**aid**
  162:1 173:9

**air**
  114:5 126:7,
  18

**Alfa**
  186:17,23
  190:1

**allegation**
  229:16

**allegations**
  193:15

**allege**
  63:5 96:10
  100:23

**alleged**
  63:2 117:11
  118:24 119:4
  178:16 181:8

**allegedly**
  94:19 95:2

**alleging**
  62:4 63:19,
  24 95:3
  110:16,25
  113:20
  119:16

**allow**
  187:22

**allowed**
  137:15 176:8
  208:15

**alphabet**
  210:14

**Amazon**
  41:17

**ambit**
  49:22 54:8

**amend**
  13:8,9

**amends**
  193:24

**American**
  24:18
  204:17,18
  205:17,24

**amicably**
  185:9

**amount**
  13:20 107:19
  115:14 134:8
  171:16 175:7
  176:19 177:6
  178:19
  180:3,16
  182:19
  234:20
  235:24 236:3
  237:4,12
  238:7,10,12
  240:10

**ampersand**
  94:12

**analysis**
  45:11 128:12
  171:14 172:9
  180:11

**analyze**
  62:16 146:24

**ancillary-
related**
  207:6

**and/or**
  147:18

**Andrews**
  11:10 54:25
  89:1

**angry**
  197:4

**annually**
  154:25

**ans-**
  49:8 78:1

**answer**
  13:5,9 16:12
  26:1,3 30:19
  33:16,25
  34:9,16
  35:23 37:13
  49:7,8 50:20
  53:23,24
  54:3,4 58:24
  59:11,17,20
  60:10 62:15
  64:25 66:3,
  13 67:20
  68:13 71:5
  74:21 76:20
  77:22 78:11
  81:4,23
  86:8,23
  89:21 90:25
  96:3,5 99:9
  100:12
  105:8,20,22
  107:2 108:24
  110:10
  114:13
  117:15

125:8,13,15,
  19 126:1
  128:19
  130:7,17
  131:3,9
  134:21
  135:6,16
  137:5 143:24
  151:25 157:3
  158:25
  162:10,12
  165:19,22
  184:6 190:6,
  25 191:6
  195:8 196:5
  199:25
  208:17
  210:2,3
  224:9,11
  225:18
  226:4,9
  229:25
  230:18 232:9
  234:16,25
  235:3 237:1,
  2 239:1,6
  240:4

**answered**
  49:4 64:15
  78:1,2,10
  86:23 90:25
  91:8 110:19
  124:15 137:3
  148:10
  188:22
  189:7,12
  190:24 195:9
  199:25
  207:19
  213:21,23
  214:21
  225:19

**answering**
  85:22
  130:21,25
  190:12,13
  208:13

Barry Lepatner
November 22, 2021

answers
  54:11 129:7,
  9,18 131:7
  136:19
  137:16
  208:21
anticipate
  240:7
anticipation
  211:18
anybody
  16:21 40:6
  121:1 124:5
  156:8 176:7
  187:22
  189:16 221:9
anymore
  71:14
anyone
  31:25 64:20
  65:11,24
  66:5,19
  113:13
  219:23
apart
  64:8,9
apartment
  8:23
apologies
  78:17 202:19
  212:16
apologize
  148:9 176:12
  224:8
apologized
  183:3
apologizing
  184:21
apparent
  182:12
appellate
  13:21 72:5,
  16
Apple
  114:5
appli-
  239:11

applicable
  80:4 145:1
  146:15,20
  147:18
application
  210:7,18,24
  211:2,5,13,
  17,23 213:15
applies
  207:1,14
apply
  15:21
appoint
  218:14,19
appointed
  118:16
appointing
  218:11
appointment
  218:22
appreciate
  176:13
appropriate
  127:8 219:14
  229:21
  235:1,2,10
approval
  126:11
approve
  136:11
approved
  115:8 140:14
approximately
  11:20 74:9
April
  191:11
  192:20
  196:11,23
  197:12
  198:10,15,16
arbitrate
  73:14
architect
  27:8,21
  107:17 108:2
architects
  23:9 221:25

area
  26:19 55:20
  87:12 134:4
  179:8,25
areas
  23:8 125:2,4
  138:20
  182:10
argued
  123:8
arguing
  117:17
  123:22
  194:17
argument
  238:14
argumentative
  194:15
  195:10
arising
  206:9 208:4
arms
  165:6,21
arose
  68:7 140:16,
  17
around
  26:19 39:6
  53:21 89:17
  107:21
  127:17
  165:6,21
  187:8,24
  206:23
  211:12
  212:13
arrange
  127:6
arrangement
  7:13 63:8
arrows
  48:13
articles
  222:4,9,13
artificial
  220:23

ascertained
  126:4
asked
  22:25 48:17
  59:9 63:10
  64:15 86:22
  89:5 90:24
  91:7 100:11,
  12 110:18
  124:14
  131:23 135:1
  137:2,7
  139:1 145:3,
  4,15 146:16
  147:21
  148:1,5,7,10
  154:16
  164:24 179:5
  188:21
  189:11
  190:23
  195:8,9
  199:24 209:9
  214:20
  215:17
asking
  19:14 38:25
  42:17 68:17
  69:1 80:19
  82:14 97:11
  98:4,5 111:6
  130:13,15
  148:8 151:24
  157:23
  165:17
  166:10,11
  171:6 173:10
  176:11 183:7
  190:7 195:1,
  4 197:18
  198:4,19
  207:18 209:5
  226:6
  230:19,21,24
  234:19,20,21
asks
  213:19

Barry Lepatner
November 22, 2021

aspect
  157:11
  164:11
aspects
  157:10
  164:12 217:4
aspersions
  189:15
Assemble
  45:21
asserted
  206:11 208:6
  229:16
asserting
  165:16
asserts
  92:19 93:9
  100:18
assessment
  155:8 175:6
assigned
  24:3 50:12
  193:4
assignment
  138:25
assist
  77:12 197:8
assistant
  42:3 43:15,
  17
assisting
  10:3
Assoc
  218:5
associate
  22:19
  170:18,22
Associate's
  143:17
associated
  173:22 206:8
  208:3
associates
  10:14 12:3,
  6,8,13 13:2,
  6,12 25:11
  30:7 32:14,

17,22,25
33:6,9,12,
15,18,23
34:1,5 40:5,
9,24 45:9
46:23 47:1,
4,9,16,25
48:3 49:6
50:4,7,18,23
51:5 53:13,
20 54:4,9
59:24 60:19
61:25 62:7,
14 63:23
64:1,4,14,21
65:12,24
66:24 67:12,
15,23 68:19
69:19 70:8,
17 71:2,21
72:20 75:4
83:9,15,25
86:16,21
87:1,10,15
88:7,23 91:6
92:2,23
93:6,11
94:13
100:20,24
104:10
111:16
116:13
117:8,12
118:9,17
119:5,17,19
120:6,14
121:24
122:16
123:20
124:23 125:6
128:24 130:8
131:5,14
133:2 138:1
143:9 144:8,
25 145:14,24
146:12,14,23
147:13
148:3,15
149:4,12,16

150:7,21
151:5,15
152:2
154:20,23
155:8 156:9
157:7,8
158:10,16
159:9,13,17,
23 160:21
161:16,18
165:12 166:1
167:2 168:2,
19 170:18
184:13,15,17
185:8 187:1,
6 188:17
189:10 193:5
197:23
204:10,19
205:15
206:20 207:3
210:5 213:15
214:7,19
217:1,4,8,19
218:12,15,20
219:5,7
220:4,9,12
221:11,16
222:15,19
223:2,5
224:2,5,15,
25 225:23
226:18,25
227:10,15
228:18,25
229:15
230:3,14
231:10
232:1,16
233:15 234:9
235:8 239:7
assume
  27:24 33:25
  154:1
assumed
  230:10
assuming
  215:22

assumption
  61:8
assure
  183:9
attach
  72:4,9 168:8
attached
  72:19 96:22
  97:24 99:6,
  20 168:18
  170:2 178:9
  211:16
attachments
  98:10
attacked
  188:8
attempt
  109:19
attempted
  99:15
Attendance
  135:21
attending
  10:2
attention
  140:1 197:1
attorney
  10:5 14:10,
  13 31:24
  61:17 67:12,
  13,23 76:12,
  15 89:3
  123:3 128:21
  131:5
  132:20,21
  134:13,24
  136:5 139:2,
  15,18 150:2
  167:1 170:3
  171:1 184:5
  191:18
  196:18 205:4
attorney's
  73:10 232:12
attorneys
  14:18 23:7
  33:17,22

Barry Lepatner
November 22, 2021

65:19 120:23
145:1 146:21
147:18
August
70:7,18 71:3
auspices
159:21
authenticate
19:3 20:12
authority
167:17
authorized
80:13,22
158:15 223:9
auto
186:25
Avenue
52:16 53:14
55:13,17
88:9
avoiding
48:19
Aw
200:1
award
13:20 69:8
237:7
aware
8:1 14:21
80:10,19
82:18
104:22,23
151:10,14,25
152:11
155:22
231:24
232:14
awareness
107:11
AWS
41:17

B

B-A-R-R-Y
8:11

back
21:19 26:1,3
29:19,21
34:16,19
44:8 48:17
50:6 62:12
67:3 71:13
81:14 87:22
90:2,4 91:15
99:21,25
100:1 103:2
106:9 110:11
112:12,13
114:11
115:12
125:7,12,16
127:13 137:5
162:12,20
167:9
173:10,20,23
174:11,22
175:10
176:14,24
177:4,10,13,
22 187:17
190:10 196:3
206:16,22
208:22
224:9,11
232:22
239:20
background
225:8
backwards
198:16
bad
145:7
ballpark
24:22
bank
158:4
bar
68:9 69:15
barely
12:22
Barile
88:8 178:16,
23 181:8,18

182:1
Barry
7:21 8:11
9:16 61:16
75:17 123:3
128:23
133:22,23
153:18
178:14 181:7
187:1 191:1
193:24
197:16 202:9
based
116:9 132:2
145:6 174:16
209:20,22
basement
134:4 138:9,
20 179:8,25
basic
215:17
basis
46:18,20
102:6 120:22
176:1 180:2
194:1,17,22
195:2,5,13
220:15
223:20
Bates
70:12 72:11
82:2,5,11,16
88:10
104:11,15,
16,18,19,20
186:6 191:11
196:11
198:10
200:14
201:21
204:25 205:3
206:1
bathroom
135:22
BB
191:10,13
196:24
197:13

BBL
133:20,21
bblesq.com.
34:20
Beach
88:9
began
164:5
begin
76:3
beginning
34:9 95:19
190:24
behalf
52:8 54:23
90:13 116:7,
21 128:20
144:4 145:24
149:3 150:20
152:7 165:13
180:9 206:6
218:24
219:4,5
225:19 226:4
beings
154:12
belief
102:6
believe
11:16 12:17
22:4 33:19
34:21 41:17
44:12 56:7,
17 67:24
71:16 72:4
74:5,10 78:4
90:11 92:8
99:17 100:11
147:16
149:18,19
151:1,7
168:5,14,16
178:4 185:2
199:17
207:2,9,16
210:4 214:18
216:10,16
217:5 223:12

Barry Lepatner
November 22, 2021

228:9 229:4
235:12
236:13 238:7
**below**
70:11 158:12
**benefit**
36:22 47:23
174:1
**berserk**
127:12
**best**
57:20 62:20
102:13
114:7,8,23
147:11 224:4
**better**
133:12
193:23
**bid**
108:8 190:1
**big**
126:3 127:9
236:16
**bill**
230:11
**billed**
112:4,18
159:8 173:24
182:18
**billing**
28:22 73:11
173:5,6,9,18
174:12,15
176:25
177:11,14,24
181:17
231:17
**bills**
112:21
173:19
174:20,21
**bit**
93:22 202:17
**boiler**
126:17,24
128:3 179:22

**bonding**
45:13
**Book**
144:7
**Borgeest**
7:20,23
153:7 167:1
168:17
178:11
**bottom**
52:13 55:11
70:12 72:11
81:25 82:3,
16 85:6
97:22 104:20
157:22
170:8,9
172:21,22
182:15,22
183:1 204:24
211:15,17
**bounds**
193:23
**bow**
211:11
**box**
213:3,6
**Brad**
155:9,14
**brain**
74:23
**Bramnick**
7:17
**breach**
93:11 111:17
149:22
223:12
**breached**
94:17,19
95:4,9,21
110:16
113:20
117:18
119:25
**break**
34:13 51:17
91:13 98:11

**briefly**
185:12
**bring**
18:5 20:8
21:16 44:11,
13,15 51:22
52:19 54:13
59:16 89:8
92:5 108:2
112:8 138:22
145:18
185:20
**bringing**
89:8 189:25
**broke**
32:6 34:8
125:10
**broker**
56:4,5 57:24
59:7 153:25
**brokers**
57:10 154:18
215:5,18
**Brooklyn**
14:3
**brought**
10:13 28:1
57:11 60:17
112:6 115:5
124:7 165:5
222:22
**Bruce**
133:23
**budget**
109:13 115:1
**Building**
61:10
**built**
46:1
**bullet**
45:1,6,22
46:2,8,18
199:2
**bumpy**
192:15
**business**
49:2 62:19

63:12 64:7
76:3,5 83:21
112:3 123:14
131:15
134:15,18
166:3 182:9
210:1
**button**
174:20

---

**C**

**c'mon**
200:1
**C3**
36:8,11,17
37:3,7,14,
16,21
**call**
9:25 24:13
48:11 56:9
57:16,22
134:20
148:21
178:18
185:12
208:22 228:5
238:2 239:20
**called**
9:17 24:8
36:10 56:17
115:4 141:16
144:10 149:8
166:4 174:11
197:8 225:18
**calling**
8:15,16
139:23
**capacity**
135:14
136:4,6
137:9
199:16,22
223:17
**capital**
8:12

Barry Lepatner
November 22, 2021

Cappello
  118:7,15,21
  122:14 123:2
  151:19
  152:4,7
  218:11,14,19
  219:10 225:8
  226:12
  228:13
  236:17
  239:13
Cappello's
  227:17
caption
  13:22
captured
  8:4
care
  18:3 124:3
  145:1
  146:15,20
  147:18
  149:23 166:6
  189:1
career
  14:8 65:10
carefully
  130:2
Carl
  7:17 20:1,17
  29:9 38:6
  56:8 57:25
  68:16 93:25
  137:5 148:20
  160:2,4
  183:19,20
  185:12
  194:17 228:7
  231:5
carried
  84:12 85:2
  86:10
carrier
  56:2 59:10
  87:8
carriers
  23:17

carry
  62:18 83:21
  129:5
carrying
  77:9
case
  12:17,19
  13:22,24
  15:7 16:25
  23:24 26:9
  28:13,16,19
  30:7 43:10
  59:18 62:4
  68:5,22
  78:23 82:10
  89:9 103:12
  120:24
  123:12
  124:10
  129:12 142:1
  143:18
  165:10 174:1
  179:1 207:22
  209:19
  222:24
  225:10
  231:22
cases
  11:21,22
  12:7 23:14,
  17,24 24:10,
  23 25:10,11
cast
  189:15
categories
  48:21
caught
  48:14
caused
  136:9 137:13
  164:23
causing
  128:3 229:17
CC
  196:10,13
CED
  149:9 236:11

ceilings
  179:24
cell
  17:4,20,23
cellar
  138:11
CER
  7:2
certain
  12:14 43:10
  47:24 63:10,
  11 64:2 68:6
  88:24 96:14,
  19 107:23
  133:4 203:1
certainly
  31:9 196:3
  229:8
CES
  165:5 236:14
cetera
  15:25 69:8
  215:22
change
  53:24 158:8
  191:23,25
changed
  15:2 39:12
  42:6 132:1
changes
  19:21 22:5
  39:3
characterize
  95:6 97:13
charge
  107:19
chargeable
  140:6
charged
  73:10 84:25
  85:4
charges
  198:1
Charles
  145:19 146:3
chat
  18:11 20:14,

  16,18,22
  21:10,14,16
  29:5,10 38:5
  203:21,24
cheap
  121:13
check
  158:13 190:1
  211:25
checked
  213:4,12
checks
  140:12
choice
  225:3
choose
  136:22
chose
  136:22 152:9
  220:12
chosen
  39:15 162:6
circumstances
  26:23 147:7
city
  8:14 13:14
  34:7
claim
  11:24 13:17,
  18 26:13
  27:4,16,17
  87:5,7 89:8
  95:7 96:2
  118:10
  119:12,15
  120:25
  121:17,23
  122:17
  123:19 124:2
  125:3 129:1
  138:18,23
  139:22
  141:3,7
  151:22 162:2
  163:10 165:9
  176:2 180:4
  193:15

Barry Lepatner
November 22, 2021

206:9,10
208:4,6
209:19,21,22
211:20
216:20 217:4
218:5 220:9
223:3,6,7,15
229:19
**claimant**
118:11
120:23
122:17
**claimants**
111:25
118:22 126:3
193:1
**claimed**
147:4
**claims**
23:10,11,13
24:13 57:11
58:21 60:11
63:10 120:13
121:5 122:5
123:2,8
124:8 128:12
137:14
145:14
146:11,22
147:12,19
148:3,15
150:6 151:4
162:4,14,16
163:4,17,18,
25 164:1,8,
13,18 165:9,
16 175:5
178:16
180:11 181:8
209:18
223:19
233:20
**clarification
s**
14:23
**clarified**
13:18

**clarify**
175:25
**clean**
140:15
**clear**
21:25 51:2
59:9 65:23
69:12 83:23
86:2 95:22
99:10 121:12
129:16 130:1
148:11 173:4
175:24
188:14
189:15
205:16
222:24
231:20
**clearly**
98:12 229:22
**click**
41:4,12
44:8,9
**client**
11:24 46:25
47:2 48:1
58:16,18,20,
22,25 61:20
62:17,19
69:20 70:21
71:18,23
72:7,23
73:14 83:25
104:25
111:21
128:20
131:4,5
132:20 133:8
134:5,14,16
159:15 165:8
174:2 187:22
223:10 227:2
232:12 238:4
**client's**
27:13 207:8
**clients**
36:13,19,22
37:15 39:7,

8,9 46:9,16
47:24 48:9
70:22 83:21
86:11 130:10
131:15,18
132:22
134:21
155:17 160:1
166:3 176:18
177:6 178:17
182:20
219:18
221:15
**clients'**
72:14,18
73:18
**close**
181:1
**closely**
140:11
**closet**
106:7
**CNA**
210:24
211:17
**codes**
147:8
**codified**
73:19
**colleague**
10:2 16:6
38:9 74:12
**collect**
173:23
**colon**
138:10
**come**
48:9,18
49:18 74:2
91:15 131:11
173:22
**comes**
21:19 49:9
**comfort**
51:17
**commence**
48:12

**commenced**
168:3
**common**
47:20 50:8
**communicate**
17:4,19
**communicated**
137:18
**communication
s**
57:23
**community**
219:23
**commuted**
76:4
**companies**
23:23
**company**
24:19,24
25:5 26:8
27:11,12,22
28:11,15
32:20 35:8
76:6 149:8
174:9 176:2
205:18 206:6
215:19,20
229:5,7
230:11
**company's**
28:22
**complain**
57:18
**complaint**
27:17 92:6,
12,19,22
93:9,14
94:5,8 98:7,
9 99:5,16,22
100:1,18
110:12
117:18
119:17,22,24
122:7 147:13
215:25 216:7
223:18
232:21

Barry Lepatner
November 22, 2021

233:13,16
**complete**
36:11 42:20
108:11,24
116:3 133:5
138:25 165:7
194:6
**completed**
128:14
213:15
**completely**
115:17
**completeness**
40:14
**completing**
165:14
**completion**
54:24 105:17
106:18 134:1
141:11
164:20
**complicated**
163:15
**complimented**
179:16
**comply**
102:1,8
**composed**
115:20
**compress**
115:22
**computer-
based**
174:14,15
**con**
197:9
**concerned**
219:25
**concluded**
240:13
**conclusion**
120:22
**conditioning**
126:7,18
**conduct**
14:19 80:4,
11,20

