# EXHIBIT F

```
 1

 2   SUPERIOR COURT
     J.D. OF STAMFORD/NORWALK AT STAMFORD
 3   - - - - - - - - - - - - - - - - - - - - -x
     JAMAL NUSSEIBEH, JULIA NUSSEIBEH,
 4
                     Plaintiffs,      Index No.
 5                                    DN FST CV 17 6031573 S
                     -vs-
 6

 7   LePATNER PROJECT SOLUTIONS, LLC,
     ET AL.
 8
                     Defendants.
 9
     - - - - - - - - - - - - - - - - - - - - -x
10        DEPOSITION OF BARRY B. LePATNER, ESQ., taken

11   by Plaintiffs, on October 24, 2019, at 9:58 a.m., at

12   the Spaces Center, 230 Park Avenue, New York, New York

13   before Monique Cabrera, a Shorthand Reporter and

14   Notary Public within and for the State of New York.

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1

 2   A P E A R A N C E S:

 3   DISERIO MARTIN O'CONNOR CASTIGLIONI, LLP
            Attorneys for Plaintiffs
 4   One Atlantic Street
     Stamford, Connecticut  06901
 5   Sharrington@dmoc.com

 6
     BY:  SCOTT M. HARRINGTON, ESQ.
 7          (203)358-0800

 8

 9   WINGET SPADAFORA SCHWARTZBERG, LLP
            Attorneys for Defendants
10   One Canterbury Green
     201 Broad Street - Suite 1000
11   Stamford, Connecticut  06901
     Cappello.J@WSSLLP.com
12
     BY:  JODY N. CAPPELLO, ESQ.
13          (203)328-1200

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1

2

3              IT IS HEREBY STIPULATED AND

4        AGREED that all objections, except as

5        to the form of the question, be and

6        the same are hereby reserved to the

7        time of the trial;

8              IT IS FURTHER STIPULATED AND

9        AGREED that the within deposition may

10       be sworn to before any Notary Public

11       with the same force and effect as if

12       sworn to before a Judge of this Court;

13             IT IS FURTHER STIPULATED that

14        the transcript is to be certified by

15        the reporter.

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                      B. Lapatner
 2  B A R R Y  B.   L E P A T N E R, ESQ. called as a
 3  Witness, having been first duly sworn by
 4  Monique Cabrera, a Notary Public within
 5  and for the State of New York, was examined and
 6  testified as follows:
 7                  COURT REPORTER:  Please state your
 8          name and address for the record.
 9                  THE WITNESS:  Barry B. LePatner.
10          Office address is 10 East 40th Street, New
11          York, New York 10016.
12  EXAMINATION
13  BY MR. HARRINGTON:
14          Q      Good morning, Mr. LePatner.  My name
15  is Scott Harrington.  I represent the plaintiffs,
16  Jamal and Julia Nusseibeh, and 707 IF, LLC, in this
17  case.
18                  I understand that you are an
19  attorney?
20          A      Yes, sir.
21          Q      How long have you been an attorney,
22  approximately?
23          A      Over 40 years.
24          Q      And have you ever had your deposition
25  taken before?
```

Page 5

                              B. Lapatner

1

2          A       Yes, sir.

3          Q       How many times approximately?

4          A       Maybe four to five.

5          Q       Have you taken depositions as an

6     attorney?

7          A       Yes.

8          Q       So you are generally familiar with

9     the process?

10         A       Yes.

11         Q       Briefly, because sometimes it's

12    different when you're an attorney than when you are

13    a witness, but obviously, the Court Reporter is

14    taking down anything that anybody says in the room.

15    She can only take down one person at a time, so it's

16    best to try and wait until I finish my question

17    before you answer.  She can't take down nods or

18    gestures, so you have to answer everything audibly.

19               If you need to take a break for any

20    reason, just ask me to take a break.  The only thing

21    that I ask you is that if there is a question

22    pending, that you answer the question before we take

23    the break.

24         A       I understand.

25         Q       So you are an attorney; correct?

Page 6

B. Lapatner

1

2      A       Yes.

3      Q       And where did you go to undergraduate

4  school?

5      A       I went to undergraduate school at

6  Brooklyn College.  I then went to Brooklyn Law

7  School and right after law school I commenced my

8  legal career.

9      Q       You are currently employed by

10  LePatner & Associates, LLP?

11      A       Yes.  It's a firm I've had for just

12  under 39 years.

13      Q       So you have been practicing at

14  LePatner & Associates, LLP for 39 years?

15      A       It had other names sometimes along

16  the way.

17      Q       But it's been a firm that you have

18  been a principal of since you started?

19      A       I have been a principal for all of

20  those years.

21      Q       Did you work at any firms before

22  LePatner & Associates or any of its predecessors?

23      A       I was a partner at Wilson Elser

24  Edelman & Dicker.  They're in New York City, but

25  they have offices across the country and around the

1                              B. Lapatner

2   world.

3          Q       Did you have any other legal jobs

4   prior to Wilson Elser?

5          A       Before I joined Wilson Elser I was in

6   the enforcement department at the New York Stock

7   Exchange.

8          Q       The enforcement department?

9          A       The enforcement department.

10         Q       Was that your first job out of law

11  school?

12         A       First job out of law school.

13         Q       What type of work did you do at

14  Wilson Elser?

15         A       Well, they represented essentially

16  insurers of every stripe.  So I focused on probably

17  three major areas, where I was involved in major

18  cases:  One, legal malpractice.  I defended many,

19  many lawyers; two, I was involved in the title

20  reinsurance business of Lloyds of London; and three,

21  I was involved heavily in representing architects

22  and engineers all over the country who were subject

23  to malpractice claims, errors and omissions.

24         Q       Approximately how long were you at

25  Wilson Elser?

Page 8

B. Lapatner

1

2        A        Seven years.

3        Q        After law school, have you had any

4   other formal further education in any field?

5        A        Nothing formal.

6        Q        Anything informal?

7        A        If you count all the CLE classes that

8   I have attended.  I have taught CLE classes.  I did

9   a program around New York State on legal malpractice

10   with David Siegel.  I have spoken on topics related

11   to instructions and infrastructure widely across the

12   country, probably if you Google me it would be a lot

13   easier to see the rest of the resume.

14        Q        Do you have any training, outside of

15   legal training, any training in the construction

16   field?

17        A        If you mean formal training, have I

18   taken a specific course, no, but I've had the

19   wonderful experience of working with some of the

20   best experts in the country on countless cases; that

21   was a tremendous predicate to the last couple of

22   decades as a construction lawyer and advisor.

23        Q        Do you have any training in

24   architecture or engineering?

25        A        No.

1                       B. Lapatner

2          Q       So you don't hold any licenses or

3    anything like that as a design professional or an

4    engineer or an architect?

5          A       Only having been graced by the AIA as

6    being given the title of honorary AIA member.

7          Q       When did you get that honorary

8    membership?

9          A       2003.

10          Q       You're licensed as an attorney in New

11    York; correct?

12          A       Yes.

13          Q       Any other states?

14          A       I won't count pro hac vice where I

15    have been admitted for trial purposes in numbers of

16    states over my career.  I am admitted in numbers of

17    -- besides the Southern District and the Eastern

18    District of New York, numbers of other courts where

19    I've had either trials or matters that I applied for

20    licenses.

21          Q       Do you have any current licenses,

22    aside from federal courts in any states?

23          A       Not that I'm aware of, no.

24          Q       You are not licensed in Connecticut?

25          A       No, I am not.

                         B. Lapatner

1

2          Q        Have you ever been licensed in

3    Connecticut?

4          A        No.

5          Q        Is anyone in your firm LePatner &

6    Associates licensed in Connecticut?

7          A        Currently, no.

8          Q        Back in 2013, 2014, was anybody?

9          A        I am not sure of the answer to that.

10          Q        Do you recall what lawyers were at

11    the firm in 2013 and 2014, other than yourself?

12          A        I think there were about four or five

13    other lawyers, four other lawyers, five.

14          Q        Do you remember their names?

15          A        Ron Feingold, F E I N G O L D; Jeff

16    Kleiner, K L E I N E R.  There may have been several

17    names that I don't recall.

18          Q        Are Mr. Kleiner and Mr. Feingold,

19    were they admitted in Connecticut?

20          A        Not to my knowledge.

21          Q        Are they still with your firm?

22          A        No.  One is retired and one has

23    become a general counsel for an insurance company.

24          Q        Are you also affiliated with LePatner

25    Project Solutions, LLC?

Page 11

                        B. Lapatner

1

2       A       Yes.  This is a project management

3    company that I formed many years ago to provide

4    project management services to our clients.

5            Q       What, if any, is the connection

6    between LePatner Project Solutions, LLC and LePatner

7    & Associates, LLP?

8            A       The project management company is an

9    affiliate, an associate of the law firm, and works

10   hand and glove in many, many respects because so

11   many of our clients want the expertise of the

12   project management, either on individual situations

13   that arise during their construction or when we do

14   contracts for our clients for projects of scale.

15   They often turn to us and say, "We want you to

16   manage the projects as well."

17               So we do that for our clients in

18   conjunction with providing the contract

19   negotiations, the business advice and services,

20   putting together the insurance packages and the

21   like.

22           Q       So you mentioned project management

23   services, is that what LePatner Project Solutions is

24   limited to or is it something broader than that?

25   Generally describe the type of services?

Page 12

                              B. Lapatner
1
2       A       In general, when we are retained by a
3   client for project management services that are
4   provided through LPS, LePatner Project Solutions,
5   the client is asking us to help them in the range of
6   services that sometimes includes helping them do the
7   due diligence and hire the team members, negotiate
8   their contracts, assist them in putting together a
9   schedule with team members, assist them in
10  overseeing the design and overseeing the course of
11  the construction of the project all the way through
12  to occupancy.
13      Q       During 2013 and 2014, did LePatner
14  Project Solutions have employees?
15      A       Yes.
16      Q       How many employees did it have?
17      A       I believe the two at that time were
18  Brad Cronk, C R O N K, and Francisco Rivera and, of
19  course, I was the principal of the firm.
20      Q       Are both of them still employees
21  today?
22      A       Brad Cronk just left in the last few
23  months.  He has become a developer, I trained him
24  for it.  And Francisco still works for us.
25      Q       Do you have any employees now in

Page 13

                        B. Lapatner

1

2   addition to those two, in addition to Francisco?

3        A     Yes.

4        Q     How many employees do you have now?

5        A     One other.

6        Q     Who do you have?

7        A     His name is Christopher Reynolds, R E

8   Y N O L D S.

9        Q     What training did or does Mr. Cronk

10  have?  What is his background?

11       A     He's a licensed architect.

12       Q     And he was a licensed architect in

13  '13 or '14?

14       A     Yes, all of his career.

15       Q     Do you know whether he was licensed

16  in Connecticut?

17       A     I wouldn't know that information,

18  what states he was, because previously he had worked

19  for architectural firms that did work in and outside

20  of New York.

21       Q     Does LePatner Project Solutions

22  engage in providing architectural services for it's

23  clients?

24       A     Absolutely not.

25       Q     Did it every do that in 2013 or '14?

Page 14

                        B. Lapatner

1

2       A       It has never provided design services

3   of any kind.

4       Q       Do you recall when you hired

5   Francisco Rivera?

6       A       I don't recall the year, no.

7       Q       Mr. Rivera testified at his

8   deposition that he was hired shortly before the

9   Nusseibeh project?

10      A       To answer your question, I believe he

11  was working on a prior project before he was put on

12  to the Nusseibeh project.

13      Q       Do you remember what project that

14  was?

15      A       He had several going at the same

16  time.

17      Q       What's your understanding of Mr.

18  Rivera's background?

19      A       He had worked extensively in Chicago

20  for an architectural firm or a design firm but I

21  think it was an architectural firm, and he had been

22  involved in the actual project management,

23  construction phases of numerous projects, which is

24  why he was of great interest to us and proved to be

25  a valuable individual in helping us on these

Page 15

1                          B. Lapatner

2  assignments.

3          Q       Is LePatner Project Solutions a

4  licensed home improvement contractor in any

5  jurisdiction?

6          A       No.

7          Q       So not licensed in Connecticut as a

8  home improvement contractor?

9          A       No.

10         Q       And were not in 2013 or '14?

11         A       No.  We don't do construction.

12         Q       None of your people do any physical

13 construction; is that correct?

14         A       No.  I may have once carried a board

15 upstairs for a client, but no.  Ours is an oversight

16 function and a consultancy and advisory in nature.

17         Q       When did you first have contact with

18 the Nusseibehs?

19         A       I don't remember who initiated the

20 introduction.  I have no recollection of how they

21 came to involvement, but I was asked to come and

22 visit the site at 35 Andrews Farm in Greenwich,

23 Connecticut.  I believe I met both of them the first

24 time when I went up there for a visit.

25         Q       Do you know if they had reached out

Page 16

B. Lapatner

1
2     to you or --
3              A      I wouldn't have known about their
4     situation without somebody asking them to contact me
5     because they had a difficult construction problem.
6              Q      So I presume they contacted you by
7     phone.  Do you remember the first contact?
8              A      I assume that.
9              Q      You don't remember the date?
10             A      I wouldn't.
11             Q      Do you remember, did you have
12    conversations before you had a meeting up at the
13    property?
14             A      I can only assume when somebody
15    reaches out to me, any perspective client, we have a
16    conversation, and I try to understand what their
17    problem is or the level of distress.  They're
18    referred to me because I have done a lot of this
19    over the years.
20             Q      Do you recall, whether it was on the
21    phone or at that first meeting, what they told you
22    about the situation that they had?
23             A      I think it was Jamal.  If Julie was
24    on the phone, I don't remember.  They explained they
25    had a very difficult relationship with the

1                         B. Lapatner

2  construction management firm that they had hired,

3  who had been doing work that they found was causing

4  them a lot of problems and they had heard that

5  that's what I get involved in a lot.  They asked if

6  I would come up and look at it for them and give

7  them some thoughts on how they could proceed.

8          Q       Did they reach out to you as an

9  attorney?

10                 MR. CAPPELLO:  Object to the form.

11         A       You would have to ask them.  I

12 wouldn't know their state of mind.

13         Q       What did they ask you to do then?

14         A       If I can come up and visit the site

15 so that I could see what they had been experiencing.

16                 MR. HARRINGTON:  I am going to mark

17         this.  So if we can start at 22.

18         (E-mail sent 11/13/13 was marked as

19         Exhibit No. 22 for identification, as of

20         this date.)

21         Q       Mr. LePatner, I am showing you what

22 we have marked as Exhibit 22.  Do you know what that

23 document is?

24         A       It's an e-mail I sent to both Julia

25 and Jamal Nusseibeh on November 13, 2013.

Page 18

                              B. Lapatner

1              Q      On the top first paragraph it says,

2    "It was good speaking to you today." Does that

3    refresh your recollection as to when you first spoke

4    to them?

5              A      Well, yes, that's the date.

6              Q      The third paragraph down you indicate

7    that you want to inspect the project next Tuesday?

8              A      Well, they had invited me up.  They

9    said we want you to do that after this discussion,

10   because -- well, go ahead.

11             Q      The heading down at the bottom

12   indicates your name as Esquire and LePatner &

13   Associates, LLP.  Does that indicate to you whether

14   you were reaching out to them or they were reaching

15   out to you as a lawyer or as a member of LePatner

16   Project Solutions or is that just on the bottom of

17   all of your e-mails?

18             A      The question about any involvement of

19   LPS is never raised at this point.  This was

20   strictly they called me as someone recommended to

21   them who does construction claims, construction

22   litigation, construction advisory services for

23   owners.

24                    As a result of that discussion and

25

Page 19

1                              B. Lapatner

2    asking them questions, I was able to say the issue

3    you are facing falls into these categories.  That

4    would be the beginning of a process regarding the

5    nature of the extent of any claim you have against

6    these people.

7              Q      Had you reviewed any documents at

8    this point in time?

9              A      No.

10             Q      The last sentence of the third

11   paragraph talks about decisions as to -- well, I'll

12   read it.  "Decisions as to whether to detain York to

13   complete the work or work directly with the

14   subcontractors can be made as we more fully

15   understand the project exigencies and how much work

16   remains."

17             At least at this point in time was

18   there any discussion about whether to keep York or

19   fire York?

20             A      You can't make that determination

21   until you have spent considerable time understanding

22   what the original scope of their work was,

23   understanding the nature and extent of any

24   deficiencies in their work, whether or not

25   individual subs have caused the problems or all of

B. Lapatner

1

2  the subs have caused the problems or whether the

3  construction management itself has been deficient in

4  administering the project.

5              All of those factored in to an

6  ultimate recommendation as to whether you keep some

7  or all of them or, in some cases where we have had

8  major problems on major projects, whether you work

9  with that CM, if they are workable, and force them

10 to complete and get everything right to avoid

11 consequences which would be much worse for them.

12      Q     Was it your understanding that York

13 was a construction manager as opposed to a general

14 contractor on this project?

15      A     At that time I wouldn't have known

16 one way or the other.

17      Q     What is your understanding with what

18 you know now?  What is your understanding of what

19 York was?

20      A     They held themselves out as

21 construction managers.

22      Q     Not as a general contractor?

23      A     They, to my knowledge, and I could be

24 wrong, I would have to go back and specifically

25 look, but to my knowledge, they did not have their

Page 21

                    B. Lapatner

1
2    own contracting group.  They oversaw subcontractors
3    that they brought in.
4                    I could be wrong, it's been six
5    years.
6        Q        I just want to make sure we are using
7    the same terminology.
8                    So, in your view, a general
9    contractor would be one who does some work with its
10   own forces?
11       A        No.  A general contractor provides an
12   owner with a fixed price for the work; guarantees
13   that all the work would be performed for that
14   amount; does not disclose what prices he is paying
15   his subcontractors because he is the one who is
16   promising the completion for a specific amount and
17   that way if he can force his subs to work faster,
18   smarter or better and do it and save money off that
19   fixed price, that's his profit.
20                   A construction manager works on a
21   transparent basis, on securing bids for each of the
22   line items on a project:  Brick work, steel,
23   concrete, et cetera, et cetera, glass, all the way
24   down.  Works with an owner to pick the best price
25   and the best subs, whose contract prices make up a

                            B. Lapatner

1    schedule of values which the owner knows about,

2    against which requisitions each month as to the

3    percentage of completion of each sub is listed, and

4    the CM is responsible for overseeing them, but they

5    have their own individual subcontracts, sometimes

6    through the CM, sometimes through the owner, it

7    depends on how it's set up, but it's disclosed what

8    their line-item valuation is for their scope of

9    work.

