UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
LEPATNER AND ASSOCIATES, LLP,           :
                                        :
                Plaintiff,              :
                                        :
           -v-                          :       21-cv-3890 (JSR)
                                        :
RSUI GROUP, INC.,                       :       MEMORANDUM ORDER
                                        :
                Defendant.              :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

     This case involves the scope of an insurer's duty to defend
the law firm to which it issued a legal malpractice policy in
relation to an underlying suit brought against both the law firm
and a management company owned by the same individual who owns the
law firm. Here, plaintiff LePatner & Associates, LLP ("L&A"), a
law firm owned by Barry LePatner, brings suit against RSUI Group,
Inc. ("RSUI"), the company that issued its legal malpractice
policy, arguing that RSUI was also obligated to pay defense costs
for a construction management LLC, LePatner Project Solutions
("LPS"), also owned by Barry LePatner, in connection with an
underlying state court action in which parties to a home renovation
project brought claims for breach of contract, unfair trade
practices, and negligence against both L&A and LPS (along with
other sub-contractors).

Now before the Court are the parties' cross motions for summary judgment, ECF Nos. 32 and 33, on plaintiff's remaining claims: L&A's request for a declaratory judgment that RSUI has breached its obligation to defend L&A, and L&A's breach of contract claim for RSUI's alleged breach of its obligation to defend L&A.[1] As set out below, the Court determines, based on the language of the relevant insurance policy and undisputed facts, that LPS is not an insured covered by the policy and that the policy only covers professional services provided as a lawyer, which is not what LPS provided in the underlying project. Furthermore, two additional policy exclusions act as independent bars to coverage for LPS's defense costs. Accordingly, the Court grants summary judgment in favor of RSUI on both claims and dismisses the action.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements, Counterstatements, declarations, exhibits, and affidavits, and are undisputed unless otherwise indicated.

---

[1] LePatner has represented that there is no longer any dispute concerning RSUI's duty to indemnify L&A in connection with the underlying action. ECF No. 41 ¶ 103.

2

## I.  Factual Background

LePatner Project Solutions, LLC ("LPS") is a project and construction management company based in New York City and owned by Barry LePatner ("LePatner"). LePatner also owns LePatner & Associates, LLP ("L&A"), a law firm based in New York City. LPS is registered with the State of New York as an LLC; L&A is registered with the State of New York as an LLP with a separate State ID number. LePatner filed separate governance documents in connection with the formation of LPS and L&A, respectively. LePatner further testified that although they share the "same physical address" (and did so at the times here relevant), L&A and LPS are "separate entities." ECF No. 36-3, Ex. C at 47:9-19.

The Policy

Landmark American Insurance Company ("Landmark"), through RSUI, issued a Lawyers Professional Liability Policy to L&A for the period of 2017 to 2018 (the "Policy").[2] The only Insured under the Policy is L&A. ECF No. 36-11, Ex. K; ECF No. 36-4, Ex. D ¶ 16. LPS is not listed as an Insured under the Policy. ECF No. 36-11, Ex. K; ECF No. 36-4, Ex. D ¶ 16. The Policy provides coverage only for "Damages and associated Claim Expenses arising out of a

---

[2]    RSUI notes that Landmark is a wholly-owned subsidiary of RSUI, and that plaintiff improperly named RSUI as the defendant in this action.

negligent act, error, [or] omission . . . in the rendering of or failure to render Professional Services as a Lawyer . . . ." ECF No. 36-11, Ex. K. The Policy defines "Professional Services" to mean "only services performed for others by an Insured such as an escrow agent, lawyer, notary public, administrator, conservator, executor, guardian, guardian ad litem, arbitrator, mediator, trustee, and title insurance agent." ECF No. 36-11, Ex. K.

The Policy also includes several exclusions relevant here. Exclusion II.E provides that the Policy does not apply to any Claim or Claim Expenses based upon or arising out of "[a]ny entity other than the Named Insured or any Predecessor Firm in which any Insured or any Related Individual(s) of an Insured has an ownership or controlling interest excess of ten percent (10%), whether such ownership interest or control is financial or otherwise." ECF No. 36-11, Ex. K. Exclusion II.R of the Policy provides that the Policy does not apply to any Claim or Claim Expenses based upon or arising out of "[s]uits brought against any Insured if such Claim or suit arises out of an act, error, omission, or Personal Injury of another person or entity with whom the Insured shares common office space or common office facilities and who is not an Insured under this policy." ECF No. 36-11, Ex. K. Endorsement No. 6 provides that there is no coverage for "any Claim based upon or arising

4

directly, or indirectly, out of any actual or alleged violation of consumer protection laws . . . ." ECF No. 36-11, Ex. K.

Part I.B of the Policy provides that RSUI "will have the right and duty to defend any Claim against an Insured seeking Damages to which this Policy applies, even if any of the allegations of the Claim are groundless, false or fraudulent." ECF No. 36-11, Ex. K at 5.

In connection with obtaining the Policy, L&A submitted a main application and five separate supplemental applications to RSUI (collectively, the "Application"). ECF No. 36-11, Ex. K; ECF No. 36-4, Ex. D ¶ 17. Barry LePatner signed and dated the Application, which made no reference to LPS. ECF No. 36-11, Ex. K at 7; ECF No. 36-3, Ex. C at 211:24-212:9; ECF No. 36-4, Ex. D at ¶ 17. The application reflects that the applicant's precise registered name, as "reflected on the firm's letterhead" is "LePatner & Associates, LLP," with no reference to LPS; the type of entity being insured is an LLP, not an LLC; the firm does not practice in states other than the primary location, which at the time LePatner completed the application, was New York; and the firm regularly confirms representations in writing through the use of formal engagement letters. ECF No. 36-11, Ex. K at 1, 5; ECF No. 36-3, Ex. C at 213:14-17. The Policy provides that application statements are material, that the Policy is issued in reliance on them, and that

the application is incorporated into and constitutes part of the Policy. ECF No. 36-11, Ex. K.

Nusseibeh Project

In November 2013, homeowners Jamal and Julia Nusseibeh met with LePatner to discuss their home renovation project in Greenwich, Connecticut, which allegedly had been left incomplete by the Nusseibehs' previous contractor. As set out in the complaint they later filed, the Nusseibehs alleged that at this meeting they discussed with LePatner that "they needed a skilled construction professional to take control of the work on the project" and that they needed "to complete work on the property so that they could occupy their home by March 2014." ECF No. 36-2, Ex. B ¶ 12. LePatner had emailed the Nusseibehs with the similar understanding that they needed assistance completing the project and occupying the house promptly.

Later that month, Jamal Nusseibeh emailed LePatner and stated, inter alia, that "there is a legal aspect and a project management aspect" to the project and that he wanted "to be sure that we have the same understanding and expectations moving forward . . . ." ECF No. 36-7, Ex. G at 1; ECF No. 36-6, Ex. F at 41:16-42:3. LePatner responded by email, stating that he would send the Nusseibehs "a detailed proposal for the separate legal

and project management services required to address the close out issues for your residence." ECF No. 36-7, Ex. G at 1.