**conducted**
118:21
**conference**
16:3 176:17
177:5,16
178:17,18
179:17,19,20
235:22
239:23 240:1
**conferences**
127:25
**confidence**
109:10
**confirm**
17:18,23
18:23 19:1,
16 31:18
47:10 54:17
73:17 111:6
158:17
168:20
197:11,14
203:5 206:17
212:1,3
213:19
231:19
**confirmed**
103:1,4
111:12
**confirms**
107:3 225:12
227:9,13
**conflict**
27:19 28:9
**conjury**
179:22
**conman**
187:21
**Conn**
144:7
**connected**
126:20
**Connecticut**
10:15 11:10
54:25 64:22
65:4,6,7,13,
20 66:1,7,20

68:1,21 76:3
87:8 88:10
89:2,7,17
99:18
100:20,25
101:6,10,23
102:1,8
115:24
144:14,18
162:6 171:4,
7 180:14
225:4,7
**connection**
53:3,7,10
54:23 85:1
87:2,17
89:13 90:14
96:18 102:2
103:10 117:4
151:5,16
158:23 159:5
161:19
164:7,19
165:15 180:7
210:19
216:21
226:19,25
227:15
228:17 230:8
235:8 238:9,
19
**consent**
7:12,20,24
200:8
**consented**
26:21 27:18,
24 64:7
89:10
**consents**
7:18,22
**consider**
49:9 75:6,9,
15 133:5
192:11 193:7
197:5
**considered**
147:6 192:20

**consistent**
83:23
**consistently**
220:1
**constant**
161:22
**constantly**
140:17
**constructing**
101:4
**construction**
11:23 36:11,
14 39:14
48:7 49:19
61:10,18
77:5 87:6,13
88:8,24
89:13 96:15
101:5 108:9
111:1 123:13
124:2,17
131:16,18
134:16
136:7,9
137:17 141:7
163:12
164:14 175:5
178:25
219:23
221:9,24
238:2
**construction-
related**
124:8 207:8
**consultant**
43:13
**consulting**
58:17 80:15
87:12 123:14
144:12,19
**contact**
74:2 194:8
**contacts**
48:10
**contains**
73:3,9
84:17,25

Barry Lepatner
November 22, 2021

contemplated
  58:25 124:5
contemplates
  86:14 91:3
contend
  121:1 193:13
  220:1 236:4
contended
  193:14 220:1
contending
  235:25
contends
  235:18
content
  225:21
contention
  98:6 117:22
  220:16
contest
  188:1
context
  25:17 98:16
  163:7 188:11
  201:4 202:23
continue
  83:17 108:25
  113:23 190:5
  198:4
contract
  85:15 86:6
  93:11 95:1,3
  192:12 193:8
contractor
  61:10 101:8,
  22 134:2
contractors
  45:13 108:9
contractually
  162:4
contrary
  229:3 230:4
contribute
  234:11
contribution
  234:22
control
  19:5 25:24

107:7 114:25
  115:3,10
controlled
  115:7
conversation
  31:21 135:22
  139:10
  178:15
  181:8,18,24
conversations
  8:3,4 139:16
  232:6
conveyed
  168:17
coordinate
  77:14
coordination
  106:6
  138:10,11,
  12,13 140:19
  147:11
copied
  118:13
  122:19
  167:24
copy
  18:18,23
  19:16 21:20
  22:2 96:21
  97:23 98:13,
  20 99:5,19,
  22 118:14
  156:24
  167:25
corner
  39:23 82:3
  104:20
corners
  27:16
Corp
  61:11
corporate
  32:13 47:13
  49:19 74:7
corporation
  221:20,22

correct
  8:23 10:5,6,
  8,16 11:6,
  12,15,16
  13:25 15:3,
  9,22 18:23
  21:20 22:2,
  14,15 23:1,
  19 24:1
  25:17 26:9
  27:14 28:13,
  14,19,20,23
  32:24 33:2,3
  34:2,24
  35:1,9 39:19
  40:1,2,5,11,
  20 41:5,6
  44:11 45:3,
  4,7,9,24,25
  46:4,5,18,19
  47:11,14,15,
  20 48:3 51:7
  52:9,10,16,
  17 53:14
  55:1,4,5,7,
  13,14 60:19
  61:18,20
  62:7 63:7
  64:1,14,17
  67:14 70:18
  72:11,16,17
  73:5,7,12,
  15,20,21
  76:13,15,16
  79:22,23,25
  80:1,5,6,9,
  13 81:9
  82:7,10,19
  84:11,15,16,
  20,22 85:13
  86:17,21,24
  87:3 90:15,
  23 91:1,6,9
  92:3,4,17,
  18,24,25
  93:3,11
  94:10,13
  95:5,16
  97:4,15,25

100:6,10,21
  101:12,19,
  23,24 102:3
  105:6 111:19
  113:21
  114:14,17
  117:6 119:18
  120:5,7
  124:13
  132:17 133:9
  134:9
  135:19,20
  136:1,2,10
  138:22
  141:2,11
  142:5,19
  144:16,20
  145:1 146:4,
  5,7,12
  148:1,4
  149:25 150:2
  156:18,20,22
  157:1 158:19
  159:1,3
  160:16,23
  163:19
  164:1,2,10,
  20 168:4,5,
  10,12,20
  174:7,8
  177:2,11,25
  178:1 185:9,
  10 186:23
  187:2,3
  190:22
  192:22 193:9
  196:24,25
  197:14 200:9
  201:23
  204:3,5
  205:12,18
  213:4,7,8,
  12,13,16,21,
  25 214:19
  215:10,12
  216:9,10
  218:12,16,21
  219:11
  221:3,12,17,

Barry Lepatner
November 22, 2021

20 222:5,15,
20 224:3
234:5,11
236:12
**correctly**
101:14
127:22 134:6
142:25
213:23
**correspondence**
76:22 161:7
183:16
**cost**
36:12,15
57:16 127:20
138:22
145:10
**costs**
57:15 141:25
165:3 209:4,
14 237:15
238:12
**counsel**
7:12 24:3
25:2,23
27:2,3,5,10
30:12,17
31:7,14
49:19 82:17
87:2,8,16
88:23 89:12
115:24
118:16 123:7
125:21
151:19 162:6
178:19
180:14
189:2,21
218:25
225:3,10,15,
22 235:17
**counseling**
132:1 207:8
**count**
215:24
**counter**
60:11

**counterclaim**
12:16 61:15
**counterclaimed**
13:16
**counterclaims**
59:17,20
**countersigned**
82:22 84:15
**countersuits**
13:7
**countless**
130:9 132:22
138:19
**country**
68:10 69:16
**couple**
129:18
**course**
11:14 14:8
27:23 46:19
51:18 69:18
96:1 114:17,
19,20 139:5
141:3 164:21
178:12
192:10 201:2
205:5 215:3
220:2 225:16
**court**
7:5,25 8:13,
18,20,22,25
9:5,9,14
10:15 15:17,
24 18:12
20:25 21:2,4
26:2 32:8
34:14 38:17,
20 42:18
44:23 52:3
59:21 60:3
64:24 67:17
70:3 74:18
78:5,7 87:11
88:4 89:23
91:22 92:10
98:22 104:5
108:21

114:10 118:2
125:9,11,14,
20 130:22
132:8,10
135:11 143:3
149:1 153:2
156:20,22
160:2,5,8
162:11
163:20
166:21
169:10,16
171:22
180:25
185:12,17,25
190:14
197:18
201:16
203:22 204:5
210:13 216:4
217:15
224:10
230:25
232:25
233:3,8,11
235:21
239:22,25
240:8,12
**Court's**
240:1,7
**court-conducted**
233:21
**Cove**
8:20
**cover**
219:3
**coverage**
23:14 28:8
45:14,23
57:15 93:2
123:23
205:9,12,13
209:20
210:18
211:5,6,13,
14,19 212:20
215:3,7,9,

12,19 217:3,
11,23 218:4
220:7,8,11
223:2,5,8
**covered**
23:9,11
27:16 206:2,
5,22 207:13
217:5
**covering**
125:2
**COVID**
15:16
**COVID-19**
15:3,8
**craziness**
57:11
**crazy**
127:18
182:10 188:3
**create**
48:18,19
220:12 222:3
**created**
34:19 35:3
36:10 37:11
47:23 127:22
220:17,22
222:19
**creating**
98:14 179:12
**creation**
209:25
222:14
**credibility**
68:19
**credible**
179:15
**credibly**
111:8
**credits**
182:16,17,22
**critical**
79:8
**Cronk**
155:9,14

cross
  55:15,16
CT
  178:19
culprit
  178:25
curiosity
  55:16
current
  13:9,11
  33:5,7 35:11
  43:2 56:2,9
  59:9 108:1
customary
  215:21
cut
  67:18
cutting
  64:25

_____

        D

D-A-I-S-Y
  179:3
d-h-g
  43:22
dad
  55:18
daily
  46:18,20
  115:13
Daisy
  179:3,15
  180:8
damage
  128:4 136:12
  140:22 162:3
  180:11
damaged
  165:1
damages
  77:13 114:25
  128:11,14
  137:13,14
  164:22 165:7
  175:6 206:8
  208:3 236:23

Dan
  140:11
Dana
  129:2 162:7
  180:14
dangerous
  134:4
Daniel
  187:13
date
  22:16 31:18
  32:21 62:1
  85:12 86:8
  97:19 106:2
  109:4 122:20
  127:14
  172:18,20
  181:20 182:6
  183:14,15
  184:10,19
  193:16
  211:17 215:1
dated
  52:7 55:6
  70:7 77:18
  104:9 118:8
  122:15
  154:10
  166:18
  169:1,21
  172:1 178:3,
  7 181:4
  186:6 191:11
  196:11
  198:10
  201:21
dates
  135:23
  172:20
  184:20
dating
  81:18
day
  10:1 18:18
  28:1 37:24
  83:23 87:9
  115:6 122:7
  131:16

134:18
  180:12
  184:21 205:9
  216:18 224:8
days
  11:14 14:25
  141:18
  192:14
DD
  198:9,11
dealing
  129:20 182:8
  194:11 199:8
dealings
  116:9 213:25
dealt
  43:7
December
  33:12 35:19
  39:4 40:13,
  20 41:19
  42:8,23
  43:18 152:22
  153:6 172:2
decide
  97:11
decision
  57:7 83:18,
  20 196:4
decisions
  41:2
declaration
  9:1 204:8
declarations
  204:15
  206:7,17
  239:12
declare
  7:11 9:2,3
declared
  9:17
dedicated
  50:25
deductible
  215:20
  239:8,15

deem
  189:20
defective
  77:12
defend
  23:17,23
  24:24 25:5,
  17,20 26:6
  27:21 122:4,
  5 220:16
defendant
  7:20 9:24
  15:11 61:14
  63:20 143:16
defendant's
  19:24 20:6
  29:11 44:20
  104:4 143:2
  152:25 240:4
defendants
  60:11 93:1
  94:25 120:5
  143:8 144:4,
  7 146:14
  147:6 225:10
defended
  14:13 176:4
defending
  27:7,8
  118:17
  142:13
  229:15
defense
  20:2 23:21
  24:3 25:24
  57:15 207:23
  209:4,14
  216:21
  217:1,7
  219:3
  223:11,14,20
  228:17
  231:25
  232:15
  233:17,20
  235:17,24
  236:21
  237:4,9,15

238:9,12,20
**deficiencies**
  36:21
**definable**
  137:13
**define**
  107:18 108:4
**defined**
  97:2,15
  103:23
  107:19
  110:17
**defines**
  96:13 97:16
**definition**
  96:7 97:16
  98:4
**delays**
  36:16 201:8
**delivery**
  135:23
  139:11,17
**demand**
  153:20
**demarking**
  95:23
**deny**
  111:8 176:2
**department**
  135:1
**depending**
  26:23 50:24
**deponent**
  7:21
**deposed**
  11:19,21
**deposition**
  7:2 8:5
  10:3,8
  11:13,17
  15:1,6,12
  18:2,6,14,
  20,24 21:21
  22:3 28:17
  29:22 30:3
  31:6 41:10
  68:16 97:4

103:2,4,21
117:13 119:6
134:20
156:25 176:9
179:16 185:6
208:23
239:21
240:13
**depositions**
  12:5 14:9,
  12,20 15:8,
  10,21 21:13
  118:22
  121:19
  176:4,5
**describe**
  45:2 84:21
**described**
  102:12
  128:19
**descriptions**
  40:4
**design**
  36:14 48:7
  107:20 108:3
  131:18
  137:17 138:9
  219:22
**designer**
  179:4,11
  180:8
**designing**
  180:1
**designs**
  165:1
**destroyed**
  136:21
**destruction**
  136:13
**detail**
  162:2
**determine**
  48:25 62:16
  66:5,15,18
  109:6
  137:12,14
  164:22 165:3

237:3
**determined**
  228:24
**determining**
  231:9
**develop**
  48:22 164:24
**developed**
  36:12,17
  77:8 162:5,
  17 163:17,25
**developer**
  13:15
**developing**
  162:16
  163:4,18
  164:1,8,18
**development**
  77:4 88:9
  162:8 178:25
**developments**
  26:8 28:12,
  18 240:1
**diatribe**
  188:3
**dictated**
  159:24
**dictates**
  237:25
**different**
  30:24 31:3
  39:5 45:1
  102:19
  115:20
  116:17,18
  121:17 129:8
  131:19
  135:18
  148:7,8
  149:20
  165:7,17
  172:18,20
  173:13,14
  181:19,20
  182:6 193:15
  209:8,16
  211:4 224:23

231:6 236:6
237:23
**differently**
  191:7
**difficult**
  64:11 197:6
**digitally**
  41:14
**diligence**
  140:14
  218:24
  219:13,24
  221:10 225:9
  226:13
  227:22
**dinner**
  180:22
**direct**
  16:12 116:14
  138:24
  158:14 193:5
  197:1 223:8
  234:24
**direction**
  133:5 159:15
**director**
  155:15
**directors**
  23:12
**disagree**
  192:23
**disastrously**
  127:1
**disavowed**
  79:6
**discipline**
  69:7
**disciplined**
  68:9,24
  69:15
**disclaim**
  123:23
**disclose**
  144:9 152:9
**disclosed**
  124:11,22
  152:12

disclosing
  232:17
disclosure
  143:10,18
  145:18,24
  146:3 148:18
  149:3
  150:12,20,25
disclosures
  142:24
  151:12
disconnected
  127:5
discovery
  120:15
  123:12
  184:25
  191:18
  196:18 228:4
  240:6
discrete
  23:8
discretion
  228:24
  230:15 231:9
discuss
  176:17 177:5
  186:17
  215:18
discussed
  30:17 78:4
  81:19 86:11
  131:19
  142:16
  196:23 225:6
  229:9
  236:12,23
discussing
  131:17
  168:24
  179:19
discussion
  71:12 87:25
  139:5 175:4,
  6 180:5,13
  188:12 228:9
  232:11

discussions
  77:6 163:8
  187:12,13
  189:21 215:2
  225:7 235:1
disdain
  127:18
disengage
  127:3
disgusting
  188:4
dishonest
  187:21
dismiss
  188:16
  189:10
dismissed
  121:1 186:22
  187:5,9,19,
  25 188:10,19
  189:22
  190:2,21
dispute
  235:7
disputes
  73:14
distinction
  220:23
distinguish
  221:22
division
  13:21 39:8
  72:6,16
doctor
  194:13
document
  16:4,6,7,11
  18:10 19:2,3
  20:12 21:11,
  17,19 29:15,
  24 30:8
  52:23 53:4,6
  59:19 60:7,
  15 66:14,17
  70:13 71:1,
  4,10 73:18
  81:22 82:3,

  6,9,15,19
  83:24 84:14
  86:19 87:21
  88:2,11,17,
  22 90:18,22
  92:14 96:7
  101:17
  104:2,3,13,
  21,25 105:13
  106:12 107:8
  110:17
  117:24
  120:10,19
  132:5 141:15
  143:1,11,13,
  23 150:22
  154:13 169:5
  191:2 196:21
  202:25
  204:13 205:3
  210:21 212:4
  213:10
  222:18
  225:11,17,21
  228:2
documentation
  67:4 163:11
  226:3 229:18
documented
  144:11
  229:22
documents
  16:24 30:3
  31:8 42:10,
  21 43:8 64:3
  67:1,3,10
  107:21 147:8
  159:11
  171:14
  172:10
  228:3,12
  239:22 240:5
doing
  21:12 93:25
  107:22 108:7
  117:19
  127:19
  140:14

  172:23
  183:10 188:7
dollar
  238:7,10
dollars
  13:13 107:16
  139:21,22
  164:6
dollars'
  109:13
door
  51:4,6
doors
  140:3
double
  181:2
doubles
  233:1
doubt
  128:7 174:1
  186:13
  211:12
Dowling
  118:8 217:19
download
  38:6
dozen
  11:20
dozens
  14:11,14
drafted
  96:1
drawings
  107:17
  108:3,8
driving
  182:10
dropped
  160:6
drug-addled
  193:17 194:2
  195:18
drugs
  194:21,23
  195:6
dual
  224:5

Barry Lepatner
November 22, 2021

duality
  209:23
duct
  126:9 129:20
ducts
  126:17,18
  127:11
due
  140:14 201:9
  218:24
  219:13,24
  221:10 225:9
  226:13
  227:22
Dumpty
  48:17
duplicated
  175:20
duplication
  173:5,9,11
  174:2
duty
  25:16,20
  145:1 210:4
  220:16 235:7

——————

E

earlier
  155:1,18
  189:4 236:12
ears
  197:6
easier
  19:5
East
  47:18
Edleman
  25:6
EE
  200:13,16
  201:15
effected
  62:20
effort
  226:10

efforts
  125:5 147:11
either
  26:18 45:8
  48:12,19
  96:2 171:1
  181:24
  224:15,25
elaboration
  41:13
electric
  179:23
  186:17,23
electrical
  126:2,8
  145:7 146:25
elements
  87:7 102:14
  146:24
  149:20
Elser
  22:13,22
  23:5,15,22
  24:2,20,23
  25:6 26:6,12
email
  17:5,20,22
  30:12 55:8
  118:7,19,20
  122:10,14,19
  123:1
  153:19,23
  154:9,10
  171:14 172:9
  184:20
  186:5,8,11,
  13,25
  188:18,23,24
  189:9,25
  190:17,21
  191:10,15,17
  193:22
  194:20
  196:10,15,
  17,22,23
  197:11,13
  198:9,13,20,
  24 199:11,20

  200:13,18,
  19,21 201:5,
  20,22 202:13
  203:9
emailing
  203:13
emails
  161:8 184:24
  185:3 187:12
emotionally
  115:14
emphasize
  83:18
employ
  83:18,19
employed
  75:20,21,23
  76:14 170:17
employee
  36:5 43:11
  75:4 155:24
  156:8
employees
  35:24 36:2
  37:1 155:9,
  11 166:2
employment
  76:1
enable
  166:2
encountered
  48:24 131:21
  195:23
end
  22:16 96:21
  99:21 117:16
  120:24
  184:17 185:9
  203:2
endorse
  147:10
engage
  160:18
engagement
  69:21 92:1
  213:20,24

engineer
  24:7 27:9,21
  108:2 126:12
  129:19
  144:17,24
  146:7 149:24
engineering
  23:10 107:17
  124:12 134:3
  144:13,19,20
engineers
  127:7 128:6
  221:25
enormous
  36:15,16
  182:19,20
enter
  63:6 173:20
  174:19 240:8
entered
  62:5 63:3,8
  96:12 97:6,
  17 182:2
  226:23
entire
  10:20 122:6
  239:15
entirely
  68:22 69:13
  102:19
  115:19
  237:24
entirety
  93:16 143:23
  239:7
entities
  47:13,15
  95:7,9,20
  221:3,5,12
  225:20
  226:21
  237:24
entitled
  164:9 209:5
  237:8
entity
  47:8,22

61:16 100:5
157:7,9,24
165:13,25
209:23
212:22 213:4
221:8
**entries**
135:18
141:10
175:20
182:14
**entry**
105:24
106:3,5
132:15,25
133:12,15,17
134:12
136:4,25
138:6,17
139:6,7,9,10
171:11,12
172:4,15,25
173:13
174:4,25
175:13
176:16,25
177:11,14,24
178:14
179:17
180:13,16
181:6,17,25
182:3
**envisioned**
58:24
**equation**
236:9
**equipment**
8:1
**equivalent**
222:16
**errata**
19:20 22:5
**erroneous**
173:5
**error**
156:2,14
206:9 208:5