10                   There's two different methodologies

11   there.

12        Q      Just following up on your answer

13   before.  To your recollection, York was operating

14   more as a construction management and not as a

15   general contractor; is that correct?

16        A      The answer to that question is yes.

17        Q      You chuckled.  Is there a reason that

18   you chuckled?

19        A      Because they weren't managing very

20   much.

21        Q      Why do you say they weren't managing

22   very much?

23        A      The quality of the oversight, the

24   quality of the work the subs performed fell far

Page 23

B. Lapatner

1  short of what you would expect from an experienced

2  overseer of subcontractor and vendor work.

3  

4       Q      At around the time of this Exhibit

5  22, before you were out there, had there been any

6  specific tasks that the Nusseibehs had asked you to

7  do, anything specific?

8       A      I hadn't been retained.  I was doing

9  a courtesy for them and whoever had referred them to

10  me, to say:  Let me inquire and see if I could give

11  some thoughts on what your situation is; something

12  that I am asked to do often.

13       Q      You indicated in this Exhibit 22 that

14  Mr. Cronk was going to come out with you at that

15  meeting?

16       A      Yes.

17       Q      Did he, in fact, come out with you at

18  that meeting?

19       A      Yes, I believe he did.

20       Q      Do you remember when that meeting

21  took place?

22       A      Shortly after this e-mail went out.

23       Q      And where did you meet?

24       A      I think we first were asked to meet

25  them in the father's or the in-laws house, which was

Page 24

                        B. Lapatner

1

2    right outside the gate before you got to the

3    Nusseibehs, who were down the road.  I think they

4    met us there first to talk to us because they wanted

5    to give us the lay of the land before we went over

6    to the site where there were some workers, they

7    didn't want to walk us through until we had a

8    discussion.

9         Q    Okay.  The in-laws house or the

10   parent's house was down the road from the project?

11        A    Yes.

12        Q    Who was at the meeting at the house?

13   Who was present?

14        A    I only remember Jamal was there for

15   sure and I don't remember whether Julia was there

16   from the outset or joined the meeting.  They have

17   young children.  This was always a concern, to look

18   after the children.

19        Q    On your side it was Mr. Cronk,

20   yourself and Mr. Francisco was still there?

21        A    No, I am sure he was not at the first

22   meeting.  I don't recall him being at the first

23   meeting.

24        Q    Do you remember what you discussed

25   while you were at the in-laws' house?

Page 25

B. Lapatner

1

2      A      I think they gave us a more detailed

3  overview of the problem they had with York, which

4  appeared to be extensive; and these were the

5  problems that they could observe themselves.

6      Q      Can you be more specific as to what

7  you recall they said, the specific problems?

8      A      Work was not being done in a timely

9  fashion.  Some subcontractors were on and off the

10 job.  They had started work on one project in the

11 house, went over to another project, left that one

12 going and they couldn't understand it.  They evinced

13 what owners often get frustrated about when

14 construction projects go array.

15     Q      Did they indicate their concern about

16 being able to move into the house?

17     A      They said they had been delaying

18 moving into the house.  We did not know what that

19 meant at the time, but we understood that that was a

20 concern of theirs.

21     Q      Did they show you any documents at

22 that first meeting?

23     A      No.

24     Q      How long were you at the in-laws'

25 house before you went to the project?

Page 26

                    B. Lapatner

1

2          A       It couldn't have been more than a

3    half hour.

4          Q       Thereafter, did you go to the 35

5    Andrews Farm Road project?

6          A       I recall we went over to the house.

7    They drove us over.

8          Q       Do you remember who went over?

9          A       I know Brad Cronk and I went over

10   with Jamal.  I just can't recall if Julia was there.

11         Q       Were there any workers on site when

12   you got there?

13         A       I believe there were some workers

14   walking through the site.

15         Q       Did you talk to any of them?

16         A       Of course not.

17         Q       Was anybody from York there at the

18   time that you were there?

19         A       I don't remember.

20         Q       Do you remember specifically what

21   type of work was going on at the time?

22         A       No.

23         Q       What did you observe, in terms of the

24   condition of the construction site at the time?

25         A       To answer your question, I know that

Page 27

B. Lapatner

1    we saw a great many things that were troublesome,

2    that were at odds with good practice, and I believe

3    we wrote to them a somewhat detailed roadmap for

4    what issues they needed to get their arms around if

5    they were ever to determine the nature and the

6    extent of just how badly they were served by York.

7         Q    Could you be more specific about the

8    problems that you observed with the work that you

9    observed at the time?

10        A    I am sure there's a document that

11   assumes I look at and says "there it is."

12        Q    Sir, I am not hiding any documents.

13   I will show you the documents.  I want to know what,

14   if anything, you recall as you sit here today, the

15   first time you looked at the site that caused you

16   concern?

17        A    I just know we saw an awful lot that

18   was not working in the best interests of Nusseibehs.

19        Q    I am going to show you what was

20   actually marked as Exhibit 2 in Mr. Rivera's

21   deposition and I believe that this is an e-mail

22   chain from November 18, 2013.

23             Do you recall this e-mail chain?

24        A    No.

B. Lapatner

1

2      Q     The subject line says, "This is going

3  to be a big mess."

4      A     I see it.  I don't remember it, but

5  it was prophetic.

6      Q     You don't remember what you meant by

7  that?

8      A     What we had seen, what we had seen

9  was nothing short of a big mess by someone who had

10  been working there for a considerable period of time

11  and not carrying out the duties that they should to

12  properly work on a house of that caliber.  It's a

13  very well constructed house and it deserved a

14  first-class work product.  It was not there.

15      Q     Do you know if this e-mail chain

16  occurred before you actually physically saw anything

17  down at the house though, which is what I thought,

18  but if you're telling me that you think the big mess

19  refers to what you say?

20      A     I can't tell you without knowing the

21  date that we were actually there.

22      I would be surprised if I was talking

23  to Brad and Francisco on a telephone call and that

24  they could comment like that without us having an

25  eyes on.  I could be wrong, but this would indicate,

Page 29

                              B. Lapatner

1

2    the way we work together, that we were trying to

3    grasp the extent to which this client had been

4    victimized by a construction team.

5                    (E-mail re documentation sent marked

6              as Exhibit No. 23 for identification, as of

7              this date.)

8              Q        Do you know what Exhibit 23 is?

9              A        I don't recall this document, but I

10   recall the subjects that ultimately were involving

11   our further investigation as time went on.

12             Q        This e-mail was sent after the site

13   visit; is that correct?

14             A        Yes, that's what it says.

15                    (Discussion held off the record.)

16             Q        It also indicates in the first

17   paragraph that it's based upon your visit and you're

18   reviewing various correspondence and project

19   documentation sent to us this week.  Did the

20   Nusseibehs send you some documentation sometime

21   between the site visit and the time of this e-mail?

22             A        Based on this, I would have to say

23   yes.

24             Q        Do you recall receiving documentation

25   from them?

Page 30

B. Lapatner

1
2      A      No.

3      Q      Do you recall early on in the project
4  what, if any, documentation you reviewed?

5      A      Well, they would have been in -- I
6  think in the earlier document we asked them to
7  gather some information.  I can only imagine that
8  they tried to gather what they could in a very quick
9  time and they sent us what they had.

10     Q      I understand that.  Do you recall
11 specifically anything that you reviewed during these
12 first weeks of your involvement?

13     A      No.

14     Q      I know in the first paragraph you
15 referred to your construction as a general
16 contractor; do you see that?

17     A      I see that.

18     Q      Was your understanding that they were
19 a general contractor, based upon the terminology we
20 talked about earlier today?

21     A      My understanding is they styled
22 themselves as a general contractor.

23     Q      Okay.

24     A      Ultimately, they made themselves --
25 they acted as a hybrid.  They were neither this nor

1                           B. Lapatner

2    that.  What they were doing was syphoning money off

3    of the Nusseibehs as they could, in whatever way

4    they could.

5           Q      In the second paragraph you say it's

6    your belief that the general contractor must be

7    dismissed immediately.

8                  Do you see that?

9           A      Yes.

10          Q      You made that determination by a

11   little over week after first being contacted; is

12   that correct?

13          A      That's what we do.  We do the due

14   diligence quickly and find out by asking questions

15   that this was someone holding themselves out as an

16   overseer of construction who did not have the

17   requisite prior experience to do a project of this

18   nature.  That proved true on many levels.

19          Q      Okay.  What did you do to reach that

20   conclusion?

21          A      Let's disclose.  Number one, I forget

22   what the amount of the contract was, but let's call

23   it a million dollars for a moment.  It wasn't

24   $250,000.  In my experience, I had never seeing

25   someone holding themselves out as a general

Page 32

B. Lapatner

1    contractor or construction manager for a million

2    dollar project who could take an assignment of that

3    nature, doing over major elements of a small castle

4    and not have a set of approved, stamped, sealed

5    construction documents prepared by an experienced

6    team of architects and engineers.  No one could

7    provide that to us and the work was being done

8    haphazardly by assigning electricians to go do this

9    and plumbers to go do that, roofers to go off on

10   that, and that is in and of itself so alarming as to

11   immediately dismiss anybody as credible to be

12   handling a project of that scale.

13                   Secondly, I believe we found and it

14   makes reference to that there wasn't any approved

15   documentation filed with the local building

16   authorities; a permit was not obtained for this

17   work, and they were not licensed as general

18   contractors to do this kind of work.

19                   So there were increasing

20   characterizations of things that send off alarm

21   bells for us.  We were alerting them that that

22   should have been a big concern for them and not how

23   they brought these people on.

24        Q       You said they weren't licensed as

Page 33

                              B. Lapatner

1    general contractors.  What's your understanding of

2    what licenses a general contractor needs to do work

3    in the state of Connecticut?

4         A     I think Francisco went down to the

5    local building department and asked those questions.

6    Nobody knew about this project.  Nobody knew about

7    any filings.  Nobody had any drawings and they did

8    not have a file on this.  So as far as the Town of

9    Greenwich was concerned, they did not know this

10   project was underway.

11              So they certainly couldn't have

12   opened files.  They certainly couldn't have sent

13   inspectors.  They certainly couldn't have approved

14   the plans and specifications for mechanical,

15   electrical, plumbing, roofing; critical elements of

16   a building that has been in their purview.

17        Q     So when did Francisco go down to the

18   town to check that information out?

19        A     I'm sure, right after, in this period

20   of time, before we were formally retained, he would

21   that done that investigation.

22        Q     But you don't know specifically?

23        A     No.  We were raising as many

24   questions in this letter because it opened up doors

25

Page 34

1                          B. Lapatner

2  to other questions to be asked.  It was just

3  commenting on the alarming issues, many of which the

4  Nusseibehs were not aware of.

5          Q       What is your understanding, not in

6  terms of dollars, but in terms of what work York was

7  hired to do on the house?

8          A       I would have to see the documents

9  with a full scope, but they were doing serious work

10  involving electrical systems and running wires;

11  there were plumbing issues, there were boiler

12  issues, there were roof issues, there were

13  partitions issues, there were finished- trade

14  issues, there were gardening issues -- I don't mean

15  gardening, I mean running pipes and doing things

16  that involved work in their garden areas.  There was

17  a garage carriage house, where there was an

18  apartment above it, illegal.  They were working on

19  it without plans and specs.

20                 That's a pretty good overview of an

21  awful lot of work that was being done.

22          Q       There were no physical additions

23  being done to the house though, is that correct,

24  like not to the footprint?

25          A       Not to my knowledge.

Page 35

B. Lapatner

1

2     Q      The apartment over the garage was

3  over the existing footprint of the garage; correct?

4     A      Yes.  I don't know whether they

5  extended the roof line a little bit or not.  I would

6  have to go back and look, but it was a large series

7  of apartments for someone in the family that they

8  intended to have up there.  It was not a brother.

9  It wasn't a brother or a sister.  It was someone,

10 relatives who visited or whatever.  I don't recall.

11 That's because they were putting bathrooms in there.

12    Q      When you say that you can't do that,

13 why are you saying that?

14    A      First of all, you would have to get a

15 permit for that from the town and most towns in

16 suburban areas in the Metropolitan area don't

17 blindly grant those kinds of additional small homes,

18 because they're self-contained apartment units and

19 there is a process to that because there are zoning

20 issues that often come up.

21    Q      So you found that at some point in

22 time, LePatner, you or somebody who works for you,

23 found that there were no permits for that particular

24 work for the garage apartment; correct?

25    A      For anything.

Page 36

1                          B. Lapatner

2          Q        For anything?

3          A        That York was doing.  They hadn't

4    filed with the buildings department for approval, to

5    our knowledge.  We went down there, we asked the

6    questions, and that was one thing we had to address

7    with the Nusseibehs and with the authorities.

8          Q        While you were on the project were

9    more permits applied for?

10         A        I believe so.  I believe Francisco

11   was down there numbers of times to provide

12   explanations to the authorities why that amount of

13   work had been going on and nobody had done what they

14   should have in terms of applying for permits.

15         Q        At the time of this letter, this

16   e-mail, Exhibit 23, the Nusseibeh had not yet

17   retained you in any way; is that correct?

18         A        I don't know formally the dates.

19                  MR. HARRINGTON:  Mark this as 24.

20                  (Response to E-mail, Exhibit 23 was

21          marked as Exhibit No. 24 for identification,

22          as of this date.)

23         Q        For the record, this appears to have

24   attached to it Exhibit 23.  It appears to be the

25   e-mail that you had just looked at as Exhibit 23,

Page 37

```
 1                        B. Lapatner
 2   the bottom of this.
 3          A      Oh, this is just -- essentially, this
 4   is Jamal's response to that e-mail.
 5          Q      That's what I was asking you.
 6          A      It appears to be.
 7          Q      Do you believe that's the response to
 8   your e-mail?
 9          A      It appears to be, yes.
10          Q      Do you recall receiving this at the
11   time?
12          A      No.
13          Q      Do you have any reason to believe
14   that you did not receive it?
15          A      I would not question if it was in our
16   files that we received it.
17          Q      So in the second paragraph he is
18   asking you, one, about your fee structure.  You see
19   that in the second paragraph?
20          A      Yes.
21          Q      And he is also asking you about he
22   understands there's some legal component and some
23   project management component of the work that
24   LePatner and some entity was going to do; correct?
25          A      I see that.
```

Page 38

B. Lapatner

1

2      Q      Did you have a discussion with him

3  about what services you could offer to him?

4      A      Well, we would have, I would have

5  introduced Brad as the head of LPS.  He is not a

6  lawyer so I would have not introduced him as that,

7  but there are the issues involving the quality of

8  the work that encompassed all the things that

9  LePatner & Associates does on a daily basis for

10  their clients, looking at things and determining

11  whether we should be hiring a team of experts to

12  look at something, to understand whether it was done

13  right or not; looking at a whole slew of business

14  issues for owners as well.

15          There are things that LPS does, in

16  terms of coordinating all the disparate design and

17  construction issues that provide a separate group of

18  services.  So we would have explained that there

19  were two separate elements that have to be in

20  conjunction with on another so they could find out

21  and make decisions.

22      Q      Okay.  But the two separate elements,

23  one is under LePatner & Associates, which is a law

24  firm; correct?

25      A      That's correct.  It's a law firm that

Page 39

1                          B. Lapatner

2    provides business advisory services for clients who

3    are either planning projects or have gotten

4    themselves into bad situations.

5          Q       The law firm focuses its practice on

6    construction-related issues; correct?

7          A       Yes, that's exactly what we do.

8          Q       The conversation you had with the

9    Nusseibehs was that you could handle those legal

10   aspects.

11                 MR. CAPPELLO:  Objection to form.

12         A       That came within the purview of what

13   LePatner & Associates does.

14         Q       And you mentioned to him that you had

15   the construction management services; correct?

16         A       The affiliated firm of LPS.

17         Q       And he was asking you for a better

18   understanding of sort of, I guess, those two

19   different aspects of your representation; is that

20   correct?

21                 MR. CAPPELLO:  Objection to the form.

22         A       I believe he was asking us to submit

23   proposals so that we could talk about what we could

24   do for them.

25         Q       He also mentioned to you, at the

Page 40

B. Lapatner

1    bottom of the second paragraph, that he is going to

2    be traveling for most of December; do you see that?

3         A       I see that.

4         Q       Do you recall that he was traveling

5    when you came on board?

6         A       He was always traveling.  There were

7    frequent times during the course of our

8    representation that he would be outside of the

9    jurisdiction, whether it was domestically or

10   foreign.

11        Q       So he was asking the question about

12   the legal aspect of the project management aspect.

13   What, if anything, did you explain to him about

14   that?  Anything in addition to what you already

15   testified to?

16        A       I explained to him that we were an

17   advisory firm, explained to him the different

18   ramifications of the situation that he and his wife

19   had gotten themselves into.

20        Q       Did you have any discussions about

21   your experience in these areas?  Did you tell him

22   anything about the type of work that you did?

23        A       Whoever had referred me to him, I am

24   sure had given him an understanding of who we are

1                          B. Lapatner

2   and certainly the discussions that we had after

3   observing it alerted him that we had discovered

4   many, many new things that he did not know about,

5   even though he was there regularly.

6              I think he understood that we had a

7   very comprehensive background, to try to help him

8   resolve the deep hole that he and his wife were in.

9              MR. HARRINGTON:  Well, let me mark

10          the next exhibit.

11              (Whereupon, a recess was taken.)

12              (Defendant's Exhibit No. 25 was so

13          marked for identification as of this date.)

14              MR. HARRINGTON:  Back on the record.

15   BY MR. HARRINGTON:

16       Q     I am showing you what we have marked

17   as Exhibit 25.  Do you know what this is?

18       A     It's an e-mail, second on that day,

19   November 22, from Jamal Nusseibeh to me -- I am

20   sorry, it's from me that day, the same day, to Jamal

21   and Julia, indicating that we will send out

22   proposals, as they requested, for assisting them on

23   their residence.