The following week, on November 24, 2013, the Nusseibehs entered into a written agreement with LPS (the "LPS Agreement"), which stated that LPS would provide "project management services on behalf of LePatner Project Solutions, LLC, in connection with the investigation and completion of your residence" currently under construction in Greenwich. The LPS Agreement identified three phases of services that LPS was to provide for the Nusseibehs: Phase I, "Securing Control over the Project Site," involved surveying the work performed, meeting with the former contractor and subcontractor to understand all necessary inspections and requirements; Phase II, "Overseeing Completion of the Work," involved assuming direct control over the subcontractors and providing on-site supervision; and Phase III, "Reconciliation of Accounts," involved reconciling accounting for the work of the previous contractor and reporting to the Nusseibehs claims for any money owed by the previous contractor that may have been overpaid or not remitted properly to subcontractors, and further provided that "[o]nce the report is prepared and reviewed by you, a decision as to whether to pursue any claims against [the previous contractor] can be made." ECF No. 36-8, Ex. H at 4-5.

The LPS Agreement specifically provided that "this agreement pertains solely to project management services that do not include the performance of legal services" and that "[i]n the event that any legal services are requested they shall by performed under separate agreement by LePatner & Associates LLP." ECF No. 36-8, Ex. H at 6; Ex. D at ¶ 10. LePatner testified that the LPS Agreement was for "project management services on behalf of [LPS]" and that it was "not a written agreement for legal services to be provided by [L&A] . . . ." ECF No. 36-3, Ex. C at 86:19-24. LePatner further testified that LPS is not a law firm and did not provide legal services to the Nusseibehs. ECF No. 36-3, Ex. C at 79:21-80:9. No written agreement was ever entered into by the Nusseibehs and L&A to perform work on the project. ECF No. 36-4, Ex. D at ¶ 11. LePatner testified that "in the normal course" when L&A is retained, a written engagement or retainer agreement is provided to the client. ECF No. 36-3, Ex. C at 69:18-22.

The LPS Agreement stated that Barry LePatner, the principal of LPS, would oversee the work, and that an LPS employee, Francisco Rivera, would provide daily oversight of the project. ECF No. 36-6, Ex. F at 12:13-19. LePatner testified that Rivera "was not providing legal services or advice to the Nusseibehs," ECF No. 36-3, Ex. C at 158:17-20, and that LePatner himself has never been

licensed or admitted to practice law in Connecticut, ECF No. 36-3, Ex. C at 64:20-23; 65:3-10.

The Nusseibehs were billed separately for the "advisory work" provided by L&A and the "project-management work" provided by LPS. ECF No. 36-6, Ex. F at 476:6-477:14.

After about four months, on April 2, 2014, the Nusseibehs emailed LePatner to inform him that they considered the contract with LPS for project management terminated.

*Nusseibeh* Action

Nearly three years later, on March 24, 2017, the Nusseibehs filed their complaint in the underlying action in Connecticut state court naming LPS and L&A as defendants (along with several subcontractors), alleging breach of contract (Count One), violation of the Connecticut Unfair Trade Practices Act (Count Two), and negligence (Count Three). ECF No. 36-2, Ex. B. The Complaint alleges each claim as to both LPS and L&A.

Count One, for breach of contract, alleges failure to fulfill obligations under the LPS Agreement and breach of the LPS Agreement in various ways, all of which refer to failing to complete requirements of the Agreement, which, as LePatner testified, exclusively concerned construction management services and explicitly excluded legal services. ECF No. 36-2, Ex. B, 1-13. Count Two alleges violation of the Connecticut Unfair Trade

Practices Act ("CUTPA") as to negligence in making home improvements and as home improvement contractors in five specific ways, four of which concern construction and renovation, and one of which concerns the failure to "document, prepare and/or pursue claims against [the previous contractor]." Id. at 13-14. Count Three, which alleges negligence in "construction, legal and related services" provided by LPS and L&A, further specifies the ways that either entity was allegedly negligent -- all of which refer either to requirements of the LPS Agreement, to which only LPS, and not L&A, was a party, or concern construction management tasks or supervision of subcontractors. Id. at 15-16.

On April 7, 2017, the Nusseibeh action was noticed to Landmark for coverage under the Policy. Landmark acknowledged receipt in a letter sent to L&A, which stated, inter alia, that "assuming a duty to defend is owed under the Policy, Landmark will appoint counsel to defend this matter, if required." ECF No. 36-13, Ex. M at 1. The next day, RSUI wrote to counsel at the law firm of Winget Spadafora Schwartzberg LLP ("Winget") stating that Landmark would like to assign Winget to defend L&A -- but that while LPS is also named as a defendant, it was not covered under the Policy and that Landmark was thus not providing a defense for LPS. LePatner stated that he was pleased with Winget's representation and that he consented to RSUI's assignment of Winget as defense counsel for

L&A. ECF No. 25-1 at 4, ¶ 9. LePatner also separately retained Winget to represent LPS in the Nusseibeh action.

On July 20, 2017, Landmark issued a coverage position letter to L&A, stating that Landmark would provide defense and indemnity for L&A in connection with the Nusseibeh action subject to a reservation of rights. ECF No. 36-14, Ex. N. The letter also stated that no coverage exists for the claims against LPS because LPS "does not meet the definition of a covered entity per the terms of the Policy." ECF No. 36-14, Ex. N. The letter explained that the Policy specifically limits coverage to legal malpractice claims, and that to the extent that the Nusseibeh complaint alleges claims that do not arise out of L&A's provision of services as a lawyer, the claims do not qualify for coverage under the Policy. The letter also cited Exclusions II.R and II.E.

*Correspondence Concerning Billing, Fees, and Costs*

An RSUI claims specialist, Katherine Dowling, communicated with Winget defense counsel Jody Cappello about the Nusseibeh claim by email. In January 2019, Dowling asked Cappello whether the Nusseibehs had retained an expert on legal malpractice and, if they had not, whether it was appropriate to file a summary judgment motion on the legal malpractice issues. ECF No. 32-6, Ex. F ("If they're not getting an expert on the legal mal issues, can we file a motion for summary judgment?"). Cappello advised that

Connecticut case law effectively disallows moving for summary judgment on failure to disclose an expert. Id. On May 17, 2019, Dowling asked Cappello if the Nusseibehs had ended up disclosing a legal malpractice expert and whether the verdict form would allow a jury to separately assess damages to L&A, the insured, as opposed to LPS. ECF No. 32-6, Ex. G. On November 13, 2019, Dowling asked again about filing a motion for summary judgment on the legal malpractice claims where the Nusseibehs had neither provided an expert nor any proof of those allegations. Id. Ex. H.