**errors**
56:17 57:4,8
58:10 59:10
135:2 155:3
**Esler**
24:16
**Esq**
187:1
**essence**
122:6
**establish**
26:14
**estate**
48:7 74:6
**estimate**
14:10,12
24:22 25:1
**et**
15:25 59:24
69:8 101:7
215:22
**ethical**
69:9
**evacuate**
126:22
**evaluated**
147:6
**evening**
239:25
**event**
83:7 86:14
91:3
**eventuated**
180:12
**everybody**
127:4 188:2
**evidence**
195:17,21
230:12,20
**evidenced**
82:16
**exact**
33:24 112:19
172:20
175:13
176:25
177:11,23

183:14,15
184:10
**exactly**
83:23 129:15
146:19
159:23
**EXAMINATION**
9:20
**exception**
58:11 70:20
214:1
**exchange**
198:3
**exclusion**
176:1 215:23
**exclusive**
24:8
**excuse**
35:18 76:25
80:18 90:4
96:17 109:25
118:3 130:4
133:24
153:17 157:8
174:4 178:7
191:24 195:4
205:7 214:16
233:14
**exercise**
188:12
230:15
**exercised**
231:9
**exhibit**
19:24,25
20:7 22:9,10
29:7,12,13
30:20 32:4
38:14,16
44:20,21
52:1,2,23,24
53:17,18
54:13,15
60:1,4,5
70:2,5 78:4,
6 81:13,14,
17 86:19
88:2,3 89:16

90:11 92:8,9
95:5,16
96:10,22
97:3,24
98:9,10,11
99:5,16,17
100:4,9
101:18
103:11,20,25
104:4,7
105:5
106:10,21,25
110:1 111:18
113:1,11,15,
21 116:8,22
118:4,7
122:11,12
129:12
132:6,7
135:9,11,13
143:2,6
145:20,21
148:24,25
152:25 153:4
154:6,7
156:17,18,19
160:15
161:14
162:21,24
166:20,23
169:14,18,21
171:21,24
173:2,3
174:23 178:6
180:23,24
185:22,23,24
186:1,5
191:8,10,13
196:10,13,24
197:13
198:9,11
200:11,13,16
201:15,18
203:10
204:3,4
210:10,12,18
214:18
216:2,3,7
217:13,14,17

Barry Lepatner
November 22, 2021

232:22,23
233:6
**exhibits**
10:4 18:8
20:2 99:20,
23
**exist**
173:12 201:2
220:23
**existed**
222:21
**existence**
222:22
**exists**
183:16
209:25
**exit**
17:6
**expect**
191:23,25
**expected**
147:5
**expedited**
177:20
**expenses**
73:11 206:9
208:4 216:20
219:3
**expensive**
126:17
136:13
**experience**
132:2
**experienced**
131:25
**experiences**
194:5
**expert**
45:5 46:7,13
121:7 123:7
142:1,3,18,
24 143:10,18
144:9,15
145:13,18,23
146:3,10,19
147:17
148:2,14,18

149:3 150:6,
12,19,24
151:3,12
152:16
153:21,24
216:20
236:4,10,11,
15,16,22
**experts**
46:12
121:10,14,
18,20,22
124:11,13,
17,19,21,22,
24 125:1
142:14
149:11,15
151:14
152:1,2,5,
11,13,15,17
165:2,4
236:17,22
239:3,5,13,
16
**explain**
26:11 50:10
80:25 105:7
139:14,20
161:23 199:3
237:23
**explained**
13:17 109:12
137:1 182:7
**explanation**
73:3,10
172:14,25
**explode**
126:25
**exploded**
128:3
**explored**
123:8
**exposed**
197:3
**exposure**
27:13 124:4
**extended**
223:11

**extension**
223:9
**extent**
26:13 114:25
137:12
164:22 165:8
**extra**
173:18
**eye**
194:8
**eyes**
93:21 194:6
**eyesight**
94:1

---

**F**

**face**
229:18
**faced**
121:4 124:4
**fact**
19:17 28:21
44:7 58:19
63:23 70:16
71:1 111:6
112:21 142:3
149:22
165:22
179:18
188:13,17
209:25
218:14,19
223:10
**facts**
64:10 144:23
146:18
147:7,16
**factual**
64:3 102:6
194:1,17,22
195:2,5,12
220:15
**fail**
95:9
**failed**
48:16 94:16

95:7,10,20
138:25 166:4
**failing**
94:1
**failure**
177:16
206:12
**fair**
14:17 16:2
23:16 71:9
137:10 187:4
235:5,12
**faith**
230:16 231:9
**fall**
48:21 49:22
**falls**
223:13
**false**
206:11 208:6
223:15
**familiar**
10:7 14:18
15:23,24
25:16 55:20
150:23
151:18 157:6
194:4 202:23
203:6 215:17
**familiarity**
104:17
**fantasy**
194:7
**far**
68:13 219:25
220:1 221:13
232:10
240:10
**Farm**
11:10 54:25
89:1
**father-in-law**
115:13
**favor**
174:2
**favoring**
182:21

**February**
 44:6,7
 122:15
 178:3,7,14
 181:4,6,18
**fee**
 73:14
**feel**
 9:25 18:25
 182:19
 204:13
**fees**
 11:25 12:16
 13:13,20
 73:10 84:25
 85:3 142:1,
 18 153:21,25
 216:20
 228:17,24
 230:8,13
 231:10,21,25
 232:15
 235:16,24
 236:4,10,15,
 16,21,22
 237:4
**fell**
 23:12 164:13
**FF**
 201:16,17,18
 203:10
**fiduciaries**
 23:13
**field**
 59:3 63:12
 64:6 159:20,
 25 193:3
 219:19,22
 221:7,24
**figure**
 17:9 19:10
 42:16 127:7
 138:21 140:4
**figuring**
 41:21
**file**
 47:5 60:15
 222:4,9

 226:4
**filed**
 32:20 92:6,
 12,17 119:17
 144:3 216:1,
 7 222:2,13
 225:19
 233:14,15
**filibuster**
 109:19
**filibustering**
 131:9 208:20
**filing**
 47:6
**fill**
 196:4
**final**
 187:14
**finally**
 165:5
**find**
 42:25 96:6
 98:13 141:19
 173:8 179:9
 198:4
**finding**
 65:14 127:15
**fine**
 16:9 17:16
 20:3 91:22
 131:13
**finish**
 102:25 130:5
 202:22
 208:17
**finished**
 79:10 108:23
 116:2 128:16
 199:6 222:12
**fire**
 107:25 109:3
**fired**
 107:13
**firm**
 11:24 12:2,9
 22:13,20,21,
 23 23:3,7

 25:7 26:17,
 21,25 33:2,7
 36:20 42:22
 43:3,11 44:5
 47:25 49:13,
 17,18,23
 50:11 54:5
 57:24 61:25
 62:10,18
 63:9,11
 64:5,10
 65:15 70:23
 74:5 75:5,24
 79:22 97:9,
 18 111:25
 112:11,18,20
 115:22
 116:16
 119:12,15
 124:1,7,9
 127:24
 128:5,10
 129:2,24
 130:1 132:21
 135:5
 144:20,21
 146:14,23
 155:11
 159:21 166:2
 170:19
 173:21 183:5
 207:5 212:20
 213:10,19
 219:14,21
 221:14 223:9
 225:4,5,7,12
 226:23
 227:3,14,18,
 25 228:22
 237:16,24,25
 238:3,8
**firm's**
 154:18 200:9
 210:1
**firms**
 23:22 154:20
**first**
 8:10 18:18

 21:14,16
 31:2 38:6
 57:3 62:11
 63:8,24 74:2
 100:13
 105:9,24
 107:5,9
 112:15
 132:15
 135:19 137:7
 139:9 141:8
 144:6 168:6
 171:11
 173:15,16
 174:25
 181:25
 188:13
 191:21
 192:5,6
 193:21
 217:23
 218:17
**five**
 25:10 33:20
 117:19
 134:8,20
**fix**
 109:9
**fixed**
 108:10,13
 115:17
**flame**
 126:24
**Foam**
 138:12
**focus**
 202:12
**focused**
 120:15
 123:12,21
**folks**
 197:10
**follow**
 56:10 58:1
 228:6
**followed**
 165:1 179:14

Barry Lepatner
November 22, 2021

following
  9:1 30:24
  94:18 102:11
  109:2 117:19
  144:9 151:25
  192:10
  239:21 240:1
follows
  9:19
footer
  52:13
foreign
  24:6
forensic
  77:15 128:11
forerunner
  34:6
forget
  108:24 238:1
forgive
  59:8 154:16
  173:22
form
  40:12,21
  78:23 211:19
  215:13
formal
  78:25 186:17
  213:20
formally
  89:23
formation
  32:12,20
  37:20
formed
  23:2 32:17,
  19 35:2
  37:17 76:6
  85:15 86:6
forth
  85:3 128:22
  129:5 187:17
  239:22
forum
  66:11
forward
  13:17 19:3

21:13,15
  123:24
  227:23
found
  17:11 57:16
  223:19
foundation
  53:23 76:19
  83:16 89:20
  95:17 107:1
  117:14 119:7
  120:17 122:2
  142:6 161:3
  181:22
  207:25 222:6
  224:17 229:1
  230:18
  231:12
  237:19
four
  22:19 27:16
  76:10 117:19
  139:8 151:13
  152:2,12
  173:18
  178:19
  180:17
  181:24
  201:1,2
Fox
  7:23 10:2
  16:7 20:22
  21:9 99:7
  153:7
frame
  89:5,9
  115:22
  166:13
framework
  87:4 128:25
  164:24
Francisco
  75:1,3 83:20
  106:1
  132:16,25
  133:5 138:6,
  24 139:2
  140:20

155:9,18,22
  158:8,10,17
  171:13
  172:5,15
  173:1 197:8
frankly
  68:24
fraudulent
  162:14
  206:11 208:6
  223:16
fraudulently
  162:5
free
  9:25 18:25
  204:14
frequently
  139:4
Friday
  134:1
friend
  74:11
front
  16:25 17:3
  39:7 51:6
  60:13 105:13
  112:7,9
  130:10
  143:12
  194:18 220:6
FRR
  105:25
fulfill
  94:16 95:20
fulfilling
  238:3
full
  50:15 109:6
  152:14,16
  163:13
  164:22 165:8
  182:1 194:7
  205:13
  217:1,7
  219:3,14
  221:6 223:20
  237:8,12

238:12
fully
  14:21 15:23
  85:15 86:6
  108:12 207:4
  221:15
  233:20
fund
  207:23
funny
  141:19
furnished
  118:14
furtherance
  112:1 128:10
  165:14
  180:10 211:3
  238:3
future
  197:5
fuzzy
  163:22

———————

G

G-I-L
  43:6
garage
  138:10,20
gas
  126:23
gateway
  24:13
gave
  11:17 12:6
  29:6 37:11
  54:11 112:2
  131:2,25
  149:21
  151:17
  182:16
  195:12 225:8
  230:7,10
general
  70:15 83:3
  101:10

Barry Lepatner
November 22, 2021

generic
  141:12
Gerbino
  154:11
getting
  20:22 21:7
  46:1 85:18
  114:7 126:13
  128:13
  139:25
  165:19,20,21
  181:1 215:24
  234:7
GG
  204:3,4
  214:18
Gil
  43:6,11
Gina
  154:11
give
  14:19 25:25
  42:19 51:11
  68:11 87:6
  107:16,20
  108:13,14
  133:8 164:3
  173:10 174:1
  179:5 184:6
  187:15
  208:22 237:2
given
  23:8 27:1
  66:2 235:5
giving
  110:10
  128:10
glad
  141:19 196:3
glazed
  194:6
goal
  182:18
goals
  63:13 64:7
  112:3

goes
  58:2 96:20
  131:17
  154:13
  157:24
going
  10:3 13:10
  16:5,6,10
  17:11 18:8,
  9,10,17 19:3
  20:11,13,15
  21:1,9,13,
  15,20 28:17
  29:3 39:21
  44:8 49:14
  50:6 51:14
  56:8 57:22
  58:17 59:19
  60:1,25 61:1
  68:13 75:12
  83:17 85:7
  87:22 89:6
  93:21 99:24
  106:15
  109:15
  123:25 130:6
  131:6 147:10
  148:21
  152:17
  156:12 158:6
  162:1,7
  163:9,14
  165:3,4
  170:21 171:2
  179:21
  180:21
  183:20
  190:4,16
  195:25
  198:16
  199:18 202:8
  207:11
  208:21 219:2
  226:16 228:5
  230:11
  232:12
  234:11,12
  240:6

good
  9:22 14:25
  17:25 32:9
  74:19 91:19,
  21 93:20
  141:12
  187:10
  230:15
  231:2,9
gourd
  188:5
governing
  15:21 222:18
grab
  17:8
graphic
  39:6
graphically
  39:5
graphics
  39:11,12
grasp
  163:13
great
  125:5
Greenwich
  11:10 54:25
  88:9 89:2
groundless
  206:11 208:6
grounds
  208:22
Group
  9:24 70:9
groups
  23:11
guarantee
  72:21
guess
  32:6 57:16
  74:11 112:15
  154:6 157:9
guidelines
  28:22
guise
  139:24

guises
  107:23
gun
  121:4
guys
  46:17 179:18

H

half
  11:20 31:23
  138:7 141:25
  174:3 178:20
  180:17
  181:25
halfway
  200:20
Hampton
  16:19
hand
  16:4 129:1
  192:25
hand-over
  192:15
handled
  24:23 25:11
  43:10 140:20
handling
  25:3
handy
  87:22 171:20
hanging
  50:24
happen
  49:14,15
happened
  116:1 124:9
  173:21
  187:19
happy
  103:3
harassment
  190:24
hard
  42:16 197:7
hardware
  140:3

Barry Lepatner
November 22, 2021

Harlem
  14:6,7
harm
  229:17
hat
  132:1
hats
  26:22
Haven
  76:3
head
  199:19
heading
  45:21 46:1
  141:13
headphones
  121:13
hear
  114:3,7
  125:21
  218:17
heard
  125:23
  141:20,21
  188:3 197:4
  236:6,19
hearing
  34:12
hearings
  15:24
heat
  126:13
heating
  126:7,9,17,
  21 127:5
held
  87:1
hell
  136:17
help
  67:10 70:2
  88:13 112:2
  115:10 165:3
  166:2
helping
  77:14 114:24

hereof
  96:23 97:24
hereto
  96:22 97:24
hey
  199:18
HH
  210:11,12,
  13,18
Hidden
  8:20
high
  188:9
highlight
  45:16 54:19
  101:2 168:11
  172:6 175:17
  176:20
  181:11
  200:24
  212:23
  217:25
highlighted
  220:6
highlights
  198:24
highly
  131:17
  151:17 214:1
hire
  46:22,24
  47:2,25
  48:1,2 49:5
  50:3,4 62:13
hired
  61:15,25
  62:10,15
  63:21,23,24,
  25 64:4
  109:11 125:2
  126:11,12
  137:11
  144:15 150:9
  179:6
hiring
  49:10,19
  62:13 64:10

Hofmann
  170:20,21
hold
  17:8,24
  30:23 45:5
  87:15 88:23
  144:1 167:9
  188:9 202:7
  218:8 233:3
holding
  89:11
hole
  69:2
home
  8:23 16:19
  96:19 101:6,
  8,22 102:1,8
  109:16 111:3
homeowner
  12:23
homepage
  38:5,11
  131:22
honest
  75:6,8
  155:19
honestly
  184:3
hope
  226:10
hosted
  41:15,18
hour
  31:22,23
  51:16 174:3
  176:19 177:7
  181:14
hours
  134:8 136:1
  138:7 139:8
  171:16 175:7
  177:22
  178:20
  180:17
  181:25
house
  109:4

115:12,16
  126:10,14,
  18,23 127:11
  128:2,15
  136:14,21
  199:8
housekeeping
  10:10 11:3
  18:3
huge
  126:14
Humpty
  48:17
hundred
  13:12
HV
  126:6
HVAC
  126:6 129:20
  134:3 145:7

─────────
        I
─────────

icons
  40:23 41:4,
  10
idea
  37:13 42:25
identificatio
n
  19:25 22:10
  29:13 38:16
  44:21 52:2,
  24 60:5 70:5
  88:3 92:9
  104:7 118:4
  122:12 132:7
  143:6 145:21
  148:25 153:4
  154:7 156:19
  166:23
  169:18
  171:24
  180:24
  185:24
  191:13
  196:13

Barry Lepatner
November 22, 2021

198:11
200:16
201:18 204:4
210:12 216:3
217:14
**identified**
36:20
115:17,24
126:13
**identifies**
52:15 53:13
**identify**
26:13 66:21
79:14 109:8
114:24 136:9
163:9 212:8
**identifying**
77:11 162:3
**identity**
220:13,18
**II**
164:9 216:2,
3,7 233:8,9
**III**
162:22
163:1,6
**illustration**
39:14
**imagine**
157:10 158:4
192:2 197:9
**immediately**
127:3,21
**implying**
227:2
**important**
51:3 65:22
86:5 107:10
129:15
188:15
222:24
**improper**
209:21,22
**improperly**
140:24
**improvement**
96:19 101:7,

8,22 102:2,9
111:3
**in-person**
15:10
**inadvertence**
78:22
**inadvertent**
20:17 182:14
183:5
**inbox**
17:5,21
**inception**
74:15,22
**include**
83:6 126:6
182:2
**included**
58:19 159:13
168:23 187:7
219:7
**includes**
65:9
**including**
207:6 216:20
234:8
**incompetent**
201:9
**inconsistencies**
182:11
**inconsistent**
54:10
**Incorporated**
9:25
**incorporation**
222:4,10,14
**increase**
93:22
**incurred**
128:11
209:15
216:21
228:17
230:13
231:22,25
232:15
235:16,24

236:21
237:4,16
**indemnified**
58:20
**indemnify**
57:14 235:7
**independent**
58:16
**independently**
142:13
**Index**
59:21
**indicate**
7:15 8:6,14
**indicated**
10:1 82:10
**individual**
43:4,5 71:22
72:3 74:25
75:7 236:17
**individuals**
236:14
**industry**
36:14
**inefficiencies**
36:13
**inferior**
77:12
**inflicting**
115:14
**information**
28:16 32:12
41:22 43:1
68:17 77:13
114:16,18
115:23 133:9
164:25
167:20
187:15,16
211:16
212:21
219:15
229:6,8
237:5
**informed**
216:17,19

**initial**
49:5 102:20
175:6
**initially**
115:20 163:8
**initiate**
66:9
**initiated**
63:13
**injury**
206:10 208:5
**inquiries**
66:9
**inspection**
145:6
**installation**
126:19
**installed**
126:17 145:8
174:16
**Installers**
106:6
**instances**
24:2
**instructed**
161:24
**instruction**
17:2
**instructions**
14:18 15:21
112:2 229:3,
12 230:5,7,
10
**insulation**
138:12
**insurance**
23:16,23
24:9,18,24
25:4,17 26:8
27:11,12,21
28:11,15,22
45:12,23
46:4,14,15
55:25 56:4,
5,6,7,10,12,
15,20,23
57:1,5,8,10,

17,25 58:7,
10 59:13
135:3
153:19,23
154:12,17,
18,22,24
155:3,4
176:1 204:18
205:8,17
223:13
229:4,7
230:11
**insured**
25:22 26:18,
20,24 27:1,
4,7,17,18,24
28:4,6,8
206:6,7,18
207:17
210:25
223:15 237:9
**Insured's**
123:13
**insureds**
23:17 26:7
**insurer**
26:6 27:25
59:5 123:22
205:21 207:4
210:4 219:13
227:20
**insurers**
24:6 29:1
**insuring**
206:1
207:12,17,20
208:1 219:14
**intelligent**
75:16 155:19
**intended**
8:3 41:14
140:8
**intent**
86:9
**intention**
87:9 187:8
**interest**

28:7 102:14
147:12 219:6
220:18
223:15
224:5,6
226:24
**interested**
198:17 199:3
**interests**
220:13
226:21
227:14
229:14 237:9
**interior**
179:4,11
180:7
**internal**
29:1
**internship**
171:1
**interrogatory**
235:15,19,21
**interrupt**
130:18 131:7
208:9 209:1
**interrupting**
98:21
208:11,15
**intertwined**
237:24
**intervene**
127:24
**introduced**
9:23 58:12
**invalidated**
200:4
**investigating**
142:14
**investigation**
54:24 140:10
**invited**
136:7
**invoice**
53:6,9,13
104:1,9
105:9,16,25
106:20