24       Q     You indicated that you have a

25   separate proposal for legal and project management

Page 42

```
 1                    B. Lapatner
 2  services; is that correct?
 3          A       I believe we provided that to them.
 4          Q       You also indicated in the second
 5  paragraph you'll detail every step of the process on
 6  a proposed timeline for completion?
 7          A       Yes.
 8          Q       Did you do that?
 9          A       I would have to look at the proposals
10  to see and confirm, but I believe we did give them a
11  detailed road map, a rather extensive one at that.
12          Q       I am showing you what we marked
13  previously at Mr. Rivera's deposition as Exhibit 1;
14  do you know what this is?
15          A       This is the proposal from LePatner
16  Project Solutions, dated November 24, 2013.
17          Q       Did you draft this proposal?
18          A       I am certain this is drafted in
19  conjunction with Brad Cronk.  I am not sure about
20  Francisco's involvement, but I am sure we looked
21  over this, discussed the problems and drafted this
22  detailed outline of issues that they should -- that
23  we recommended should be confronted.
24          Q       Is this a form that you use or is
25  this specific to this project?
```

Page 43

                              B. Lapatner

1        A       It's specific to this project.

3        Q       Do you know if there is a separate

4   proposal that you did for any legal work?

5        A       I don't recall.  I would have to have

6   him show me if there is a legal retainer for that

7   work.

8        Q       I have not seen a legal retainer.  I

9   am just asking if you recall one?

10       A       I don't believe there was one.  I

11  believe we were coming there to clean up this mess.

12       Q       When you say you were coming there to

13  clean up this mess, what is this mess you are

14  referring to again?

15       A       I went through all of this.  They had

16  been fleeced by somebody holding themselves out as a

17  contractor.

18       Q       So you are referring to this mess,

19  which you spell out in the proposal?

20       A       That is correct.

21       Q       Did you ever advise the Nusseibehs to

22  seek separate counsel to review this agreement

23  before they entered into an agreement with you?

24       A       When we understood the breadth and

25  extent of the breaches and the illegality of what

Page 44

                              B. Lapatner

1

2   York did, I recommended that they hire Wiggin &

3   Dana.

4        Q     Did you do that in writing?

5        A     I don't recall, but I know

6   specifically I told him:  You should be starting

7   litigation at some point because you have enough

8   documentation -- this is down the road a bit,

9   because it took us months and I personally dealt

10  with one of York's principals quietly to urge him to

11  send this information so I could understand how we

12  could pay him what he was owed, all in the guise of

13  getting him to reveal more and more how he

14  improperly dealt with everything on the project.

15                  Once we had gotten that, I said, "You

16  should be starting a lawsuit in Connecticut."  We

17  have worked in the past with Wiggin & Dana, who is a

18  pretty responsible established firm.  I called a

19  partner at Wiggin & Dana and asked him if he had

20  construction counsel experience and he said, "Yes,

21  we do" and so on.  I said, "Good, I am going to be

22  recommending you for this matter that we had," which

23  I outlined in one sentence and he said, "We would be

24  happy to do it."

25                  I recommended it to Jamal more than

Page 45

                              B. Lapatner

1

2    once after that.  I said, "You can start your

3    lawsuit against them, you have enough."

4         Q       Going back though to November 24 of

5    2013, if you look at the last page of that, at some

6    point in time the Nusseibehs signed this; is that

7    correct?

8         A       It appears to be so, yes.

9         Q       Did you advise them orally or in

10   writing at any time prior to November 27th, 2013,

11   that before entering into this agreement, they

12   should seek to have other counsel review this

13   agreement?

14        A       Everything Jamal did, to my

15   knowledge, was discussed with his father and his

16   accountant Daniel Rosen.

17               Number two, to my understanding,

18   Jamal was a lawyer.  I forget whether Julia was also

19   a lawyer, I don't remember, but they certainly made

20   it clear to me that they had legal backgrounds.

21        Q       I understand.  My question is:  Did

22   you advise them to have separate counsel look at

23   this before they entered into this agreement?

24               MR. CAPPELLO:  To the form.

25        A       I don't recall.

Page 46

B. Lapatner

1    Q    If there was something in writing to

2    that effect, would it have been in your files?

4    A    I wouldn't know that.  I would assume

5    they would refer this just the same as they would

6    have referred the contract with York to legal

7    counsel.  I would assume a million dollar contract

8    with York would have similarly been reviewed by

9    their legal team or Jamal and Julia would have

10   determined that they did not need outside counsel

11   because they had legal backgrounds.  I could not

12   know what was in their minds.

13   Q    I am not asking what was in their

14   minds, I am asking you what you did.

15   A    I am saying that I don't recall.

16   Q    You referred to the York contract as

17   a million dollars.  Was it originally a million

18   dollars?

19   A    I don't recall what it was, but I am

20   sure there's documentation that shows that it was an

21   extensive contract because it grew through so-called

22   change orders that they were being asked to pay.

23   They were becoming alarmed because there was no

24   documentation to support the change orders that they

25   could put their fingers on, why they were being

Page 47

                              B. Lapatner

1

2    asked to do this.

3         Q      Did they tell you that, that they

4    were becoming alarmed when the change orders were

5    being presented?

6         A      Yes, because we asked for them to

7    show us what York was claiming they were owed, and

8    they said, well, here is an original list of things

9    and here are documents where they say they are owed

10   much, much more.

11               I said, "Where's the backup?  Where's

12   the subcontractor line items?

13               "No, they just gave us something,

14   which was this," and it was sketchy, to say the

15   least.

16        Q      So you had been given at least the

17   documents purportedly to be the contract between the

18   Nusseibehs and York?

19        A      I believe so.

20        Q      There's a reference in the second

21   paragraph to the various materials you have provided

22   us as to the scope of work to be performed.  My

23   question is going to be:  Do you remember what it is

24   they provided you at this point in time?

25        A      I can't recall.

Page 48

                          B. Lapatner

1

2       Q       If they, in fact, provided you

3   documents, would you have maintained them in your

4   file in this matter?

5       A       Yes, I would assume it would be

6   there.

7       Q       For documents related to LePatner

8   Project Solutions, you retained documents on paper,

9   electronically or how do you keep your documents or

10  a particular matter?

11      A       I am sure both.

12      Q       You don't recall specifically on this

13  one did you have paper and/or electronic?

14      A       I am sure both.  I have seen files

15  and I have seen digital documents.

16      Q       Have you provided what you have to

17  your counsel in response to the discovery request?

18      A       Completely, to my knowledge.

19      Q       As you sit here today, do you have a

20  recollection -- I know I asked you this question

21  before to a certain extent, but do you have a

22  recollection of what the scope of the work was that

23  York was actually supposed to do on the Nusseibehs'

24  project?

25      A       Only in outline form.  As I

Page 49

B. Lapatner

1  mentioned, they were doing work involving roof

2  mediation.  They were doing work involving boilers,

3  gas lines, plumbing lines, electrical lines interior

4  partition work and repositioning of rooms, doing

5  work laying piping in the garden.  They were doing

6  work relating to that adjacent garage cottage, the

7  residential portion above it.  I think that

8  represents an outline of the scope that I recall.

9          Q      Your letter seems to break down what

10  you're proposing in two phases.  Do you recall

11  having done that?

12          A      Yes.  It was informational.

13  Information gathering was necessary to fully explain

14  the nature and extent of York's involvement and

15  identifying the extent of appropriate remediation to

16  do the corrective work, what that would entail.

17          Q      So you reiterate your prior advice

18  that you think York should be dismissed immediately;

19  correct?

20          A      Based on what we had learned, there

21  was no value in keeping them on because, A, they

22  couldn't be trusted to do the right work.  C,

23  evinced a departure from any measure of standard of

24  care to oversee a project like this and, D, they

Page 50

                            B. Lapatner

1                               B. Lapatner

2    weren't even there.  There was a noticeable lack of

3    principal attendance to oversee the work of the

4    trades and that's a bad sign.

5           Q      So from what you saw, York was not

6    actually even on site?

7           A      Or have a consistent project manager

8    who was in control of the project.

9           Q      You state in the paragraph under A,

10   under phase one, that you have been unable to

11   identify any previous work by this contractor that

12   reflects the experience or qualifications.  It goes

13   on -- to assume the complexity of this project?

14          A      Yes.

15          Q      What, if anything, did you do to

16   check out their qualifications?

17          A      We spoke to them.  We asked them to

18   disclose the prior projects they had done and they

19   were limited in nature, such that they could not

20   tell us a project of this scale that they had worked

21   on or a project of this quality, that represented

22   the high level of quality.

23                 Number two, we talked to the people

24   down in the building department who had said they

25   had only seen them involved in small projects.

Page 51

B. Lapatner

1                      B. Lapatner

2                  Number three, we went online to

3  identify projects and found, I don't recall

4  specifically, but found projects that could not

5  equate to something of this nature, but basically by

6  talking to them, they, in a nice way, were having

7  conversations.  They explained that this was a

8  project of a scale that was not like projects they

9  had worked on.

10         Q      You had done all this that you just

11  stated, you had done this all of this before

12  November 24th?

13         A      Yes.

14         Q      You had talked to the Building

15  Department before November 24th.

16         A      Well, Francisco lived in Connecticut

17  at the time, so it was easy for him to go over.  He

18  lived in New Haven.  It was easy for him to go over

19  there and make the inquiries.

20         Q      You did not personally check with the

21  Building Department; is that correct?

22         A      No.

23         Q      Would Francisco be the only one from

24  LePatner Project Solutions project to do that?

25         A      He was the person who went and did

Page 52

                        B. Lapatner

1    some of the checking.

2         Q       He was the person on behalf of

3    LePatner Project Solutions; correct?

4         A       Yes.

5         Q       We'll spend a little time on that

6    document, so keep it in front of you.

7                 Part B of phase 1 talks about a

8    personal meeting with the principals of York.  Did

9    that ever take place?

10        A       Yes, I met with one or both of those

11   principals.

12        Q       Do you remember their names?

13        A       One was named Gerile, B E R I L E, I

14   could be wrong.  And the other gentlemen I spoke to

15   I met at the site, because I think we walked at one

16   point, just kind of familiarizing what you have been

17   doing, to get the lay of the land from him and to

18   try to understand his billings, because he was

19   asking to be paid a lot of money.

20               I said, "If I am going to be able to

21   explain this to Jamal and Julia, I need to

22   understand what you did."

23        Q       So at this time was York asking to be

24   paid additional monies than what they had already

Page 53

                              B. Lapatner

1

2   been paid?

3           A       Yes.

4           Q       Do you know the order of magnitude,

5   what amounts they were looking to be paid?

6           A       I'm sure it was six figures.  Whether

7   it was 150 or 350, it was a lot of money, because

8   Jamal had stopped paying them weeks before.

9           Q       He told you that?

10          A       Yes, he told me that he paid them

11  regularly because they were always insistent on

12  being paid, I forget whether it was every two weeks

13  or every four weeks.  He had decided not to pay them

14  at some point, and I think there was some

15  documentation where he wrote to me and said:

16  "Interestingly York hasn't come around asking me for

17  payments with the regularity" -- he thought they

18  were having guilt conscience or they were just

19  giving up on the job.  He couldn't understand why

20  they weren't there like clockwork, like they had

21  been up to that point?

22          Q       At this point in time, had Jamal

23  started paying subcontractors directly?

24          A       I don't recall.

25          Q       Do you remember that having happened

1                         B. Lapatner

2   at any time before you became involved?

3            A       I don't recall that.

4            Q       Just flip the page.  The top of the

5   next page talks about recommending that you have

6   interviews with each of the completion trades to

7   ascertain various things.  Did you, in fact, have

8   those interviews with the completion trades?

9            A       Yes.

10           Q       Did you conduct those personally or

11  did somebody else conduct them?

12           A       I met with some of them.  Brad and/or

13  Francisco met with others and secured information

14  about whether they were owed money, which was very

15  important because subcontractors don't stay on the

16  job if somebody hasn't paid them.

17           Q       Were you also looking to see whether

18  you would keep one or more of these subcontractors

19  on the job to either finish their work or perform

20  further work?

21           A       Yes.

22           Q       Do you remember which subcontractors

23  you spoke to specifically?  By subcontractors, you

24  can refer to them as subcontractors or trade

25  contractors, whatever it is.

Page 55

                           B. Lapatner

1

2      A       It's the same thing.

3      Q       Do you understand what I'm referring

4  to?

5      A       It's the same thing.  No, I don't

6  specifically, but I dealt with all of them at one

7  point or another in my regular visits to the site.

8      Q       Did you determine whether any lien

9  waivers had been obtained from any of these

10 subcontractors prior to your involvement?

11     A       We determined it, yes.

12     Q       Had they?

13     A       I don't recall at that point in time,

14 because at some later point we secured the lien

15 waivers, but I don't know who had given up to that

16 point and who had not provided them.

17     Q       You said that you had secured lien

18 waivers.  So once you came on the job you secured

19 lien waivers from subcontractors or trade

20 contractors?

21     A       We had to know if they were paid and

22 what they were paid for what services because the

23 documentation was scarce, as far as York was

24 concerned.

25     Q       But my question is:  Did you actually

Page 56

B. Lapatner

1  secure lien waivers from one or more of these

2

3  contractors?

4       A    At some point yes, of course.  I

5  wouldn't have been able to stay on the job

6  otherwise.

7       Q    Subsection C, we are on page two of

8  Exhibit 1, it says you were going to do a detailed

9  survey of the work performed to date by York and

10  compare it to the authorized scope and approved

11  change orders.  Did LePatner Project Solutions do

12  that?

13       A    Yes.

14       Q    Did that result in a written

15  document?

16       A    Yes.

17       Q    What is on that written document?

18       A    Exactly what it says here, a

19  correlation between the amounts that had been paid

20  by the Nusseibehs to York and what was allegedly

21  performed, what was not performed, amount of

22  revisions that had to be made, that we had to go

23  back and tell these people to do it over again.

24  That survey was done and provided.

25       Q    Do you remember when, in the course

Page 57

B. Lapatner

1    of your involvement in the project it was provided?

2

3         A       No.  But I know a survey was done.

4         Q       Did you ever advise on the percentage

5    of completion of the work for each of those

6    contractors?

7         A       I don't recall how the survey was

8    done, in terms of percentage of work or in terms of

9    defective work that had to be declared worthless.

10        Q       Just so I can understand what the

11   survey should entail, so was it by contractor?

12        A       Trade.

13        Q       Okay.  By trade.  So you would have

14   an electrician and you would say what they were

15   supposed to do within -- this is for contractors or

16   change orders; correct?

17        A       For this scope of work and this

18   amount of money, what had been done which was

19   acceptable and what was done that was below standard

20   and whether they should have been paid and owed

21   $5.00 or whether they were paid by York $200 and you

22   didn't get any value for that or you only got a 5.00

23   value for that.

24        Q       And LePatner Project Solutions

25   provided that survey in this particular case?

Page 58

B. Lapatner

1    A    Yes, ultimately, because this is

2 essential to understand or you're going to be very

3 surprised if you ever think about trying this case.

4         When we took over the assignment of

5 trying to get this project completed, week after

6 week, month after moth, we uncovered the full depth

7 of the horrific and deficient work that York and

8 these trades had done.  Whereas it seemed like the

9 wires had been wired and the plumbing had been

10 installed and the gas lines had been done, we would

11 find out, week after week, the true extent of how

12 dangerous the conditions were existing that would

13 have precluded the family from being allowed to move

14 in, otherwise they would have been in danger of

15 their lives.

16         So, when we uncovered something like

17 that and we brought in experts to figure out what

18 does this mean, while up to that point we might have

19 thought 50 percent of the electrical or the piping

20 was fine, we now learned that because we had a

21 dangerous boiler condition that could have exploded

22 one day, very close to it before we caught it, an

23 extensive amount of work that previously might have

24 been considered uncovered but acceptable, now went

Page 59

                         B. Lapatner

1

2   off the charts and had to be totally replaced.  That

3   happened time and time again, to open up new cans of

4   worms and would be explained to Jamal and Julia.

5                So this was not a project that went,

6   "Oh, we have 30 percent to complete, let's complete

7   the 30 percent and get them in."

8                That 30 percent went backwards to 60

9   percent, then 50 percent, then 70 percent, and every

10  time we would explain the problems that we

11  encountered, we would go back to the clients, write

12  them reports, and have to deal with the subs to do

13  the corrective work or in some cases bring in other

14  trades to address this continuing evolution of one

15  disastrous aspect of the work after another.

16       Q    So we'll break that down a little

17  bit.

18                So you said week after week you were

19  uncovering new things; is that correct?

20       A    Could have been every two weeks, I

21  couldn't tell you.  If I look at the documents, it's

22  all there.  We have progress reports that explain

23  the uncovering of major problems.  It would be one

24  thing if your clients had fallen into the hands of

25  contractors who hired subs whose quality of work was

Page 60

1                          B. Lapatner

2    a little bit below par for the nature of what was

3    promised, but what we uncovered was of such grossly

4    negligent handling that it rose to levels of almost

5    criminal negligence, and each of those things

6    triggered implications for other trades because if

7    you have to rip out walls, then the sheetrock guy

8    who had been completed up to 50 percent, now has to

9    go back and start over again, because he had to get

10   access to pipes or electrical lines or conduit pipes

11   and so on.

12                All of this was explained and all of

13   this was time lined.  All of this was shown to your

14   clients who could not have been stupid.  They are

15   not stupid people.  Were they understanding?  No,

16   that's another separate issue, but it was fully

17   explained to them what a dangerous situation they

18   had put themselves in by hiring York and letting

19   York go on as long as they could without a set of

20   architectural plans and specifications.

21        Q      So you say it was explained to them

22   whenever you uncovered these things; is that

23   correct?

24        A      Absolutely.

25        Q      Who explained it to them?

Page 61

                              B. Lapatner

1

2       A       I did, Francisco did.  We sent

3  reports.  If you haven't seen them in the record or

4  you are just asking that for the purpose of

5  extending this deposition, it's in the record.

6       Q       The reports, you indicate there were

7  reports; how often were reports prepared?

8       A       It's whatever, you will see it in the

9  record.  I know there are detailed progress reports

10 that we did specifically for that project for a

11 period of time, covering a period of time.  It's

12 there.  Anyone can see it.  Any professional would

13 know that they were done with detail, with an

14 understanding of what was being uncovered and with

15 an understanding of the depth of the miscreant

16 activities that York perpetrated on those clients.