Cappello and Dowling went back and forth about billing. On August 11, 2020, Cappello informed Dowling about the expert he intended to retain for LPS, stating that he understood that LePatner was not planning to pay the fees or costs associated with deposing the expert and that LePatner believed RSUI was required to pay the costs of all experts and defense fees for the entire case; Cappello wrote that he would direct LePatner to speak with RSUI about this because Cappello could not take any position on coverage. Id. Ex. J. On August 11, Dowling asked, "[y]ou have a separate agreement with [LePatner] for defense of the construction side of the case, correct? [LePatner] will need to be billed according to that agreement." Id. On August 11, Cappello replied that because of working remotely, he was not able to confirm that a separate acknowledgment letter had been sent, but that he had

discussed this with LePatner at the outset. Id. On August 21, Dowling replied, stating that "[a]ny work related solely to the construction claims should have been completely separated at the outset. If there was time that applied to both the legal and the construction entity it should have been divided in 1/2 in the billing. As we stated at the outset, we are not footing the bill for defense of the construction entity." Id.

In a separate email thread, on August 21, 2020, Cappello informed Dowling that he planned to send a bill for the Nusseibeh matter and that, due to an error, the time entries went back to 2017; Cappello asked Dowling to confirm that he could submit this invoice with entries going that far back. Id. Ex. K.

On August 21, 2020, Dowling emailed her supervisor, Robert Orr, about Cappello's request, explaining that Dowling had advised Cappello that RSUI would not pay for time related to defense of LPS, that time spent for defense of both LPS and L&A should have been divided at the outset, and noting that she had some concerns about how Cappello had handled the billing. Id. Ex. L.

*Counsel's Communication Regarding Proposed Alternate Counsel*

On December 8, 2020, RSUI's outside insurance coverage counsel, Kaufman Borgeest & Ryan LLP ("KBR"), sent LePatner a letter; the letter stated that RSUI was responding to LePatner's November 2, 2020 email to RSUI about the payment of expert fees in

connection with the Nusseibeh matter. The letter informed LePatner that RSUI "has elected to terminate its consent to the continued representation of [L&A] by Jody Cappello at [Winget], due to an emerging conflict of interest between [L&A] and [LPS]." Id. Ex. M. The letter also stated that according to the disclosures, the expert rendered no opinion on legal malpractice. Id. The letter stated that any expert fees incurred on behalf of LPS could not constitute claim expenses under the policy, but that "[n]evertheless, and solely as an accommodation, on February 6, 2020, Landmark agreed to reimburse 50% of [the] expert fees, with the understanding that CED's expert analysis on behalf of [LPS] would have a collateral benefit to [L&A]," and that Landmark would reimburse 50% of the expert fee costs pursuant to that prior agreement. Id. Ex. M at 3.

The letter further explained the proposed appointment of new counsel due to the emerging conflict of interest between L&A and LPS, stating that it had "become apparent that [Winget] could no longer adequately represent the interests of [L&A], due to an emerging conflict of interest with non-insured co-defendant [LPS]." Id. The letter explained the conflict of interest arose because there were "contrasting liabilities, exposures, and defenses" available to L&A and LPS, respectively," and that based on the allegations in the Complaint, most, if not all, of the

liability and exposure for this matter appears to be borne by LPS, and not L&A." Id. The letter concluded that Winget's continued representation of both L&A and LPS would thus frustrate LPS's ability to defend itself with respect to the Complaint, and that "[a]ccordingly, Landmark will be retaining new counsel to represent [L&A]." Id. The letter also stated in closing that if LePatner disagreed with the views expressed in the letter, Landmark welcomed the opportunity to discuss the issues further. Id.

On December 10, 2020, Kenneth Walton of the firm Lewis Brisbois entered an appearance on behalf of L&A in the Nusseibeh action. ECF No. 44-5, Ex. E. That same day, LePatner emailed Lewis Brisbois and demanded that Lewis Brisbois withdraw its appearance and stating that "failure to withdraw your appearance will trigger the filing by me of an unethical charge against you and your firm with the appropriate Connecticut State bar officials." ECF No. 44-6, Ex. F. On December 15, 2020, Jody Cappello of Winget re-entered an appearance on behalf of L&A, replacing Walton and Lewis Brisbois as counsel of record in the Nusseibeh action. ECF No. 44-7, Ex. 8. Since December 15, 2020, Cappello and Winget have represented both L&A and LPS. Id.

It is undisputed that RSUI defended L&A in full throughout the entirety of the underlying action. Moreover, even though the expert retained in the underlying action opined on issues of

project and construction management, and was not retained to render any opinion on legal malpractice, ECF No. 41 ¶¶ 85-94, RSUI still agreed to fund 50% of the expert fees as an accommodation, id. ¶¶ 97-99, 102. LePatner did not have insurance coverage for LPS before 2019, but in 2019 LePatner obtained insurance coverage for LPS through another insurer. ECF No. 41 ¶¶ 105-111.

The Nusseibeh action was settled in October 2021. At this stage, L&A asserts that it seeks $168,625 in outstanding defense costs and expert fees.

## II.  Procedural Background

L&A commenced this action on June 10, 2021, seeking a declaratory judgment that RSUI breached its obligation to defend and indemnify L&A (Count One), alleging breach of contract for RSUI's alleged failure to defend and indemnify L&A (Count Two), and alleging a "breach of the duty of good faith and fair dealing" (Count Three). L&A initially sought an order to show cause and preliminary injunction requiring RSUI to pay defense costs for LPS in the underlying litigation. At the order to show cause hearing on July 19, 2021, L&A's counsel conceded that trial in the underlying case had been adjourned until October; as such, the Court denied L&A's motion without prejudice, ECF No. 18, and, as noted, the underlying case was settled in October. On October 4,

16

2021, the Court granted RSUI's motion to dismiss Count Three as duplicative as a matter of law of Count Two. ECF No. 27.

On January 5, 2022, the parties filed cross motions for summary judgment. ECF Nos. 32 and 33.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).[3] The moving party bears the burden of demonstrating the absence of any genuine dispute as to any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether there is a genuine dispute as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Liberty Lobby, 477 U.S. at 255. The same standards apply when the parties file cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d

---

[3]   Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

Cir. 2001) ("[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."). In considering "what may reasonably be inferred" from witness testimony, however, the court does not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St Vincent's Hops. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

## DISCUSSION

Because both remaining counts -- for breach of contract and for a declaratory judgment of the same -- concern RSUI's duty to defend L&A in the underlying Nusseibeh action, the summary judgment analysis is the same. The Court considers first whether, under, any theory, RSUI is obligated to pay for LPS's defense costs and expert fees under the Policy. Second, the Court considers plaintiff's other allegations that RSUI breached its duty to defend L&A.

I.    **Whether RSUI Is Obligated to Pay for LPS's Defense Costs**

Part I.B of the Policy provides that RSUI has the duty to defend "any Claim against an Insured seeking Damages to which this Policy applies, even if any of the allegations of the Claim are groundless, false or fraudulent." ECF No. 36-11, Ex. at 5. "[A]n insurer's duty to defend is exceedingly broad." Colon v. Aetna Life & Cas. Ins. Co., 66 N.Y.2d 6, 8 (1985). An insurer does not owe a duty to defend, however, "if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured." Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 160 (2d Cir. 2003) (quoting Frontier Ins. Co. v. State, 87 N.Y.2d 864, 867 (1995)).