117:2,7
132:5,13
135:9 140:25
141:9 142:16
159:12 167:7
169:1,11,20,
21 170:1
171:12,20
172:1,16
173:2,3,14
174:23
175:11,15
178:3,7,8,9
180:19
181:4,5,20
182:6 186:1
228:21
**invoiced**
129:13
159:17 200:8
236:18
**invoices**
52:19 53:2
67:8 85:18
103:6,22
105:4 115:8
116:5,10,12,
16,20 140:5,
21 141:9
161:10
168:8,17,19,
23 173:14
174:6 181:19
182:5,15,23
200:9 230:3
238:4
**invoicing**
79:2 116:24
174:10 230:8
**involve**
136:20
**involved**
12:23 15:23
25:2 68:4,6
93:2 170:25
**involving**
11:9 23:17

**ipad**
17:8
**Irish**
43:25
**irrelevant**
64:9 238:14
**issuance**
58:13 79:4
102:11 109:2
211:3
**issue**
10:10 11:3,8
18:3 19:9
68:5,19,22
73:23 80:17
98:12,15
99:21 121:3
125:25 127:9
150:10
194:19
236:16
**issued**
27:22 53:3,
7,9 70:17,22
71:2 78:24
117:7 122:7
204:10,18
205:14,17
207:2 214:6,
18 215:4
227:9
**issues**
68:7 71:22
124:24
125:3,18
126:3 128:25
131:18 142:4
177:16,19
215:7 227:2
**item**
140:22
**items**
45:10 138:23
146:16 147:4
162:3 165:7
192:14 240:2

Barry Lepatner
November 22, 2021

**J**

**J-A-M-A-L**
  11:1
**J-U-L-I-A**
  11:1
**Jamal**
  10:13,25
  55:9 79:6
  82:23 85:10
  88:23 89:3
  102:12
  104:10
  111:25
  127:25 129:2
  132:13
  135:24
  136:16
  137:18 179:5
  184:21 185:3
  187:11
  188:24 192:8
  193:6 196:22
  197:12
  200:21 201:7
  203:12
**Jamal's**
  106:7 114:20
**January**
  20:9 21:21
  22:3,6 33:21
  36:3 104:9
  106:4 169:1,
  15,21,22,23
  170:17
  171:4,7,12
  172:1,3,4,16
  173:1
  174:10,25
  175:14
  176:17
  177:14,24
  204:11,21
**Jeff**
  67:5,13
**Jeffrey**
  170:14

  175:1,14
  177:15
**JJ**
  217:13,14,17
**JNP**
  104:15
**JNP_0002581**
  104:11
**JNP_0002586**
  104:12
**JNP_0003528**
  185:21 186:7
**JNP_0007898**
  200:15
**JNP_0007981**
  201:13,22
**JNP_0008375**
  198:7,10
**JNP_0008461**
  191:12
**JNP_0008462**
  196:8,12
**job**
  76:17 108:15
  127:19
  179:15
  187:10,20
  189:14 198:2
  199:15,20
**Jody**
  118:7,15
  122:14 152:4
  218:11,14,
  19,25 219:4,
  10 225:8
  227:17,18
  228:13
  236:17
  239:13
**John**
  115:4
**Joint**
  72:5,15
  73:19
**jointly**
  119:22

**joking**
  25:15
**judge**
  191:7 196:1,
  4 228:10
  237:7
**judgment**
  13:19 69:8
  237:8
**Judiciary**
  99:18,20
**Julia**
  10:13 11:1
  55:8 82:22
  85:10 88:24
  104:11
  111:25 128:1
  132:13 179:5
  187:11
**Julie**
  102:13
**July**
  217:11,18
  233:22
**jump**
  206:23
**jurisdiction**
  80:12,21
**jurisdictions**
  81:6
**JWK**
  175:1

**K**

**K-L-E-I-N-E-R**
  67:13
**K-N-U-T-H**
  144:12
**Katherine**
  118:8
  170:20,21
  217:18
**Kaufman**
  7:19,23
  153:7 167:1

**keep**
  39:21 60:25
  61:1 85:7
  87:22
  106:11,15
  110:9 151:24
  165:17
  171:20
  190:16 202:8
**kept**
  115:6,8
  127:14,15
**kind**
  11:21 28:21
  49:21 89:25
  125:10 188:8
  194:9,10
**kinds**
  46:14 134:17
  142:15
**Kirschenbaum**
  70:9
**kitchen**
  115:7
**KK**
  233:2
**Kleiner**
  67:6,13,22,
  25 68:4
  170:13,15,16
  175:1,2,3
  177:15,24
**Kleiner's**
  175:14
**Kliman**
  67:11
**knew**
  27:25 74:5
  116:11 171:6
  225:7
**know**
  10:19 11:13
  12:20 14:15
  15:2 18:3,25
  19:1 20:17
  21:6 24:21
  27:10 28:5,

17,18 29:5,
20 30:10,14,
17 33:19,24
37:16 39:11
40:14 41:23,
24 42:6,15,
19,24 43:2,4
45:15 46:13,
14 48:10
59:6,11
65:19,20
66:8 68:18,
19,20 69:1,
2,3,12 71:11
76:5,7 90:5
97:11 98:1
99:23 104:19
109:14
118:19
121:17
122:3,4,19
124:20
131:9,10
137:16
148:20
152:4,15
156:10
157:24 158:5
163:14
164:12
166:16 167:5
169:2,3,7
171:3 176:7
178:23 188:6
193:11
194:14
197:21 201:4
208:14
209:5,7
210:24
211:21
215:23
222:11
224:21 225:6
228:21
229:23
231:2,8,11,
14,18 232:6,
23 235:24

236:3 237:1,
22
**knowing**
194:6
**knowledge**
47:7 65:25
67:25 68:3
69:6,17
116:9,23
156:7 171:9
200:8
**knowledgeable**
141:6
**known**
182:9 219:23
221:10
**Knuth**
142:25
144:12,16,24
145:12
**Kroll**
25:6

───────────────

**L**

───────────────

**L&a**
94:8,16
96:13,14
97:6 110:16,
25 117:18
119:25
**L-A-P-A-T-N-**
**E-R**
19:18
**L-E**
8:12 19:18
**lacks**
53:22 76:19
83:16 89:20
95:17 107:1
117:14 119:7
120:17 122:2
142:6 161:3
181:22
188:11
207:25 222:6
224:17 229:1

230:17
231:12
237:19
**laid**
115:1
**Landmark**
24:18,19
153:20
204:6,17,18
205:17,24
210:19,25
211:1 214:6
215:8 218:4,
10 220:8
223:1,4,10
225:5 227:17
**Landmark's**
217:23
**Landmarks**
220:7
**lanes**
196:2
**large**
67:4 108:6
136:21 179:8
**largely**
26:14 77:20,
22 78:11
79:5
**largest**
125:2
**late**
85:12
**law**
11:24 12:2,9
22:13 23:10,
22 26:17,25
33:2,4 36:20
47:25 49:13,
17,23 50:11
54:5 61:18,
25 62:10,18
63:9,11
64:4,10,21
65:4,6,7,13,
25 66:6,19
68:1,21 74:5
75:5 79:21

80:12,13,14
87:11 89:7,
16,24,25
97:9,17
111:25
112:11,18,20
115:22
116:16
119:12,15
124:1,6,9
127:23
128:5,10
129:2,24
130:1 132:21
135:5
146:14,23
155:11
159:21 166:2
170:19
171:4,7
173:21 183:5
200:9 209:25
219:14,21
221:14
223:9,14
225:2,4
227:3
237:24,25
238:3
**lawsuit**
59:20 60:16,
17 110:11
111:11
**lawyer**
12:15 66:10
67:5 72:7
74:5 80:11,
12,20,22
114:15
134:16
135:15
137:9,11,22
152:5 161:6
170:24 182:8
199:5,14,16
206:13
207:1,15
208:14 226:2

Barry Lepatner
November 22, 2021

lawyers
  48:11 49:20
  66:21,23
  89:9 151:18
  173:17
  219:21 221:9
  227:6
lax
  173:18
laymen's
  118:25
lead
  137:5
learn
  114:18
learned
  74:4 77:3
  114:16
  137:18
  232:2,4,18
learning
  219:2
leave
  22:22,25
  76:1
leaving
  197:23
  199:4,12
led
  57:7 140:18
  168:16
left
  22:20 23:2
  76:2
left-hand
  39:23
legal
  11:25 13:13,
  16 23:11
  26:15 27:12
  28:11 39:19,
  25 49:2,20
  54:8 62:1,6,
  19 63:12
  64:7 67:6
  68:7 69:19,
  24 70:11,16

71:1,17
72:22 73:4
77:23 78:24
79:1,19,24
80:3 83:6,7,
22 86:14,20
90:23 91:4
112:3 115:24
117:4,11
118:24 119:5
120:13,24
121:5,7,23
123:19
124:19,24
128:20,25
129:21,25
131:4,15
132:19 133:1
134:13
136:25
137:24
138:17
139:15,17
141:2,3
142:16,18
145:13
146:11,21
147:19
148:2,14
150:6,10
151:4,10,19,
22 157:10
158:18,22
159:4 160:22
162:6 166:3
174:12 180:8
186:17 207:5
210:1 221:1,
5,6,12 237:2
legally
  206:8 208:3
lengthy
  19:1
Lepat-
  59:4
Lepatner
  7:21 8:11
  9:16,22

10:14 11:4
12:3,6,8,13
13:1,4,6,12
17:14 18:14
19:5,15 21:6
22:1 29:8,15
30:7 32:13,
17,22,25
33:5,8,11,
14,18,22
34:1,4,25
36:8,10,20
37:3,5,7,12,
16,21,25
38:4,9 40:4,
9,23 44:16
45:9 46:22
47:1,2,4,7,
9,16,22,25
48:3 49:1,6,
10,13 50:3,
7,15,18,23,
25 51:5,25
52:22 53:13,
19 54:4,7,9,
23 55:3
57:17,23
58:14,20
59:1,22,23
60:17,18,24
61:3,16,17,
25 62:7,9,
14,20 63:21,
23 64:1,4,
13,20 65:11,
23,24 66:23
67:12,15,23
68:18 69:18
70:1,8,17
71:2,9,21
72:20 75:4
82:2 83:9,
15,25 86:16,
21 87:1,10,
15 88:1,7,22
90:13 91:5
92:2,7,23
93:6,10,16
94:9,12 96:9

99:9 100:5,
19,24 104:3,
10 105:12
106:11
109:18 110:8
111:16,22
112:9 113:23
116:12
117:8,12
118:9,17
119:5,17,19
120:5,13
121:24
122:16
123:3,19
124:23 125:6
126:12
128:23,24
129:6 130:8,
18 131:5,14
132:12
133:2,22,23
137:25
143:1,8,9,17
144:4,8,25
145:14,23,24
146:12,13,23
147:5,13,25
148:3,15
149:4,12,15,
16 150:7,19,
21 151:5,15
152:2,23,24
153:18
154:19,20,23
155:8 156:8
157:1,6,7,8,
9,12,13
158:10,15
159:9,13,17,
23 160:13,21
161:16,18
165:12,13,25
166:1,18
167:2 168:2,
9,19 170:18
176:3 178:15
181:7 184:3,
13,14,17

Barry Lepatner
November 22, 2021

185:8 187:1,
6 188:16
189:1,2,10
192:2,12,24
193:5,8
195:5,16
197:23
204:10,19
205:14
206:20 207:3
208:9,21
210:4 212:3
213:14
214:7,18
216:17,19
217:1,3,8,
17,19 218:5,
12,15,20
219:4,7,16,
19 220:3,9,
12,24
221:11,16
222:14,19
223:2,5,11
224:2,5,15,
25 225:23
226:7,18,25
227:10,15
228:18,25
229:14,15
230:3,13
231:10,25
232:15
233:14,18
234:9 235:8
239:7,19,20
240:4
**Lepatner's**
18:6 20:9
61:25 66:13
226:15
229:25
**lepatner.com**
112:10
**Lepatners**
212:5
**let alone**
109:8

**letter**
27:22 70:7,
14,21 88:6
89:25 90:2,9
152:23
153:6,9,13
154:1
166:17,18,25
167:3,11,13,
16,24 168:1,
7,16,18
170:2 178:10
217:11,18,
20,22 220:5
227:18 228:6
**letterhead**
55:4 70:8
88:7 104:10
116:12
159:12,18
168:20
**lettering**
82:11
**letters**
20:2 89:15
181:2
213:20,25
**levels**
46:15
**Lexington**
52:16 53:14
55:13,17,19
**LHR761397**
204:7
**liability**
23:24 24:10
32:23 33:1
35:8 57:17
125:5 154:24
215:16
221:17,20,21
222:17
**liable**
235:18
236:1,5
**licensed**
64:21 65:3,
12,20,25

66:5,19
68:21 81:7
101:8,22
144:17
**lien**
199:7
**lieu**
7:10
**life**
128:4
**lighting**
140:18
**likelihood**
12:15 128:3
**limit**
80:24
**limited**
32:23 33:1
35:8 68:6
115:11 116:1
221:16,19,21
222:17
**limits**
215:21
**line**
70:10 118:9
122:16,21
138:23
148:23
156:16
157:4,19,22
158:1 167:2,
19 190:1
234:14
**lines**
126:23
140:18
**list**
51:8 133:4,6
152:16
178:18
179:18
180:1,11
**listed**
32:3 45:6,
10,22 46:2
122:17,21

170:10
175:15
181:14,19
206:18
**listen**
114:8 129:24
130:2
**listing**
152:14
**lists**
55:12 118:10
122:17
**literally**
107:15
**litigation**
10:12 13:10,
11 74:23
82:15 93:2
96:2 104:22
114:20
116:10
118:18 129:3
180:13 196:2
210:5 220:2
**little**
34:13 60:23
93:22 173:18
192:15
202:16,17
212:13
**live**
41:3 48:8
**lived**
48:8
**lives**
76:4
**LL**
32:25
**LLC**
11:5 14:1
37:3,12,16,
22 47:10
54:23 55:4
59:23,24
60:12,18
61:15 84:11
85:15 86:6

Barry Lepatner
November 22, 2021

90:14 143:9
192:2,12
193:8 213:7
222:10
**Lloyd's**
23:13
**LLP**
47:10 59:24
60:19 83:9,
25 86:16
118:9 122:16
144:9 155:8
187:1 206:20
213:4 222:15
**LLP's**
143:9
**loaded**
99:19
**local**
178:19
180:14
**locate**
99:22
**located**
16:16 88:25
**location**
27:3 71:24
213:11,14
**locations**
54:5
**London**
23:14 24:5
**long**
22:18 24:11
31:20 89:23
96:20 129:19
131:3,8
205:9 216:18
222:21 224:8
**longer**
188:8 235:7
**look**
16:8,11
18:22 29:18
43:9 53:12
61:3 66:4,14
81:24 97:12

98:1 105:24
119:23
133:11 136:8
167:5 171:11
175:19
177:14
191:21 231:3
**looked**
38:22,25
53:16 60:14
77:18 106:21
149:20
**looking**
39:12,18
53:17 82:6
94:21 98:15,
18 123:23
132:15
136:17 141:1
150:10
167:10
**looks**
175:19
211:15,18
**lose**
42:18 160:2
**losing**
143:4
**loss**
26:15 128:4
**lot**
187:12
**lots**
197:25 198:1
**LPA**
82:5 204:25
**LPA0052**
82:6
**LPA_0004**
206:2
**LPS**
50:12,13
51:23 59:23
61:6 62:9
63:7 79:7
85:18 94:8,
9,15,17,19

95:8,14,21,
22,25 96:7,
12,13,14,21
97:1,6,14,
17,23 98:3,5
101:6,9,15
107:4
110:16,17,25
111:2 112:4,
23 115:21
117:18
118:17
119:25
123:25 125:6
131:23
146:14
147:13
159:20,22
163:6,15
209:19,24
210:5 219:8
220:2,14,23,
24 221:7
222:21 223:8
224:6
**lurch**
197:24
199:4,13

---

**M**

---

**made**
22:20 39:3
96:22 97:24
122:5 189:14
194:20 198:1
229:20
**Madison**
70:9
**mail**
30:13
**maintain**
194:8
**maintained**
54:5
**major**
102:14
109:15 126:5

140:4,10,22
146:24
**make**
14:23 15:19
19:2,23 30:1
50:2 60:23
65:22 68:24
69:11 71:7
78:18 83:20
96:2 120:22
128:12
129:15 130:1
147:25
175:24
188:14,19
192:15
193:24
197:14
206:23
214:14
222:23
231:19
**makes**
19:5 97:9
**making**
19:20 22:5
133:13
238:14
**mal-**
151:10
**malpractice**
12:12,16
13:16 23:10,
11 27:9
117:11
118:24 119:5
120:13,25
121:5,8,23
123:19
124:25 142:5
145:13
146:11,22
147:19
148:3,14
150:6 151:4,
22
**man**
44:2,3 115:4

Barry Lepatner
November 22, 2021

manage
  192:15
management
  52:8 54:22
  61:5,8 63:6
  77:5 83:5
  90:13 96:15
  101:4,19
  103:24
  109:25 111:1
  113:19
  121:25
  123:25 138:2
  157:11 162:8
  192:1,13
  193:9 199:18
  200:5 201:9,
  10,11
manager
  87:6 115:6
  164:14
  199:4,14,23
managers
  108:9 113:7
manages
  41:24,25
managing
  48:20
manner
  7:14 102:19
  177:20
mansion
  108:6 127:19
manufactured
  223:19
manufacturer
  140:19
marauders
  136:22
MARBAN
  7:2
march
  44:6,7 109:4
  127:14
  130:10
  132:12,15,24
  133:15,17

134:12
135:8,17
139:7 200:14
201:21
202:13
mark
  18:8 19:23
  20:6 22:8
  29:11 38:14
  44:20 59:19
  60:1 132:6
  143:2 145:20
  148:24
  156:17
  166:20
  169:12
  171:21 179:2
  180:8,23
  185:22
  210:10 216:1
  217:13
marked
  19:25 22:10
  29:7,13
  38:16 44:21
  52:1,2,23,24
  60:5 70:2,5
  81:13,17
  88:2,3 89:15
  90:11 92:8,9
  95:5,16 97:3
  99:16 100:4,
  9 101:18
  103:11,20
  104:7 105:4
  106:21,25
  110:1 111:18
  113:1,11,15,
  21 116:8,22
  118:4,6
  122:10,12
  129:12 132:7
  143:6 145:21
  148:25
  152:25 153:4
  154:5,7
  156:19
  160:14

161:14
166:23
169:2,7,18,
20 171:24
173:2,3
180:24
185:24 186:4
191:9,13
196:9,13,24
197:13,18
198:8,11
200:12,16
201:14,18
203:10
204:3,4
210:12,17
214:17
216:3,6
217:14
marking
  104:4
marks
  178:18
  179:3,4,15,
  17 187:8,24
  188:11
Martorana
  145:19
  146:4,6,9,19
  147:16
  148:1,13
material
  28:7
materials
  36:19
math
  25:13
matter
  9:2,4 13:3
  25:3,5 52:20
  60:15 66:9
  70:22 120:25
  189:4,23
  192:3 211:21
  215:3 233:22
  235:9 236:24
  237:5 238:20
  239:8

matters
  30:21 31:3
  67:4
mean
  12:20 24:22,
  25 27:23
  30:14 41:12
  50:10,13
  68:17 101:18
  110:6
  113:22,25
  194:18 231:3
  232:9
meaning
  15:2 23:10
  27:8 118:22
  123:2 153:18
  159:20
  223:18
means
  46:13
mechanical
  126:2,8
  134:2 145:7
  146:25
  179:23
mediation
  233:21
medical
  194:13
medicated
  188:5 195:19
medication
  193:19
  194:3,10
meet
  101:9 135:22
meeting
  176:18 177:5
  178:17
  183:17 207:7
meetings
  79:3 102:12
  103:5 133:25
member
  46:3