17      Q       Continuing with Exhibit 1.

18              Part D of phase 1, it indicates that

19 you are going to identify code provisions of the

20 work, that the work must conform to and arrange

21 necessary inspections or sign-offs.

22              Does that relate to your testimony

23 about going to the town?

24      A       I am only smiling.  It is incredible

25 that intelligent people like Jamal and Julia and

Page 62

B. Lapatner

1  their parents who are actively involved in them and

2  the money involved, would never have had

3  professional architects and engineers and design

4  professionals preparing a detailed set of drawings

5  and specs before they undertook the work that they

6  let York do.  It's incredible, the negligence of

7  this client in allowing that to happen is one level.

8  Okay?

9               When we would say, they did not do

10 this to code, every town has a code requiring how

11 this has to be done, you don't have anything telling

12 them about the code.  They went off and did whatever

13 they thought, which was in violation of how you

14 would want to put a safe house together for a

15 family.

16              They were like shocked.  Oh.  It's

17 incredible how naive they were.  And number two,

18 compounding everything, they brought into the midst

19 of our trying to get ahold of everything on this

20 project, a man by the name of David Peer, who they

21 said was a designer for them, who they gave discreet

22 assignments to, that when we found out what he was

23 doing, he was setting the project back further.

24 Despite my telling Jamal and Julia numerous times to

Page 63

B. Lapatner

1   fire that guy because he is talking to the

2   contractors about doing things that are, A, totally

3   wrong and, B, against your interests and, C, since

4   you want to get into the house, he is making more

5   work for you that we are going to have to rip out.

6   They kept him on.

7              So this was a client who was their

8   own worst enemy.  We tried to be very nice and

9   professional about it.  We tried to say, "Look, you

10  are going to hold this up," they had an expectation

11  that all of this was going to be done like this.

12  And I only know that if you should dare to try put

13  an expert on to testify in this case, he will get

14  destroyed if he says that he believes we didn't

15  perform properly to try and help these clients who

16  are their own worse enemies.  That will be shown and

17  that will be established convincingly, through the

18  best professionals you have ever seen come forward

19  and testify that what we did was to try to put our

20  fingers into the dyke while the clients were

21  pounding more holes into it.  Okay?  That will be

22  shown.

23       Q      Did you ever advise the client in

24  writing to terminate David Peer?

Page 64

B. Lapatner

1      A      I would have to go back to our

2   records, but was it clear?  Oh, yes, it was very,

3   very clear, because we would walk around and say,

4   what he just did over here for you by telling the

5   contractor to do it, it has to be ripped out and let

6   me tell you why and Jamal would agree.  He did work

7   in ripping out in the basement work that complicated

8   things, setting it back weeks and months.

9      Q      This was after you became involved in

10  the project?

11     A      Yes.

12     Q      Was David Peer involved on the

13  project before you became involved in the project?

14     A      I believe so.

15     Q      Going back to my original question:

16  Did you identify code provisions that the work must

17  conform?

18     A      I answered yes.

19     Q      Did you do that in writing?

20     A      Yes.  I am sure in our reports you

21  are going to see reference to those especially

22  dangerous conditions that we uncovered, that had we

23  not, allowing that family to occupy that premises

24  would have been criminal.

Page 65

B. Lapatner

1

2    Q      The dangerous conditions that you

3   refer to, you referred to a gas leak?

4    A      There were gas problems, there were

5   boilers problems and there was one other situation.

6   Not to mention the fact that they were doing

7   electrical and plumbing work without licensed

8   oversight, which don't ever let happen on your

9   house.

10    Q      Are you saying that the contractors

11   that were there did not have licenses?

12    A      I would have to check to see whether

13   one or more of them did not have the requisite

14   licenses, but anyone who is a licensed plumber,

15   licensed, knows they have to schedule inspections by

16   the town inspectors.  No inspections were ever

17   ordered by York or their professional

18   subcontractors.

19    Q    As you sit here now, you are not sure

20   whether or not whoever was working for them,

21   electrical, was licensed prior to that?

22    A      I would have to review the records,

23   if it was written.  As I sit here now, I am not

24   going to remember every detail of a very complicated

25   situation for a client that made things worse for

Page 66

                         B. Lapatner

1

2  themselves, but irrespective of how they behaved, we

3  were trying to do the best for them to uncover the

4  depth of the hole that they had dug for themselves.

5          Q      Who is the expert who uncovered the

6  boiler problems, the gas leak problems?

7          A      I forget whether -- at some point we

8  had problems with the boiler and the gas and we

9  brought in engineers.  I forget their names, but

10 they were Connecticut licensed engineers, very

11 skilled, who started investigating and uncovered one

12 thing after another that we were tracking down and

13 brought it to the attention of the trades involved

14 and the clients.

15         Q      Was it CES?

16         A      I am not sure of the name.  It's in

17 the record.

18         Q      Do you remember the name Russell

19 Knuth, K N U T H?

20         A      I remember Russell.  I would not have

21 remembered his last name.

22         Q      You dealt with Russell on this

23 project?

24         A      Yes.

25         Q      And they were brought in at

Page 67

                         B. Lapatner

1

2   LePatner's recommendation?

3         A       Yes.

4         Q       Do you remember when they were

5   brought in, in terms of time, from the time that you

6   started; do you recall?

7         A       Within months.  It was not at the

8   end, the very end of the time we were on the

9   project.

10        Q       You knew early on that the Nusseibehs

11  had not had a set of architectural plans approved.

12  You knew early on in the project that that was the

13  case; correct?

14        A       Yes, and we talked with them about

15  shutting down the project until they got a licensed

16  architect and engineers to do the right thing and

17  they rejected that recommendation.

18        Q       That was an oral recommendation or a

19  written recommendation?

20        A       I can't remember whatever was in the

21  record, but we specifically talked to them about

22  that at the outset, the first few weeks.  We said:

23  "You don't have the greatest subs here.  They don't

24  know what they are working from because they can't

25  look to the specifications.  You don't have a set of

Page 68

                        B. Lapatner

1

2  specifications.  Everybody is doing what they think

3  they should be doing to carry out a scope of work.

4  That is not in your best interest.

5                    I told them, get on this.  If you

6  want, we will recommend, there are wonderful

7  architects and engineers in Connecticut, wonderful,

8  you can interview them, hire them.

9                    "No, we have to get into the house.

10 Do whatever you can, as fast as you can, to get us

11 into this residence.  I am being pressured by my

12 father or father-in-law.  They can't understand why

13 this is taking so long."

14                    I said, "You know why it's taking so

15 long, because you are here all the time watching and

16 seeing what we are showing you."

17                    He said, "I don't care.  We have to

18 do it.  We are not going to stop this project."

19                    Once again, the Nusseibehs proved to

20 be their own worst enemy.

21      Q     You had these conversations with

22 them, did you have any written conversations with

23 them?

24      A     I don't recall, it's in there or it's

25 not in there, but do I remember being told we are

Page 69

                         B. Lapatner

1

2   not going to stop and bring on architects and

3   engineers.

4                  The conversation came up again with

5   David Peer.  "How are you letting this guy design

6   things for you?"

7                  He said, "Well, he said he is an

8   experienced designer.

9                  "Do you know where his design

10  documents are?"

11                 Jamal said, "No, I brought him into a

12  room where David Peer had designed what he wanted

13  the contractors to do on the wall and when we

14  questioned him, he said, "Yes, they can build from

15  that."

16                 We are appalled that that is how work

17  was being done, authorized by Jamal and Julia that

18  all had to be done over because that guy did not

19  know what he was doing either.

20       Q     What type of work was he doing?

21       A     He was designing things in their

22  bedroom; he was designing some things in the

23  basement; she had some bathroom designs, but it was

24  like they would come up with some idea and go to him

25  and he would start -- stay in the house all the

Page 70

                              B. Lapatner

1

2   time, without any design documents, without anything

3   going for a permit, without anything that showed

4   coordination of how the electrical mechanical

5   plumbing would go together.  And he was designing it

6   by hand on the wall and your clients thought that

7   was fine, against our recommendation to get rid of

8   him.

9        Q       Skipping down to E, phase 1, there is

10  an indication here that you were going to discuss

11  the retention of an architect and engineers who may

12  be needed to repair detailed designs and documents;

13  you had that discussion?

14       A       As I said, yes, several time.

15       Q       And you are saying they never wanted

16  to retain an architect to do drawings; is that

17  correct?

18       A       Despite a lot of patience on my part

19  to explain how that would benefit them, yes.  If you

20  see down below, in paragraph E like in Edward, what

21  I had explained to them:  "We will discuss with you

22  the retention of an architect and engineers who may

23  be needed to prepare detailed design documents for

24  corrective or completion work, as well as to perform

25  needed sign-offs to ensure the certificate of

Page 71

                              B. Lapatner

1

2  occupancy:

3              "A certificate of occupancy," I

4  explained, "(or substantial completion) is usually

5  required from the town in regards to gas line work,

6  septic system work, electrical, et cetera.  We shall

7  also inquire as to whether any of these inspections

8  have been performed to date."

9              So early on we are telling them, this

10 is how you are going to get to a completed project.

11 How he ever got to those dates, because we left

12 before the last things were done, most towns are not

13 going to accept without being able -- to give you

14 certificates of occupancy without being able to see

15 what work was done on critical trades.  That was

16 good advice we gave them.

17      Q      Going on, page 2 we get into phase 2,

18 which is overseeing completion of the work.  In

19 general, what were you going to do?  What was

20 LePatner going to do for the Nusseibehs on

21 overseeing completion of the work?

22      A      It was determined that numbers of the

23 trades brought in by York were not capable of

24 performing at the level of the work to meet the

25 Nusseibehs' requirements for the quality of the

Page 72

```
 1                        B. Lapatner
 2   house that they had.  And as we identified, talking
 3   to the trades, all nice people, hard working, but
 4   not necessarily the caliber of the trades that we
 5   ever would have brought on to a project like that.
 6                    We said to them:  "We would suggest
 7   we get rid of some of those trades because you're
 8   always going to have a problem with the caliber of
 9   their work.  They're not capable of performing at
10   the level that you want and that you deserve."
11                    They specifically said:  "We want you
12   to keep them going, because if we have to go out and
13   bring somebody else on it's going to slow us down
14   and we are never going to be able to move in.  We
15   have to move in."
16                    That was the one thing we heard all
17   the time, "You have to give us a date, we have to
18   move in."
19                    We said:  "If we are going to be on
20   top of these people, because we're not going to
21   accept inferior work on your behalf, we are going to
22   make them do it over and over again, that is going
23   to delay."
24                    They said, "Stay on top of them.
25   Stay on schedule.  Get us to a completion date."
```

Page 73

B. Lapatner

1

2          We said, "You are not going to get

3   there with these people," but we were told to keep

4   them on.

5          Q      Which particular people did you

6   recommend that they change, that they told you to

7   keep on?

8          A      I think, over time, I would have to

9   check the records, but I know some of the critical

10  trades.  First of all, the painting guys were lovely

11  guys, but they couldn't paint their way properly out

12  of a good room.  The plumbing people clearly were

13  not acceptable for what they installed and what

14  created a dangerous situation, and I would have to

15  check the records to see whether the electrical

16  people were also constantly redoing their work, who

17  were identified.

18         Q      Any other trades, when you say that

19  there were people who you say were not up to snuff

20  -- I am not using your words, but pretty much were

21  not up to snuff, that you said that they should

22  replace that they refused to replace?

23         A      I am sure the records would show

24  which ones we were constantly staying on top of to

25  have redoing work.

Page 74

                              B. Lapatner

1

2          Q       By records it would be e-mails,

3    letters, reports?

4          A       Yes.

5          Q       You talked about painters being

6    lovely people, but weren't the caliber; do you

7    recall which painters these were?

8          A       I don't remember their names, but I

9    can tell you that Julia and Jamal were screaming

10   about how they did not do a room right and get them

11   back to do it over again, and they saw it.

12         Q       This is while you were on the

13   project?

14         A       Yes.

15         Q       Not from prior work?

16         A       No, no, no.  They were very

17   particular and they would tell us, "Get that trade

18   back in there and do it over again."

19         Q       So on phase 2, the bottom of page 2

20   of Exhibit 1.  Exhibit A, this contemplates you're

21   going to meet with the subcontractor to see if

22   they're okay to continue with; correct?

23         A       Yes.

24         Q       For those, you are going to identify

25   a completion schedule for their work and incorporate

```
 1                         B. Lapatner
 2   that into a coordinated schedule for completion?
 3         A     Yes.
 4         Q     Did you, in fact, do that?
 5         A     I believe we had schedules and
 6   schedules, as I mentioned, that were constantly
 7   being revised because of uncovering work that made
 8   us go backwards as opposed to moving towards
 9   completion with capable trades who knew how to stay
10   on a schedule.
11         Q     So you believe you had a completion
12   schedule?
13         A     Yes, we did have some dates where we
14   expected the work to be completed by and we did have
15   all of these events that were identified to Julia
16   and Jamal as impacting those completion dates.
17         Q     Did you use any kind of scheduling
18   software to do the schedules?
19         A     I don't remember.
20         Q     Does LePatner Project Solutions use
21   scheduling software?
22         A     Sure.
23         Q     What do you use?
24         A     E-Builder, Microsoft Project
25   Management -- I forget which set worked for which
```

Page 76

                            B. Lapatner

 1

 2  projects.

 3          Q       Do you know if any was used for this

 4  particular project?

 5          A       I can't recall.

 6          Q       Continuing on the bottom of page 2,

 7  it says: "Subcontractors will be retained for the

 8  completion work under a written directive that calls

 9  for them to supply needed manpower that if not met

10  will result in their termination."

11                  Did you, in fact, prepare written

12  directives for completion work to be performed by

13  subcontractors?

14          A       Yes.  Each trade after being

15  interviewed and after assuring us that they could

16  stay on schedule, was given a schedule for work.  We

17  went through room by room what they would do to get

18  to that end date.

19          Q       This was a written directive?

20          A       To the best of my knowledge.

21          Q       Is it something that you would have

22  done or is it something that Francisco would have

23  done?

24          A       Francisco or Brad, I forget who.

25          Q       On this particular project, how much

Page 77

1                        B. Lapatner

2      time did Brad spend on this project?

3            A        I think Brad would only come by

4      occasionally, because he was the head of LPS Project

5      Management Group and he had his own projects that he

6      was heavily invested in.  Sometimes I would say,

7      "Come along with me, just take a look and see and

8      either he and I or he and I and Francisco would walk

9      through and just remark on the progress.

10            Q        So in terms of LePatner Project

11     Solutions though, the person in LePatner who would

12     be preparing these written directives for the

13     contractors would have been Francisco?

14            A        More than likely the primary person.

15            Q        And going on to the next page, which

16     is part B of phase 2, you were going to develop a

17     payment program based upon the percentage of

18     completion of work?

19            A        Yes.

20            Q        Did that, in fact, happen?

21            A        Yes.  We had to review and recommend

22     payment for work that was properly performed.

23            Q        So LePatner Project Solutions was

24     going to prepare, was going to approve payments to

25     subcontractors?

Page 78

B. Lapatner

1    A    We would make recommendations but, of

2    course, Jamal and Julia would walk around and they

3    made their own determination whether they wanted to

4    pay somebody or not.  We weren't involved in the

5    actual payment process.  In fact, we didn't even

6    collect up the requisitions.

7                Jamal made the decision to keep on

8    his own personal owner's representative, I forget

9    his name, a man who plugged himself down there every

10   day, sat in the kitchen and dealt directly with the

11   trades himself, on his own portfolio, whatever he

12   was authorized by Jamal to do, and we would

13   constantly say, "What is he doing on the job?"

14               Jamal would say, "I need him there.

15   He is continuity for me because he remembers what

16   happened before with York."

17               Another reason why, there was a lot

18   of bosses running around, a lot of people telling

19   the trades what to do and all of it was directed by

20   Jamal, who had his own reasons.

21        Q    So you're saying -- this is John

22   Santoro was the person?

23        A    John Santoro, thank you very much.

24        Q    So your testimony is that John

Page 79

                              B. Lapatner

1

2   Santoro was there because Jamal wanted him there?

3          A       Not us.  We didn't know who he was

4   initially.  He was not certainly under our purview

5   to oversee work.  He didn't do any work, and he

6   reported to Jamal.

7          Q       Are you saying you recommended to

8   Jamal that he not be there?

9          A       I said, "What is he doing?"

10                 And the answer that was given was,

11  "He has continuity.  He has purview over certain

12  things I want him to look at."

13                 Fine, I am not going to argue with a

14  client on something like that.

15         Q       Did you have discussions with

16  Francisco about his interaction with John Santoro?

17         A       Yes, and Francisco, if you have the

18  opportunity to ask him, he will tell you his own

19  stories about dealing with John.  A nice enough guy,

20  but as much got in the way as he did provide some

21  service that we never understood.

22         Q       But it's your testimony that you did

23  not want him there?

24         A       We had no need for him.  We didn't

25  understand why he was giving instruction to trades,

Page 80

                            B. Lapatner

1    and we certainly saw no reason for him being on the

2    job, anymore than we saw there was a reason for Dave

3    Peer on the job.  You either want to complete the

4    work or you want to find new jobs and assignments

5    for contractors that were interfering with the

6    actual performance of what you want done, which is

7    let's get to some substantial completion.

8         Q     What is your understanding of what

9    John Santoro's background was?

10        A     I just understood he had some

11   construction background of some type.  I never went

12   into his resume.  I was never asked to interview

13   him.  I would see him there when I came every week.

14   We might chat.  Most times in the winter he was

15   freezing because there was never enough fuel in the

16   fuel tanks or there were problems with the gas lines

17   and with the boiler.  There were times when the

18   project was entirely jeopardized when the

19   temperature in the house was below freezing, which

20   means that any wood floors, any painting, anything

21   that was a finishing trade could be totally undone

22   because that three-store cycle is a disaster for the

23   interior of a residence.