"To determine if a defense obligation exists, courts compare the allegations of the complaint to the terms of the policy." Bridge Metal Indus., LLC v. Travelers Indem. Co., 812 F. Supp. 2d 527, 535 (S.D.N.Y. 2011); Accessories Biz, Inc., v. Linda & Jay Keane, Inc., 533 F. Supp. 2d 381, 386 (S.D.N.Y. 2008); see also Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 148 (2d Cir. 2004).

In a nutshell, plaintiff argues that because the complaint's allegations refer to both L&A and LPS, and do not separate the allegations against each entity, that RSUI must pay the defense expenses for LPS -- even though only L&A is an Insured under the

Policy and even though the legal malpractice Policy only covers professional legal services, not the construction management services LPS provides and provided to the Nusseibehs. Conversely, RSUI argues that because the Policy language is clear that LPS is not an Insured and that only L&A's legal services are covered, that it is not required under any theory to pay defense costs and expert fees for LPS.

A. Allegations in the Complaint

L&A characterizes the claims in the underlying lawsuit as "covered and non-covered claims against L&A," rather than separable claims, i.e., covered claims against Insured L&A, and non-covered claims against LPS, which is not an Insured. On its face, the Nusseibeh complaint does purport to assert each claim against both LPS and L&A; but in terms of the nature of the underlying claims, the specific allegations in each count are more illuminating. Count One, for breach of contract, alleges failure to fulfill obligations under the LPS Agreement and breach of the LPS Agreement in various ways, all of which refer to failing to complete requirements of the Agreement -- which, as LePatner testified, exclusively concerned construction management services and explicitly excluded legal services. ECF No. 36-2, Ex. B, 1-13. Count Two alleges violation of CUTPA as to negligence in making home improvements in five specific ways, four of which concern

construction and renovation, and one of which concerns the failure to "document, prepare and/or pursue claims against [the previous contractor]." Id. at 13-14. Count Three, which alleges negligence in "construction, legal and related services" provided by LPS and L&A, further specifies the ways that either entity was allegedly negligent -- all of which refer either to requirements of the LPS Agreement, to which only LPS, and not L&A, was a party, and concern construction management tasks or supervision of subcontractors. Id. at 15-16.

Plaintiff argues that RSUI is required to pay defense costs and expert fees for LPS under two main theories: (1) because the Nusseibeh complaint named L&A and LPS on all of the claims and its allegations against L&A and LPS were intertwined, that somehow this means that to defend L&A, RSUI must also pay defense costs and expert fees for LPS; and (2) that, for various reasons, L&A and LPS are effectively the same entity for purposes of the duty to defend. Neither argument is availing.

1. The *Nusseibeh* Complaint's Allegations Against L&A and LPS

L&A contends that the allegations in the Nusseibeh complaint against L&A and LPS are "inextricably intertwined" such that they are inseparable for purposes of the duty to defend. Put another way, plaintiff argues that the Nusseibeh complaint's allegations "implicate L&A in liability for the activities of LPS and for the

21

construction-related claims," because they do not separately address the factual allegations as to LPS as opposed to L&A. ECF 32-2 at 17.

While New York law is clear that an insurer must defend its insured against all claims, even those that appear not to be covered or potentially meritless, and must render its coverage determination based on the allegations in the complaint, none of the cases cited by plaintiff stands for the proposition that the duty to defend requires an insurer to defend a non-insured against non-covered claims, even if they are part of the same lawsuit. See, e.g., Colon, 66 N.Y.2d at 6-10 (holding that insurer had duty to defend because complaint included allegations suggesting that driver, who was otherwise stranger to the insurance policy, was an insured under the policy, though driver was later determined at trial to not be an insured); Goldberg v. Lumber Mut. Cas. Ins. Co. of New York, 297 N.Y. 148, 151-54 (N.Y. 1948) (holding that insurer had duty to defend insured even though it later learned facts that indicated that the circumstances of the occurrence meant it was outside scope of coverage).

Plaintiff's argument relies on the fact that the Nusseibeh complaint not only sues L&A and LPS in each of its claims, but also makes no effort to expressly separate them out in its allegations. Plaintiff adds that RSUI cannot look to extrinsic

22

evidence outside the Nusseibeh complaint to otherwise deny coverage unless the evidence is unrelated to the merits of the underlying action and conclusively eliminates any possibility that an insured's conduct might be covered. See Avondale Indus., Inc. v. Travelers Indem. Co., 774 F. Supp. 1416, 1424 (S.D.N.Y. 1991). But while this analysis applies to an insurer who attempts to rely on extrinsic evidence to limit or deny coverage *to its insured*, it does not prevent RSUI from relying on the fact, now conceded by LePatner, that LPS is not an Insured under the Policy. See Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 621, 634 (N.Y. 1997). Moreover, even if Avondale applied here, the evidence to which RSUI points to show why LPS is not an Insured under the Policy is totally unrelated to the merits of the underlying action. And further still, the matter is now before the Court on a motion for summary judgment, at which stage the Court can look at all undisputed evidence in determining whether "it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured," in which case there is no duty to defend. Maryland Cas. Co., 332 F.3d at 160.[4]

_____

[4]   The cases plaintiff cites are not to the contrary: all consider the duty of an insurer to its insured. See ECF No. 42 at 6-7 (citing cases). As discussed below, plaintiff admits LPS is

In this latter regard, there is no genuine dispute of material fact that the complaint includes claims arising out of LPS's provision of construction management services that are legally and factually separable from any claims of legal malpractice against L&A. Moreover, admissions and other formal submissions in the underlying litigation make clear that the thrust of the complaint was about the failure to finish the construction project on the timeline promised. Jamal Nusseibeh testified that LePatner was hired to organize the construction and renovation on the house, resolve the issues with the previous contractor, and manage the construction to get them into their home, id. ¶¶ 44-45, and the scope of expert discovery in the underlying action included only expert opinion on construction and engineering issues, not legal malpractice, id. ¶¶ 82, 85-94. The language of the complaint itself, though it does mention the word "legal," is overwhelmingly focused on the construction management services and construction services for the home improvement contract. See generally ECF No. 36-2, Ex. B, 1-16.

---

not an Insured under the Policy. ECF No. 41 ¶ 47-48. There is no support for preventing this Court from considering the ample and virtually uncontested evidence discussed here that shows that there is no genuine issue of material fact as to whether LPS is an Insured under the Policy, that construction management services are not covered under the Policy as a matter of its plain language, and that several exclusions to the Policy plainly exclude from coverage the claims against LPS.