Barry Lepatner
November 22, 2021

members
   46:15
memorializes
   239:25
memory
   187:19
men
   197:9
mention
   197:7
mentioned
   149:18
MEP
   125:3,18,25
   126:2 131:24
mess
   140:15
   179:12
met
   79:4 144:25
method
   36:18
methodology
   36:11,12,17
Michael
   148:18 149:5
middle
   144:13 184:5
Middletown
   144:13
midst
   199:6
million
   107:16
   109:13
   127:19 164:5
Millwork
   106:6
mind
   42:18 70:25
   106:12 110:9
   151:25
   172:24
   183:14
   184:10 194:7
mine
   93:21 230:5

minimize
   36:21
minute
   238:21
minutes
   31:22 91:17
mischaracteri
zed
   158:25
misconstrued
   59:1
mispronouncin
g
   10:20
misspells
   19:17
mistakes
   183:4
misunderstand
ing
   161:21
   183:24
misunderstood
   197:19
mom
   141:18
moment
   17:6 24:11
   26:2 73:23
   108:21,22
   114:10
   125:9,14
   126:25
   162:11
   183:12 186:9
moments
   182:10
money
   164:25
   197:25
month
   37:24 64:9
   79:1 112:21
   134:19
   140:16,17
   161:10
   187:18

monthly
   174:20 200:8
months
   109:6,8
   116:1
Morehand
   24:8
morning
   9:22 197:4
mother
   141:16
motion
   13:19 84:5
mouth
   193:20
move
   66:12 84:2
   99:24 100:14
   115:12 117:9
   135:4,6
   196:7 197:21
   226:14
moved
   39:6 227:22
moving
   127:13
   229:24
multi-page
   201:22
multiple
   182:5
myriad
   128:24

_____

           N

n-e-r
   8:12
N-U-S-S-E-I-
B-E-H
   10:25
name
   7:16 8:10
   9:23 10:17
   19:18 35:3,5
   37:5,25
   43:6,7,23,25

49:1 50:16
56:7 58:19
59:6 67:7
71:24 76:5,7
77:5 93:5
142:25
150:18
159:22
170:14
205:21
206:18
219:19
221:8,22
238:1
named
   38:5 88:8
   120:4
names
   42:9 92:22
   93:1 170:10
   219:21
narrative
   106:5 133:1
narratives
   133:24
nation
   26:19
natural
   185:15
nature
   12:22 23:20
   26:13 62:22
   85:3 114:24
   128:1
   137:12,24
   164:22 180:4
   207:5
nauseum
   130:11
necessary
   26:9,15
   28:12,13
   147:7
need
   16:12 21:2
   48:25 57:10,
   14 64:6
   66:4,8,14,

15,18 68:15,
24 81:22
93:21 95:24
102:8 109:5
130:22
137:16
143:23
163:10
185:12
188:25
202:9,25
204:14 226:3
228:8 231:1
237:3,6
**needed**
29:1 43:9
45:14 64:5
108:5 109:3,
9 115:15
145:9 159:24
163:11 180:1
**needs**
49:2,3 207:8
**negatively**
227:21
**negligent**
162:14 206:9
208:4
**negligently**
162:4
**negotiating**
186:21
188:18
**negotiations**
199:7
**Neil**
7:23 10:2
16:6,12
18:5,9,25
19:8,11
20:8,24
21:15,22
22:11 29:4,
8,18,25
38:3,9 39:20
40:25 44:13
45:16 49:24
51:22 52:12,

18 54:12,19
55:22 59:16,
22 60:22
61:22 62:25
63:16 69:23
71:7 73:1,25
81:11,25
82:25 84:23
85:6 87:20,
22 88:13,18
92:5 93:14
95:12 96:6
98:9,13,17
99:4,25
100:16 101:2
104:1 106:8,
14 117:24
120:20 122:8
132:4 133:10
142:23
145:18
152:22
153:7,14
154:3 162:20
164:15
166:17
168:25
169:6,7
171:19 172:7
174:23
175:10
176:21 178:4
180:19,22
185:20 198:6
200:10
202:21
203:4,19,25
204:8 206:22
210:6 212:2,
12,15,23
216:1,12
217:25
232:21
**networks**
48:10
**never**
13:4,17
26:24 27:19,

20 29:6,22,
24 30:2,8,10
47:3,6,8
58:24 65:3
69:6,17
74:13 84:12
87:9 103:23
108:12,13,14
112:4 113:2
116:23
118:13,14
120:14
121:1,3
123:3 128:7
129:13 132:1
142:20
147:21 148:1
156:13 171:5
173:23
187:24
192:24 197:3
200:5 227:21
228:2,20
229:8,9
230:10
231:17
**nice**
39:13,16
**Nicholas**
88:8
**nominal**
57:16 221:22
**non-adversarial**
222:1
**non-lawyer**
193:3
**non-lawyers**
159:14
173:17
**non-legal**
83:19 114:4,
5 116:13
166:1 200:6
**non-licensed**
221:23
**non-operating**
221:21

**non-responsive**
66:12 84:3
109:18 135:6
208:20
226:14
229:24
**normal**
46:19 69:18
**Northbrook**
24:9
**Notably**
118:23
**note**
75:10 229:23
**Noted**
102:23
**notice**
7:3 29:5,9,
11,22 30:3
160:4
**noting**
84:6
**notwithstanding**
218:22 219:1
**November**
22:21 33:9,
12,18 35:15,
18,25 38:22
39:1 40:10
41:18 42:8,
23 43:17
52:7 55:6
74:10 76:17
77:18 81:18
85:12 88:6
96:11 97:2,
20 153:18,22
154:1,11
156:4
**number**
8:23 23:9
45:1 72:11
77:10 78:22
79:3 107:14
111:20
116:17

Barry Lepatner
November 22, 2021

118:10
122:17
135:18 165:7
204:25 205:3
232:23
236:20
**numbered**
30:25
**numbering**
82:16
104:15,16,19
**numbers**
104:18
173:14
181:20 182:6
234:8 236:6
**numerous**
36:13
**Nusseibeh**
10:13,18
11:1 55:9
74:22 79:5,
6,20 82:13,
23,24 85:10,
11 88:24
103:1 104:11
111:25
118:11
122:18
132:13 145:8
168:9 179:5
183:18 192:8
193:6 194:2,
22 195:6,18
196:11
198:24
199:2,12
200:21 201:8
203:13
209:19
216:22
223:18
225:15
233:18
**Nusseibeh's**
196:22
197:12

**Nusseibehs**
11:9 52:7
53:10 57:12
58:12 74:3
77:3,6,19,24
78:14,20,25
79:16,25
80:3 81:18
84:11,15
85:16,17
86:7 87:2,
11,16 89:12
92:3,6,17
95:1,3
96:10,12,18
98:3 100:6,
10,23 101:5
102:3
103:19,23
104:21
106:24 107:4
109:1,24
110:16,25
111:2 112:16
113:9,13,18
116:6,7,10,
21,25 117:3,
10 118:18,23
119:4,11
120:14
121:7,10,14
123:18,24
124:12
126:11
127:2,12
130:13
131:2,20,22
133:3 136:7,
11 137:12,15
139:1,25
140:7,12,24
151:23
158:19,23
159:4,7,9
160:15,22
161:16,19
163:8 164:4
165:14
173:10 174:7

180:9 182:13
183:3,13
184:9,12,17
185:9 186:6
187:5 188:16
189:9 191:10
192:21 193:1
197:22,23
198:9 199:22
200:13
201:20
213:25
225:10
229:16
**NYC**
70:10

_____

O

**O'CONNOR**
43:19,24
**oath**
7:10 155:23
**object**
110:3,4,5
130:7 181:21
215:13 229:5
234:14,25
**objected**
153:24 195:9
**objecting**
201:10
**objection**
53:22 75:10,
12 76:19
83:16 86:22
89:18 90:24
91:7 95:17
107:1 110:3,
18 117:14
119:7 120:17
122:2 124:14
137:2 142:6
147:20
160:24 161:3
181:21
188:21
189:11

190:23
194:14 195:8
199:24
207:25
214:20 222:6
224:17
225:24 226:1
229:1 230:17
237:19
**objections**
7:13
**objective**
207:7
**objectives**
62:19 83:22
166:4
**obligate**
237:10
**obligated**
206:8 208:3
**obligation**
80:25 95:21,
24 223:13
229:4 238:4
**obligations**
94:16 220:3
**observations**
195:22
**obtain**
177:17
**obtained**
123:7 149:11
**obtaining**
177:19
**obviously**
16:10 31:2
79:1
**occasionally**
26:7
**October**
18:7,15,19,
20,24 19:21
118:8
**odds**
192:3
**offended**
183:6,8

Barry Lepatner
November 22, 2021

**offer**
  39:9
**offered**
  54:8 86:11
  207:6
**offering**
  80:14
**offerings**
  37:14
**office**
  32:20 47:20,
  21 50:6,8,19
  53:20
**officers**
  23:12
**offices**
  26:19 54:5
**okay**
  7:25 8:13,
  22,25 9:9,14
  10:15 11:5,
  11 12:10
  13:1 14:17,
  25 16:8,14,
  15 19:20
  20:21 21:4,
  12 28:2,10
  32:2,9 33:17
  34:18 37:6
  38:2,18
  39:17 40:13
  43:15 44:4,
  22,25 45:21
  46:22 47:9,
  16 48:6
  49:24 50:6,
  17 52:6,18
  53:12,16
  55:21 57:21
  58:2 59:12,
  15 60:21
  61:13,21
  63:16 64:18
  65:5,9,22
  67:22 70:16
  72:14,24
  73:22 74:19
  79:12 81:2

82:25 84:6,8
86:12 90:1
91:14 94:4,
15 97:1
101:21
104:24
105:4,24
106:8 110:3,
21 111:10
114:1 116:4
117:23 120:8
122:23
125:25
131:8,13
132:9,23
135:17 138:5
139:6
141:14,22
142:10,22
143:25
144:5,16
145:17
146:17
147:24
148:12,17
150:5,11,17
151:2,8
153:12 155:6
156:15
157:22,23
159:1,8
162:20
163:17
167:11
168:1,18
169:12,13,
17,20 170:20
172:21
174:22
175:23
176:11,13
177:1 178:2,
13 181:14
184:4,12
185:5 186:2
190:20 191:5
193:12
195:11
196:21

198:22 200:3
202:24 203:6
204:17
205:6,23
206:21
209:10
212:20
213:18
214:14,25
217:10 224:1
225:17
228:11,14
231:16
232:20
233:10
234:2,7
235:5,15
237:3 239:3,
18
**older**
  94:1
**omission**
  120:16
  206:10 208:5
**omissions**
  56:18 57:4,8
  58:10 59:10
  135:2 155:3
**once**
  127:4 128:9
  165:22 231:1
**one**
  10:10 12:17
  15:14 17:2
  18:3 20:13
  25:11 26:2,
  6,12,19 28:1
  36:25 40:12,
  21 42:5
  45:10 48:16
  51:11,17
  52:19,20
  53:2 58:25
  64:13,23
  65:2,19 67:5
  69:3 78:22,
  23 87:9
  89:15 94:17

96:17 98:15,
22 105:7
108:21,22
111:20 112:6
114:10
115:16
117:19 122:4
125:2,4,9,14
126:25
127:16
130:22
133:12
135:19
136:12
137:16
140:18
142:24
143:19 148:6
149:18 151:1
162:11
164:11
167:10,25
170:23,25
171:9,20
172:22
173:4,25
175:18
176:11,19
177:7 178:24
181:14
190:14,25
202:14,22
203:15 209:9
211:19 212:7
221:13
222:19
224:10,23
226:6,16
231:1 236:18
238:5 240:2
**ones**
  57:11 131:19
  140:5,7
  152:15
  198:14
**ongoing**
  13:22 112:22
  140:22 199:7

Barry Lepatner
November 22, 2021

Oops
  167:9
open
  17:5 20:23
  21:10 126:24
operate
  219:17,19
operated
  47:8 54:7
operating
  221:7
opine
  142:4 144:25
  145:5
opined
  124:24 145:2
opinion
  114:5
  145:13,16
  146:10,20,21
  147:17,22
  148:2,14
  149:21 150:6
  151:4
  191:23,25
  195:18
opinions
  144:11,23
  146:18
  147:16
opportunity
  71:9 99:8
  114:7
opposed
  122:6 221:8
opposite
  136:19
oral
  79:19
orally
  112:17
  113:13
order
  31:18 66:5
  81:22 128:15
  134:17
  137:12

138:18
164:21
198:15 222:3
239:24
240:3,7
ordering
  139:24
orders
  196:1
organization
  41:24 42:1
original
  62:12
Orr
  122:15
out-of-bounds
  28:4
outline
  94:18 163:16
outlined
  164:17 193:2
outside
  31:24 43:13
  50:22 51:4,
  10 81:6
outstanding
  192:13 199:7
  237:15
overlooking
  13:9
overly
  195:19
overmedicated
  194:5
overnight
  30:13
overruns
  36:15
oversaw
  25:10
oversee
  107:6
overseeing
  106:17
oversight
  105:17
  141:11

164:20
Oversight/
completion
  105:1,6,14
  106:13
  132:14
owe
  180:22
owed
  187:14
  223:20 229:4
owes
  210:4
owned
  75:24
owner
  33:7 45:13
  68:18
owners
  33:5,8,11,14
  35:11,14,17,
  21 36:15
  48:14,22
ownership
  61:7

───────────
      P
───────────

P.E.
  146:4 148:13
  149:5 150:20
p.m.
  91:23,24
  99:13,14
  152:20,21
  160:10,11
  185:13,18,19
  240:13
packet
  178:4
page
  15:20 29:20
  39:12,17
  40:3 44:14,
  15,25 52:13
  71:15 72:1,
  2,6,10

73:11,15
81:21,23,24,
25 82:20,25
85:7 90:20
93:15,17
112:9
133:10,14
141:8 147:25
153:14
154:13
156:15,16
157:4,19,22,
24 158:1
162:21 167:9
168:6 178:13
181:5 190:8
202:18
204:8,15
206:1,17
212:10
217:22 223:1
233:25
239:12
pages
  81:25 204:24
paid
  79:1 103:23
  112:20
  137:22
  140:1,8,24
  155:24 156:7
  197:24 200:5
  231:24
  232:14
  238:13
  239:7,12
pain
  115:14
painstakingly
  173:8
painting
  126:14
pandemic
  15:3
panel
  23:22 27:3,
  10 69:9
  152:16

Barry Lepatner
November 22, 2021

panoply
  221:6
paper
  114:15
parade
  130:10
paragraph
  60:23,25
  61:4,14,22
  62:24 63:2,
  3,5,21,22
  83:2 86:12
  90:20 93:14
  94:4,7,15
  95:11,15,20
  96:9 97:14
  100:1,16,23
  101:16
  110:13,15,
  22,24 144:6
  155:6 191:22
  192:6,7,8
  197:2 198:17
  201:7 216:11
  232:21
  233:16
paragraphs
  30:25 233:25
paralegal
  171:2
paralegals
  170:23
part
  8:4 16:11
  46:21 49:2
  72:22 77:9
  81:22 96:23
  97:24 102:25
  126:3 128:14
  136:21
  140:10 178:6
  199:6 201:22
  205:25
  206:22
  207:12
  218:17 228:9
partial
  13:19 236:7

participant
  15:12
participate
  233:20
participating
  7:6
particular
  166:12
particularize
  d
  116:16
parties
  7:6,12 8:5,8
  9:10 12:20
  62:4 63:5,24
  175:5 234:21
partner
  22:15,20
  129:3 180:13
Partners
  171:15
  172:11
partnership
  32:23 33:1
  221:17
  222:17
parts
  121:17
party
  12:7,9 13:7
  97:9 111:19
  229:22
passed
  141:18 162:6
past
  13:10 32:21
  48:8 120:3
Patrick
  7:19 9:23,25
  21:9 51:13
  141:21 228:8
pause
  42:19
pay
  139:25 140:7
  141:25
  142:18

153:20 156:6
182:20
206:6,8
208:3 209:3,
6,14 216:19
231:25
232:14
235:18
236:1,5
237:12
238:16,22
239:4
paying
  140:1,12
  153:24
  237:18 238:8
payment
  117:3 158:14
  161:9 174:7
  187:14
  231:21 236:7
  239:15
payments
  158:14
pays
  157:25
PE
  144:16
penalty
  7:11 9:5,7,
  18
pending
  99:1,2
people
  39:14 42:4,7
  45:8 49:18
  63:11 64:6
  83:19 108:15
  136:10
  163:11 164:4
  174:19
  187:21
  194:4,6
  195:22
  219:18,21
  225:6
percent
  12:14 17:10

32:18 33:7
142:18
percentage
  26:17
Perfect
  18:12
perfectly
  222:23
perform
  58:21 69:19
  96:14 102:5,
  15 103:7,9,
  18 109:23
  134:24
  147:14 207:7
  219:17
performance
  83:6 96:18
  109:14
  151:23 160:1
  210:1
performed
  12:1 58:19,
  23 77:16
  79:8,15 83:8
  86:15 88:25
  89:14 91:4
  106:23
  108:4,5
  110:25
  111:22,23
  112:23 113:2
  116:6
  119:10,11
  128:20
  129:10
  131:2,4
  134:13
  136:3,6
  137:8,24
  138:1 146:25
  155:8 164:7,
  19 165:13
  169:22
  172:2,15,25
  180:7
performing
  78:20 101:4

Barry Lepatner
November 22, 2021

112:1 135:7,
14 147:9
161:19
221:14
**period**
204:11,19
210:25
**perjury**
7:12 9:6,8,
18
**permit**
177:16
**permits**
177:17
**permitted**
226:4
**person**
7:10 17:7
42:16 44:4
66:17 75:16
144:11
150:15
155:16,19
182:9 231:1
**personal**
194:5 197:2
206:10 208:5
**personally**
69:9 128:8
234:9
**personnel**
116:13
159:13,19
173:17 193:3
221:8,24
**pertains**
83:5
**pertinent**
71:23 196:2
**Peter**
8:12
**phase**
105:1,5,14,
17 106:13,17
107:7,8
132:14
141:10

162:22
163:1,6
164:9
**phone**
17:4,20,23
134:20
140:21
**phonetic**
24:9 69:8
**phrased**
78:17 103:16
**physical**
47:17 50:11
51:1,7 55:12
158:13
**physically**
7:7 15:16,18
16:16
**pick**
8:2 182:11
**picked**
175:20 225:3
**piece**
114:15
**pipes**
134:4
**piping**
126:21
**place**
165:5
**plague**
48:22
**plagued**
36:15
**plaintiff**
61:15 82:10
205:8,11
235:16,18
**plaintiff's**
207:22
209:2,13
**plaintiffs**
147:5,12
152:10,12
205:7
209:21,22
228:4 236:24

**plan**
77:15 138:10
**played**
23:6 62:18
**please**
7:15 8:1,6,
9,14 9:1,25
20:8 21:23
29:4,18 38:3
51:12 60:23
62:25 87:21
89:9 90:2
96:7 98:23
99:4 107:8
108:22
110:9,11
114:9 125:13
130:23 131:7
132:5 150:12
180:21
200:25
202:23
203:3,13,19
210:21
211:25
212:24
217:11
**pleased**
223:23
**plumbing**
126:2,8
145:7 147:1
179:23
**pods**
114:5
**point**
10:22 45:22
46:2 48:16
93:20 117:11
118:24 119:4
133:13
144:22
185:16
189:23 199:2
236:25 240:8
**pointed**
126:3

**points**
45:1,6 46:8,
18
**policies**
207:4 215:4,
16 239:8
**policy**
24:4 56:10,
18 59:7
70:22 135:2
203:19
204:7,11,18,
19,23 205:6,
8,11,14,16
206:25
207:2,14
210:7,20
211:2,3,6,
14,19 213:22
214:2,5,6,17
215:9,11
217:6 218:3
220:4
239:12,15
**poor**
109:14
**poorly**
78:17 95:25
103:15
108:13
**popular**
174:12
**portfolio**
23:8
**Porticullis**
171:15
172:11
**portion**
106:12 155:7
203:1 220:6
229:24
234:10
**portions**
66:12 84:3
226:15
**posing**
85:20

Barry Lepatner
November 22, 2021

position
 207:22
 209:3,6,13
 217:23 220:7
 233:17,19
possibilities
 173:12
possibility
 173:4
possible
 19:4
potential
 27:13 171:14
 172:10 175:4
potentially
 142:14 173:7
powered
 17:24
powering
 17:13
practice
 23:4,8,15,21
 28:25 33:4
 64:21 65:3,
 4,5,7,13,25
 66:6,19
 68:1,21
 80:12,13,21,
 22 89:7,25
 144:7 171:3,
 7 213:10
practiced
 26:18
practices
 73:11
 100:21,25
practicing
 80:14 81:6
 89:16,23
preceded
 136:22
 198:14
preceding
 37:24 61:13
precise
 184:10

precisely
 33:19 130:9
 131:21,22
 138:4
predecessor
 25:7 37:5,22
predecessors
 13:3
preliminary
 14:22 35:5
premise
 209:21
premium
 57:19
preparation
 134:1,5
 135:23
prepare
 31:5 108:3
 151:19
 163:10 180:1
 233:21
prepared
 32:2,14 89:4
 115:23
 121:18 122:4
 133:6,8
 151:21 152:6
preparing
 121:4 164:13
present
 7:7 15:16,18
 65:9,18 66:1
 233:19
presented
 27:5
press
 174:20
pressuring
 115:13
pretty
 68:13 215:17
prevent
 127:13
previous
 26:3 34:16
 78:7 114:11