24             I am sure there will be enough

B. Lapatner

1
2    testimony saying we would report this to Jamal and
3    we would bring this to his attention and somehow the
4    house remained freezing cold in the wintertime.
5    Again, something out of our control; something that
6    affected the performance of the workers; and
7    eventually we brought in Russell as an engineer who
8    started to do whole analyses and explain what was
9    going on and make recommendations.
10        Q     Did the Nusseibehs agree with you to
11   bring on Russell as an engineer?
12        A     We said to him, "If you don't have a
13   professional engineer in here to discuss why your
14   whole boiler and heating system is not working, why
15   we are experiencing other problems, and at some
16   point I thought there was a report of gas leaks, but
17   my memory is a little cloudy on that, which is what
18   led to learning that the plumbing guy, the
19   electrical guy, the gas trade had put the wrong pipe
20   in the wrong place and we were this close to having
21   an explosion and the whole house going up.  I hope
22   he has told you about that.
23        Q     Part B, still on page 3, top of page
24   3 of Exhibit 1 talks about determining on a
25   case-by-case basis whether any subcontractors who

                          B. Lapatner

1  hadn't been paid should be kept on.  Did that

2  happen?

3       A    I am sure it had to happen because at

4  some point we had to continue to recommend how to

5  keep these contractors going because we were told,

6  "Keep them going.  Don't fire them."

7       Q    Well, at some point in time you

8  recommended firing some subcontractors, correct?

9       A    Yes, and we were told, "You do that

10 and we are going to delay the work, right?"

11            I said, "Yes, because it's in your

12 best interest, the same way we're recommending that

13 nobody should be doing work without a set of plans

14 and specifications or a licensed professional."

15            Each time we were told just to keep

16 going forward.

17       Q    You recommended terminating the

18 electricians and the HVAC people and the plumbing

19 people; correct?

20       A    I believe, but I am not 100 percent

21 certain, but I believe we made some recommendations.

22       Q    And they actually followed those

23 recommendations because you sent a letter

24 terminating them; correct?

B. Lapatner

1

2      A      I don't remember the specifics, but

3  in some cases we did recommend and especially in

4  light of what we found out with the boiler and the

5  gas line, I believe some of those recommendations

6  were heeded.

7      Q      Do you recall any specific

8  subcontractors by trade or by name that you

9  recommended be removed that the Nusseibehs refused

10  to remove?

11      A      I don't recall.

12      Q      Continuing on Exhibit 1, page 3,

13  subsection C, it says:  "Will provide you with a

14  recommendation for a completion date to oversee the

15  work of the completing trades to ensure that your

16  move in will be accomplished on said date."

17              Did you do that?

18      A      Well, remember, at some point we did

19  come up with a completion date, and certainly

20  removing subcontractors and terminating them, if

21  Jamal approved and Julia approved, was going to push

22  that date back and certainly the events I described

23  to you were going to push that date back.  So, yes,

24  all that was done.

25      Q      Do you remember the completion date

Page 84

                         B. Lapatner
1
2   that you recommended?
3        A      No.
4        Q      Flip quickly to page 5.  Just above
5   where it says phase 3, it says:  "However, barring
6   any extensive issues that may impact the work, we
7   believe that our interior work can be completed by
8   no later March 15, 2015."
9        A      I see that date, yes.
10       Q      Was that a date that you came up, at
11  least what you knew at the time of this letter?
12       A      It had assumptions in there yet to be
13  approved, numerous assumptions yet to be approved,
14  all of which were detailed before that had to be
15  investigated to see, but based on the percentage of
16  completion, assuming normal trades could do normal
17  work in a progression without having to go
18  backwards, that's the date we said was possible we
19  believed all interior work would be completed, yes.
20       Q      Flip back to page 3.  We are going to
21  page 3.
22              What, in general, were you proposing
23  to do in phase 3?
24       A      There were so many shortfalls in what
25  work we did that was out of the norm, trying to ever

Page 85

B. Lapatner

1

2  get your arms around what they had done for many,

3  many months with their subs, lack of documentation,

4  lack of specific scope, lack of ensuring that they

5  were moving towards a completion based on licensed

6  work that was going to be inspected, this was an

7  open book.  We did not know what we were going to

8  encounter.

9              We knew it was going to be

10  interesting because of what we had quickly adduced,

11  but we could never have anticipated the true nature

12  of how far they fell from any standard; and really,

13  what we ended up doing was giving them a roadmap to

14  sue these people for millions of dollars for being

15  criminally negligent, almost leading to the

16  explosion of the entire house, which is what our

17  experts told us was very possible.

18       Q       What experts told you that?

19       A       I believe Russell and his team.  I

20  think we had some construction plumbing

21  subcontractors who agreed with it.

22       Q       That situation was rectified by early

23  December of 2013; correct?

24       A       I forget the date, but that problem

25  was identified and immediately rectified, and it

Page 86

B. Lapatner

 1    showed us the level of oversight that had not been

 2    performed by York or anybody in a responsible

 3    position and the reason why we were recommending

 4    licensed architects and engineers be brought on to

 5    do the right set of plans and specs and not have any

 6    work done on -- you know, this is the scope of work.

 7                  We had never seen someone be told to

 8    do a scope of work without a specific scope of

 9    detailed plans and specifications.  The Nusseibehs

10    tolerated an intolerable situation that threatened

11    their family.  We tried to do the best we could,

12    despite the roadblocks they put in our way.

13         Q    One of the roadblocks you said, one

14    was David Peer, correct, he was a roadblock?

15         A    One.

16         Q    Another one was what you are

17    testifying to, which is they refused to hire

18    architects to complete a set of plans and

19    specifications?

20         A    They never hired, from day one,

21    licensed architects and engineers to put into a set

22    of construction documents what they wanted for the

23    scope of work.  It's unbelievable for intelligent

24    people not to know that you need licensed

Page 87

                        B. Lapatner

1    professionals to do this level of work.

2                    Number 3, their due diligence for

3    work must have been while they were sleeping because

4    no one, no one would ever hire York for that project

5    who had done any level of due diligence, and

6    certainly York never would have been hired if they

7    had licensed architects and engineers put those

8    documents out for bid amongst several contractors,

9    because they did not know how to put a bid together

10   and they didn't provide a bid.

11                   They didn't know how to put estimates

12   together and they didn't provide estimates.  They

13   did not know how to coordinate their trades and no

14   coordination was ever done.  They did not know how

15   to put together a schedule and no schedules were

16   done.  They did not know how to review the change

17   orders that were coming in asking for more and more

18   money on spurious grounds and none of those change

19   orders were validly performed.  They never submitted

20   requisitions monthly that comported with the

21   standard of care in our industry and none of them

22   were ever done that way.

23                   So when you talk about undermining

24   their own case, they had no clue how they had been

Page 88

B. Lapatner

1  sucked in to someone who defrauded them and acted in

2  a way that threatened their entire family.  They

3  should be ashamed of themselves, that they put their

4  family in jeopardy, with young children.

5

6      Q      They weren't living in the house at

7  the time; correct?

8      A      That's correct.

9      Q      They never lived in the house before

10  you came on board; correct?

11      A      I think that's correct.  I think they

12  bought the house a year earlier.

13      Q      So they had not moved their family in

14  prior to your involvement?

15      A      That's correct.

16      Q      I think you assigned York as being

17  incompetent by even agreeing to undertake the work

18  without a detailed set of drawings; correct?

19      A      No competent contractor would ever do

20  this kind of work without a set of plans and

21  specifications from a licensed architect and

22  engineer; to do so throws their competence into

23  serious question, day one.

24      Q      Subsection B, under phase 3, you talk

25  about the contractor intentionally seeking to be

Page 89

B. Lapatner

1    opaque as to how the work was being priced, paid to

2

3    the subcontractors and coordinated.  Is that

4    basically what your testimony was just in the last

5    minute or two?

6         A    Yes.

7         Q    Subsection C, you're identifying a

8    lack of coordination and scheduling, but you refer

9    to the prime examples being the plumbing and

10   electrical work; do you see that there?

11        A    Yes, I do.

12        Q    At this point in time, what

13   specifically were you referring to about the

14   plumbing and electrical work that you felt showed a

15   lack of coordination and scheduling?

16        A    I believe, and the record would have

17   to be reviewed, York had work being installed out of

18   phase, that's the best way I will describe it.  In

19   order to move a project smoothly, what you want to

20   make sure of is you don't have trades doing work

21   that when the following trade comes in, you have to

22   rip out their work because it was premature.  Okay?

23             In my world, the whole issue of

24   coordination of the subcontractors makes or breaks a

25   project, okay?  I have written books on this.  I

Page 90

B. Lapatner

1  have spoken around the country on this; that if a

2  contractor does not know how to properly phase the

3  work and coordinate the subcontractors with each

4  other, you are going to have a project out of

5  control in various places and what is called

6  "rework" becomes the norm.  That's what this case

7  was about and when we talked to the trades they

8  would say, "You just told us to go ahead."

9           "But you knew there was going to be

10  work that..."

11           "Yes, but we were told to just do

12  it."

13           That became another aspect of York's

14  shortcomings and lack of control and coordination of

15  their trades.

16      Q     On the next page, page 4, the

17  paragraph above "Fees."  So directing your attention

18  there, you were going to provide an analysis of the

19  work in place, percentage of completion by the subs

20  as of the date of York's termination, and a

21  reconciliation of the monies paid for this work as

22  compared to what was performed.  It's your testimony

23  that you provided that to the Nusseibehs; right?

24      A     Yes.

Page 91

                          B. Lapatner

1

2        Q        Do you know when you provided it to

3   the Nusseibehs?

4        A        No, sir.

5        Q        Was it after you were no longer

6   involved in the project?

7        A        I don't remember, but we had that

8   information and we provided it to them.

9        Q        Just under Fees, on Exhibit 1, page

10  4, talks about how Francisco is going to provide the

11  daily oversight on the project; is that what was

12  done?

13       A        Yes, it was done.

14       Q        And you were going to oversee the

15  entire project as the principal; correct?

16       A        Yes.

17       Q        Forensic accounting work was to be

18  provided by Pamela Tulados.  Is she somebody that

19  worked for LePatner Project Solutions?

20       A        Yes.

21       Q        What type of experience did she have?

22       A        She had experience working for

23  companies like Kroll Associates.  They were forensic

24  investigators who would be sent in to analyze

25  situations of potential fraud in a company,

Page 92

B. Lapatner

1

2  situations of defalcations, and she had been

3  involved in numerous of these investigations, so she

4  knew how to collate and coordinate and put them into

5  reports that were understandable.

6        Q      What did she do on the Nusseibeh

7  project?

8        A      When we fed her the information that

9  we got from York and the subs and all the financial

10 payments, shortfalls and everything else, she

11 collated that into the overall survey and mailed us

12 a report that was provided to the Nusseibehs.

13       Q      You referred to Francisco Rivera as a

14 highly experienced project manager and project

15 architect.  What exactly was -- I know you said he

16 worked in Chicago, what exactly was his experience

17 as a project manager and project architect?

18       A      He had extensive experience on

19 large-scale projects, knowing how it comes together,

20 knowing how to read drawings, knowing how to relate

21 to subcontractors, knowing how to look at schedules,

22 review completion percentages and everything that

23 goes into the attendance of overseeing construction

24 phase work.

25       Q      Did he have experience with

1                              B. Lapatner

2      residential projects prior to this?

3            A      I know many commercial projects that

4      he was involved in.  Today I know he has a lot of

5      experience on residential.  I don't recall what

6      specifically it was before he joined us.

7            Q      What experience did LePatner Project

8      Solutions have in residential projects?  You do a

9      lot of residential projects is the question?

10           A      We get asked to look at a lot of town

11     houses, a lot of build outs, a lot of high- end

12     expensive apartments, sometimes on multi- floors.

13     We get involved in hotel projects, so we understand

14     everything that goes into a project that is either

15     residential or relating to people living there,

16     hospitality and the like.

17           Q      Had you done any work in Connecticut

18     prior to the Nusseibeh project?

19           A      Probably.  I am trying to remember

20     specifically over the years.  At this second, I

21     can't recall other projects.

22           Q      Did you have any prior experience in

23     residential projects in Greenwich prior to the

24     Nusseibeh project?

25           A      I am sure I was called in to look at

Page 94

                        B. Lapatner

1

2    numbers of projects for either clients or friends

3    who asked me to come and see the quality of work or

4    look at whether their contractors were doing the

5    work.  It's just the nature of the business.  I do

6    that all over.

7          Q     But had LePatner Project Solutions

8    ever served in a construction management or

9    construction oversight scope of work in a

10   residential project in Greenwich prior to the

11   Nusseibeh project?

12         A     Well, a few miles down the road, I

13   think it's over the border, but we were involved in

14   120 million dollar entire expansion of the Osborn

15   retirement community, which was very high end,

16   residential, skilled nursing and assisted living

17   facilities for almost a decade.

18         Q     Any single family residences though?

19         A     As I said, out of that there might

20   have been many times board members asked me to look

21   at these houses, after a while.

22         Q     Separate and apart from you being

23   asked to look at things because of your experience,

24   I am just asking, you would agree with me that at

25   least the phase 2 scope of work here in Exhibit 1,

Page 95

1                    B. Lapatner
2    generally involves a construction management type of
3    work in overseeing the completion of a project;
4    correct?
5         A     Yes.
6         Q     Had LePatner Project Solutions done
7    that for a single-family residence of whatever size,
8    prior to the Nusseibeh project?
9         A     Not in Connecticut that I can recall
10   as I sit here now.  Other places, yes.
11        Q     Had you done work, any oversight work
12   on any residence you owned?
13        A     That I owned?
14        Q     Yes, or lived in?
15        A     Is that like am I a fool for a
16   client?
17        Q     I am just asking if you were
18   involved, if you have done any renovation work on
19   your own home, where you have overseen the project?
20        A     Yes.
21              (Discussion held off the record.)
22              MR. HARRINGTON:  Back on the record.
23   BY MR. HARRINGTON:
24        Q     Once again, on page 4, it skips back
25   to phase 1, 2 and 3, dealing with fees, but it says:

Page 96

B. Lapatner

1    "Francisco Rivera will commence immediately, perform

2    a room-by-room, area-by- area survey of the work

3    performed."

4

5                Did he actually do that?

6        A        I believe we did, in order to get a

7    trade-by-trade understanding of where each room was,

8    in terms of percentage of completion and quality.

9        Q        Did that occur early on in the

10   project?

11       A        I think it occurred early on.

12       Q        Did you participate in that?

13       A        The actual percentages, no.  He was

14   there three days a week, so that was one of his

15   early jobs.

16       Q        Did you participate in any -- have

17   you seen any written document with a room-by- room,

18   area-by-area survey for that project?

19       A        I believe there was one for each of

20   the trades, because we had to move from room to room

21   with the trades sequentially.  In other words, what

22   we were doing was getting out of certain parts of

23   the houses, getting into other parts, and we needed

24   to move the trades sequentially so that the work

25   could be completed on a room-by-room basis.

1                    B. Lapatner

2              Before that, it was helter skelter

3    and it required, like I said, the lack of

4    coordination required people to go back and do

5    rework.  We were desperately trying not to let that

6    happen again.

7         Q    There were two documents that I asked

8    Francisco about at his deposition.  It wasn't

9    entirely clear how you created them and exactly what

10   they were, but let me see if you know or don't know

11   what they are.  I am showing you what we previously

12   marked as Exhibit 20.

13             The question was:  Have you seen that

14   before and do you know what that is?

15        A    Oh, yes.  This is either the or a

16   portion of the room-by-room survey that was done in

17   the initial walkthrough.  November 27 we could have

18   only been on the job for weeks, two weeks, maybe,

19   but what is identified today on the different scopes

20   of work in each area for that particular room.

21        Q    The last two pages of that appear to

22   be, I don't know if they were part of this

23   particular document, the last two pages.  They look

24   to be part of a report.  I don't know.  If it's just

25   that they were produced together.  I don't know if

Page 98

                          B. Lapatner

1

2    they were meant to be part of the same document.  Do

3    you know?

4         A     This looks like it would have been

5    part of a draft of the first progress report, which

6    is designated "Progress Report Number 1," I am sure

7    it's in the files you have seen.  It looks like it

8    may have been the draft that became part of it

9    because we systematically said:  Let's give them a

10   detailed report that is the project report as

11   opposed to other things that we promised.

12        Q     That wasn't a trick question.  I was

13   just trying to figure it out.

14        A     It looks like work in process for

15   that large a report.

16        Q     So it probably, it may be, it may not

17   be part of the prior --

18        A     Some of these questions are the

19   questions we would have tried to answer to get into

20   the report.  It says:  "We are trying to determine

21   how subcontractors are seeking payment from York

22   after so much has been paid out."  So it's that kind

23   of questioning we were constantly throwing around,

24   to get our arms around the different disciplinary

25   areas that we had to get under control if there was

Page 99

```
 1                        B. Lapatner
 2   going to be a game plan to complete the project.
 3          Q      So I'm just wondering, this appears
 4   to be, at the top of Exhibit 20 it talks about a
 5   walkthrough that apparently occurred on November
 6   27th?
 7          A      Yes.
 8          Q      Barry, that is you; correct?
 9          A      Yes.
10          Q      Mark, do we know who Mark is?
11          A      Along with John Santoro there was
12   another young guy, could that have been Mark?  I
13   will see his name somewhere else.  He was kind of
14   like a beach boy.  He would be on the job doing work
15   that Jamal wanted him to do, cabinetry work or
16   something, disappear for a month or two, then he
17   would come back, "I am ready to work," and he would
18   stay for two or three weeks and disappear.  I am
19   wondering whether he would have come by and looked
20   at, to give us a rounding out of what he was doing.
21                  Eventually we said, "You have to fire
22   him."  Because he was telling us, "Give him a scope
23   of work to do," and he never shows up and this was
24   crazy.  So it was another one of Jamal's obstacles
25   that he threw in front of us.  I am not a hundred
```

Page 100

                          B. Lapatner

1   percent sure of what his name was.

2

3        Q      Is this possibly Mark Fredricks with

4   York?

5        A      No.  I doubt we would have done that.

6        Q      You would not have toured with York.

7        A      I doubt it.

8        Q      You don't recall touring with York?

9        A      I don't recall doing this with David

10  Peer, Jesus, putting him together with York would

11  have been a fight because they did not get along, we

12  were told.

13       Q      Do you recall walking around with

14  Julia, Jamal, and David Peer and John Santoro at the

15  beginning of the project?

16       A      Yes, I am sure we needed and wanted

17  everybody's input as to what they could tell us.