Specifically, Count One of the underlying complaint, for breach of contract, alleges failure to fulfill obligations under the LPS Agreement and breach of the LPS Agreement -- to which only LPS (and not L&A) was a party -- which provided that LPS (and not L&A) would provide construction management services and which explicitly excluded the provision of legal services. ECF No. 36-2, Ex. B, 1-13; ECF No. 41 ¶¶ 13-21; ECF No. 36-8, Ex. H at 6; Ex. D at ¶ 10. LePatner's testimony confirmed that the work performed pursuant to the LPS Agreement involved "construction management type work" to oversee the completion of the Nusseibehs' home renovation. ECF No. 41 ¶¶ 13-21; ECF No. 36-3, Ex. C at 86:19-24. The Nusseibehs were billed separately for "advisory work" provided by L&A (not pursuant to any written agreement, despite L&A's general practice, ECF No. 36-4, Ex. D at ¶ 11; ECF No. 36-3, Ex. C at 69:18-22), and the "project management work" provided by LPS pursuant to the LPS Agreement. ECF No. 41 ¶ 42. There is nothing inseparable about the underlying nature of Count One's allegations as to L&A as opposed to LPS.

Count Two of the underlying complaint alleges violation of CUTPA as to negligence in making home improvements and as home improvement contractors in five specific ways, four of which concern construction and renovation, but one of which concerns the failure to "document, prepare and/or pursue claims against [the

25

previous contractor]," in violation of consumer protection laws. ECF No. 36-2, Ex. B at 13-14. But even the evidence of this latter allegation in Count Two is not relevant since Endorsement No. 6 of the Policy expressly bars coverage for claims "based upon or arising directly, or indirectly, out of any actual or alleged violation of consumer protection laws . . . ." ECF No. 36-11, Ex. K; ECF No. 41 ¶¶ 33-34, 55.

Finally, Count Three, which alleges negligence in "construction, legal and related services" provided by LPS and L&A, further specifies the ways that either entity was negligent -- all of which refer either to requirements of the LPS Agreement, to which only LPS, and not L&A, was a party, and concern construction management tasks, or concern supervision of subcontractors. ECF No. 36-2, Ex. B, 15-16. Again, there is nothing inseparable about the underlying nature of Count One's allegations as to L&A as opposed to LPS.

*2. L&A and LPS are Not the Same Entity for Defense Purposes*

Plaintiff also advances several variations on an argument that for duty to defend purposes, L&A and LPS are effectively the same entity, and that RSUI is thus required to cover LPS's defense costs and expert fees in order to fully defend L&A. As discussed further below, LPS and L&A are undisputedly separate entities, and plaintiff's theories to the contrary are unavailing.

LPS and L&A are undisputedly separate entities, as LePatner's own testimony reflects. L&A is a law firm that provides legal services; LPS is a project management company that provides project management services. ECF No. 41 ¶¶ 1-7. L&A and LPS are separate entities: L&A is registered as an LLP and LPS is separately incorporated as an LLC. Id. ¶¶ 3-6. LePatner's application for coverage from RSUI makes no mention of LPS. Id. ¶ 58.

Plaintiff first argues that because Barry LePatner is a principal of both L&A and LPS, and is a Covered Person under the Policy, that essentially any work he did for either L&A and LPS is covered, regardless of whether the work is specifically legal, because he is a lawyer and applies his legal expertise and training even in construction or project management work. See ECF No. 32-2 at 18. But, quite aside from the vagueness of this assertion (not to mention that Barry LePatner is not named as a defendant in the underlying complaint), its legal effect is flatly contradicted by the provision in the LPS contract with the Nusseibehs flatly disclaiming that LPS will be performing any legal services. See ECF No. 36-8, Ex. H at 6; Ex. D at ¶ 10.

Plaintiff next asserts that because the Nusseibeh complaint alleged complaints as to construction, legal, and advisory services, without separating out legal services by L&A, that "L&A had an equal interest in defeating the legal and construction-

27

management claims" and that "[a]ny defense of the claims against LPS would inure to the collateral benefit of L&A, which faced liability for all the same claims." Id. On this theory, plaintiff argues that RSUI thus had a duty to defend LPS. But the fact that Barry LePatner chose to insure L&A, but not LPS, despite his claim of the interplay of their work, clearly excludes RSUI from having to cover claims against the non-insured LPS -- especially when Exclusion II.E of the Policy specifically exempts this situation from coverage.

Finally, plaintiff contends briefly that because a jury could have held L&A liable for LPS upon finding that L&A was LPS's agent, that RSUI must also pay defense costs and expert fees for LPS. ECF No. 42 at 8-10; ECF No. 46 at 9. This hypothetical agency argument does not provide any explanation that would prevent the operation of Exclusion II.E to specifically exempt this situation from coverage under the Policy.

B. Comparing the Policy Terms to the Complaint's Allegations

Beyond all this, the terms of the Policy make crystal clear in at least three ways that claims against LPS for construction management services are not covered by the Policy, because (1) LPS is not an Insured under the Policy, (2) construction management services are not covered by the Policy, and (3) two additional

exclusions to the Policy further exclude coverage of claims against LPS.

   *1. LPS Is Not An Insured Under the Policy*

   Because coverage extends only to named entities or individuals defined as insured parties under the relevant terms of the policy, an insurer owes a duty to defend or indemnify to Insureds, but not to an entity that is not an insured under the policy at issue. Sanabria v. Am. Home Assur. Co., 68 N.Y.2d 866, 868 (N.Y. 1986); see also Cath. Health Servs. of Long Island, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., 46 A.D.3d 590, 592 (2d Dep't 2007); Nat'l Abatement Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 33 A.D.3d 570, 571 (1st Dep't 2006). Plaintiff admits that LPS is not an Insured under the Policy. ECF No. 41 ¶¶ 47–48.

   As noted, L&A contends that the work performed by LPS on the Nusseibeh project was "inextricably related" to the legal services performed by L&A, such that the entities are effectively the same for purposes of coverage and the duty to defend in a lawsuit against both entities. But L&A's contention does not square with the undisputed facts, including LePatner's own testimony. L&A is a law firm that provides legal services; LPS is a project management company that provides project management services. ECF No. 41 ¶¶ 1–7. L&A and LPS are separate entities: L&A is registered

29

as an LLP and LPS is separately incorporated as an LLC. Id. ¶¶ 3–6. LePatner's application for coverage from RSUI makes no mention of LPS. Id. ¶ 58.

Furthermore, as discussed above, there is no genuine issue of material fact as to the services performed on the Nusseibeh project: LePatner testified that LPS provides "project management services," and was not providing "legal services" on the Nusseibeh project. ECF No. 41 ¶¶ 19, 21–24, 37, 40–41. The language of the LPS Agreement itself makes clear that LPS was agreeing to provide project management services to the Nusseibehs, not legal services, id. ¶¶ 13–21; ECF No. 36-8, Ex. H at 6; Ex. D at ¶ 10, and LePatner's testimony confirmed that the work performed pursuant to the LPS Agreement involved "construction management type work" to oversee the completion of the Nusseibehs' home renovation, ECF No. 41 ¶¶ 13–21; ECF No. 36-3, Ex. C at 86:19–24. The Nusseibehs were billed separately for "advisory work" provided by L&A (not pursuant to any written agreement, despite L&A's general practice, ECF No. 36-4, Ex. D at ¶ 11; ECF No. 36-3, Ex. C at 69:18–22), and the "project management work" provided by LPS pursuant to the LPS Agreement. ECF No. 41 ¶ 42. On summary judgment, the Court need not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts," as plaintiff's assertion is here that L&A and LPS were effectively

the same for purposes of the Nusseibeh project and defending the Nusseibeh action. Berk, 380 F.Supp.2d at 342. As admitted by plaintiff, LPS was not a covered entity under the Policy. ECF No. 41 ¶ 47-48.