 125:15
 128:19
 162:12
 224:11
previously
 54:11 77:18
 81:12,17,19
 101:17 133:7
 152:3,13
 169:2,7
 170:12
 236:23
price
 108:10,14
 127:20
 136:10
primary
 26:12
 213:11,14
principal
 144:21
principals
 162:19
 178:24
prior
 37:19 53:16
 54:2 58:6,9,
 13,25 59:3
 87:5 149:18
 199:20
 202:17
private
 8:2,23
privileged
 167:19
probably
 12:25 37:11
 44:1 93:22
problem
 62:17 127:16
 134:18
 193:19 194:3
problems
 48:12,20,23
 107:7,24
 108:6 109:7,
 9 114:24

 126:5,8,9,16
 131:20,24
 136:9 137:17
 138:19 179:7
proceed
 9:15 102:19
 179:10
proceeded
 200:6 227:23
proceeding
 7:6,8,9 87:8
 89:24 159:14
proceedings
 15:18
process
 36:14 48:14
 163:15
 186:21
 188:18
 189:25
 201:11 222:1
proclaim
 215:22
procure
 57:7
procured
 46:3 57:4
 155:3,4
procurement
 57:25
produced
 82:9,12,15
 124:21
 184:25
 191:18
 196:18
 228:3,13
 240:6
producing
 188:7,25
production
 56:9 57:23
 205:3 228:6
 239:21
professional
 23:24 24:25
 57:17 80:4,

```
11,20
144:17,24
146:6 149:24
154:24 197:3
206:12
207:1,14
215:15
```
**professionals**
45:13 200:7
**proffer**
68:15,25
**program**
24:4 36:21
48:19
**programs**
24:10
**project**
10:13 11:4,
8,23 12:7,13
13:2,4,14,15
34:24,25
35:2,7,11,
14,17,21,24
36:2,5,8,25
37:5,7,12,
20,22 38:1
39:14,19
40:1,5,9,24
43:9 44:10,
11,14,15,17
45:2 46:3,
15,23 47:3,
4,7,10,17,22
48:2,12,15
49:1,5,10,13
50:4,7,14,
15,18,25
51:1,5,9,23,
24 52:8,9,
15,19 53:3,
10,20 54:2,
6,7,13,22,23
55:3,12,24
56:9,12,15,
19,22,25
57:3,8,18,25
58:6,9,14,20
59:1,3,5,10,

```
12,23 60:17
61:5,8,9,16
62:5,9,13,20
63:6,14,21,
25 64:13
67:7 68:4,7
73:23 75:21
76:23 77:2,
17 78:14,21
79:4,16,21,
24 80:2
81:12 83:5,
14,15 84:10,
18 85:1,15
86:6 87:3,
17,18 89:14
90:3,10,13,
14 92:20,22
93:5,10
94:10 95:4,
15 97:2
100:3,8,10,
19,24
101:19,21,
23,25 102:7,
21 103:8,10,
17,19,24
105:1,5,14,
17 106:9,13,
23,24
109:23,24,25
111:17,23
112:16
113:1,7,8,
10,14,19,20
115:4,6,19
116:4,7,19,
20,22,25
117:5 119:18
120:5,16
121:25
123:21,25
124:23
127:23
129:11
132:14
137:24
138:1,2
140:6 141:10
```

```
143:8,17
144:8 145:25
147:9 149:4,
12,16 150:21
151:15 152:1
154:21,22
155:2,15,16,
24,25 157:9,
11,12,13
158:2,3,11,
21,23 159:3,
5,10,16
160:14
161:13,18,
20,25 162:25
164:20
165:12,15,25
166:7,8,12
168:9 171:1
183:13,17
184:9 189:1
192:1,2,12,
13,16,20,21,
24 193:4,8,9
195:23
199:4,13,17,
22 200:5
207:23
209:3,14
219:5,9,20
220:17,18
221:11,19
222:3,5,10
223:11
224:2,15,25
225:22
226:18,24
227:10,14
228:18,25
229:15
230:4,14
231:11,21
237:17
238:2,7,16,
22 239:4
```
**project-
specific**
45:11

**projected**
193:16
**projects**
36:16 48:20
57:13 87:14
131:16
134:22
139:24 140:9
164:23
166:2,4,7,11
**promises**
221:14
**promoted**
37:13
**prompted**
201:4
**promulgated**
83:24
**pronounce**
10:17 170:13
**Pronouncing**
142:25
**pronunciation**
10:17
**proper**
66:11 85:20
147:10
177:17
**properly**
97:13 108:11
140:6 147:6
**property**
88:25 96:19
107:21 165:1
**proposal**
52:6 53:17
54:14,18,22
58:12,13
63:13 69:21,
24 70:11,17
71:2,17
73:3,9,13
77:17 78:3,7
79:5,7 81:18
84:12 85:23
86:10 90:11,
12 91:12

Barry Lepatner
November 22, 2021

101:18
102:12,15
103:2,6
107:4 109:2
111:23 115:2
138:12 159:7
160:19
163:15 200:4
**proposed**
73:4 84:21
102:13 103:3
107:6 227:17
239:24 240:3
**proposing**
227:25
**prosecute**
162:7
**prospective**
39:8 48:1
**protect**
223:14
**prove**
111:14 124:8
125:5 193:16
**proven**
193:14
**proves**
133:12
**provide**
13:21 28:25
40:5 58:18
69:20 77:23
79:19,24
80:3 87:4
89:24 95:10
102:9 103:9,
18 109:23
114:22
131:23 133:3
134:17
145:15
146:10
147:21
148:2,13
150:5 151:3
155:17
159:14
216:25

217:3,7
218:4 220:8,
11 221:6
223:2,5,11,
14 229:8
**provided**
30:4,18
49:20,21
62:22 71:18
72:20 73:4
77:25 84:18
86:20 106:23
112:20 113:3
116:13
121:25 124:1
129:21,25
130:9 132:20
133:2
139:15,18
159:20,25
180:8 192:1,
25 193:2
205:4 223:24
229:18
**provider**
148:6 174:12
**provides**
45:2 73:13
112:10,11
131:14
218:10
**providing**
47:24 49:16
77:13 78:13
87:12 145:12
146:19
147:17
149:23
158:18,22
159:4,6
211:19
223:10 229:6
**provision**
90:23 117:4
160:22 218:4
**public**
40:6 42:3
219:15

**pull**
29:4,9 38:4,
9 69:24
81:11 87:20
90:2 98:11,
17 99:4,15,
25 104:1
106:9
117:23,24
122:8 132:4
142:23
148:18
150:12
152:22 154:3
156:3,10
166:16,17
169:1,6
171:19 178:2
191:8 196:8
198:6
200:10,11
201:12,13
203:19 210:7
215:25
217:10
232:20
**pulling**
43:8 99:7
210:8
**punch**
133:6 178:18
179:18 180:1
**Punchlist**
132:16 133:1
**pure**
27:16
**purported**
153:20
**purportedly**
159:19
**purports**
105:22 168:7
**purpose**
164:3 173:9
**purposes**
20:25 29:2
**pursuant**
7:3 72:15

77:17 78:3,
19 79:15
103:10,19
106:24
109:24
116:6,7,21
129:11 138:2
144:6 161:17
218:3 219:12
**pursue**
87:7 137:15
229:19
**pursued**
120:14
**pursuing**
87:5 123:19
**purview**
164:13 193:4
**push**
203:13
**put**
9:11 13:17
18:10 20:16,
18 21:14,16
38:5 39:7,15
48:17 63:11
75:12 104:21
111:15
114:15
115:24
126:17
128:14,25
129:2 136:12
137:13
138:18 141:7
165:7 173:19
180:3 181:25
187:24
203:21 238:1
**putting**
128:12 141:3
162:1 180:10
215:7 219:20
240:2

Barry Lepatner
November 22, 2021

**Q**

qualified
  77:25
quality
  188:7 191:23
  192:1
quantify
  180:2
quantum
  235:16
quarter
  139:8
question
  15:5,6 22:1
  28:7 36:24,
  25 38:24
  40:18 41:11
  42:20 49:4,
  5,7 57:14
  58:8 62:12
  66:22 69:4,
  13 70:24,25
  71:5 74:17
  77:22 78:10,
  17,18 79:13,
  14 80:16,18
  81:4 85:23
  86:1 94:6
  99:1,2,9
  100:12,13
  103:13,15
  105:8,12,16
  109:19,20,22
  110:8 111:4
  112:15
  114:9,11
  120:2,4
  125:12,15,22
  129:8,25
  130:17,21,25
  131:1 132:23
  135:7 137:5,
  6,7 143:24
  148:5,9
  151:24,25
  157:3,23

159:2 163:21
165:18,23
167:21,22
170:8 172:24
182:23
183:25
184:5,8
188:2 189:7,
8 190:6,12
195:10,15
197:7 203:1
205:10
207:11
208:13,24
209:2,9,11,
17 211:3
212:15,21
213:7,9,18
224:23
226:12 227:7
230:1,6
231:5,6
232:10,13
234:25
235:11
237:13,14
238:22
questioning
  185:3 234:15
questions
  14:22 16:12
  19:14 20:12
  42:17 66:11
  69:3 81:23
  85:19,21
  129:7 134:22
  135:1,24
  136:20
  165:24
  166:14
  176:8,11
  183:7 215:2,
  9,11 226:6,9
  230:2 239:19
  240:5
quick
  10:10 21:10
  29:3 36:25

51:17 91:13
170:8 202:17
quickly
  19:12 75:11
  126:4
quite
  68:24 194:4
quotation
  188:11
quote
  61:7 113:7
  118:21,23
  123:6 155:7
  168:8 187:8,
  24 191:22
  192:9

**R**

R-A-M-P-A-R-T
  56:6
rabbit
  69:2
racked
  74:23
raise
  110:7
raising
  110:5
rambled
  193:19
Rampart
  56:6 57:24
  153:19,23,25
  154:12,17
  155:1,4
ranting
  188:3
rantings
  203:7,15
re-design
  179:12
re-putting
  163:7
re-read
  207:19

reach
  16:3 146:15
reached
  152:5 234:21
read
  25:25 26:3
  34:16 36:19
  51:4 86:12
  93:16,19
  94:22
  101:12,13
  114:11
  119:21
  125:7,12,15
  134:6 153:11
  156:6,13
  158:12
  162:12
  190:10,17
  201:3
  207:12,20
  224:9,11
  240:10
reading
  31:3 121:3
  147:2 202:14
reads
  61:4 94:15
  132:16 138:9
  144:12
  157:23
  171:13 175:4
  191:22 206:5
  213:10
  216:17
  217:24
ready
  133:4 167:8
real
  29:3 48:7
  74:6 185:12
reality
  194:11
realize
  126:22 164:5
  233:4
realized
  173:20

Barry Lepatner
November 22, 2021

193:22

**realizing**
184:22

**Realty**
59:24 60:11
61:15

**reason**
40:23 41:8
99:19 102:4
107:14
184:22
186:13
187:10
211:12

**reasonable**
145:10

**reasons**
23:9 26:20
59:2 68:11
126:13

**recall**
12:19 15:14
18:19 19:20
22:5,7 24:11
32:21 35:6
41:20 42:9
66:25 70:14
74:8,11,24
76:21 120:12
121:9,20,22
141:24
153:9,22
154:1 155:20
184:19
186:8,11
191:15
196:15
197:22,25
198:13,19
200:18,19
203:9,12
214:22
217:20 240:4

**recalled**
43:9

**received**
167:25 215:8
228:21

231:17
235:19

**receiving**
153:9 198:13
217:20

**recognize**
38:10 53:4
60:7,10
88:17 92:13
104:13,16
204:13
210:20,23

**recollection**
42:22 53:19
67:2,11 74:4
83:12 106:22
119:3 123:18
156:11,13
158:9 186:10

**recommend**
27:3 45:12,
23 46:16
49:11 62:21
128:5 179:6

**recommendatio
n**
179:14 225:5
227:20

**recommendatio
ns**
128:8,10,13

**recommended**
48:5 77:8
107:9,11
114:22
127:10 152:6

**Reconciliatio
n**
162:22 163:1
164:9

**record**
7:16 8:3,6,
7,10,19 9:2,
11 10:2,16
16:17 21:25
51:19,20,21
65:23 69:12
71:11,12,13

75:12 84:7
85:17 87:24,
25 91:23,24
94:9 99:10,
11,13,14
120:25
148:10
152:19,20,21
160:7,10,11
175:24
185:16,18,19
188:14 189:5
194:18 196:3
229:23
231:20
235:23
240:11

**recorded**
15:25 184:20

**recording**
8:1,8

**recovery**
171:15
172:10

**reduce**
63:15 93:15,
18

**refer**
10:11 11:3,7
87:22 182:14

**reference**
34:25 95:8,
25 166:13
179:6

**referenced**
163:6 180:15
236:11

**references**
140:2,3

**referral**
74:12

**referred**
74:7,24
126:1 152:15

**referring**
10:12 11:4,8
12:2 74:25

101:16
103:25
125:18
154:20,21
162:15
184:24 185:3
186:22

**reflect**
67:1

**reflected**
134:11 135:8
136:4,24
138:16
140:25 164:9

**reflects**
141:9

**refresh**
42:11,21
53:18 67:2,
10 83:12
106:22 119:3
123:17
156:11,12
158:9 202:3

**refreshes**
186:9

**refused**
189:21
229:21

**refute**
147:12

**regarded**
151:17

**regarding**
14:19 31:25
68:16 106:7
126:9 129:19
139:17
145:13
146:11,21
147:17
148:2,14
150:6 151:4
171:14
172:10 209:6

**registered**
32:22 33:1
35:7

Barry Lepatner
November 22, 2021

regret
 203:14
regretted
 193:21
regularly
 28:25 213:19
regulations
 147:8
reinsurance
 23:14
reject
 165:4
rejected
 79:7 102:14
 103:5 107:4
 159:7 192:25
relate
 71:23
related
 16:24 77:10
 101:5 111:1
 121:23,24
 124:2 125:3
 131:24
 142:4,14
 175:5 177:19
 180:12 207:9
 228:24
 231:10
relating
 32:12
relations
 42:3
relationship
 26:23 37:6
 157:13
 184:16 185:8
 188:13
 189:14 197:5
relative
 61:8
relevancy
 68:16,25
relevant
 68:12,23
 147:7 211:17

rely
 215:5
relying
 115:21
remain
 192:3
remaining
 236:8
remedial
 128:5 145:9
remediate
 108:5 109:16
remediating
 114:23
remediation
 77:11
remember
 12:22,24
 43:7 67:6
 74:23 121:16
 153:12,24
 170:22
remembered
 150:18
remind
 141:17
remote
 15:12 240:13
remotely
 7:9
removal
 134:5
render
 206:12
rendering
 206:12
rendition
 194:9
renovation-
 199:6
repeat
 9:1 34:9
 38:24 64:24
 86:1 103:14
 114:9 125:21
 136:15
 155:10

158:25
162:10
163:21
190:16
232:10
repeatedly
 161:6 192:24
 197:8
repeating
 129:6 190:16
rephrase
 132:23 148:9
replace
 127:11
 226:11
replacement
 127:6,8
 134:3
replacing
 215:19
report
 26:7,13
 27:11 28:11
 134:5
reported
 24:14
reporter
 7:5,25 8:13,
 18,22,25
 9:5,9,14
 15:17,25
 18:12 21:2,4
 26:2 32:8
 34:14 38:17,
 20 42:18
 44:23 52:3
 60:3 64:24
 67:17 70:3
 74:18 78:5,7
 88:4 91:22
 92:10 98:22
 104:5 108:21
 114:10 118:2
 125:9,11,14,
 20 130:22
 132:8,10
 135:11 143:3
 149:1 153:2

156:20,22
160:2,5,8
162:11
163:20
166:21
169:10,16
171:22
180:25
185:17,25
190:14
197:18
201:16
203:22 204:5
210:13 216:4
217:15
224:10
230:25
232:25
233:3,8,11
240:12
reporter's
 20:25
reporting
 7:8,14 28:21
reports
 28:25 152:8
represent
 9:24 18:17
 26:18,21,25
 44:16 58:16
 170:1 178:8
 191:17
 196:17
 218:12,15,20
 219:6 224:4,
 14,25 225:4
 226:17,20,24
 227:14,20,23
 229:14
 235:20
representatio
n
 170:4 178:11
 191:19
 196:19
 204:22 205:2
 211:1,7
 223:23 224:6

Barry Lepatner
November 22, 2021

representatio
ns
  213:19
representativ
e
  26:8 223:17
representativ
es
  226:11
represented
  23:13 27:6,
  18 28:5,6,8
  37:14 154:23
  219:9 220:3
  224:1
representing
  87:10
repudiate
  112:16
repudiated
  112:25
  160:15
repudiating
  113:10,14
reputation
  188:8 189:16
request
  28:16 89:3
  133:9 179:4
  239:13
requested
  58:18 83:8
  86:15 91:4
  128:23 133:3
  140:23
  159:15
require
  237:2
required
  28:22 46:3
  72:5 107:5
requirement
  110:4
requirements
  45:12 72:6
  101:9 147:8

requires
  80:25
requisite
  46:14 123:7
reservation
  25:22 26:25
  27:15,22,25
  28:4 217:2,8
  218:6,23
  219:1 220:10
  223:3,6
  240:3
reserve
  152:8
reserves
  26:15
reserving
  192:11
  239:20
residence
  54:24 107:12
  109:11
  135:21 145:9
  178:17
  183:17
residential
  13:14
residents
  12:23
resign
  184:23
resigned
  184:18,19
resigning
  197:24
resolved
  120:24
respect
  12:5 13:13
  24:5 32:3
  45:6 46:7
  68:7 88:24
  98:6 124:24
  141:10
  142:11
  146:15
  147:4,18

218:5 220:9,
  13 223:3,5,7
  240:5
respective
  41:2
respects
  219:7
responded
  227:21
response
  129:7,19
  135:23
  162:15
  196:22
  197:12 198:5
  235:19
responses
  58:11 127:18
  211:22
responsible
  237:17 238:8
responsive
  69:13 79:12
  131:9 207:10
rest
  71:4 192:16
  196:5 202:2
result
  69:8 102:15
  103:6 114:23
  188:4
resulting
  61:9 77:13
retain
  25:23 83:13,
  14 121:7,10,
  14 219:4
  224:24 225:3
  226:17
retained
  23:16 24:24
  25:4,7 26:5,
  6,17 63:9
  69:19 72:8
  83:25 87:4
  108:1 128:6
  142:4 146:9,

13 148:13
  149:15 150:5
  151:3,15
  152:1,5,8
  164:3 179:15
  199:16,22
  218:25 219:6
  224:14
  226:20
  227:9,13
  236:17
retainer
  69:21 71:20
  72:19 92:1
  226:22
  227:3,8,12
retaining
  129:19
retention
  27:10 49:12
  72:23 78:25
  116:1 161:6
retired
  44:6
review
  31:8 45:12,
  23 71:9
  81:21 134:1,
  2,4 140:21
  143:22
  146:16
  167:13
  171:13 172:9
  175:6
  177:16,19
  186:9 202:25
  214:7,19
  215:4
review/update
  132:17 133:1
reviewed
  90:20 106:20
  115:8 174:21
  211:2 215:4,
  10 225:6
reviewing
  70:25 129:20
  214:23

Barry Lepatner
November 22, 2021

RFA
  211:22
ride
  107:15
ridiculous
  109:5
right
  10:23 13:22
  15:11 20:1
  21:3 25:22,
  23 27:1
  31:11 32:9,
  18 38:11
  39:21 41:2
  45:22 55:2
  64:12 66:8
  69:5 73:11,
  14 76:12
  78:18 84:23
  87:14 93:7,
  20 94:24
  101:17
  111:13
  112:11
  119:20
  126:23
  127:19
  135:25 139:2
  147:3 153:15
  157:4 158:23
  168:25
  176:19
  178:23
  185:11,23
  196:7 208:25
  209:1 211:11
  222:13 225:2
  231:4 233:10
  238:25
  239:11,20
right-hand
  82:3 104:20
rights
  25:23 26:25
  27:15,22,25
  28:4 72:15,
  18 73:19
  192:11