18  This is mostly them telling us stuff, not what we

19  have identified for ourselves, because there are

20  areas here that I can see that we were told this is

21  the status of this, that subsequent reports show no

22  way was that the truth.

23       Q      For instance, staying on that first

24  page, it says, there is one thing that says the

25  "water treatment system finished today, 11/27/13."

B. Lapatner

2  Do you know who put that -- my question is:  Was the

3  list created and that was put in later or do you

4  have any idea how this was put in there with

5  something being finished?

6       A     This was what we orally reported.  We

7  walked through and they said, "Oh, that's just been

8  finished."  We are trying to get a baseline.

9       Q     Got it.

10             There is one other document which

11  stated that the day before -- I am just not sure.  I

12  am going to ask you if you know what it is, Exhibit

13  21?  This appears to be broken down by contractor.

14             The question I have is:  Did your

15  office prepare this?

16       A     What I am not sure of is whether this

17  is something we were handed from York because we

18  were doing a lot of back and forth with York in a

19  kind of cooperative way.  Look, we just want to get

20  your books and records straightened out, so can you

21  give us some more backup on that?  They were feeding

22  us documents for weeks and weeks that was eventually

23  very helpful in reconciling their numbers, but this

24  could just as easily have come from them.  It

25  doesn't look like the way we would do this, so I am

Page 102

                              B. Lapatner

 1

 2  hesitant --

 3         Q      You are not sure who prepared it?

 4         A      I am trying to see something that

 5  would indicate.  Here it's dated November 26th.  It

 6  says, "Upgrade the HVAC systems and boilers to high

 7  efficiency," and it says, "Replace the two existing

 8  oil -- and it says in red, "Done."  We would not

 9  have been in a position yet to know that.  Someone

10  would have to report that to us.  There is too much

11  here that required a detailed understanding and we

12  were not yet up to speed on that.

13         Q      On page 5 of Exhibit 1, at the top,

14  it says there would be weekly meetings with you, the

15  Nusseibehs and the subcontractors at the site,

16  attended by both Francisco and you.  Did you in fact

17  attend weekly meetings on site?

18         A      My records show that I was there very

19  regularly, unless I was out of town for some reason.

20         Q      What happened at the weekly meetings?

21         A      Several things.  Francisco and I

22  would be there very early, sometimes 7:30 in the

23  morning, because we wanted to meet the trades as

24  they were starting and:  What are you working on

25  today?  I want to verify, how much will you get

Page 103

B. Lapatner

1    done?  Where will you be at the end of this week?

2    We wanted to ask those questions for scheduling

3    purposes.

4

5              A lot of times they would report that

6    they were encountering new problems because of poor

7    coordination or they were obstructed or somebody was

8    preventing them from getting there or David Peer had

9    just knocked down three walls and prevented them

10   from doing the scope of work.

11             So we would always get there very

12   early.  Depending on the family's schedule, Jamal

13   and Julia or just Jamal would be there, because

14   sometimes the children and school or whatever took

15   Julia out of the opportunity to meet at times.  But

16   Jamal would come by and we would then walk the

17   project with him, talking about progress or talking

18   about problems or discussing issues that we wanted

19   to bring to his attention, and there was always a

20   list.

21             So that was the regular meetings that

22   took place during those walkthroughs and the

23   meetings with the clients.

24        Q    Were subcontractors at these

25   meetings, too?

Page 104

                        B. Lapatner

1

2        A        No.  We would talk independently of

3    the subs.

4        Q        So it was not -- I am sure you are

5    familiar, a lot times you would have projects with

6    meeting minutes, where all the subcontractors attend

7    and you get bullet items and every week or every

8    other meeting you see where you are on those bullet

9    items.  Did you do that?

10       A        We do that on all our projects, we

11   never have the clients there, most of the time,

12   because if you have to take a subcontractor's head

13   off, you don't want to do it in front of a client.

14   If you have to say, "Guys, you have four workers

15   showed up instead of eight, I am going give you five

16   days to start getting the eight guys on or I am

17   going to recommend you be terminated."  You have

18   those discussions with trades, often without the

19   clients being there.  Some clients were at the

20   regular project meetings, but that kind of meeting

21   would always be before, so that you can talk to

22   people privately and not embarrass them in front of

23   their clients.  That's part of keeping good

24   relations with trades.  You have to respect them.

25       Q        Did you prepare any written minutes

Page 105

```
 1                          B. Lapatner
 2    for any of these meetings?
 3           A      I didn't.
 4           Q      Do you know if any were prepared?
 5           A      I know many times when Francisco from
 6    those meetings was following up in direct dealings.
 7                  MR. HARRINGTON:  Mark these two as
 8           exhibits as 26 and 27?
 9                  (Project Meeting Minutes 1/06/14, was
10           marked as Exhibit No. 26 for identification,
11           as of this date.)
12                  (Project Meeting Minutes 1/14/14, was
13           marked as Exhibit No. 27 for identification,
14           as of this date.)
15           Q      I am handing you Exhibit 26 which,
16    for the record, says "Project Meeting Minutes,
17    January 6, 2014," and Exhibit 27 at the top says,
18    "Project Meeting Minutes, January 14, 2014."
19                  Do you recall seeing these while you
20    were working on the Nusseibeh project?
21           A      No.
22           Q      Does LePatner Project Solutions, do
23    you utilize similar meeting minutes in other
24    projects?
25           A      There are usually -- the minutes are
```

B. Lapatner

1

2  usually prepared not by us.  In other words, on all

3  contracts where we are the project managers, the

4  meeting minutes are either produced by the project

5  architect or the project executive or project

6  manager for the CM because from that flows their

7  directions to all of their trades.

8          Q      You don't know who prepared the 26th

9  or 27th?

10          A      This does not look like something

11  that my office prepared.

12          Q      You indicated you have not seen these

13  before, so you wouldn't know if there were other

14  meeting minutes after this date?

15          A      Correct.

16          Q      For the record, these are the only

17  two that I found in the documents you produced, but

18  you're not sure who created them?

19          A      I am not sure they are in our files,

20  but if they were in our files, it does not appear to

21  be something that we generated because you would see

22  what we generate says "Prepared by LePatner Project

23  Solutions."

24          Q      Your name would be on it somewhere?

25          A      Yes.

1                      B. Lapatner

2          Q       Do you know if the Nusseibehs

3    prepared any meeting minutes?

4          A       No.  They were prolific e-mailers.

5    E-mails would come out of them:  I just looked at

6    this requisition and so on.  I can't understand, how

7    could we ever justify payment to this particular

8    trade or that.  I walked through and I saw this

9    wasn't done.  I mean, they would do their own

10   walkthroughs and flurries of e-mails would just come

11   down with their observations.

12         Q       Not a document like 26 or 27?

13         A       No.  They were not people that

14   stopped to do something like this.  It would be

15   someone on the job.

16         Q       Did you ever have an issue with the

17   Nusseibehs paying any of your bills?

18         A       Only at the very end.

19         Q       But then they ultimately paid

20   everything?

21         A       Yes.  We reached agreement and there

22   was no problem.

23         Q       And there is one question that I have

24   about Exhibit 1 -- well, don't hold me to that, it

25   could be more than one, but on page 6, third

Page 108

1                          B. Lapatner

2    paragraph, you specifically spell out that

3    agreement, Exhibit 1, pertains solely to project

4    management services; that did not include the

5    performance of legal services; correct?

6          A      Correct.

7          Q      And it says, "In the event that any

8    legal services are requested, they shall be

9    performed under separate agreement by LePatner &

10   Associates, LLP"?

11         A      That's correct.

12         Q      And I think I asked you earlier, you

13   were not sure if there was a separate engagement

14   letter for any legal work?

15         A      I don't recall one.

16         Q      Do you recall doing any legal work

17   for Nusseibeh?

18                MR. CAPPELLO:  Objection to form.

19         Q      Which you would consider legal

20   services?

21         A      Did I look over the contract and see

22   if they had an arbitration clause or mediation for

23   York, is that giving legal advice?  I would not call

24   it -- I would call that business advisory advice,

25   because when the issues piled up insofar as the

1                         B. Lapatner

2  allegations against York, I became very, I will use

3  the word adamant in my discussions with Julia and

4  Jamal:  Get someone on board to start a lawsuit

5  against them.  It doesn't matter whether you have

6  every dollar of damage because we are going to

7  uncover more stuff down the road.  It doesn't

8  matter.  Put them on notice.

9                 You've got them individually because

10 these guys literally were frauds and, as I

11 mentioned, I gave them the name of Wiggin & Dana,

12 because I remembered they had a Stamford office,

13 which is not far away from Greenwich, so that was

14 convenient, and I never learned that they followed

15 up or did anything.  I don't know if the Statute of

16 Limitations is now expired, but they certainly

17 missed the opportunity to go after those people,

18 which clearly stole their money.

19      Q     And you indicated that you had put

20 them in touch with Wiggin & Dana.  Was there any

21 time you contemplated that LePatner & Associates

22 would be involved in representing them in litigation

23 against York?

24      A     The only thing we could do is be a

25 fact witness, a preparer of the documents, a guider

Page 110

                              B. Lapatner

1   of their counsel, because if I ever did bring a

2   lawsuit, let's say I was admitted in Connecticut, I

3   would be disqualified because I was going to be a

4   fact witness.  That conflict of interest comes up a

5   lot of times.  In fact, there's a project right now

6   where I have handled as the project manager and the

7   construction counsel and the general counsel for a

8   client.  We have fabulous quality firms that we will

9   call upon who are excellent at construction law,

10  some of whom were younger former partners of mine

11  and we retain them on behalf of the client because

12  we would be disqualified.

13          Q      Did you have that conversation with

14  Jamal an Julia?

15          A      I said:  We have to get a Connecticut

16  counsel.  We have all the information.  We would be

17  able to feed them, save them a lot of time and money

18  feeding them all of the stuff that we have digested,

19  because drafting that complaint is not going to be a

20  difficult one:  Breach of contract, negligence

21  breach of fiduciary duty, fraud, misrepresentation.

22  Anybody can draft that stuff, there is no magic to

23  that, but we have all of the stuff to back it up.

24          Q      And do you recall if LePatner &

1                        B. Lapatner

2    Associates billed the Nusseibehs for any work that

3    it designated as litigation or legal work?

4          A      Well, they may have some billings

5    from LePatner & Associates because of the

6    distinction between this advisory work on the

7    termination and so on, which is not project-

8    management work.

9                  The project-management work was what

10   we did on site, okay?  So we may have separately

11   billed in order to make it easier for Jamal and

12   Julia to look at our bills and distinguish that we

13   are not sticking things underneath, because we gave

14   them specific scopes of work with specific fees

15   here, and what was ancillary to that we wouldn't

16   have wanted to mix up and say that's coming under

17   this scope of work.

18                  So there may have been invoices

19   issued under LePatner & Associates, but I'm sure

20   that would have detailed the other advisory work.

21         Q      For the LePatner Project Solutions'

22   work, did those bills actually go out under a

23   LePatner Associates' billing format?

24         A      I was not involved in that.

25         Q      So you were not involved in the

Page 112

                         B. Lapatner

1  billing?

2       A       I have enough on my plate, invoicing

3  and so on.

4       Q       Let me ask you a little bit about

5  that.  When you when say Francisco was doing work on

6  the project, does he submit time sheets?

7       A       Yes.  I am sure they're all digitized

8  and they're all reflective.  We give individual time

9  records.  Everybody puts in individual time records,

10 like all professionals do, by project, where were

11 you, what you were doing and so on, and the dates.

12      Q       My question is:  Are there records

13 that show that work was done that didn't ultimately

14 end up on a bill or is the intention that every hour

15 that you are doing work was going to end up on the

16 bill?

17      A       I can't answer that question, it's

18 hypothetical.

19      Q       On this job?

20      A       But there was Francisco three days a

21 week on this job, eight hours a day, six hours a

22 day, four hours a day.  I am sure that was recorded

23 by him.  Did he take a trip to Las Vegas and put it

24 on the bill?  I don't think so.  He is as honest and

Page 113

```
 1                    B. Lapatner
 2   scrupulous as you're going to get.
 3                    MR. HARRINGTON:  Please mark Exhibit
 4        28.
 5                    (Multiple bills stapled together was
 6        marked as Exhibit No. 28 for identification,
 7        as of this date.)
 8        Q     I am showing you what we have marked
 9   as Exhibit 28, which I will represent for the record
10   are multiple bills stapled together.  It's not just
11   one bill.
12        A     I was going to say it looks like it's
13   from a major corporate law firm who's giving a bill
14   for two weeks of 35 associates working, so I am glad
15   you said it's from multiple days.
16        Q     It's multiple bills with multiple
17   components.  I can't say it's all the bills that
18   were issued, but I believe they are the majority of
19   the bills that were issued.
20                    My question is:  Do you know, in
21   light of your prior testimony that you didn't really
22   get involved in the billing, whether or not these
23   are all of the bills that were issued?
24        A     I would never know.  I would have to
25   ask my office to do a reconciliation.
```

Page 114

B. Lapatner

1

2    Q    If you could, it's sort of in the

3  middle of the package, I didn't count the pages in,

4  but at the top it's an invoice dated February 28,

5  2014.  It's invoice number 37918.

6    A    December 24th?

7    Q    February 28, 2014?

8    A    I have one here.  Yes.  I have it.

9    Q    This purports that -- there's a

10  reference to litigation up top?

11    A    Yes.

12    Q    My question is:  Is this an invoice

13  that was for legal work as opposed to project-

14  management work?

15    A    No.  This all refers to the claim to

16  be presented against York, and what is clear is I

17  asked one of my associates, Jeff Kleiner, JWK, to

18  look into it so we can talk to Jamal and Julia about

19  whether there would be jurisdiction in Connecticut,

20  whether there were any issues of mediation or

21  arbitration that would precede it, because there

22  would be no sense sending this to a Connecticut

23  litigation firm if there was a requirement that they

24  had to engage in mediation first before starting

25  litigation.

Page 115

1                          B. Lapatner

2              It says, on February 25, BBL, me:

3    "Conference with clients to review claims against

4    York.  Conference with clients to review

5    recommendations to make demands on York, its

6    principals and dispute of issues in arbitration.

7    Review title search."

8                   We were worried that they were

9    judgment proof, so we did a title search to see

10   because we had heard they did projects and were

11   working on projects in Westchester.  So if we found

12   that they had current contracts, then we could

13   garnish or go after or tie up those projects if

14   those were the only resources against them.  All of

15   this was in furtherance of discussing with them what

16   their rights were.

17        Q     Okay, but my question was:  When you

18   have a reference on the bill to litigation, this is

19   separate and apart from phases 1, 2, and 3 that are

20   referenced in the agreement?

21        A     Exactly.  It's formation, telling the

22   clients what we have gathered in terms of

23   recommendations, how they should proceed against

24   York, because Jamal said, "How shall I go about

25   doing this?"

Page 116

                              B. Lapatner

1
2                We said, "We will give you some
3       recommendations."
4        Q       And you gave some recommendations and
5       then you also said you referred them to Wiggin &
6       Dana?
7        A       That's correct.
8        Q       Do you remember the attorney at
9       Wiggin & Dana that you referred them to?
10       A       No, but I remember that I called Mark
11      K. Kaduboski, K A D U B O S K I, who is a partner in
12      the firm.
13       Q       Did you know him from somewhere else?
14       A       Yes.  Either, I believe, for a client
15      of mine or he may have done corporate work -- I knew
16      the firm had done.
17       Q       At some point in time, after Exhibit
18      1 was executed, LePatner Project Solutions began to
19      work on the project; correct?
20       A       Yes.
21       Q       Do you recall if you were involved in
22      the communications that actually terminated work?
23       A       I believe my office drafted a
24      proposed termination letter.  I do not know what
25      happened to it.

Page 117

B. Lapatner

1    Q    You don't recall if it was sent?

2    A    I believe at some point York was

3    terminated by Jamal.  It was very important to

4    formally end that contract.  The reason was to make

5    sure that they were not going to get paid any more

6    money from Jamal.

7         MR. HARRINGTON:  Mark Exhibit 29,

8         please.

9              (Termination notice to York was

10        marked as Exhibit No. 29 for identification,

11        as of this date.)

12   Q    I'm showing you what we have marked

13   as Exhibit 29.  It appears your office drafted a

14   termination notice to York; is that correct?

15   A    This is drafted by my office, yes.

16   Q    Do you know if this was -- if you

17   look at the second page, the actual draft notice, it

18   says, "via hand delivery," correct?

19   A    Yes.

20   Q    Do you recall if an actual final of

21   this was hand delivered to York on the site?

22   A    What I was trying to recall as you

23   mentioned, hand delivery, was Francisco, who I said

24   lived in New Haven, would have dropped it off on the

Page 118

B. Lapatner

1

2  way to the site, but I don't recall.

3        Q      Do you believe that at some point in

4  time the termination notice, either the same as

5  Exhibit 29 or a similar form that is Exhibit 29, was

6  given to York?

7        A      I believe they received notice the

8  formal termination.

9        Q      But was it on a document that was on

10  LePatner Project Solutions letterhead, like this

11  one?

12        A      I can't recall what they received.

13        Q      Did you have any conversations with

14  them after that was sent?

15        A      Well --

16        Q      "They," meaning York?

17        A      I can't recall, but I do remember

18  conversations, very nice ones, with Mr. Barile, B A

19  R I L E.  I think that's his name, one of the two

20  principals of York, about the fact that we needed

21  them to turn over all of this requested information

22  if there was ever going to be a reconciliation and

23  any final payment by Jamal and Julia to them.  In

24  fact, I think this letter refers to the fact that,

25  quote, "You are requested to please prepare a final

Page 119

B. Lapatner

1      requisition for payment through November 26th, 2013.

2      At the time of payment of the final requisition by

3      the owner, York shall execute a final release and

4      lien waiver form."

5              It was trying to be business like

6      and, hopefully, securing the last of the project

7      documentation and payment documentation that we

8      could get from them because some of the subs were

9      giving us different numbers.

10        Q    Did they ever give you a final

11      requisition for payment?

12        A    I don't recall.

13        Q    Did they actually submit requisitions

14      for payment on this project or did they submit

15      something other than that?

16        A    There were pieces of paper, I would

17      call it.

18        Q    Not a formal AIA requisition?

19        A    Nothing that they did was in

20      accordance with standard expectations of the

21      industry.