  2. *The Policy Does Not Cover LPS's Construction Management Services*

A professional liability policy does not provide coverage for wrongful acts in rendering or failing to render "professional services" unless the activity in question is specifically included in the definition of "professional services" in the policy. See Propis v. Fireman's Fund Ins. Co., 66 N.Y.2d 828, 829-30 (N.Y. 1985). Under New York law, an insured performs "professional services" for the purposes of a professional liability policy if they "act[] with the special acumen and training of professionals when they engaged in the acts[.]" Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., 880 F.3d 64, 71 (2d Cir. 2018).

The Policy provides coverage only for "Damages and associated Claim Expenses arising out of a negligent act, error, [or] omission . . . in the rendering of or failure to render Professional Services as a Lawyer . . . ." ECF No. 36-11, Ex. K. The Policy defines "Professional Services" to "mean[] only services performed for others by an Insured such as an escrow agent, lawyer, notary public, administrator, conservator,

31

executor, guardian, guardian ad litem, arbitrator, mediator, trustee, and title insurance agent," ECF No. 36-11, Ex. K; the Policy's definition of professional services does not include project management or construction management services, ECF No. 36-11, Ex. K.[5]

Plaintiff selectively quotes the Policy's definition of "professional services" to argue that it is, "therefore, essentially undefined," and that it should thus be interpreted as covering "any service of any kind whatsoever" that a person who is a lawyer provides. Ignoring definitional language to argue that a term is undefined is unpersuasive. The construction management

---

[5]   Plaintiff selectively quotes this same section of the Policy to dispute that the Policy's definition of professional services does not exclude project management or construction management services. ECF No. 42-1 ¶ 51. As plaintiff's argument goes, the Policy "does not exclude project management or construction management services that are related to or associated with the services provided to another by an Insured lawyer." ECF No. 42-1 ¶ 51. This amounts to a conclusory assertion and legal conclusion by plaintiff that is not supported by the actual language of the Policy nor supported by any additional evidence. Indeed, in its own 56.1 Statement, plaintiff also cites to policy language that contradicts its assertion: the Policy provides that "Covered Persons" include "any lawyer or professional corporation . . . who was, is or becomes a principal, shareholder, partner, officer, director, member, manager, employee or independent contractor of a Named Insured, but only while acting on behalf of the Named Insured and within the scope of their duties as a lawyer." ECF No. 36-11, Ex. K at 5, ¶ 3. As RSUI points out, Barry LePatner was not a named defendant in the Nusseibeh action and this policy language does not provide any further support for any conclusion that RSUI owes a duty to defend LPS in the Nusseibeh action.

services provided by LPS employees, including LePatner, are not professional services within the meaning of the RSUI legal malpractice policy issued to L&A. The various services related to overseeing construction and managing and completing the renovation project, ECF No. 41 ¶¶ 10, 13–17, 37, are not legal services, and do not involve the special acumen and training of an attorney. Beazley, 880 F.3d at 71. While LePatner does wear a hat as a lawyer, licensed in New York, he does not wear it at all times and while performing all tasks; insofar as his role in the Nusseibeh project was providing oversight and management of the construction project, he was not providing professional legal services. Id. ¶¶ 43–45. Furthermore, it was another LPS employee (who is not a lawyer, but rather an architect), Francisco Rivera, who was identified in the LPS Agreement as the primary person who would handle daily oversight and direct the contractors as needed to complete the project. Id. ¶¶ 22, 41.

Given the language of the Policy, plaintiff's argument amounts to the theory discussed (and rejected) above, that because Barry LePatner is a lawyer, any time he is involved in a contract for work, even if for LPS and regarding construction management services, claims regarding that work fall within the "professional services" of the Policy. That effectively rewrites the policy in

33

two ways: by writing out the definition of professional services, and by ignoring Exclusion II.E, as discussed in the next section.

### 3. Two Other Exclusions Prevent Coverage

Even if the Court were to assume, despite all the evidence to the contrary discussed above, that LPS was an Insured or entitled to coverage under the Policy under some theory advanced by plaintiff as described above, coverage for LPS for the Nusseibeh action would nevertheless be barred by two policy exclusions, Exclusions II.E and II.R, which operate as additional and independent grounds to find that there is no possible basis for finding Policy coverage for LPS's defense costs.

Both Exclusions II.E and II.R are designed to address the situation encountered here, where a professional service provider also engages in business activities outside of providing their professional services -- here, where LePatner wore one hat as an attorney and principal of L&A, and one hat as a project or construction manager and principal of LPS. These exclusions make clear that the professional liability policy does not cover risks that arise from an otherwise covered professional service provider wearing another business hat or for the entirety of intermingled services.

Exclusion II.E, the Business Enterprise Exclusion, provides that the Policy does not apply to any claim or claim expenses based

on or arising out of "[a]ny entity other than the Named Insured . . . in which any Insured or any Related Individual[s] of an Insured has an ownership or controlling interest in excess of ten percent (10%), whether such ownership interest or control is financial or otherwise." ECF No. 36-11, Ex. K. These types of exclusions prevent collusive suits that try to use malpractice coverage to shift a lawyer's business loss onto the malpractice carrier and also avoid circumstances where an insured intermingles his legal practice and business relationships to such an extent that the insurance carrier incurs additional risk and has to cover the insured for claims related to the conduct of the business, rather than out of the professional practice. See, e.g., Admiral Ins. Co. v. Adges, No. 11-CV-8289 JPO, 2012 WL 2426541, at *2 (S.D.N.Y. June 27, 2012). The exclusionary language in Adges, like Exclusion II.E here, excluded from coverage claims made against any business enterprise not named in the policy and in which an insured held more than a 10% controlling interest.

Plaintiff fails to respond altogether to Exclusion II.E and makes no argument about why it does not apply in this case. The plain language of the exclusion makes clear that there is no possibility of coverage for LPS's defense costs and expert fees because LPS is a business enterprise not named in the policy and in which the Policy's Insured's related individual, Barry

LePatner, holds a more than 10% controlling interest. LePatner is the sole owner of L&A and LPS, ECF No. 41 ¶¶ 1-2, 29-36, and LPS is a wholly separate business enterprise, id. ¶¶ 3, 5-6. To the extent that the Nusseibeh complaint's allegations are based upon and arise out of the project management services that LPS rendered, Exclusion II.E precludes such claims from coverage under the Policy.