217:2,8
218:6,23
219:2 220:10
223:4,6
ringing
  197:6
rip
  109:15
risk
  48:20
risks
  124:6
Rivera
  75:1,3,6,9,
  15,21,23
  76:1,12
  77:9,16,23
  78:13,20
  79:15 83:20
  106:1
  132:16,25
  133:6 138:6
  155:9,19,22
  158:8,10,17
  171:13
  172:5,15
  173:1
Rivera's
  76:17 77:2
  156:3,24
road
  11:10 54:25
  63:10 89:1
roadmap
  164:3
Robert
  122:15
Rodriguez
  7:18
role
  23:7 26:12
  28:9 59:1
  62:9,17 68:6
  77:2
Roles
  76:25

room
  7:8 15:16,19
  16:3,21
  179:22
rooms
  133:4
Rose
  154:11
Rosen
  140:11
  187:13
routine
  23:19 28:24
RS
  214:15
RSU
  211:19
RSUI
  9:24 24:15
  66:8 82:15
  97:7 118:8
  122:15
  130:10
  141:25
  142:17 168:4
  207:23
  209:3,6,13
  211:6,14,16
  214:5 216:8,
  14,17,19,25
  217:7,19
  218:14,19
  220:16,17
  226:10
  231:24
  232:14
  233:15
  234:8,11
  235:18,25
  236:4,24
  237:5,10
RSUI's
  217:11
  233:17
  234:22 235:7
RSUI_000122
  70:12

RSUI_000125
  70:13 72:10
RSUI_000890
  154:4
RSUI_000934
  117:25
RSUI_001150
  217:12
RSUI_001421
  122:9
RSUI_0015
  88:12
RSUI_001577
  87:21 88:10
rule
  84:4 191:7
  234:15
rules
  10:7 15:20
  72:5,15
  73:20 80:4,
  11,20 81:5
run
  61:16 107:21
  126:23
runs
  70:13 88:11
Russell
  142:25
  144:12
Ryan
  7:20,23
  153:8 167:1

_____

S

S-A-N-T-O-R-O
  115:5
sake
  40:14 99:23
  176:21
Sal
  43:6
Salisbury
  7:17 9:13
  19:4 20:3,
  13,19 31:10,

Barry Lepatner
November 22, 2021

15 51:13,16
53:22 58:2
64:15 65:14
67:19 68:11
69:5 75:10,
17 76:19
80:23 83:16
84:4,8 86:22
89:18,20
90:24 91:7,
14,18,21
93:18,23
94:2 95:17
107:1 108:19
110:3,18
113:22 114:1
117:14
119:7,9
120:17 122:2
124:14 130:5
131:6,11
137:2,10
141:20 142:6
147:20
148:22
160:24 161:3
167:18
178:10
181:21
183:22,24
185:14
188:21
189:11
190:23
194:14,25
195:7,12
197:16
199:24
203:21 204:1
207:25
208:11
209:8,16
214:10,20
215:13 222:6
224:17
225:24 226:1
228:8,12
229:1 230:17
231:2,12

232:2,3,7,
11,17
234:12,14,24
235:10
237:19
238:21,25
240:9
**Santoro**
115:4
**sat**
115:6
**satisfactory**
159:25 160:1
**satisfied**
239:14
**saying**
14:15 27:20
63:20,22
64:2 95:23
187:18 188:6
189:22
203:13 220:8
223:1 227:19
**says**
28:5 30:21
49:9 50:22
55:2,7 61:11
70:11 85:9
95:20 96:21
97:5,16,21
104:25
106:13,17
111:5,7,9
119:25
146:17 147:3
154:2 158:13
177:15
188:25
193:10
207:20 208:2
210:23
212:21
**schedule**
108:10,14
109:13 115:1
**scheduled**
127:14
233:22

**Schneider**
154:11
**scope**
73:4 84:17
106:15
107:18 108:4
109:6 134:2,
3,4 145:4
**screen**
16:7,8 18:8,
10,15 21:10,
17 30:21
38:4,7,11
39:18 41:8
49:22,25
52:21 63:16
90:10 122:22
157:4 180:21
**screenshot**
38:10 40:22
41:9 44:17
**scroll**
16:13 18:25
19:12 21:22
29:17,21,25
38:23 39:20
40:3 44:25
45:11 52:12
55:11 59:18,
22 60:22
61:21 62:24
70:19 71:8
72:25 73:6
85:5 88:18
90:4,19
104:24
106:14 138:5
139:6 143:20
144:5 157:20
168:20 170:7
172:21
201:25
202:17,21
203:3,4
204:14
205:19
210:21 212:3

**scrolled**
60:25
**sec**
218:8
**second**
17:10,12,24
46:2 51:12
52:21 58:24
96:17 118:20
133:12,14
154:12
186:16
191:22 192:5
197:2 216:16
224:10
**Section**
72:15 73:19
101:7,10
207:13
**sections**
109:16
**secure**
46:16 163:10
164:24
215:24
**secured**
154:24
**see**
12:23 18:14
29:19 30:21,
23,25 39:23
45:19,20
49:22 52:11
55:19 60:24
62:2,9 63:16
71:4 72:11
82:2 83:2,10
88:15 94:20
96:24,25
104:25 105:2
106:17
118:12,20,25
119:2
122:20,22
123:1,4,9,15
133:17
135:24 137:6
138:7,14

139:12
140:17
141:24
143:4,11,12,
21 144:14
146:1 149:6,
9 150:22
153:10,17
154:14
155:7,12
157:5,16
163:1,16
167:4,18
169:24
171:17
172:12,22
174:25
175:8,20
176:16,21,
22,24 177:5,
7,10,15,23
178:1,21
180:17
181:6,10,12,
15 182:22
183:11
186:9,16,18,
24 190:3,7
192:4,5,17
196:21
198:2,3,5,
18,25 199:3,
9 200:23
201:7,11
202:2
203:12,14,16
204:24
206:2,14
208:1 212:7,
20 213:1
216:23
218:7,9
233:3,24,25
**seeing**
82:20
**seeking**
83:13 205:9,
11,13 209:20

236:24 237:5
**select**
27:1
**selected**
225:9 228:1
**selection**
225:12
**send**
57:19 72:23
89:5 221:23
**sending**
89:14 153:22
154:1 167:7
**senior**
155:16
**sensitive**
8:2
**sentence**
96:20 97:23
118:20
122:25
123:6,11
155:10
186:16,20
189:24
191:21
192:5,6,9
193:22
216:17
217:24
218:10,18
**sentences**
83:22 123:1
194:7
**separate**
39:18,25
40:4,8,10,19
47:5,8,13,
15,21 62:5,
6,22 64:12
83:8 86:16
91:5 120:4
157:9 168:19
181:24 182:3
209:23,24
220:13,17,25
221:3,12
222:2,4,9,

13,19 227:12
**separated**
228:16 230:3
**separately**
60:18 62:13,
16 92:23
93:5 119:19
224:14,22,24
226:17 227:9
**separating**
230:13
**separation**
228:20
237:22
238:13
**September**
22:19 61:14,
24 63:20,22,
25 64:1
**seq**
101:7
**series**
20:11 151:17
187:12
**serious**
48:23 193:19
**seriousness**
128:1
**serve**
225:13,22
**served**
30:7,11,12
235:15
**service**
173:6 174:12
**servicer**
174:9
**services**
11:25 36:8
37:7 39:8,19
40:1,4
41:13,17
44:10 45:2
46:21 47:24
48:15 49:17,
20,21 52:8
54:8,22

56:6,7
58:13,15,17,
18,22 61:6
62:1,6,22
63:6,10 67:6
69:19,24
70:11,17
71:2,17
72:22 73:4
77:24 78:1,
2,14,24
79:2,8,19,25
80:3,15
83:6,7,14,19
84:17,21
86:10,15,20
87:12 90:13,
23 91:4
95:10 96:15
101:5,19
102:5,10,16,
18 103:9,18,
23 106:15,24
109:24,25
111:2 112:1,
10,19,22
113:3 115:11
116:14
117:4,7
119:10
121:25
128:20
129:21,25
130:9 131:4,
15,24 132:20
133:2
134:13,15,
17,24 135:8,
14 136:25
138:17
139:15,17
141:2
142:15,16
144:13,19
147:9,14
149:21,23
151:18,23
153:19,23
155:16

Barry Lepatner
November 22, 2021

158:18,22
159:4,6,8,
15,20,23
160:18,22
161:8,9
162:1 180:8
182:17 190:5
192:25
193:2,3
199:18 200:5
206:3,5,13,
22 207:1,5,
6,9,13,15
210:1 219:18
221:7,14
223:9 237:25
238:5
**set**
38:18 85:3
102:20
107:17,20
108:3,7,9
128:22
239:22
**sets**
69:2
**settlement**
27:13 234:6,
8,10,23
235:1,6
**settlements**
28:12 234:20
**several**
13:12 121:16
166:5
182:15,23
**shade**
139:10,16
**Shame**
134:25
**Shan**
24:8
**share**
16:7 18:8,9
20:23 21:11
38:3,7 47:20
50:7,18
180:20

**shared**
53:20
**sharing**
180:21
**short**
127:12
**shot**
38:4 41:8
**show**
16:5 36:20
41:10 112:12
146:18 202:3
**showed**
117:17
127:18
198:14
**shower**
138:11
**showing**
51:25 52:22
54:10 70:1
81:16 88:1
92:7 104:3
118:6 122:10
143:1 150:19
152:24 154:5
159:11
162:24
166:18 186:4
191:9 196:9
198:8 200:12
201:14 204:2
210:17 216:6
217:17
233:13
**shown**
20:19 41:7
51:9 116:11
156:7 161:7
206:6
**shows**
167:25
199:20
219:17
**shut**
17:9
**sic**

32:13 67:11
96:11 101:10
138:10 179:2
**side**
236:9
**sign**
50:22,24
51:4,10 64:8
**signature**
29:20 89:5
186:25 212:8
**signatures**
211:25
212:4,9
**signed**
29:20 64:2,
12 82:19
84:14 85:10,
25 86:9
**significantly**
123:8
**similar**
95:24 134:21
148:6 175:19
**simple**
105:12
109:22 110:9
131:1 135:7,
16
**simply**
165:22
**simultaneous**
224:6
**simultaneousl
y**
14:5 71:25
94:23 98:19
103:12
119:14 120:1
143:21 144:2
182:25 183:2
195:3 198:22
201:24 202:1
212:17
220:25 234:1
**single**
199:5

**sir**
59:18 67:16
85:19 91:11
99:2 134:23
150:23
190:11 194:4
**sit**
32:18 65:20
66:25 151:20
215:3
**site**
133:6,25
134:10
138:12
178:16 188:3
**sitting**
17:9 18:20
186:12
**situation**
12:18 14:24
47:1 49:11,
12 58:25
64:11 158:4
182:13
190:15
**situations**
26:16 28:10
**size**
93:15
**sizes**
63:15
**skills**
109:10
210:14
**slab**
135:23
**slash**
105:17
141:11
**slightly**
183:8
**slings**
48:13
**slowly**
71:8
**small**
26:16

Barry Lepatner
November 22, 2021

smaller
  60:24
software
  174:16,17,18
  182:8
sole
  24:3,7 68:18
  164:2 209:25
  218:25
solely
  27:6 47:23
  54:7 83:5
solution
  44:15 127:17
solutions
  10:14 11:4,5
  12:7,13
  13:2,4 34:24
  35:1,2,7,12,
  14,17,21,24
  36:2,6 37:1,
  5,8,12,20,22
  38:1 40:5,9,
  24 44:11,14,
  17 45:2
  46:23 47:3,
  5,7,10,17,22
  48:2 49:1,6,
  10,13 50:4,
  7,14,15,18,
  25 51:1,5,9,
  23 52:9,15
  53:20 54:7,
  14 55:3,12,
  24 56:9,12,
  16,20,22,25
  57:4,8,18,25
  58:7,9,14,20
  59:2,5,10,
  12,23 60:18
  61:16 62:6,
  10,13,21
  63:14,21,25
  64:13 75:21
  79:4,21,24
  80:2 81:12
  83:14,15
  84:11,18

85:15 86:6
90:3,10,14
92:20,23
93:6,10
94:10 95:4,
16 97:2
100:3,8,10,
19,24 101:21
102:1,7
103:8,11,17,
19 106:9,23,
25 109:23
110:1
111:17,23
112:16
113:1,10,15,
19,20 116:5,
8,19,20,22,
25 119:18,19
120:5,16
122:1 123:21
124:23
129:11 132:2
138:1,2
143:9,17
144:8 145:25
149:4,12,16
150:21
151:15 152:1
154:21,23
155:2,24,25
157:10,12,14
158:2,3,11,
22 159:3,17
160:14
161:13,18
162:25
165:12,25
183:14 184:9
189:1 192:2,
12,20,24
193:8 207:23
209:3,14
219:5,9,20
220:17,18
221:11,19
222:3,5,10
223:12
224:3,15

225:1,22
226:18,24
227:10,15
228:18,25
229:15
230:4,14
231:11,21
237:17
238:8,16,22
239:4
solve
  134:17
sophisticated
  48:15 49:19
sort
  71:24 165:20
  185:15
sorts
  36:18 140:13
sought
  68:17 231:20
  235:16
sound
  88:9 207:3
Sounds
  91:21
South
  16:19
Southampton
  8:17,21
space
  47:20,21
  50:6,8,11,19
  51:1 53:20
Spadafora
  218:11
  223:24
  224:1,14,24
  225:12
  226:17,23
  227:14
  228:16,23
  230:2,8,15
  231:8,20
  235:17
  238:19,23

speak
  31:17,20,24
  34:13 66:2,
  18 190:9,11
speaking
  14:5 67:11
  71:25 94:23
  98:19 103:12
  119:14,25
  143:21 144:2
  153:25
  182:24 183:1
  195:3 198:22
  201:24,25
  212:17
  220:25 234:1
speaks
  191:2
specialize
  87:13
specialized
  207:5
specializing
  61:17
specific
  23:4 36:21
  162:3 229:12
  230:7
Specifically
  145:15
specifics
  146:16 150:9
  234:7
specify
  11:7 39:11
spell
  8:9 43:20
spelling
  10:22
spend
  188:24
spent
  116:15
spoke
  31:7,14
  75:11 151:21
  193:20

Barry Lepatner
November 22, 2021

227:18
**sponsor**
  13:15
**squint**
  141:17
**stamp**
  82:2,5,6
  104:18,20
**stamped**
  70:12 88:10
  104:11 186:7
  191:11
  196:12
  198:10
  200:14
  201:21 206:2
**standard**
  28:24 70:21
  71:20 72:22
  78:23
  146:15,20
  147:17
**standards**
  149:23
**standpoint**
  64:3 197:3
**stands**
  36:11
**start**
  22:16,20,23
  32:11 65:17
  142:24
**started**
  22:18,21
  102:17
**starting**
  34:13
**starts**
  86:13 154:10
  204:25
**state**
  8:14 16:17
  21:1 25:21
  32:23 33:3,4
  34:7 35:8
  59:21 66:1,
  6,20 68:1

89:17 97:5
99:17,19
101:22 113:9
144:18
165:22
186:20
188:17
193:18 197:2
**stated**
  58:14 59:11
  61:19 102:18
  107:14
  111:24
  118:23 119:2
  152:4 226:20
**statement**
  48:5,6 61:19
  72:14,18
  73:18 97:7,
  8,9,12,21
  107:3 117:6
  168:15
  194:22 195:6
  235:13
**statements**
  14:22 111:15
  122:5 194:19
**states**
  61:14,24
  83:3 86:18
  94:8 100:22
  101:13
  118:21
  123:2,6,12
  132:25
  133:24,25
  135:21 144:6
  153:17
  155:10 157:5
  172:9 176:17
  178:15 181:7
  189:25 206:2
  213:10
  216:14
  233:17
**stating**
  7:15 193:7

**status**
  28:16
**Statutes**
  101:11
**stay**
  40:25 90:5
  189:2,20
**steak**
  180:22
**steal**
  107:15
**Stephen**
  70:9
**stepped**
  193:23
**steps**
  127:3 145:9
  163:9,16
  165:2
**stimulation**
  194:10
**stipulations**
  9:10
**Stoltz**
  7:19 9:12,
  21,24 10:21,
  24 11:2
  18:5,13
  19:8,13,23
  20:1,5,10,
  15,21,24
  21:6,12,18,
  22,24 22:8,
  11,12 25:25
  26:4 29:4,
  14,17,23,25
  30:5 31:13
  32:7,9,10
  34:12,17
  38:3,8,14,
  18,21 39:20,
  22 40:25
  41:1 44:13,
  19,22,24
  45:15,18
  49:24 50:1
  51:11,15,18,
  22 52:4,5,

12,14,18
53:1 54:1,
12,16,19,21
55:21,23
56:8,11
57:22 58:4,5
59:16 60:4,
6,22 61:2,
21,23 62:24
63:1,15,18
64:18,19
65:1,16
67:21 68:15
69:10,23
70:4,6 71:7,
13,19 72:25
73:2,6,8,25
74:1,16,19,
20 75:14,19
76:24 78:6,
9,12 81:2,3,
11,15,20
82:1,25 83:1
84:1,6,9,23,
24 85:5,8,18
86:25 87:20
88:1,5,13,
14,18,21
90:1,7,19,21
91:2,10,13,
16,19,25
92:5,11
93:13,20,24
94:3 95:11,
13 96:4,6,8
98:8,17,20,
24 99:1,4,8,
15 100:2,15,
17 101:2,3
104:1,6,8
106:8,16
108:16
109:17
110:6,14,21,
23 113:24
114:2,8,12
117:21,23
118:5 119:13
120:9,11,19

Barry Lepatner
November 22, 2021

121:6 122:8,
13 124:18
125:7,10,12,
17,24
130:12,24
131:8,13
132:4,9,11
133:10,14,16
135:10,12
137:4,20
141:14,18,
22,23 142:9,
23 143:4,7
145:17,22
147:23
148:17,23
149:2
150:11,14
151:8,9
152:18,22
153:3,5,14,
16 154:3,8
156:15,21,23
157:19,21
160:4,7,9,12
161:11
162:9,13,20,
23 163:23,24
164:15,16
166:16,22,24
167:12,21,23
168:11,13,25
169:5,12,14,
17,19 170:7,
11 171:19,
23,25 172:6,
8 174:22,24
175:10,12,
17,22
176:20,23
178:2,5
180:19
181:1,3,11,
13 182:4,7
183:19,23
184:1,3,7
185:11,15,20
186:2,3
189:6,17

190:19
191:4,8,14
194:16
195:1,4,11,
14 196:8,14
197:20
198:6,12
200:2,10,17,
24 201:6,12,
17,19,25
202:5,8,11,
21,24 203:4,
8,17,24
204:2,6,9
205:19,22
206:21,24
208:8,12
209:10,12
210:6,14,16
212:2,6,12,
19,23,25
214:3,4,13,
24 215:25
216:5,11,13
217:10,16,25
218:2 222:7
224:7,12,19
225:25 226:5
228:5,11,14,
15 229:11
230:19,22
231:4,7,15
232:5,8,20
233:1,6,10,
12 234:17,19
235:4,14
238:6,24
239:2,18
240:11
**stop**
84:23 180:20
183:20 202:9
**stopped**
127:4
**stopping**
42:17 185:16
**strategy**
27:12 28:12

48:18,23
77:8,10
114:22
**street**
13:24 14:1,2
47:18 55:15,
16,17 59:18
70:10 144:13
**strictly**
137:24
**strike**
66:12 84:2
135:4,6
226:14
229:24
**structure**
32:13 57:12
79:6
**stubs**
156:6
**stuff**
196:5
**style**
12:19,20
**sub**
135:23
**subcontractor
s**
107:12 108:1
115:7
**subheading**
146:17
**subject**
13:6 118:9
122:16,20
145:16 173:5
196:1,6
218:5 220:10
223:3,6
235:20,21
240:7
**submit**
116:5,20
**submitted**
117:3 210:19
211:6,8,14
236:15