22        Q    So you made the assessment early on

23      that York should be terminated, even before this

24      termination notice was sent; correct?

Page 120

B. Lapatner

1
2          A       After we had assessed the baseline of

3    their departures from the standard practice and

4    their inability to account for the work; their

5    inability to coordinate the trades, which was very

6    obvious; their inability to get the work permits and

7    to do the established things that should have been

8    done before the work started, it was not a far

9    difficult decision to make that recommendation to

10   Julia and Jamal.

11         Q       Did you believe that any of the work

12   that was performed by subcontractors under York was

13   performed adequately?

14         A       I am smiling because in my business,

15   the answer to that question would be how long is a

16   piece of string, which is an old British adage?

17   Determining how much of an individual trade's work

18   was adequate, was a function of what happened in the

19   weeks and months ahead that undid much of what would

20   ordinarily have been accepted, as you saw in one of

21   those preliminary walkthroughs, where it says "done,

22   done, done."  If we now walked ahead six weeks,

23   eight weeks, nine weeks, ten weeks, much of that

24   would have been undone, undone, undone, and ripped

25   out and redone again.

Page 121

B. Lapatner

2       So it did not -- it turned out that
3   any initial assessment of what was acceptable was a
4   function of events that superseded that approval.
5   That approval would have been temporary and
6   superseded by other decisions as we uncovered
7   things.

8       Q     Did you ever tell the Nusseibehs that
9   at least some of the work, you thought some of the
10  work was sufficiently performed?

11      A     Yes, because we had to make some
12  payments to these trades for work that was properly
13  done, that could not be questioned at the time.  I
14  might just mention it was always a recommendation,
15  because Julia and Jamal were the final decision
16  makers because they were walking around and deciding
17  what to send on to the accountants for payment.

18      Q     Were you involved in the payment
19  approval process personally?

20              MR. CAPPELLO:  Objection to form.

21              MR. HARRINGTON:  I will rephrase the

22          question.

23      Q     Were you involved in the process of
24  approving payment for contractors who were working
25  after LePatner Project Solutions came on the job?

Page 122

1                      B. Lapatner

2       A       I personally did not put the

3   percentage on it, that was Francisco who was there

4   and could determine whether it was 28 percent or 35

5   percent, the scope; but our office was always

6   recommending agents or saying, yes, I believe we

7   could recommend that you could pay so and so that

8   amount.  It didn't necessary mean that Jamal and

9   Julia paid that amount.  If they felt, felt in their

10  own opinion, somebody had done what should have been

11  done that month.

12      Q       What is your personal -- you

13  personally, Barry LePatner, what was your personal

14  involvement in the process whereby a sub would

15  submit an invoice and that invoice would move up the

16  chain, once you guys were on the project?

17      A       What I would learn when I came there

18  each week and then had meetings in the office, was

19  about issues that had to go to Jamal and Julia, I

20  would present them.  So if we had trades who said:

21  You wanted me this month to do the electrical work

22  in and around these walls in the basement, I would

23  hear Francisco say, "You are not going to believe

24  this, but David Peer told another trade to knock

25  those walls down because he had another idea that he

Page 123

B. Lapatner

1  wanted to introduce to put in.  So they would undue

2  all the work that had been done.

3

4              I would learn about that.  We would

5  then talk about what does that mean to the approvals

6  for work?  When are we going to have a new scope?

7  How are we going to figure a new scope because we

8  don't have a set of drawings from David as to what

9  he was doing and what he was contemplating, unless

10 he finally drew something on a wall for the trades.

11             These are the kind of issues that

12 would come to me, not whether the painter had nicely

13 done this wall but still had to do touch- up work so

14 we would only recommend X percent of that room and

15 not Y percent.  That was not what I there for, but

16 the issues had impacted the schedule, impacted

17 budget, impacted we are going to have to rip out all

18 of your HVAC systems because what they previously

19 did has impacted the life span of your boiler.

20             You had a boiler.  What they did was

21 by running the gas into the wrong pipes and running

22 it, the engineers told us maybe they got another two

23 or three years of that thing, but it's dangerous now

24 because what they had connected up affected the life

25 cycle and the way of a normal functioning system.

Page 124

                        B. Lapatner

1

2   That lead to a whole recommendation from the

3   engineers; new exhaust piping and new ducts and so

4   on, which we were actively involved in trying to

5   negotiate a price at the time we left the project.

6          Q    But in terms of the approval of

7   invoices when and as they were submitted, was the

8   process that they would go to Francisco who would

9   then pass them on to the Nusseibeh?  What was the

10  process?

11         A    I am trying to remember whether John

12  Santoro was also involved with some of the trades

13  and approving those things, but I know we gathered

14  them up and there was correspondence, e-mails or

15  whatever to Jamal and Julia, recommending payments

16  for these trades where we did not have issues.

17  Where we felt comfortable we would say:  We would

18  recommend that you pay them this amount.

19              They weren't always followed by Jamal

20  and Julia and the trades would come to us and say:

21  They only paid us less, and we would say:  We'll

22  talk about that in the next week or the next

23  submission.

24         Q    Do you recall any specific instances

25  where you made a recommendation of payment and Jamal

Page 125

                        B. Lapatner

 1

 2   and Julia didn't make the payment?

 3        A      No.  It was more then once or twice,

 4   and we understand, that's the owner.  The owner

 5   makes the final decisions.  All we had was a role to

 6   kind of take this spool of wool that was all over

 7   the place and migrated into the outside where the

 8   pipes that were left exposed to the carriage house

 9   with the illegal bathroom up on top, and just try to

10   pull this together for him, so he could get into the

11   house.  And I remember we were maybe a week or 10

12   days away when we just terminated.

13        Q      You had mentioned earlier Dan Rosen,

14   the accountant; was he involved in the payment

15   process?

16        A      I believe he had control over the

17   checkbook.  I believe he wrote the checks for them

18   or directed a bank to write the checks, I don't

19   know.  But he was the accountant.

20        Q      Did Francisco communicate directly

21   with them?

22        A      Yes.  There was a major issue about

23   York having purchased hardware from a local

24   Greenwich, an Old Greenwich hardware store, a

25   supplier, I forget their name, but it caused a major

Page 126

                              B. Lapatner

1
2    problem because we left them to account.  The

3    numbers kept changing and we had trouble

4    recommending to Jamal and Julia and Dan -- and these

5    people were hounding Jamal and Julia.  They would

6    say, "I got another name, e-mail from the hardware

7    store, take care of this."

8                    We don't know how because the number

9    keeps changing.  They keep finding other invoices

10   that they say they delivered to York, on site where

11   nobody knows where they are.  We are trying to

12   reconcile that with York and I remember being in the

13   middle, just tell me a number, please.

14           Q     You don't remember the name of that

15   store?

16           A     It's in the records.  There's so many

17   e-mails, it became humorous:  "Let's just tell them

18   some number, pay them."  They didn't want to pay

19   them unless they paid them in full, and got a

20   release and we had trouble getting that final number

21   because between York, the hardware store and people

22   on the job, the trades, they couldn't reconcile or

23   recommend that that was stuff for their job.  So

24   they were wondering, and we had to start an inquiry

25   whether York had ordered it in the name of Jamal or

Page 127

                              B. Lapatner

1    Julia for this project but were using that for

2

3    another project.

4         Q      Do you recall if it was a Clafs, C L

5    A F S?

6         A      Yes, two, A's or two F's or either

7    one.  Yes, and it was an unholy mess.

8         Q      Do you know if they ever got paid?

9         A      I think I had instigated it to myself

10   and said, "Look, this is the best we could do."  I

11   dealt with Dan Rosen and I just said, "Just pay

12   them."  I am trying to remember whether we got them

13   to sign a lien waiver on the lease, so we got Jamal

14   and Julia off the hook on a potential lien.

15        Q      Let me show you what we have marked

16   as Exhibit 4 at Francisco's deposition.  Do you

17   recall sending this letter, e-mail I should say?

18        A      No.

19        Q      Do you recall the e-mail at all?

20        A      I recall the substance of these

21   issues being vigorously discussed.

22        Q      So the beginning of the second

23   paragraph, it says, the first sentence:  "Based upon

24   our review of the work in place, it appears that

25   most of the work has been capably performed,

Page 128

```
 1                      B. Lapatner
 2   although highly dissatisfied with York's lack of
 3   experience oversight," et cetera.
 4             So, is it your opinion as of December
 5   1st, 2013 that most of the work had been capably
 6   performed?
 7        A    When I walked past the boiler and
 8   people say, "Yes, we just finished installing it,"
 9   and it says boiler installation done on November
10   26th or whatever, at that time I haven't gotten into
11   looking closely at it, inside of a week-and-a-half
12   or less than a week and that statement is valid,
13   only to await subsequent investigation of the myriad
14   things that we did uncover.
15        Q    When you were referring to the work
16   that you thought had been capably performed, you
17   mentioned the boiler; were you talking about
18   finished work or you don't know what you are talking
19   about?  I don't mean to say you don't know what you
20   are talking about -- you don't know what you are
21   referring to?
22        A    Here is what this document says:
23   There are things that had gotten done over six
24   months, a year, however long York had been on it,
25   but there are major issues to be investigated and
```

Page 129

B. Lapatner

1  when you read this, you see that York has not been

2  paying subs.

3  You see there is no planning and

4  oversight by York, which is why you haven't had them

5  be finished.  You see walls currently being torn

6  down, then being built, then being rebuilt and

7  there's no plans or specs to tell who is doing what.

8  You have trenches being dug outside, covered over,

9  uncovered; electricians are supposed to be there,

10  they're not showing up.  You don't even have the

11  right permits and you have partial payments for work

12  performed and long delays because some of the subs

13  are going, "When am I getting paid?"  Okay.

14  So we then say, in this one week that

15  we have been on the job or ten days, whenever it

16  was, John Santoro, who was the superintendent who

17  was working -- I am not sure, but let's assume for

18  York for the moment, who was kept on the job by

19  Jamal, okay?  Based on John's experience on the

20  project paying subs directly on your behalf, which I

21  think is what continued even after we were gone, not

22  on the project, he said, I wrote, "We have to still

23  analyze York's records for verification of all these

24  numbers and pieces of paper."

Page 130

B. Lapatner

1        We told the subs:  Get us everything

2  you know so we can start a full reconciliation and

3  now we are saying:  Here is what people are saying

4  they are owed, and there's the name of that guy, the

5  mover, John Carney.

6                So how many subcontractors on your

7  job are saying they are owed $190,000 for work they

8  say they performed under York but never were paid,

9  and here is a group of subcontractors who have not

10  submitted anything to us yet.  We don't know

11  anything about it.  We estimated an additional 25 to

12  $100,000 in shortfalls when payments they're asking

13  for, Peers quickly has or hasn't paid them.  Then

14  you have these other suppliers who have sent in

15  bills helter skelter, we don't know how much they

16  are owed, but let me tell you what we have uncovered

17  very quickly about York.

18                We have already found they are

19  involved in other litigation situations with owners.

20  The trades have told us they are worried about

21  getting paid by York because they know York is being

22  sued on that job and that job, which means they have

23  money that they took from you, Jamal, because you

24  just handed it to them without any accounting and

1                          B. Lapatner

2  there is little likelihood you are getting it back,

3  because the work suffered and it's been done in an

4  improper and inferior way, you got no value for it.

5              So, we are seeing and hearing about

6  problems they have and we learn that they have some

7  properties, including two properties that you should

8  follow up to see whether we can use them as assets

9  if you have a problem down the road of getting a

10  reconciliation that makes sense with York.  The subs

11  even told us, York has a reputation for nonpayment.

12  York has changed names several times.  Good job,

13  Jamal, on checking out who you hired.

14              All the trades mentioned that getting

15  an electrician was extremely important to move

16  things forward.  John Santoro has a few candidates

17  lined up, so apparently an electrician had already

18  walked off the job and was not putting up with it

19  anymore.  So without the electrician, you can't

20  close up walls and apply finishes, forget that we

21  learned that the electrician did a shitty job.  So

22  we will try and help you get one.

23              And then we describe the problems

24  they have with the City of Greenwich or the Town of

25  Greenwich on permits.  Then we talk about the

Page 132

                              B. Lapatner

1    problem of David Peer, who apparently is assisting

2    me with mill work and promised to send us drawings

3    and information -- never did because he didn't do

4    any.  Then he has his assistant, Paula, the interior

5    decorator, who created a whole other level of

6    problems by ordering furniture before anything was

7    done, and her status on the job is in question by

8    other people.

9                 The kitchen was 58 degrees on

10   Saturday, even with the heat on.  We have no idea

11   what is going on with the mechanical plumbing and

12   electrical crews, but we need an engineer there.  If

13   you don't get an engineer on board, you are never

14   going to get these problems solved.  All of the

15   painting and finishing work would be affected

16   without a properly balanced HVAC system as there are

17   wild temperature and humidity swings.  I couldn't be

18   more deeply involved in trying to help these clients

19   identify the slew of issues that were created by

20   York, and more were to come, more to change the

21   scopes of work, more were to follow from David Peer

22   being destructive, more were to follow when we

23   uncovered the slew of things that our report say,

24   and these people are suing me.  I can't wait until

Page 133

                              B. Lapatner

1
2    you can identify what we did wrong because should
3    that effort fail, it will be my turn.
4              MR. HARRINGTON:  Can you go back and
5         tell me what the question was here?
6              (Off the record.)
7         A      If I failed to answer it exactly, if
8    you repeat it, I will start all over again.
9         Q      I think the question was trying to
10   ask you what particular work you were referring to
11   that at the time you thought had been capably
12   performed, and you may not recall.
13        A      I did that in the negative.  I am
14   trying to say we could recommend certain work at
15   this point, only to undue that recommendation when
16   information that was slowly evolving with every day
17   and week undid the work that we thought was
18   satisfactory.  It was a moving chess board, if you
19   want to put it in some analogy.
20        Q      Would it be fair to say at this point
21   in time that you didn't think that the HVAC work had
22   been capably performed?
23        A      I am not sure whether -- we knew we
24   needed engineers in there because the heating system
25   was turned up to normally heat this very large house

Page 134

B. Lapatner

1  and it was cold as the dickens there, affecting the

2  performance of the work because some of the workers

3  were concerned -- let's say a painter:  I don't want

4  to put paint on if it's 55 degrees in here, because

5  it does not attach itself as well as when we are in

6  a temperate, meaning about 65 to 70 degree

7  environment, and it was also affecting in-place

8  work, finished work in some areas, because it's just

9  bad practice to be doing some kinds of work when

10  there are temperature fluctuations because it's

11  going to affect the quality of the work.

12        Q     You actually mention that later in

13  the e-mail.  You say, "We need some type of

14  mechanical plumbing, electrical engineer that could

15  do an analysis because the kitchen was 58 degrees?

16        A     Did I know specifically what was

17  wrong with the HVA system, no, but when we brought

18  in people and we found out that the line was here

19  and it should have been feeding into here and that

20  it created a very dangerous situation, we moved very

21  quickly to save that house from a very bad ending.

22        Q     Did the engineer find that out or did

23  some contractor find that out?

24        A     I can't tell you at this point

Page 135

B. Lapatner

1    because one thing happened with the other thing

2    happening right after it.  So there may have been

3    something that was raised as a question by the

4    contractor relating to someone else's work that we

5    immediately said:  We have to get an engineer on

6    board to just tell us, because we are not going to

7    use our knowledge when an expert's knowledge is

8    really required.

9

10        Q    Just going back to the original scope

11   of my question, you made a reference to most of the

12   work had been capably performed and I was trying to

13   find out if you remembered if you had a specific

14   work that as of December 1st you thought had been

15   capably performed.  I know you gave a long answer

16   and my question is:  I don't think -- agree with me

17   or disagree with me, it did not include the HVAC guy

18   that you thought had been capably performed as of

19   this date; was it?

20        A    If it turned out there was no fuel in

21   the fuel tank and that's why the heat was not coming

22   up, it would have nothing to do with the quality of

23   the work.

24        Q    You didn't know at that time?

25        A    We didn't know.  We were exploring

Page 136

B. Lapatner

1   not one, not six, but 56 different issues that were

2   impacting the budget and the schedule.

3

4       Q      You did reference here that the

5   subcontractors who you spoke to told you getting an

6   electrician involved was extremely important;

7   correct?

8       A      That's called lack of coordination.

9   Everybody should have been stopped until that was

10  done, because there was a lot of work that was

11  proceeding and Jamal wanted that work going forward,

12  that we said without the proper coordination,

13  without a set of plans and specs, you are shooting

14  from the hip and letting people go because we may

15  run into situations and we are likely to, that we

16  are going to have to rip out work because it's not

17  properly phased and coordinated.

18      Q      You mentioned here that John Santoro

19  has a few candidates lined up.  Was there a reason

20  that John Santoro was lining up candidates?

21      A      Yes, because he was a local guy and

22  he said, "Oh, I have worked on various other

23  projects with other electricians."  We were already

24  skeptical about accepting recommendations from him.

25  York, he came with York apparently, and Jamal was

Page 137

                              B. Lapatner

1    very happy to keep him on board and pay him to stay

2    on the project.

3              We never saw his bills.  We never saw

4    what he did or the scope of what he was doing.

5    Jamal said, "I will take care of him," and we put

6    that under the category of Jamal, John Santoro, this

7    other mill worker guy, David Peer and Paula were all

8    running around doing their own little work and we

9    had to work in and around them because Jamal signed

10   off on them.

11        Q    You are saying you had no involvement

12   with approving John Santoro's bills?

13        A    I don't believe we saw John's, I

14   don't believe.  Could I be wrong?

15        Q    Would Francisco have more knowledge

16   of this than you would?

17        A    Yes, he would, but I know we had

18   issues with John Santoro.

19        Q    You did not mention any problems with

20   John Santoro in this particular e-mail?

21        A    Not yet.  After ten days, not yet.

22        Q    Did you do anything personally about

23   trying to locate and hire an electrician?

24        A    No.

Page 138

                          B. Lapatner

1

2        Q       Would that have been Francisco's job?

3        A       What would happen was, if John

4   Santoro mentioned anyone, we would have looked at

5   their credentials to see if they had capability.  I

6   don't remember what happened with the subsequent

7   retention of an electrician.