Exclusion II.R provides that the Policy does not apply to any claim or claim Expenses based upon or arising out of "[s]uits brought against any Insured if such Claim or suit arises out of an act, error, omission, or Personal Injury of another person or entity with whom the Insured shares common office space or common office facilities and who is not an Insured under this policy." ECF No. 36-11, Ex. K. L&A and LPS shared the same physical address in 2013 and 2014 while the Nusseibeh project was ongoing. ECF No. 41 ¶ 7. Furthermore, Endorsement No. 6 of the Policy bars coverage for claims " based upon or arising directly, or indirectly, out of any actual or alleged violation of consumer protection laws . . . ." ECF No. 36-11, Ex. K. Endorsement No. 6 thus serves as an independent bar to coverage for Count Two of the Nusseibeh complaint, which alleges a violation of CUTPA. ECF No. 41 ¶ 33-34, 55.

Plaintiff has, by failing to respond altogether to these arguments in its summary judgment briefing, effectively abandoned any argument to the contrary. See, e.g., Di Giovanna v. Beth Israel Med. Ctr., 651 F.Supp.2d 193, 208 (S.D.N.Y. 2009) (concluding that where plaintiff fails to respond to arguments in summary judgment motion as to why certain claims should be dismissed, this constitutes plaintiff's abandonment of those claims). And these arguments are dispositive: the exclusions make clear that the Court can conclude "as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify" LPS; accordingly, RSUI's duty to defend L&A does not cover LPS's defense costs or expert fees. Maryland Cas. Co., 332 F.3d at 160.

## II. Whether RSUI Otherwise Interfered with L&A's Defense

Plaintiff argues that RSUI violated other "bedrock principles of New York insurance law" by (1) taking or not taking various steps regarding choice of counsel for L&A, and (2) communicating with defense counsel in various ways. L&A does not allege how L&A or LePatner were damaged by any issue related to choice of counsel when LPS retained its chosen counsel or by any alleged communications between RSUI and defense counsel. These allegations are, in any case, without merit.

A. Allegations Related to Choice of Counsel

L&A first argues that RSUI interfered with L&A's defense because RSUI did not notify L&A in 2017 that it had a right to retain independent counsel, which plaintiff contends RSUI was required to do under New York law, and because RSUI tried to appoint separate counsel for L&A in 2020.

In New York, the general rule is that the duty to defend "customarily includes an insurer's right to choose the attorney and to control the litigation strategy." In re WorldCom, Inc. Securities Litig., 354 F. Supp. 2d 455, 464 n.11 (S.D.N.Y. 2004). An insurer who undertakes the duty to defend subject to a full reservation of rights does not thereby waive the right to control the insured's defense. See Liberty Mut. Fire Ins. Co., v. Hamilton Ins. Co., 356 F. Supp. 3d 326, 337 (S.D.N.Y. 2018). An insured's right to independent counsel "is only triggered when the reservation of rights creates a potential conflict of interest for the counsel provided by the insurer, and in particular, where the defense attorney's duty to the insured would be to defeat liability on any ground but his duty to the insurer would be to defeat liability on only those grounds for which the insurer might be liable." Id. at 338. Where there are multiple claims that do not present any conflict, however, such as, "for example, where the insurance contract provides liability coverage only for personal

injuries and the claim against the insured seeks recovery for property damage as well as for personal injuries," then "no threat of divided loyalty is present and there is no need for the retention of separate counsel." Great Am. Ins. Co. v. Houlihan Lawrence, Inc., 449 F. Supp. 3d 354, 373 (S.D.N.Y. 2020).

### 1. 2017

RSUI informed L&A in 2017 that it would defend L&A subject to a reservation of rights, and that LPS was not covered under the Policy. RSUI appointed Winget as defense counsel, to which LePatner assented. LePatner also separately retained Winget to represent LPS. It was not until three years later, in November 2020, that LePatner raised any objection to RSUI's assertion that LPS was not covered by the Policy, after a dispute arose over payment of expert fees. Landmark attempted to retain separate counsel for L&A on the ground that this dispute created a conflict of interest between L&A and LPS, but LePatner threatened to file a bar complaint against RSUI's proposed substitute counsel; in response, the proposed substitute counsel withdrew from the representation just five days after being appointed. Plaintiff makes no argument that these five days caused L&A or LePatner (or LPS) any harm or had any impact on the defense in the Nusseibeh litigation, for any of the entities. Winget re-entered an appearance, and the litigation proceeded for another year before a settlement was reached.

As for plaintiff's contention that RSUI had an affirmative duty to advise its insured of its right to retain independent counsel, the New York Court of Appeals has yet to directly address the issue, and lower state courts are divided. See, e.g., Exec. Risk Indem. Inc. v. Icon Title Agency, LLC, 739 F. Supp. 2d 446, 451 (S.D.N.Y. 2010) (noting that "[t]he New York Court of Appeals has not directly addressed this issue [of whether an insurer's failure to affirmatively inform an insured of its right to retain its own counsel is a deceptive act or practice], and the Departments of the Appellate Division that have reached this issue are divided"). Given this state of the law, the Court does not find that RSUI interfered with L&A's defense or otherwise harmed L&A because it did not tell L&A that it could retain independent counsel -- especially where LePatner (himself a lawyer) expressly assented to RSUI's retention of Winget as defense counsel for L&A and consented to the 2017 defense arrangements.

Unlike in the cases cited by plaintiff, here, RSUI's coverage position did not create a conflict of interest between RSUI and L&A simply because RSUI stated that it denied coverage for non-covered claims against a non-insured entity, LPS. See ECF No. 32-2 at 18-22. Accordingly, there was no conflict of interest in 2017 to trigger any right of L&A to independent counsel or to require retention of separate counsel at that time. See Great Am. Ins.

Co., 449 F. Supp. 3d at 373; Liberty Mut. Fire Ins. Co., 356 F. Supp. 3d at 337. In any event, even assuming for purposes of argument that RSUI should have notified L&A that it could retain independent counsel in 2017, plaintiff makes no allegation that it was harmed as a result of any such alleged omission. An insured must allege that it suffered an actual injury due to an insurer's failure to inform the insured of its right to retain independent counsel, as a breach of contract claim requires a plaintiff to allege and establish, inter alia, breach as well as damages caused by a defendant's breach. See Nielsen Co. (U.S.), LLC v. Success Sys., Inc., 112 F. Supp. 3d 83, 97 (S.D.N.Y. 2015). Here, plaintiff does not even allege how L&A's defense was specifically harmed as a result of any of these alleged actions or omissions on the part of RSUI.

### 2. 2020

Plaintiff never explains how RSUI's proposed appointment of alternative counsel in 2020 interfered with the defense of L&A, and, as discussed below, a review of the underlying emails does not support any allegation that RSUI improperly interfered with L&A's defense.