**submitting**
239:24
**Subparagraphs**
94:20
**subpoena**
30:3
**subs**
109:3 133:25
178:16 180:3
181:9
**subsequent**
103:4,5
**subset**
49:17
**substance**
144:22
146:18
147:15
232:11
**substantial**
13:20
**sue**
115:25
136:23
**sued**
13:3,5,7,12
27:9 113:18
119:18 217:5
**sues**
12:15
**suffering**
48:13
**suggest**
21:14,15
114:5 192:10
230:12
**suggested**
89:4
**suggesting**
68:12 218:23
**suing**
11:24 119:22
**Suite**
47:18
**summary**
13:19 237:7

Barry Lepatner
November 22, 2021

sums
  206:7
Superior
  10:14
superseded
  37:25
supervision
  116:14 193:5
supplemented
  36:18
support
  42:22 43:2
  149:22
supposed
  72:7 115:9
Supreme
  59:21
sure
  10:24 13:21
  14:10,16
  15:19 17:10,
  12 19:2,23
  26:2 30:1
  32:18 34:20
  36:23 37:12
  39:5,6 40:15
  49:4 50:2
  51:8,18 58:4
  65:23 67:3
  69:11 71:6
  76:22 78:18
  91:18 95:6
  96:5 114:10
  121:19
  124:16 125:9
  129:15 130:1
  139:19,21
  143:22
  147:25
  148:10
  162:11
  168:22 170:5
  173:7 175:24
  188:14,20
  197:14
  214:8,10,12,
  15 224:10
  225:14

231:19
236:8,14,19
surprised
  184:4
surveying
  179:12
suspended
  8:8
switch
  29:3 73:22
  183:12
  203:18
switched
  170:24
system
  126:21
  127:4,5,10
  129:21 134:3
  174:15 182:8
systems
  126:6,9,10
  145:8

                T

T-A
  43:21
T-A-D-H-G
  43:19
tab
  44:8,9
table
  16:4
tabs
  39:18,25
  40:8,10,19
Tadhg
  43:19
take
  17:5 18:2,22
  22:11 44:14
  49:24 51:17
  52:20 54:12,
  13 55:21
  61:3 64:18
  68:15 73:25
  81:14 87:21

90:1 94:22
98:11 103:3
104:2 115:9
119:23
120:9,19
121:18 132:5
141:14
143:22
145:17
148:17
150:11 151:8
153:11
164:15 167:5
169:5 171:11
186:8 200:6
201:12
202:19,20,24
203:17
210:6,21
214:3 232:12
taken
  7:2 11:13
  14:9 15:7,11
  114:21
  123:3,13
  145:9 176:3
taking
  194:19
talk
  73:23 95:14
  120:23
  136:10 163:4
  187:22 232:3
talked
  64:5 152:3,
  13 170:12
  193:20
talking
  12:11 23:25
  72:9,10
  95:15 120:3
  162:25
  163:18
  164:1,17
  165:2 166:7
  215:8 231:1
task
  139:9 140:4

tasked
  134:16
tax
  47:6
taxes
  47:5
team
  45:22 46:3,
  15 128:23
tech
  42:4,7,22
  43:2
technical
  131:17,20
Technologies
  149:9
telephone
  135:22
  139:10,16
  178:15
  181:7,18
telephonic
  239:23
tell
  11:18 14:9
  20:18 22:16
  25:19 39:10
  67:5 68:25
  70:19 72:7
  80:25 113:13
  145:6 202:8
  215:18,22
  238:11
telling
  64:3 97:12
  123:23
  127:15 128:1
  141:17
  156:14
  193:11
template
  72:23
ten
  31:22 35:3
  91:17 139:22
tenor
  79:7

Barry Lepatner
November 22, 2021

tens
139:22
tensions
127:22
term
97:1,14
terminate
183:13
184:9,11,12,
14
terminated
22:25 161:9
183:16
188:13
189:13
192:13,21
193:9
termination
61:9
terms
37:14 83:3
118:25
131:20
164:18
183:20 218:3
testified
9:18 12:6
76:8 129:9,
13,18 131:1
155:1,18,23
156:1 160:20
161:15,17
169:8 223:21
229:13 230:1
testify
11:25 32:3,
14 129:4
144:10
146:13 147:5
151:22 152:6
testifying
98:16,25
152:17
testimony
7:11 9:2,3,
18 18:19
19:15 30:8,
22 31:25

37:21 46:6
50:3 84:3
85:14 86:4,5
89:11 102:7,
22 103:8,17
105:15
108:17
112:24
114:21
116:4,19
117:2 128:18
129:10,14,17
131:3
132:19,24
134:11
135:13
136:3,24
137:23
138:16
139:15 141:1
151:20
158:7,8,21,
24 160:13
165:11 180:6
184:6
188:15,20
189:9 192:23
194:1 199:21
214:15
220:21 223:4
224:13
226:15
236:12
239:14
Testing
210:14
thank
7:25 8:13
9:9,14,22
10:19 18:12
38:20 70:4
71:16 84:7
150:17 186:2
202:10 204:1
240:12
Thanks
38:7 55:22

that's
55:7 133:12
thing
23:19 71:25
105:8 107:10
113:24
167:10
189:22 201:3
209:24
things
27:12 28:11
39:15 43:10
48:22 70:20
77:10 101:1
107:5,9
108:12
115:16
127:1,21
139:24
142:12
176:21 183:5
198:25
think
16:11 24:8
37:9 38:15
57:6,20
68:22 76:2,
11 79:12
81:13 98:14
114:6 124:16
141:20,21
145:2,10
160:5 167:18
169:11
170:12
183:22 184:4
189:7 201:8
207:10 215:6
226:2
232:22,25
237:11,17,
21,22 238:16
239:4
thinking
150:16
third
45:22 83:2
149:19

154:13 192:9
199:2
Thomas
8:12
thought
148:5 197:17
thousand
13:13
thousands
25:9,10
136:20
139:21,22
thread
154:9 201:23
203:9
threatened
229:7
three
13:16 76:2,
8,10,11
109:6 113:18
117:19 136:1
141:18
198:25
236:13,16
tie
211:11
tied
179:22
tile
138:11
time
7:5 9:11,12
10:20 15:14
22:18 24:11
25:12 26:20
31:3 32:21
36:6 37:19
40:7 42:6
52:17 55:20
57:3 65:10
66:22 86:8
94:22 98:23
101:23
108:22
115:22
116:15

Barry Lepatner
November 22, 2021

130:23
134:10 140:1
143:22
144:10
153:11 166:5
168:1 170:24
171:16
173:16,19,23
174:13,19
175:7,14
176:19
177:6,22
178:19
180:16
181:14
182:1,19,21
183:7,9
187:9,11
188:25 189:3
190:14,25
193:18
195:23
202:25
210:21,25
213:15
215:12
226:16 231:1
232:5 236:18
239:18
240:10
times
  11:18 13:1
  28:15 54:6
Timeslips
  174:11
tiptoes
  167:19
title
  23:14 33:24
  50:9 76:17
titles
  39:6
today
  12:11 23:25
  31:6,19,25
  93:3 141:1
  143:14 168:3
  186:12 215:8

216:9
today's
  41:9
toe
  167:19
told
  62:8 89:6
  109:4 126:22
  127:10
  142:20
  193:23
  236:15
tolerate
  189:16
Tom
  153:2
tomorrow
  240:8
top
  29:21 39:17,
  23 53:12
  88:19 104:24
  153:15 181:6
topic
  18:1 32:11,
  15
topics
  29:3 32:3
  73:22 183:12
  203:18
total
  78:22 235:24
  236:3
totaling
  182:16
totality
  136:8 165:6
totally
  28:3 126:19
  162:18
  230:17
totals
  142:20
touch
  115:25 129:2
tough
  42:15

Tracey
  148:19
  149:5,19,24
  150:5
Trade
  100:21,25
trades
  109:8,10
  135:22
traditional
  62:9
trained
  174:20
transcribed
  8:4
transcribing
  15:17
transcript
  8:5 18:6,15,
  18,24 19:16,
  19,21,24
  20:6,9 21:21
  22:3,6,8
  156:3,13,25
travesty
  229:20
treated
  47:8
tremendous
  115:14
  126:15
  127:22 128:4
trial
  28:17 121:4
  124:5,7
  144:10
  151:20
  193:17
  233:22
  234:4,6
true
  18:23 21:20
  22:2 94:2
  117:10
  168:14
  216:25

trustees
  23:12
truth
  80:25
try
  74:23 83:17
  93:15 115:10
  124:8 148:21
  156:11
  182:11
  226:11
trying
  25:13 69:1
  99:23 170:22
  183:6 190:4
  194:16,21,23
turn
  17:6 19:4
  30:20 81:20,
  23 110:21
  115:23
  162:20
  178:13
  205:25
  212:10
  213:18
  217:22
turned
  212:13
twice
  190:21
two
  11:14 26:22
  37:24 58:11
  64:8,9,12
  79:3 83:22
  107:14 109:5
  111:20
  117:19 129:9
  140:18
  155:11
  173:13,14
  178:24
  181:19,20
  187:11,18
  221:12 230:2
  237:23

Barry Lepatner
November 22, 2021

type
  56:15 59:12
  212:21 213:4
types
  46:14
typical
  14:18

—————————

U

uh-huh
  31:1 86:3
  96:16 125:11
  149:1 157:15
ultimately
  77:15 137:14
un-share
  21:10
unable
  74:24 194:6
  233:19
unacceptable
  219:22
unachievable
  109:5
unaware
  56:3 116:24,
  25 151:20
  152:14,16
unchecked
  213:7
uncovered
  109:7
underlying
  10:11,12
  11:9,14,18
  12:10 15:1,7
  18:2,6 23:25
  51:24 73:24
  82:12 92:6,
  13,16,19,22
  93:9,14
  94:5,8 98:6
  99:5,16,22,
  25 100:18
  104:22
  110:12

117:13
118:18
120:12,15
121:11,15
123:20
124:12 142:1
143:18
145:25
149:13,17
150:7 151:6,
16 155:23
156:25 185:1
207:24
209:4,7,15
218:15,20
219:10
223:24
224:3,16
225:1,25
226:19
227:1,16
228:19
229:19 230:9
234:4 235:6,
9,25 236:4
237:16
238:9,20
239:5,16
understand
  14:7 15:4,
  15,22 41:7,
  11 50:2 81:5
  103:13
  108:12 121:2
  124:3,6,9
  146:24
  165:23
  179:10
  188:20
  194:21
  197:15
  214:15
understanding
  25:19 80:7
  81:8 82:24
  87:13 89:22
  102:20
  107:11 150:4

159:24
205:21
207:18 211:9
understood
  20:5 72:24
  83:4 86:13
  124:4 161:25
  207:4 221:15
  224:4
undertook
  146:24
underwriters
  24:12 26:14
underwriting
  134:25 207:3
underwrote
  211:2
Unfair
  100:20,25
unfettered
  25:21 223:14
  237:8
unfortunate
  214:1
unilaterally
  229:6
unique
  20:4 48:12
  70:20 72:3
unlicensed
  219:18
unrealistic
  127:15
untenable
  233:19
unusual
  23:6,7 78:23
  215:23
unwarranted
  109:20
unwillingness
  160:17
updated
  133:7
usual
  48:21

utilize
  49:1

—————————

V

vague
  182:10
validating
  112:21
validation
  161:5
valuable
  188:9
various
  54:6 121:18
  138:23 165:9
vendor
  139:11,16
vendors
  139:23
  140:13
ventilating
  126:7
venued
  12:21 59:20
verified
  59:17,19
  60:10
verify
  46:3
versed
  163:12
version
  114:6
versions
  165:17
victim
  229:20
victimhood
  229:21
victimization
  77:4
victimized
  163:13
Victor
  126:6

video
  21:7,8
vigorously
  122:6
violated
  100:25
violation
  100:20 101:6
  111:3
violative
  234:15
visit
  133:25
  138:12
  178:16
vitiated
  160:17
  161:14
vitriol
  197:4
vituperation
  197:6
Vivian
  7:2 10:21
  18:9 29:6
  32:7 34:12
  38:18 44:22
  60:2 70:2
  71:11 74:16
  84:7 91:20
  114:9 118:1
  125:13 132:9
  135:10
  156:18,21
  162:9 204:3
  210:15 224:8
  232:23
vociferously
  229:5
voice
  110:5,7
void
  112:16
voided
  111:21
  112:25
  160:15

161:14 200:4
voiding
  113:10,14
voluntarily
  23:2

_____

          W

wait
  17:11 90:5
  96:17
  108:19,20
  118:2 195:4
  238:21
waiting
  134:21
waive
  7:13
walk
  187:10
walked
  187:9,20
  189:14 198:2
  199:15,19
walls
  179:25
want
  13:8 15:19
  16:5,13
  19:2,15
  28:5,18
  29:19 38:23
  47:2 49:9
  51:2 65:22
  78:17 84:2
  89:8 91:14,
  17 94:22
  97:7,10 99:9
  102:18
  107:25
  108:24
  112:11
  113:3,5
  114:21 115:3
  124:3 129:15
  130:1 134:23
  148:10

161:25
172:22
182:23
188:14,19,24
193:2 194:18
197:14
202:12,19,20
206:17
207:19 208:9
211:9 214:14
222:23
231:19 232:6
wanted
  39:7 58:22
  69:3 102:19,
  21 107:22
  108:2 115:11
  127:20 133:9
  136:19 160:1
  163:14
  189:20
  199:17
wanting
  188:12
Warfel
  150:13,20
  151:2,3
wasted
  164:5,25
wasting
  183:6,9
watch
  115:8
way
  21:2 38:6
  39:21 40:19
  41:21 60:24
  74:6 88:11
  89:6 94:9
  95:6 96:3
  104:15
  112:25
  115:16
  116:18,24
  148:7,8
  154:10 161:7
  165:2 170:7
  171:9 175:25

187:22
193:16
195:10,16
198:4 206:16
211:4 229:7
Wayne
  152:23 153:7
  167:1 178:10
ways
  94:18,19
  95:7 116:17
  237:23
Web
  41:17
webhost
  41:16
webpage
  44:9,11
website
  34:1,4,19,
  23,24 35:1
  38:10,12,22,
  25 39:3
  40:10,20
  41:3,5,15,18
  42:1 44:10,
  18 49:23
  50:22 99:18,
  20 111:24
  112:5,8,14
  128:22
week
  31:18,21
  64:8 118:21
  128:9 131:16
weeks
  64:9 79:3
  102:11 109:1
  173:19 189:4
  198:2
went
  46:8 57:20
  116:11 125:4
  127:12 158:7
  173:19
  179:24
  187:17
  202:16

Barry Lepatner
November 22, 2021

West
  13:24,25
  59:17,24
  60:11 61:7,
  15,24 69:25
  70:10 89:1
whatsoever
  68:3 150:10
whilst
  192:10
whispering
  8:2
whitepaper
  36:10
whoa
  130:5
Whoops
  202:16
wife
  137:19
  193:22
Wiggin
  129:1 162:7
  180:14
Wilson
  22:13,22
  23:5,15,22
  24:2,16,20,
  23 25:6
  26:5,12
window
  20:23 21:11
windows
  140:4
wine
  138:11
Winget
  218:11
  223:24
  224:1,14,24
  225:5,12
  226:17,23
  227:13,25
  228:16,23
  230:2,7,14
  231:8,20
  235:17

236:21
237:4,16
238:8,19,22
Winget's
  231:25
  232:15
wit
  155:9
withdraw
  36:23 58:8
  78:16 94:6
  103:15
  166:15
  167:21,22
  195:15
  205:10 222:8
  224:23 227:7
  231:4,5
  237:14
withdrawn
  31:4 53:8
  59:4 60:9,16
  63:4 66:16
  75:20 77:1
  90:9 91:12
  92:21 95:2
  96:5 100:14
  121:21
  144:23
  151:2,11
  157:18
  161:12
  174:5,14
  205:7 214:5,
  16 216:15,18
  222:2 223:22
  224:20
  227:11
witness
  7:10,21 8:9,
  11,14,16,20,
  24,25 9:3,7,
  17 10:23,25
  11:22,23
  14:23 19:7
  29:19 30:2
  31:12 53:24
  64:17 67:20

69:6 71:14
73:7 75:13,
18 76:21
78:10 83:17
86:24 88:20
89:19,22
91:1,9 93:25
95:19 98:14,
18,21,25
99:3 107:3
108:23
110:20 114:4
117:16,22
119:8,10
120:21 122:3
124:16
125:23 130:6
131:14
133:11
137:11
141:16 142:7
143:10,18
144:9 146:10
147:21
160:25 161:5
167:8 168:12
169:4,8,13,
15 175:18
176:22
181:12,23
184:2 188:23
189:13
190:15 191:2
194:19 195:3
197:17
200:1,25
201:1 202:2,
7,10,22
203:2,6
205:20 208:1
209:18 210:8
212:17
214:12,22
215:15 226:2
229:2 230:21
231:14
232:19
234:13,18
235:3,12

237:21 239:1
witnesses
  14:19
woman
  44:2
won
  13:19
woodworking
  126:15
word
  46:12,13
  188:10
wording
  205:14
words
  107:25
  114:15
  186:24
  187:8,25
  188:1 189:8
  190:7,9,21
  197:9 201:1,
  2 215:10
  230:5
wore
  26:22
work
  19:9 24:15,
  19 42:5,7
  45:8 46:19
  77:11,12,16
  78:20 79:15
  88:25 89:14
  96:19 102:2
  103:9,18
  106:18,23
  107:18
  108:11,18
  109:23
  116:6,20
  126:5,16
  127:17
  128:5,13,18
  129:9,10,17,
  20,21 130:15
  131:1 134:1,
  2,11,12
  136:4,24

Barry Lepatner
November 22, 2021

137:8,23
138:2,16,24
140:11,25
146:25
159:16
161:19 163:5
164:7,8,17,
19 165:4,13
168:9 169:22
172:2,15,25
173:13
179:21,23
180:3,6
187:20 188:7
198:4 200:7
221:24
**worked**
22:13,17
23:5 33:17,
22 55:18
66:22,23
158:10
**workers**
221:25
**working**
20:22 108:15
109:11
159:21
**works**
46:7 75:5
227:4
**world**
15:2 21:12
48:8 184:22
194:7 221:9
**worried**
114:2
**worth**
109:14
166:11
**Wow**
34:6 200:1
**wrap**
148:23
**wrapped**
192:14
**write**

135:2 155:7
201:4
**writes**
192:9 193:17
199:3 200:21
201:8
**writing**
56:10 58:1
87:16,19
112:17 113:9
193:7 213:20
228:7
**written**
24:3,12 52:6
69:20 72:19
81:17 86:20
92:1 100:4
161:15 190:7
207:16
213:24
222:25
225:11,17
226:22
227:8,12,24
**wrong**
48:6 57:6
87:14 108:15
126:19
138:21 148:6
149:20
**wronged**
229:22
**wrongfully**
229:17
**wrongly**
126:20
**wrote**
161:8 182:18
189:22
193:21
227:18
**www.lepatner.
com**
34:2,23
38:12
**www.lepatner.
com.**
34:22

**Y**

**yeah**
14:7 17:15,
21,23 20:5,
15,19 28:2
30:2 34:11
39:24 42:15
46:17 51:15,
18 58:4
60:13 61:1
65:2 73:21
76:11 78:9
93:23 99:7
138:8 143:22
148:22
153:12
160:8,25
170:9 176:6
184:1 186:25
187:23
202:3,5,24
203:11,22,24
212:14,15
214:10 232:5
237:11,13
240:12
**year**
12:24 37:24
42:5 44:7
57:5 134:19
215:20
**years**
11:23 12:17
13:17 22:19
34:21 35:3,4
36:9 37:19,
24 48:9
76:2,8,11
113:18
130:2,8,15
166:9,10
215:16
**years'**
166:11
**yell**
113:23

**yesterday**
31:19,22
232:2
**York**
8:17,21
13:14 16:20
25:21 32:23
33:3,4 34:7
35:8 52:16
53:14 55:13
59:21 61:17
77:4,11,15
80:10,20
87:5 88:8,25
107:14 108:1
109:11
114:24
115:5,23,25
126:5 127:1
128:11 129:1
136:9,13
137:13
138:19,23
139:23
140:5,8,13,
23 141:4
145:8 146:25
162:2,7,17,
22 163:2,5,
13,18 164:1,
8,10,18,23
165:10,16
171:15
172:10 175:5
176:18 177:6
178:25
179:10
197:10 199:7
213:16
223:13 225:2
229:19
**York's**
77:5 177:16
**you-all**
19:6

Barry Lepatner
November 22, 2021

|           Z           |
| --------------------- |

**Zero**
  36:1,4
**Zoom**
  15:9,13,24
  21:13