8               Remember, at this time, I am having

9   talks every week, in the first couple of weeks,

10  suggesting they shut the job down, get an accounting

11  of all of the York stuff and start over again with a

12  set of architects and engineers so that they could

13  have a proper functioning job and an opportunity to

14  get a correct scope of work going forward.

15       Q       Did you ever say that in writing,

16  that you should shut the job down and hire

17  architects to create a scope of work?

18       A       I doubt it, unless it's in the first

19  report.  I doubt it, but I sure know I sat down with

20  Julia and Jamal and said to them, let me explain to

21  you the original sin on this project, how you

22  retained a contractor to start doing work without a

23  set of plans and specifications.  This is not only

24  highly irregular and highly unusual, I told them,

25  but it's the cause of everything that flows from

Page 139

B. Lapatner

1    hiring York and them deciding how to do these

2    different scopes of work with a bunch of

3    subcontractors that I don't think belong on the job

4    to match the quality of this house.

5          Q      Did you request any drawings or plans

6    that York may have been working from?

7          A      I asked them of York.  We asked it of

8    the trades, and we asked it of Jamal and Julia.

9          Q      And did anybody have a drawing?

10         A      I think, yes.  The answer is yes.

11         Q      What drawings did you have?

12         A      I don't remember, but let's call them

13   sketchy, not professionally done architect and

14   engineering design documents, by any imagination.

15         Q      Is it your understanding that stamped

16   architectural drawings are required for residential

17   renovation projects?

18         A      There is certain work that you don't

19   need signed and sealed drawings, but to get a permit

20   from a local jurisdiction such as a Building

21   Department or issues such as plumbing, electrical

22   work, boiler work and sometimes, depending on the

23   jurisdiction, work such as knocking down walls which

24   are going to affect fire codes and the like, you

Page 140

                              B. Lapatner

1
2   need to get approval because you're going to have
3   inspections done based on:  Does that work reflect
4   what the town approved for you to do.
5            Q       Within this letter, Exhibit 4, turn
6   to page -- what's the last page?
7            A       The third page, top of the third
8   page?
9            Q       Top of the third page.  "We should,
10  thus, place special importance on obtaining a report
11  from the City of Greenwich, regarding general permit
12  acquisition and conditions."
13                   How quickly did someone from LePatner
14  Project Solutions go down to the Town of Greenwich
15  regarding permit acquisition and conditions?
16           A       We already talked about that.  I
17  believe, preliminarily Francisco was down there to
18  get the lay of the land; what was filed, what
19  inspections had taken place for work in place
20  already -- turned out not much -- and when we
21  determined that there had been what I am calling
22  here "piecemeal nature of the work and permit
23  acquisitions to date," we felt if we tried to come
24  in and under the radar do things, that it could have
25  opened up a very serious can of worms for the

Page 141

                              B. Lapatner

 1

 2   clients.

 3                    We had our own discussions and talked

 4   about it.  We talked with the trades, what's the

 5   best way to do this in the Town of Greenwich.  They

 6   felt that the best thing of course would have been

 7   if there was a set of drawings and plans, and then

 8   when that couldn't be produced because the clients

 9   didn't want to stop to do that, then we said we are

10   going to try and get this work approved on a

11   trade-by- trade basis.

12                    The trades worked with us to try and

13   put together some things that at least we could have

14   inspections done at a subsequent date.  I don't

15   remember how specifically it was worked out with the

16   town.  Francisco would be the one who would remember

17   the contacts and the communications, but there was a

18   process that we set in motion.

19        Q      Okay.  Do you remember what

20   electrician was ultimately hired to do electrical

21   work once LePatner Project Solutions were brought on

22   board?

23        A      No, I don't.

24        Q      Do you know whether there was more

25   than one electrician that was considered?

Page 142

                              B. Lapatner

1

2       A       I don't have any recall.

3       Q       Were you involved personally in

4  checking any references for any electricians that

5  may have been proposed?

6       A       I don't remember any question that

7  came to me about who was ultimately selected.  I

8  would have been involved in signing off on somebody,

9  but not the approval process or vetting somebody

10 because it just would not have come up to me, unless

11 they were asking me to take a final look at it.

12      Q       So that would be at Francisco's

13 level?

14      A       Yes.  And ultimately Jamal and

15 Julia's because we would only make a recommendation.

16 We weren't hiring people, we were making

17 recommendations.

18      Q       LePatner did not hire anybody

19 directly on this project; correct?

20      A       No.  Because when we brought in

21 engineers, we had them meet -- we had them inspect

22 to get an idea for us, courtesy, no charge, so we

23 could bring them to speak with Jamal and Julia and

24 they would make the decision to bring them on.

25      Q       Flip to the bottom of page two --

Page 143

                              B. Lapatner
1
2    never mind.
3          A      I want to correct something.
4          Q      Okay.
5          A      That first walkthrough, it looks like
6    the Mark who was with us, it appears he may have
7    been a York principal.  On the fourth page of this
8    Exhibit 4, Jamal writes to me on December 1st,
9    "Sounds like an excellent suggestion with regard to
10   Greenwich Town Hall.  Mark was always very elusive
11   on the 'inspections' and the 'permits.'  Things took
12   a very long time and seemed always to have trouble.
13   Now perhaps we know why, and the MEP engineer is
14   essential to know that the house is safe to live in.
15   Clearly, the heating situation needs to be addressed
16   ASAP."
17         Q      So you're reading from the fourth
18   page of Exhibit 4; is that Jamal's response to your
19   prior e-mail, it looks like?
20         A      I believe that's correct.  He is
21   writing in the evening of that day.
22         Q      You mentioned Paula Fox in some
23   earlier testimony.  Who is Paula Fox?
24         A      David Peer apparently recommended or
25   brought her on or she worked with David, there was

Page 144

B. Lapatner

1  some alliance there, who we were told was the

2  interior designer; rugs, carpets, curtains, drapes,

3  that sort of fishing.  Over time, when we started to

4  inquire or because Jamal and Julia would say:

5  "We're getting a shipment of furniture."  We would

6  see things arriving that were not a question of good

7  taste or bad taste, were questions of why would you

8  order that until the room had been finished, in

9  terms of size and scale and other things that we are

10  sensitive to.

11             Over time, we questioned Julia and

12  Jamal and said, "I think you ought to stop her from

13  delivering or stop her from ordering things until

14  you have a better picture of how we are going to use

15  that room, what it was going to look like, because

16  she may have been premature and it's going to cost

17  you a lot more money to undue."

18        Q      Was she removed from the project

19  during the time you were there?

20        A      I don't remember.

21        Q      Did you recommend a new interior

22  design for the project?

23        A      Yes.

24        Q      Who did you recommend?

Page 145

B. Lapatner

1      A      Solely with respect to the basement

2  work, after David Peer had ordered the demolition of

3  walls down there that affected electrical lines,

4  plumbing lines, heating ducts, I finally expressed

5  total frustration to Jamal and Julia.  I said, "You

6  can't do this.  What he just did in knocking out

7  these walls as you came down the basement steps,

8  caused untold damage to existing work and things

9  that they told us were going to be designed and

10 built."

11              There was a wine storage room.  There

12 was a room for children that was going to be an area

13 where children could hold plays in.  There were

14 several areas of very large basement area, and he

15 just came in and told people to demolish.

16              So I said, "You have got to listen,

17 you need to design as a whole."

18              And they said, "Do you have a

19 recommendation?"

20              I said, "I have a lovely woman, very

21 talented.  Her name is Daisy Marks, an interior

22 designer, not an architect, just meet with her.

23 Meet with her, let her see this space."

24              They did.  To my knowledge, they were

Page 146

                              B. Lapatner

 1

 2  very happy with her and she had designed something

 3  that they were very pleased with.  I didn't see it

 4  get finally built.

 5          Q      Do you remember when Daisy was

 6  brought on?

 7          A      I'll bet on this timeline, February.

 8  It was wintertime.  I remember because I think I saw

 9  her in the house and she had a big fur hat on, like

10  this.  She is a small woman, so a hat to keep her

11  head warm.

12          Q      At some moment in time, did you

13  recommend the termination of some of the

14  subcontractors?

15          A      As I said, I believe, at some point,

16  we were very frustrated by the work of some of the

17  subcontractors and did recommend that they be

18  terminated.

19          Q      Do you recall what trades, not

20  necessarily what names?

21          A      No.  You asked that previously and I

22  couldn't recall.

23          Q      I am just going to show you what has

24  been marked as Exhibit 9 at Mr. Rivera's deposition.

25  This purports to be a letter from you, December

Page 147

                            B. Lapatner

1    12th, 2013, from you.

2              Did you send this letter?

3         A    I believe so.

4         Q    You're smiling.  I am questioning, is

5    there something that you find --

6         A    This is a formality.  Once we had

7    terminated or recommended termination on November

8    26th of York, by definition, the subs were

9    terminated, but we did not -- I said, Julia and

10   Jamal, I said, "The subs appear not to be aware of

11   this.  The ones we want to keep on, we will keep on.

12   They will be directly under you, but the subs you

13   want to formally put on notice of, you have to tell

14   York, because they are under contract to York."

15             So this was just a way to say tell

16   them they are not working anymore.  They are not

17   going to be needed, they'll be terminated.  In

18   effect, you should have already told them they are

19   terminated, but now, here's the ones; so that was

20   the letter, as a formality.

21        Q    Well, in the original termination

22   letter to York, didn't you indicate that under the

23   provisions of the contract, you were reserving the

24   rights to assume the contractors and the

Page 148

                              B. Lapatner

 1

 2   subcontractors?

 3        A     Yes, that's correct, and they did not

 4   object.  Now, Jamal is talking to them.  He says:

 5   We are going to keep you on.  I would like you to do

 6   that work with LePatner Project Solutions on your

 7   numbers so we can figure out what we owe you, as

 8   opposed to what we paid York who didn't pay you,

 9   because we are not going to make those payments.

10             The point I was trying to make, so

11   this was in furtherance of which subs were

12   determined should go forward and which ones should

13   be pushed aside.

14        Q     So you specifically named them, and

15   they're in the second paragraph, which subs?

16        A     Yes.

17        Q     And do you recall, it appears to be

18   three electrical subcontractors and an HVAC

19   subcontractor.  Correct?

20        A     Yes.

21        Q     Do you know what part of the work ATA

22   Electrical had done?

23        A     No.

24        Q     How about Gunzi Electrical, G U N Z

25   I?

Page 149

                          B. Lapatner

1

2        A       No.

3        Q       It's spelled G U N Z I in the letter.

4   I think it might be G U N Z Y, in reality; but

5   that's okay.

6        A       I yield to your spelling.

7        Q       I don't know for sure, but I think

8   so.

9                How about Country Air Heating and

10  Cooling, do you know what they did?

11       A       I would only assume that's the HVAC

12  contractor.

13       Q       Do you know what work was performed

14  on the HVAC under York's contracts and change

15  orders?

16       A       Not as I presently sit here.  If I

17  was shown a document, it would recall my

18  recollection.

19       Q       Do you know what MD Grace Electrical

20  is?

21       A       Not specifically what their scope

22  was.

23       Q       Do you think this encompassed all of

24  the electricians that had done work under York?

25       A       Well, in light of the statement that

Page 150

B. Lapatner

1  John Santoro was putting together candidates for new

2  electricians, I would assume it was a clean sweep,

3  but that only showed part and parcel of another

4  level of the incompetence of York; that they would

5  have parsed out the electrical work to three

6  separate subcontractors in one residential project.

7  There would have had to have been really good

8  reasons why they did that.  The only reasons that

9  would ever lend themselves to this being done on

10  this project was he didn't pay people, so he would

11  have broken out the scope to be smaller than one big

12  scope, let's call it $200,000 worth of work to three

13  people, so that if he didn't pay them 10,000 or

14  15,000, they would stay working.  If he didn't pay

15  50,000 to somebody who is a sub, they would walk off

16  the job, and apparently he wasn't paying them made

17  them walk off the job.

18      Q     Is this an assumption on your part or

19  do you know this?

20      A     There's references here that we had

21  trouble getting the electricians to show up on the

22  job.  So when you see three electricians on a job,

23  it better be good reasons why you've broken up that

24  scope of work because there is a possibility that

```
 1                    B. Lapatner
 2  you will not get the same level of work on all three
 3  in dealing with very small electricians, not a large
 4  electrical company.
 5        Q      Did you know Gunzy Electric was hired
 6  specifically to do the generator?
 7        A      I wouldn't know.
 8              MR. HARRINGTON:  Off the record.
 9              (Discussion held off the record.)
10  BY MR. HARRINGTON:
11        Q      Let me just ask a few more questions.
12  I will show you what was marked as Exhibit 10 at Mr.
13  Rivera's deposition, and this appears to be four
14  different project progress reports with different
15  dates, obviously.
16              Do you know what these are?
17        A      Yes.
18        Q      These are project reports that were
19  prepared by?
20        A      Prepared by our whole team.  We
21  reviewed them, pulling from different sources to
22  give a summary of the different scopes of the work
23  that we were doing for the client.
24        Q      They are all stapled together, but
25  for the record, I see one that is dated December 13;
```

Page 152

                            B. Lapatner

1   one, report 3, is dated January 3, 2014; 4 is

2   January 13, 2014; and then the fifth one, February

3   1st, 2014.  There doesn't appear to be one number 2.

4   Do you have any recollection of whether or not there

5   was a formal report number 2?

6        A     I am sure there was.  I am happy to

7   get back with Francisco, pour through our records

8   and see if it got attached to something else.

9        Q     Do you know if there are any reports,

10  project progress reports, after number 5 in this

11  project?

12       A     What date was the number 5.

13       Q     February 1st, 2014?

14       A     I would have to check on that.

15       Q     Are these the project progress

16  reports that you had referred to in your earlier

17  testimony as setting forth the things that you were

18  finding on a weekly basis?

19       A     Yes.  This was a general overview so

20  that they had some document that showed where we

21  were focusing on and what was something that we are

22  going to be needing to do some further work on.

23       Q     You said this was prepared by the

24  whole team?

Page 153

B. Lapatner

1

2       A       Yes.  Francisco would have had all of

3   his notes.  He would also have spoke with the

4   subcontractors, and then we would have come back at

5   the end of a period of time and said:  Let's go

6   through this, what is the summary that we would

7   give, and we would all agree and then it would be

8   written down.

9       Q       His testimony was that he had

10  actually prepared the narrative and then he

11  submitted it to you because you were the one, you

12  were the person that dealt directly with the client,

13  before it would go to the client?

14      A       Of course.

15      Q       Is that accurate?

16      A       Yes.  He had met with the subs.  We

17  talked about whatever those issues were.  We are

18  trying here to highlight issues.  Some of these

19  letters are much more detailed to the client than

20  these reports, but we were trying to give a snapshot

21  of where the project is at a point in time.

22      Q       So I guess we are going to suspend.

23      A       Yes.

24              (Whereupon at time 2:30 p.m., the

25          deposition was concluded.)

Page 154

1

2                         C A P T I O N

3

4

5   The Deposition of BARRY B. LEPATNER, ESQ, taken in the

6   matter, on the date, and at the time and place set out

7   on the title page hereof.

8

9   It was requested that the deposition be taken by the

10  reporter and that same be reduced to typewritten form.

11

12  The Deponent will read and sign the transcript of said

13  deposition.

14

15

16

17

18

19

20

21

22

23

24

25

Page 155

1

2                    C E R T I F I C A T E

3

4

5   STATE OF_____:

6

7   COUNTY/CITY OF_____:

8

9   Before me, this day, personally appeared BARRY B.

10  LEPATNER, ESQ, who being duly sworn, states that the

11  foregoing transcript of his Deposition, taken in the

12  matter, on this date, and at the time and place set

13  out on the title page hereof, constitutes a true and

14  accurate transcript of said deposition.

15

16             _____

17                  BARRY B. LEPATNER, ESQ.

18

19  SUBSCRIBED and SWORN to before me this _____

20  Day of _____, 2019, in the

21  Jurisdiction aforesaid.

22  _____    _____

23  My Commission Expires              Notary Public

24

25

Page 156

```
 1
 2              DEPOSITION ERRATA SHEET
 3
 4   CASE CAPTION:  JAMAL NUSSEIBEH, JULIA NUSSEIBEH vs.
 5   LEPATNER PROJECT SOLUTIONS, ET AL.
 6   DEPONENT:  BARRY B. LEPATNER, ESQ.
 7   DEPOSITION DATE:  October 24, 2019
 8   To the reporter:
 9   I have read the entire transcript of my Deposition
10   taken in the captioned matter or the same has been
     read to me.  I request for the following changes be
11   entered upon the record for the reasons indicated.
     I have signed my name to the Errata Sheet and the
12   appropriate Certificate and authorize you to attach
     both to the original transcript.
13   _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
     _____
22   _____
23   SIGNATURE:_____  DATE:_____
24
25              BARRY B. LEPATNER, ESQ.
```

```
                                                      Page 157

 1                       I N D E X

 2

 3   Witness:  BARRY B. LEPATNER, ESQ.               Page

 4   Examination by MR. HARRINGTON                     5

 5

 6                     E X H I B I T S

 7   Exhibit No.          Description              Page

 8   22    E-mail witness sent to Plaintiffs

 9         11/13/13                               17

10   23    E-mail re documentation sent after

11         site visit                            29

12   24    Response to E-mail, Exhibit 23        36

13   25    E-mail from witness to Plaintiffs

14         sent 11/22                            41

15   26    Project Meeting Minutes, 1/6/14       105

16   27    Project Meeting Minutes, 1/14/14      105

17   28    Multiple bills stapled together       113

18   29    Termination letter to York            117

19

20

21

22

23

24

25
```

Page 158

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK )

4                      ) ss.

5    COUNTY OF SUFFOLK )

6            I, MONIQUE CABRERA, a Shorthand (Stenotype)

7    Reporter and Notary Public for the State of New York,

8    do hereby certify that the foregoing Deposition, of the

9    witness, BARRY B. LEPATNER, ESQ., taken at the time and

10   place aforesaid, is a true and correct transcription of

11   said Deposition.

12           I further certify that I am neither counsel

13   for nor related to any party to said action, nor in any

14   way interested in the result or outcome thereof.

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand this 4th day of November 2019.

17

18

19

20           _____

21                  MONIQUE CABRERA

22                  Court Reporter

23

24

25