In 2020, for the first time, LePatner raised an issue with how fees and billing would be handled as to L&A as opposed to LPS. Defense counsel Cappello at Winget communicated with Dowling, the

claims specialist at RSUI, about the expert fees involved with retaining the expert to offer an opinion on construction management and engineering. Dowling repeated what RSUI had stated in the June 2017 reservation of rights letter, that LPS was not covered by the Policy. Dowling instructed Cappello that he should continue to bill separately for costs associated with defending LPS, and that if the costs involved the defense of both L&A and LPS, the cost should be split fifty-fifty for billing purposes. LePatner continued to assert his position that RSUI was obligated to pay for the defense costs and expert fees associated with defending LPS.

On December 8, 2020, RSUI's outside insurance coverage counsel KBR, in response to LePatner's November 2, 2020 email to RSUI about the payment of expert fees, wrote to inform LePatner that RSUI "has elected to terminate its consent to the continued representation of [L&A] by Jody Cappello at [Winget], due to an emerging conflict of interest between [L&A] and [LPS]." Id. Ex. M. The letter stated that any expert fees incurred by CED on behalf of LPS could not constitute claim expenses under the policy, but that "[n]evertheless, and solely as an accommodation," and "with the understanding that CED's expert analysis on behalf of [LPS] would have a collateral benefit to [L&A]," that Landmark would

reimburse 50% of the expert fee costs pursuant to that prior agreement. Id. Ex. M at 3.

The letter further explained the emerging conflict of interest between L&A and LPS, stating that there were "contrasting liabilities, exposures, and defenses" available to L&A and LPS, respectively, and that based on the allegations in the complaint, most, if not all, of the liability and exposure for this matter appears to be borne by LPS, and not L&A. Id. The letter concluded that Winget's continued representation of both L&A and LPS would thus frustrate LPS's ability to defend itself with respect to the complaint, and that Landmark would therefore be retaining new counsel to represent L&A. Id. The letter also stated in closing that if LePatner disagreed with the views expressed in the letter, Landmark welcomed the opportunity to discuss the issues further. Id.

On December 10, 2020, Kenneth Walton of Lewis Brisbois entered an appearance on behalf of L&A in the Nusseibeh action. ECF No. 44-5, Ex. E. That same day, LePatner emailed Lewis Brisbois and demanded that Lewis Brisbois withdraw its appearance, stating that "failure to withdraw your appearance will trigger the filing by me of an unethical charge against you and your firm with the appropriate Connecticut State bar officials." ECF No. 44-6, Ex. F. On December 15, 2020, Jody Cappello of Winget re-entered an

appearance on behalf of L&A, replacing Walton and Lewis Brisbois
as counsel of record in the Nusseibeh action. ECF No. 44-7, Ex. 8.
Since December 15, 2020, Cappello and Winget have represented both
L&A and LPS. Id.

Plaintiff never explains how this interfered with the defense
of L&A. Neither does a review of the underlying correspondence
suggest that RSUI improperly interfered with L&A's defense.
Plaintiff makes no argument that it suffered any damages as a
result of the five days between Lewis Brisbois entering an
appearance and Winget re-entering its appearance on behalf of L&A.
Accordingly, this does not support plaintiff's broader allegation
that RSUI interfered with L&A's defense.

B. Whether RSUI Otherwise Interfered with L&A's Defense

L&A also argues that RSUI's communications with defense
counsel interfered with L&A's defense by directing defense counsel
to separately bill for costs for LPS (the non-insured co-defendant)
and directing defense counsel to communicate with RSUI's coverage
counsel, including on defensive strategy. Plaintiff never explains
how this interfered with the defense of L&A, and, as discussed
below, a review of the underlying emails does not support any
allegation that RSUI improperly interfered with L&A's defense.

Plaintiff argues that RSUI interfered with L&A's defense
because Dowling directed defense counsel Cappello to separately

invoice costs for L&A and LPS. In the course of the communication in 2020 between Cappello and Dowling about billing, Dowling confirmed that Winget had a separate agreement with LePatner for defense of LPS, and confirmed that LePatner would need to be billed expert fees for LPS according to that agreement. ECF No. 32-6, Ex. J. Cappello confirmed that he had discussed this with LePatner at the outset, though he could not confirm (because he was working remotely) if a letter had been mailed to that effect. Id. Dowling re-stated in response that "[a]ny work related solely to the construction claims should have been completely separated at the outset. If there was time that applied to both the legal and the construction entity it should have been divided in 1/2 in the billing. As we stated at the outset, we are not footing the bill for defense of the construction entity." Id. As described here and reflected in the underlying emails, nothing about Dowling's correspondence with Cappello supports the allegation that RSUI interfered with L&A's defense by requesting separate invoices for L&A and LPS.

Neither do plaintiff's other arguments about RSUI's interference with L&A's defense hold water. Plaintiff argues that RSUI interfered with L&A's defense because RSUI's coverage counsel directed defense counsel to communicate directly with them, not their client, and requested that defense counsel provide them with

information about facts, law, defense, and strategies involved in the Nusseibeh action (while acknowledging that defense counsel would not share any attorney-client communications that might be adverse to coverage).

On March 8, 2021, Wayne Borgeest at KBR sent LePatner a letter, copying Cappello and asking Cappello to provide KBR with a detailed report about liability, exposure, and damages solely with respect to the Nusseibehs' claim for legal malpractice against L&A; an explanation of Cappello's efforts to have L&A dismissed from the action; and continuing separation of defense invoices concerning Cappello's representation of L&A and LPS, as fees incurred on behalf of LPS did not constitute claim expenses under the policy. ECF No. 32-7, Ex. O.

On March 15, 2021, Cappello wrote to a KBR associate, Neil Fox, stating that he recognized that KBR was requesting certain information from him but that Cappello did not believe it was proper for him to provide KBR with that information directly, and that Cappello would communicate with Dowling, who could provide KBR with whatever she deemed proper and reasonable. ECF No. 32-7, Ex. P. On March 20, 2021, Borgeest responded to Cappello, stating that he wanted to be clear in advising Cappello that RSUI and its employee, Dowling, were KBR clients and that KBR was presently engaged in representing RSUI and Dowling in connection with the

case Cappello was defending; accordingly, KBR directed Cappello to refrain from any and all direct communication with KBR's clients. Id. The letter indicated that Fox would reach out to talk with Cappello, and that KBR understood that Cappello would not share with Fox any attorney-client communications that might be adverse to coverage, but that otherwise RSUI was entitled to know through KBR's representation all of the facts, law, defense, and strategies involved. Id.

Not only were KBR's requests justified as a matter of legal representation, but plaintiff also fails to offer how either harmed L&A's defense. A review of the correspondence, as described above, provides no support for concluding that this interfered with L&A's defense, and plaintiff fails to specify how L&A was harmed by these actions.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is hereby denied, and defendant's motion for summary judgment is hereby granted, dismissing the complaint with prejudice. The Clerk of Court is directed to enter judgment and close the entries at docket numbers 32 and 33.

SO ORDERED.

Dated:   New York, NY

March 14, 2022

JED S. RAKOFF, U.S.D.J.